## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NOMANBHOY FAMILY LIMITED PARTNERSHIP, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| McDONALD'S CORPORATION, | ) |
| McDONALD'S USA, LLC, | ) |
| RICK LEVIN & ASSOCIATES, INC., and | ) |
| RICK LEVIN, | ) |
| | ) |
| Defendants. | ) |

**08CV3787**
**JUDGE GOTTSCHALL**
**MAG. JUDGE COLE**

**F I L E D**

JUL - 2 2008
JuL 2 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTION, AND DAMAGES

The Nomanbhoy Family Limited Partnership, by its attorneys, Miller Shakman & Beem LLP, for its Complaint for Specific Performance, Injunction and Damages, states as follows.

1. This is a claim for specific performance, injunction and damages arising out of Defendants' breach of contract and interference with contract. The contract at issue is the June 18, 2008 Real Estate Sales Contract between the Nomanbhoy Family Limited Partnership and McDonald's Corporation under which McDonald's Corporation or McDonald's USA, LLC, agreed to sell and the Nomanbhoy Family Limited Partnership agreed to buy five parcels of real estate located in Illinois, Wisconsin and Indiana.

#### Parties

2. The Nomanbhoy Family Limited Partnership ("NFLP") is a limited partnership formed in January, 2008 under the laws of the state of California. The general partner of NFLP is Nomanbhoy Enterprises, LLC, and the limited partners are Shabbir T. Nomanbhoy and Munira

Nomanbhoy, as Trustees of the Nomanbhoy Family Revocable Trust dated June 5, 2000, as amended.  Nomanbhoy Enterprises, LLC is a limited liability corporation organized in 2008 under the laws of the state of California.  Nomanbhoy Enterprises, LLC has its principal place of business in Cupertino, California.  Shabbir T. Nomanbhoy ("Nomanbhoy") and Munira Nomanbhoy are both citizens of Cupertino, California.  The principal place of business of NFLP is also Cupertino, California.

3.     McDonald's Corporation ("McDonald's Corp.") is a corporation formed under the laws of the state of Delaware.  It maintains its principal place of business in Oak Brook, Illinois. McDonald's Corp. is in the primary business of selling fast foods.

4.     McDonald's USA, LLC ("McDonald's USA") is a limited liability company formed under the laws of the state of Delaware.  It maintains its principal place of business in Warrenville, Illinois.  On information and belief, McDonald's USA is a subsidiary or affiliate of McDonald's Corp. and owned the five parcels of real estate at issue her.  (McDonald's Corp. and McDonald's USA are hereafter collectively referred to as "McDonald's")

5.     Rick Levin & Associates, Inc. ("RLA") is a corporation formed under the laws of the state of Illinois, and maintains its principal place of business at 1467 North Elston Avenue, Chicago, Illinois.  RLA is in the business of auctioneering.  At all times relevant, RLA and McDonald's were represented by Ira Lauter ("Lauter").

6.     Rick Levin ("Levin") is, on information and belief, a citizen of the state of Illinois. Levin is a principal of RLA and is, on information and belief, a licensed auctioneer.

### Jurisdiction And Venue

7.     This Court has original subject matter jurisdiction of this action under 28 U.S.C.

2

§ 1332(a)(1), in that it is a civil action wherein the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

8.     Venue is proper in this Court under 28 U.S.C. § 1391(a)(1) and (2), in that all defendants reside in this judicial district and a substantial part of the events giving rise to the claim occurred, or a substantial part of the property that is the subject of the action, is situated in this judicial district. Venue is also proper under the terms of the subject Real Estate Sales Contract.

## The Agreed Sale In Bulk And In Lieu Of Auction

9.     In June 2008, McDonald's, acting individually and through RLA, advertised and promoted the sale by McDonald's of five parcels of real estate located in Illinois and elsewhere. Originally, McDonald's intended to sell the properties via auction to be held on Thursday, June 19, 2008 in Chicago. The five properties which are the subject of this dispute are  the properties that McDonald's originally intended to auction.

10.     On or around June 12, 2008, Nomanbhoy, acting for the NFLP, and McDonald's, acting for itself and through RLA, began negotiating the sale by McDonald's and purchase by NFLP of the five parcels directly rather than via auction. The negotiations, primarily via e-mail and telephone, contemplated an all-cash bulk purchase for the five properties located at 5057 Wentworth, Chicago, Illinois; 10245 Roosevelt Road, Westchester, Illinois; 130 South Virgin Street, Crystal Lake, Illinois; 6574 North 76th Street, Milwaukee, Wisconsin; and 5377 Broadway, Merrillville, Indiana (the "Five Subject Properties").

11.     Initially, McDonald's offered to sell the subject properties for $2 million. As negotiations continued into the week of June 16, 2008, McDonald's agent Lauter told Nomanbhoy on June 18 at around 2:00 p.m. Pacific Time ("PT") that McDonald's would not accept less than $1.2

3

million. However, 90 minutes later, McDonald's, acting through Lauter and RLA, e-mailed Nomanbhoy that McDonald's would now only accept $1.4 million. Two hours later, at about 5:45 p.m. PT but still on June 18, 2008, Lauter again e-emailed Nomanbhoy that if NFLP "will pay $1.4 MIL they [McDonald's] will sign the contract as agreed and cancel the Auction."

12.     Less than 20 minutes later, at about 6:00 p.m. PT on June 18, Nomanbhoy e-mailed Lauter, accepting McDonald's revised offer of $1.4 million. Nomanbhoy's e-mail stated: "Okay. I will pay $1.4 mill for the five properties."

13.     As of the time of RLA's and McDonald's renewed offer and Nomanbhoy's acceptance on June 18, Bruce Neumann ("Neumann"), Senior Counsel for McDonald's Corporation, had already signed and sent to Nomanbhoy and Lauter the Real Estate Sales Contract (the "RESC") on behalf of McDonald's. That was the last version of the contract before the June 18 offer and acceptance stated above. The parties had continued to negotiate after that version was sent, including over price. That contract, attached hereto as Exhibit A, is the Real Estate Sales Contract agreed to by Lauter and Nomanbhoy on June 18, and contains the terms and conditions governing this transaction, including the $1.4 million purchase price and $210,000 initial earnest money deposit due from NFLP.

14.     Shortly after 7:00 p.m. PT, Nomanbhoy e-mailed Neumann, Lauter and Mary Meyer ("Meyer"), McDonald's USA's Regional Real Estate Manager, that "the contract is acceptable as I indicated to Ira [Lauter]." Nomanbhoy's e-mail was referring to and attached the RESC that Neumann had sent earlier that day, as stated above. Nomanbhoy only requested confirmation that RLA was to be the escrow agent, as the contract referred to Chicago Title Insurance Company.

4

**McDonald's Confirmation And
NFLP's Performance**

15.    Within about two hours of Nomanbhoy's acceptance of McDonald's offer,

McDonald's sent to Nomanbhoy e-mails and a letter confirming that RLA represented McDonald's

in the sale of the Five Subject Properties, stating that RLA was the escrow agent, and directing

Nomanbhoy to wire the initial earnest money deposit to an RLA bank account in Chicago.  One of

those e-mails came from Neumann, who had signed and sent the RESC on behalf of McDonald's

earlier that day.  Neumann told Nomanbhoy that the initial earnest money "must be wired and

received by Rick Levin or the auction will go forward."  In other words, the auction would be

cancelled if the earnest money arrived before 1:00 p.m. Central Time ("CT").  The other e-mail, from

Meyer, referred to the "contract."  These communications from McDonald's to Nomanbhoy were

clear acknowledgments by McDonald's that it and NFLP had a contract with respect to the Five

Subject Properties.

16.    Nomanbhoy, acting for NFLP, caused the initial earnest money deposit of $210,000

to be wired to RLA early the next morning, June 19, from NFLP's California bank, Fidelity

Investments.  Due to the time zone difference, RLA's bank received the wire transfer of funds on

12:12 p.m. CT on June 19, 2008.  That was well before the auction was to start.

17.    At 12:52 p.m. CT on June 19, 2008, after RLA's bank received the earnest money,

Lauter e-mailed Nomanbhoy that RLA was "preparing to tell bidders that there is no auction."

**McDonald's Tries To Change The Deal
And Proceeds With The Auction**

18.    On the morning of June 19, 2008, Neumann sent to Nomanbhoy a different version

of a Real Estate Sales Contract which added a significant new provision that Nomanbhoy had not

agreed to, that was not in any of the prior drafts, and was not in the version sent by Neumann and accepted by Nomanbhoy on June 18. The addition stated: "In the event Seller has not received the Earnest Money before the commencement of the auction of the Properties on June 19, 2008, **or if the auction otherwise occurs**, this Contract shall be null and void and of no further force or effect." (Emphasis added.) Neumann provided no explanation for this unilaterally inserted term. This new term effectively gave McDonald's the option of proceeding with the auction despite the valid and binding contract between NFLP and McDonald's.

19. On June 18, Nomanbhoy, on behalf of NFLP, initialed each page (except the legal descriptions) of the June 18 version of the RESC sent to him by Neumann. Nomanbhoy also returned that version of the RESC to Neumann, Lauter and Meyer on June 19. On the morning of June 19, Nomanbhoy told Lauter that Nomanbhoy would not and did not accept the change proposed by Neumann earlier that morning because, as stated, it was not part of the prior negotiations, had not previously been accepted by Nomanbhoy, and was instead a unilateral change of terms by Neumann and McDonald's.

20. Notwithstanding the existence and validity of the Real Estate Sales Contract accepted by Nomanbhoy on June 18, 2008, NFLP's payment and RLA's receipt and acceptance of the earnest money, and Neumann's and RLA's indication to Nomanbhoy that McDonald's and RLA would not proceed with the auction, at about 1:00 p.m. on June 19, 2008, McDonald's and RLA held the auction and purportedly sold the Five Subject Properties. NFLP and Nomanbhoy do not currently know who purchased or the total auction price of the Five Subject Properties, but believe that the sale price exceeded the $1.4 million sum in the NFLP sales contract.

6

21.     Later in the afternoon of June 19, 2008, after the auction occurred, Neumann e-mailed Nomanbhoy and stated that NFLP did not have an agreement or contract with McDonald's. Neumann instead stated that all prior offers had been revoked and invalidated. However, Neumann could not retract or revoke the offer and acceptance made between Lauter, acting for McDonald's, and Nomanbhoy, acting for NFLP, the day before on June 18. Neumann's position was also contrary to the numerous confirmations – including his own – of the RESC made by McDonald's with NFLP on June 18.

22.     On information and belief, Levin and RLA were the auctioneers at the auction of the Five Subject Properties.

23.     At the time of the auction, Levin and RLA knew that NFLP had a valid and enforceable Real Estate Sales Contract with McDonald's for the Five Subject Properties.

24.     Levin's and RLA's auctioning of the Five Subject Properties on behalf of McDonald's interfered with NFLP's contract with McDonald's.

### Count I
### (Specific Performance)

25.     NFLP restates and realleges Paragraphs 1 - 24 above as and for this Paragraph 25.

26.     On June 18, 2008, NFLP and McDonald's entered into the Real Estate Sales Contract pursuant to which NFLP agreed to purchase and McDonald's agreed to sell the Five Subject Properties for the sum of $1.4 million.

27.     NFLP performed all conditions of the Real Estate Sales Contract to be performed by it, including the timely tender to RLA as agent for McDonald's the sum of $210,000 as initial earnest money.

7

28.     NFLP is, and at all times has been, ready, willing and able to perform and meet its obligations under the Real Estate Sales Contract, including to pay McDonald's the balance due for the Five Subject Properties.

29.     McDonald's has failed and refused to perform its obligations under the Real Estate Sales Contract and has indicated that it will not sell the Five Subject Properties to NFLP.

30.     NFLP has no adequate remedy at law because the Five Subject Properties are unique.

WHEREFORE, the Nomanbhoy Family Limited Partnership prays that the Court order McDonald's Corporation and McDonald's USA, LLC to specifically perform the Real Estate Sales Contract with respect to the Five Subject Properties, and grant such other and further relief that the Court deems just.

## Count II
## (Injunction)

31.     NFLP restates and realleges Paragraphs 1 - 24 and 26 - 29 above as and for this Paragraph 31.

32.     NFLP has no adequate remedy at law because the Five Subject Properties are unique.

33.     NFLP will be irreparably harmed if the Five Subject Properties are instead sold by McDonald's to purchasers other than NFLP.

34.     Despite demand upon McDonald's, it intends to proceed with the auctioned sales of the Five Subject Properties to purchasers other than the NFLP.

WHEREFORE, the Nomanbhoy Family Limited Partnership prays that this Court enjoin McDonald's Corporation, McDonald's USA, LLC, and their employees and agents from completing the sales of any and all of the Five Subject Properties to purchasers other than the Nomanbhoy

Family Limited Partnership.

### Count III
### (Breach Of Contract)

35.    NFLP restates and realleges Paragraphs 1 - 24 and 26 - 29 above as and for this Paragraph 35.

36.    This Count III is pled in the alternative to Counts I and II above.

37.    NFLP had a viable business plan to develop and operate or develop and resell each of the Five Subject Properties. The plan was to build shopping centers on each of the Five Subject Properties. NFLP had consulted with a builder/developer, and had incurred time and expense, to develop the plan. The plan was similar to many successful plans for the same types of property in the same circumstances.

38.    NFLP's development plan reasonably calculated the profits to be between $5 - $10 million.

39.    McDonald's Corporation and McDonald's USA, LLC have breached the Real Estate Sales Contract, and such breach has caused substantial damages to NFLP.

40.    As an alternative to the equitable relief sought above, NFLP is entitled to its damages, including the lost profits of its development and resales of the Five Subject Properties.

WHEREFORE, the Nomanbhoy Family Limited Partnership prays that this Court, in the alternative to equitable relief, enter judgment against McDonald's Corporation and McDonald's USA, LLC, in the amount not less than $5 million, or such other amount as proven at trial, and grant such other and further relief that the Court deems just.

9

## Count IV
### (Interference With Contract)

41.     NFLP restates and realleges Paragraphs 1 - 24, 26 - 29, and 37 - 38 as and for its allegations for this Paragraph 41.

42.     This Count IV is pled in the alternative to Counts I and II above.

43.     At the time of the auction on June 19, 2008, a valid and enforceable contract existed between the NFLP and McDonald's.

44.     RLA and Levin, auctioneers of the Five Subject Properties, knew that there was a valid and enforceable contract, and knew that selling the Five Subject Properties by auction would interfere with the Real Estate Sales Contract.

45.     RLA's and Levin's auctions of the Five Subject Properties were an intentional and unjustified interference with NFLP's Real Estate Sales Contract with McDonald's.

46.     Such interference caused McDonald's to breach the RESC with NFLP, prevented and deprived NFLP from acquiring the Five Subject Properties and developing them, and caused NFLP to lose significant profits on the real estate purchase.

WHEREFORE, the Nomanbhoy Family Limited Partnership prays that the Court, in the alternative to equitable relief, enter judgment in its favor and against Defendants Rick Levin & Associates, Inc. and Rick Levin, individually, in the amount not less than $5 million or such other amount as proved at trial, and for such other and further relief that the Court deems just.

NOMANBHOY FAMILY LIMITED PARTNERSHIP,
Plaintiff

By _____
     One Of Its Attorneys

10

Stuart M. Widman
Miller Shakman & Beem LLP
180 North LaSalle Street, Suite 3600
Chicago, Illinois   60601
312-263-3700
Attorney No. 3010104

PLAINTIFF DEMANDS A TRIAL BY JURY

Exhibit A

# REAL ESTATE SALES CONTRACT — VERSION 2
## WITH EXHIBIT A & B 2

1. **Parties.**

   **Seller:** McDonald's Corporation or its nominee
   One McDonald's Plaza
   Oak Brook, Illinois 60523
   Tel.: 630.836.4882
   Fax: 630.836.4804

   **Purchaser:** NOMANBHOY FAMILY LIMITED PARTNERSHIP
   (OR TRUST, OR IRA ACCOUNTS OF NOMANBHOY FAMILY)
   11254 MT CREST PLACE
   CUPERTINO, CA 95014
   Tel 408 996-8786   cell 408 507-7863
   Email SHABBIR. NOMANBHOY @ GMAIL.COM

2. **Purchase Price**
   2.1. High Bid Price                                    $ ____
   2.2. Buyer's Premium (3% of 2.1)    BULK SALE OFFER   $ ____
   2.3. Purchase Price (2.1 + 2.2)     FOR 5 PROPERTIES  $ 1,400,000.00
   2.4. Total Earnest Money Required (10% of 2.3)        $ ~~140,000.00~~ $210,000.00
   2.5. Initial Earnest Money Deposit                    $ 210,000.00
   2.6. Additional Earnest Money Required (2.4 - 2.6)    $ -0-
   2.7. Balance of Purchase Price Due at Closing (2.3 - 2.4)  $ ~~1,260,000.00~~ $1,190,000.00

3. **Agreement to Sell and Purchase.** Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller, at the price and on the terms set forth herein, the real estate consisting of that parcel of land identified on Rider 1 attached to this Contract (the "Property") and more particularly described on Exhibit "A" attached hereto.

4. **All Cash Transaction.** This is an all-cash sale and purchase; and is NOT contingent upon Purchaser obtaining financing even though Purchaser may apply to a lending institution of Purchaser's choice for a mortgage loan. Purchaser understands and agrees that neither their receipt of a commitment from such a lending institution, their acceptance of such a commitment, nor their satisfaction of any condition set forth in such a commitment shall in any way be conditions of Purchaser's obligations under this Contract. Seller makes no representation or warranty as to Purchaser's ability to obtain financing.

5. **Earnest Money.** Purchaser ~~has deposited~~ will, upon acceptance, the Initial Earnest Money set forth in Paragraph 2.5 ~~and receipt is hereby acknowledged.~~ The Additional Earnest Money Required set forth in Paragraph 2.6 shall be paid by cash or cashier's check, payable to the order of the Escrow Agent ~~as set forth on Rider 1 attached to this Real Estate Sales Contract~~ and received by Escrow Agent on or before noon on Thursday, June 26, 2008, at the offices of Escrow Agent. The Additional Earnest Money Required may be paid by personal check only if paid on the date of the auction at the time this Contract is executed. All earnest money shall be held by Escrow Agent for the benefit of the parties. Purchaser acknowledges that TIME IS OF THE ESSENCE with respect to the payment of any additional earnest money and the closing of this sale. Upon Seller's execution of this Contract, Rick Levin & Associates, Inc. or Rick Levin & Associates, Inc., in conjunction with Rick Levin, licensed Indiana auctioneer, as applicable ("Auctioneer") shall deposit the Earnest Money with the Escrow Agent for the mutual benefit of Purchaser and Seller.

6. **The "Closing."** The purchase and sale of the Property shall be closed (the "Closing") on Thursday, July 31, 2008 ~~on Tuesday, August 5, 2008,~~ or on such other date as agreed to by the parties. Closing shall take place at an office of Chicago Title Company or such other title company as agreed to between Seller and Purchaser (the "Title Company") at such location as approved by Seller. Purchaser may use the proceeds of a money lender's escrow to pay the balance of the Purchase Price, provided that the terms of the money lender's escrow are not inconsistent with the terms of this Contract or the Escrow Agreement. Purchaser shall deposit, by certified funds, wire transfer or a bank cashiers check made payable to Title Company, all funds necessary to close the transaction contemplated by this Contract and shall promptly deliver and execute all required documents.

*If due to Seller's default hereunder, Seller fails to close on or before July 31, 2008, Seller shall pay to Purchaser a penalty of two (2%) percent per annum on the total earnest money deposit, prorated to the earlier of the actual closing date, or the termination of this contract.

*Chicago Title Insurance Company*

Rx Date/Time      JUN-17-2008(TUE) 01:50        4089962786              P. 002
04/11/2008   05:07    4089962786              NOMANBHOYS              PAGE  02

7. **Delivery of Deed.** On the Closing Date, Seller shall convey or cause to be conveyed to Purchaser by recordable Limited or Special Warranty or Trustee's Deed, title to the Property subject only to the following matters ("Permitted Exceptions"):

   7.1. general real estate taxes for the years 2007 and 2008 and subsequent years;

   7.2. covenants, conditions and restrictions of record (including without limitation such easements and restrictions as may be recorded after the date hereof which Seller determines are necessary or appropriate);

   7.3. certain mutually beneficial restrictions and obligations with respect to the proper use, conduct and maintenance of the Property and other property (Purchaser hereby authorizes Seller to record any such restrictions and obligations as covenants affecting the Property and other property)X *AFTER REVISED AGREEMENT" BY PURCHASER*

   7.4. private and/or public utility easements, roads and highways, if any, whether or not of record;

   7.5. all matters which a current, accurate survey of the Property would disclose;

   7.6. applicable zoning and building lines and ordinances;

   7.7. in the event Seller or any entity related to Seller is the owner of or otherwise has an interest in any adjacent property, a reservation to Seller or its nominee of the right and privilege of Seller, its lessees, franchisees, successors and assigns to use and enjoy the benefit of all existing private utilities, drainage areas and access ways of any kind, whatsoever, if any; *Purchaser agrees to accept in Seller's deed to Purchaser the Restrictive Covenant set forth o Exhibit B.*

   7.8. ~~Purchaser agrees to accept in Seller's deed to Purchaser a restriction prohibiting the Property from being used for restaurant purposes for a period of 20 years from the date of the deed. Purchaser agrees that the restriction shall be a covenant running with the land and be binding upon Purchaser, its heirs, administrators, successors and assigns.~~ *SEE ATTACHED RESTRICTIVE COVENANT EXHIBIT B—2*

   7.9. acts done or suffered by Purchaser or by any party claiming by, through or under Purchaser;

   7.10. party wall rights, if any; and

   7.11. all installments of special assessments heretofore levied falling due after date of closing.

8. **Title/Survey** . At least ~~five~~ *BUSINESS* days prior to Closing, Seller shall show to Purchaser or his agent evidence of merchantable title in the intended grantor by delivering a Commitment for Title Insurance issued by the Title Company bearing date on or subsequent to the date of the acceptance of this Contract, in the amount of the Purchase Price subject to no other exceptions than those listed in Paragraph 7 and to general exceptions contained in said commitment. Every Commitment for Title Insurance furnished by Seller hereunder shall be conclusive evidence of title as therein shown. If evidence of title discloses other exceptions, Seller shall have thirty (30) days from Seller's receipt of evidence of title to cure such exceptions and notify Purchaser accordingly, and as to those exceptions which may be removed at closing by payment of money, Seller may have same removed at closing by using the proceeds of sale in payment thereof. Seller has *to the extent* delivered a copy of any survey of the property. All Seller's possession to Purchaser. If Seller is unable to have such defects cured or *Seller has a c* waived within 30 days, Purchaser may, as its sole remedy, terminate this Contract within 10 days thereafter. In no event shall Seller have *of such survey* any obligation to commence litigation or to expend money to cure or remove any title objections. Seller and Purchaser acknowledge and *in its possess* agree that Seller shall not be obligated to provide any new or updated survey to Purchaser.

9. **Payments at Closing.** Purchaser shall pay all recording charges, all money lender's charges (including money lender's escrow fees), municipal transaction tax stamps, if applicable, escrow fees and any and all title insurance charges.

10. **Possession.** Purchaser shall be entitled to occupancy and possession of the Property from and after the Closing date provided final payment of the Purchase Price has been made and the Closing has been fully consummated. Prior to Closing, Seller shall have sole control and exclusive possession of the Property.

11. **Prorations.** At closing, Purchaser shall receive, to the extent that they have not been paid, a credit for real estate taxes for 2007 and 2008. In the event the actual amount of the tax bills is unknown, such credit shall be based on 105% of the most recent ascertainable general real estate tax bill for the Property. General real estate taxes shall be prorated to the date of closing. If the real estate tax bill includes additional property owned by Seller, at Closing Purchaser shall give Seller a credit for taxes from the date of Closing through the remainder of the tax year and the parties shall complete a tax division on the Property such that it shall be separately assessed. Prior to such separate assessment, Seller and Purchaser shall each pay their pro rata share of the tax bill based upon the square footage of each parcel. All prorations are final. All other items customarily prorated shall be prorated as of the date of closing.

12. **Intentionally Deleted**

13. Commission/Broker-Agency Disclosure. Seller shall cause to be paid a broker's commission to Auctioneer at closing, as provided in the Exclusive Agreement For Auctioneering Services between the Seller and Auctioneer. The provisions of this paragraph shall survive the closing.   Purchaser represents and warrants to Seller that no auctioneer or broker, other than Auctioneer and _____NONE_____ ("Participating Broker") was involved in showing, submitting or selling the Property to Purchaser. Purchaser agrees to indemnify and hold Seller, Auctioneer and Participating Broker, if any, harmless and defend them from any claim relating to Purchaser's purchase of the Property asserted against the Seller or Auctioneer by any broker other than as set forth in this Paragraph 13. The provisions of this Paragraph shall survive the closing.  Purchaser acknowledges that Auctioneer and its licensed associates represent the Seller as Seller's agent in the sale of this Property.

14. Irrevocable Offer. Purchaser's execution and delivery of this Contract to Seller is an irrevocable offer to purchase the Property made to Seller and shall not be binding upon Seller until executed by Seller, or Seller's duly authorized agent.  Purchaser agrees that this offer shall remain irrevocable until 5:00 p.m. Chicago time on Monday, June 22, 2008.  Notification of Seller's acceptance may be given pursuant to the notice provision in this Contract or by telephone.  Seller's, or a duly authorized agent of Seller's, failure to notify Purchaser on a timely basis that Seller rejects Purchaser's offer shall not constitute acceptance or rejection of Purchaser's offer, but Purchaser's offer shall then become revocable by Purchaser.  If Seller rejects Purchaser's offer or Purchaser's offer is effectively revoked, all deposits made by Purchaser shall be promptly returned to Purchaser.

15. Default.
        15.1.     Purchaser's Default. At Seller's option, Purchaser shall be in default under the terms of this Contract if, in addition to any other default specified herein, Purchaser shall:

                15.1.1. fail to close pursuant to the terms hereof;
                15.1.2. fail to timely make any payment required of Purchaser hereunder;
                15.1.3. reserved;
                15.1.4. fail to appear at the time and place designated by Seller, as provided herein, to close the transaction; or
                15.1.5. fail to make Closing deposits at the times required thereunder.

                15.1.6. If Seller declares Purchaser in default pursuant to the terms herein, or if Purchaser fails or refuses to carry out any other obligation of Purchaser under the terms of this Contract and any supplemental agreements made a part hereof, or Purchaser defaults under any provision hereof, then, at Seller's option, this Contract is terminated, and, upon notice to Purchaser, the earnest money shall be forfeited.  Seller may also elect to assert against Purchaser any other remedy available, at law or in equity.

16. Demand For Earnest Money.  Purchaser and Seller hereby agree that if Seller makes a demand upon Auctioneer stating that Seller has thereby elected to forfeit Purchaser's earnest money, and demanding that Auctioneer remit to Seller any earnest money deposited by Purchaser with Auctioneer, pursuant to Paragraph 15.1.6, whereupon Auctioneer shall serve notice upon both parties as to same by certified mail, return receipt requested.  Purchaser shall have seven (7) days from the date Auctioneer deposits the notice in the U. S. mail with sufficient postage prepaid to (a) cure the default; or (b) object in writing to Auctioneer of the intended disposition of earnest money.  The mailing of a notice by certified mail, return receipt requested, shall be sufficient service when the notice is mailed.  If Purchaser fails to cure the default or Auctioneer does not receive Purchaser's written objection within said seven (7) day period, then Auctioneer is hereby authorized by Purchaser and Seller to remit same to Seller (reduced by any monies due Auctioneer from Seller, if any), and Purchaser's right under this Contract shall be forfeited, and the Contract shall be terminated without further action by either party or Auctioneer.  Seller is then free to sell the Property to any other party.

17. Interpleader.  If either party objects to the intended disposition of earnest money within within the aforementioned seven (7) day grace period, then the parties hereto agree that Auctioneer may deposit earnest money, less costs, with the Clerk of the Circuit Court of Cook County by filing an action in the nature of interpleader.  The parties agree that Auctioneer may be reimbursed from the earnest money for all costs, including reasonable attorney's fees, relating to the filing of the interpleader and do hereby agree to indemnify, defend and hold Auctioneer harmless from any and all claims and demands, including the payment of reasonable attorney's fees, costs and expenses arising out of such default claims and demands.

18. Warranty And Disclaimer Of Warranties. PURCHASER REPRESENTS THAT EITHER PURCHASER OR A DULY AUTHORIZED AGENT OF PURCHASER HAS INSPECTED, OR WAIVES THE RIGHT TO INSPECT, THE PROPERTY AND VERIFIED THE FACTS AND INFORMATION CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER PRIOR TO ~~EXECUTING THIS CONTRACT~~. PURCHASER WARRANTS THAT PURCHASER IS PURCHASING THE PROPERTY, ALL IMPROVEMENTS, FIXTURE, EQUIPMENT AND PERSONAL PROPERTY, THEREOF ON AN "AS-IS, WHERE-IS" BASIS, WITH ALL FAULTS AND WITH NO WARRANTIES OF ANY KIND, EXPRESS OF IMPLIED, EITHER ORAL OR WRITTEN, EXCEPT AS EXPRESSLY STATED IN THIS CONTRACT, WHETHER OF HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION OF IMPROVEMENTS, ENVIRONMENTAL CONDITION OR OTHERWISE MADE BY SELLER, AUCTIONEER OR ANY AGENT OF EITHER OF THEM, INCLUDING, BUT NOT LIMITED TO, INFORMATION CONTAINED IN THE SALES BROCHURE, ADVERTISING OR SUPPLEMENTAL BROCHURES. NEITHER SELLER, AUCTIONEER, NOR ANY OF THEIR AGENTS ASSUME ANY LIABILITY FOR INACCURACIES, ERRORS OR OMISSIONS CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER.

PURCHASER'S INITIALS:

By executing this Contract, Purchaser expressly represents and agrees that Purchaser is not relying upon any representative warranty or statement by Seller, Auctioneer or its or their sales representatives which differs from the disclosures made in this Contract. Purchaser acknowledges that Purchaser has not relied upon any sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Seller, Auctioneer or others, including, but not limited to, any relating to the description of physical condition of the Property, or the dimensions of the Property or any other physical dimensions thereof, the estimated real estate taxes of the Property, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other data, except as may be specifically represented herein. Purchaser has relied on their own examination and investigation thereof. No person has been authorized to make any representation on behalf of Seller. Purchaser agrees (a) to purchase the Property without offset or any claim against, or liability to, Seller or its agents, whether or not any layout or dimension of the Property or any part thereof, is accurate or correct, and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the Closing.



*SELLER AGREES THAT NO MATERIAL DIFFERENCES EXIST FROM RICK LEVIN WEBSITE INFORMATION.*

PURCHASER'S INITIALS:

19. Notices. All notices herein required shall be in writing and signed by either party, and shall be served on the other party at the addresses set forth in Paragraph 1. The mailing of a notice by registered or certified mail, return receipt requested with sufficient postage prepaid, shall be sufficient service when the notice is mailed. Notices may also be served by a nationally recognized air courier, or personal delivery. Notices sent by air courier shall be deemed delivered on the date of receipt. Either party may change its address for notice purposes by giving notice to that effect in the manner set forth herein, provided such change of address shall not be deemed received until actual receipt thereof by the addressee. Any notices required herein may be sent by and to each party's respective attorney.

20. Attorney Review. PURCHASER REPRESENTS THAT PURCHASER HAS BEEN ADVISED BY THE SELLER AND AUCTIONEER TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS CONTRACT. PURCHSER FURTHER ACKNOWLEDGES THAT HE HAS READ AND UNDERSTANDS EACH AND EVERY PART OF THIS CONTRACT.

21. Property Condition. The parties hereto acknowledge that Auctioneer is not obligated to and has not made any independent investigation of the condition of the Property including, but not limited to, any environmental matters with respect thereto (collectively the "Physical Condition"). The parties hereto further acknowledge that all investigations, reports and information with respect to the Physical Condition, if any, have been prepared by or for the Seller and have been furnished to Purchaser by Auctioneer on behalf of Seller. Seller makes no representation as to the truth or accuracy of any such investigations, reports and/or information.

22. Statutory Compliance. Purchaser and Seller hereby agree to make all disclosures and do all things necessary to comply with the applicable provisions of the Real Estate Settlement Procedures Act of 1974, as amended. Purchaser and Seller agree to make all certifications and do all things necessary to comply with Section 1445 of the Internal Revenue Code at or before the time of Closing.

23. Stamp Taxes. Seller shall furnish a completed declaration signed by the Seller or Seller's agent in the form required by the state and county, and shall furnish any declaration signed by the Seller or Seller's agent or meet other requirements as established by any local ordinance with regard to a transfer or transaction tax.

24. Use of Pronouns.  Wherever appropriate, the singular includes the plural and the masculine includes the feminine or the neuter. The term "Purchaser" shall be interpreted as "Purchasers" if more than one person are purchasing the Property, and their obligations shall be joint and several.

25. No Assignment. Purchaser shall not directly or indirectly assign or transfer his rights under this Contract without prior written approval of Seller which may be granted or withheld in the sole and absolute discretion of Seller.  Seller may assign this Contract without the consent of Purchaser, subject, however, to Purchaser's rights hereunder. Any attempted assignment or transfer by Purchaser without Seller's prior written consent shall be deemed null and void and shall be considered an event of default by Purchaser subject to the provisions of Paragraph 16.2 of this Contract.

26. Headings; Exhibits. The paragraph headings used herein are for the reader's convenience only and they shall not be used to interpret the meaning of the terms set forth herein. Exhibits attached hereto are incorporated as a part of this Contract.

27. Governing Law. The parties agree that any litigation or dispute concerning the enforcement of this Contract shall be brought in the State of Illinois, the jurisdiction shall be the county in which the Property is located, and that Illinois law shall govern its interpretation.

28. Complete Agreement; Severability. This Contract sets forth the entire understanding between the parties relating to the transactions described herein, there being no terms, conditions, warranties or representations other than those contained herein. This Contract may be amended only in an instrument signed by both parties hereto. The parties intend that faxed signatures and that a faxed Contract containing the signatures (original or faxed) of all parties is binding on the parties. At the request of either party, any faxed document subject to this paragraph shall be re-executed by both parties in an original form. Neither party shall raise the use of a facsimile machine as a defense to this Contract and shall forever waive such defense. If any provision of this Contract is invalid or unenforceable as against any party under certain circumstances, the remainder of this Contract and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Contract, except as otherwise herein provided shall be valid and enforced to the fullest extent permitted by law.

29. Invalidity.  The invalidity of any covenant, grant, condition or provision of this Contract shall not impair or affect in any manner the validity, enforceability or affect of the remainder of the Contract.

30. Purchaser's Status.  Purchaser represents and warrants there is nothing in Purchaser's status which could or might preclude or prevent Purchaser from consummating this transaction as herein set forth.  Purchaser also agrees that he or she shall not cause any labor or material to be incorporated or delivered to the Property prior to Closing.

31. Binding Agreement.  The terms and provisions of this contract shall be binding upon the parties hereto and their heirs, administrators, executors, successors, and permitted assigns.

32. Request for Escrow.  At the request of Seller or Purchaser, evidenced by written notice to the other party at any time prior to the date for delivery of deed hereunder, this sale shall be closed through an escrow with the Title Company, in accordance with the general provisions of the usual form of Deed and Money Escrow Agreement then furnished and in use by said company, with such special provisions inserted in the escrow agreement as may be required to conform with this Contract.  Upon the creation of such an escrow, anything herein to the contrary notwithstanding, payment of purchase price and delivery of deed shall be made through the escrow and this Contract and the earnest money shall be deposited in the escrow and Auctioneer shall be made a party to the escrow with regard to commission due. The cost of the escrow shall be paid by the party requesting it.

33. Other Documents. Seller agrees to furnish an affidavit of title subject only to those items set forth herein, and an ALTA statement if required by Purchaser's mortgagee, and transfer tax declarations.

34. Existing Mortgage. Seller shall have the right to pay off any existing mortgage(s) out of the proceeds of this sale.

35. Indemnity.  Purchaser covenants to indemnify, defend and hold Seller harmless against any and all losses, claims, damages, liabilities, costs (including reasonable attorney's fees and court costs), and causes of action including, without limitation, those arising from mechanics liens, injuries to person or damage to property, including the Property, suffered or incurred by Seller directly or indirectly, as a result of, the entry onto the Property by Purchaser, Purchaser's agents, contractors, employees, and licensees.

36. <u>Anti-Terrorism Representation and Warranty</u>. Seller and Purchase each represent and warrant that neither they nor the officers and directors controlling Purchaser are acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by the United States Treasury Department as a Specially Designated National and Blocked Person, or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and that they are not engaged in the transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation. Each party hereby agrees to defend, indemnify, and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the foregoing representation and warranty.

THIS SPACE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.

IN WITNESS WHEREOF, the parties have executed this Contract on the dates set forth below their signatures.

SELLER:

McDonald's Corporation

BY: _Bruce Neumann_
TITLE: _Senior Counsel_
DATE: _June 16, 2008_

SELLER'S ATTORNEY:
Bruce Neumann
McDonald's Corporation
1 McDonald's Plaza, Dept 067
Oak Brook, Illinois  60523
Tel: 630.623.7556
Fax: 630.623.8084

AUCTIONEER:
Rick Levin & Associates, Inc. or Rick Levin &
Associates, Inc., in conjunction with Rick Levin,
licensed Indiana auctioneer
1467 North Elston Avenue, 2nd Floor
Chicago, IL  60622
Telephone: 773.252.4500 x223
Facsimile:  773.252.4520

PURCHASER: _NOMANBHOY FAMILY LIMITED PARTNERSHIP_

_Nomanbhoy_
Signature _by its President_
_SHABBIR NOMANBHOY_
Signature

DATE: _June 16, 08_

PURCHASER'S ATTORNEY:
_To be determined_

EXHIBITS:

Exhibit A: Legal Description

6/18

EXHIBIT A -1

LIST OF PROPERTIES ~~Legal Description~~ — ALL FORMER McDONALDS RESTAURANTS

| # | ADDRESS | BRIEF DESCRIPTION FROM RICK LEVIN WEBSITE | Value of Property |
|---|---|---|---|
| 1. | 5057 WENTWORTH CHICAGO, IL | VACANT LAND — 1.108 ACRES | |
| 2. | 10245 ROOSEVELT RD WESTCHESTER, IL | LAND — 29,951 SF BUILDING — 2,100 SF (UNOCCUPIED) | |
| 3. | 130 S. VIRGINIA ST CRYSTAL LAKE, IL | VACANT LAND — 26,000 SF | |
| 4. | 6574 N. 76th ST MILWAUKEE, WIS | VACANT LAND — 22,526 SF | |
| 5. | 5377 BROADWAY MERRILVILLE, IN | VACANT LAND — 1.55 ACRES (2 PARCELS) | |

6/18

5057 S. Wentworth, Chicago

LC 012-1061    FILE NO. 8591

THAT PART OF THE NORTHEAST 1/4 OF SECTION 9, TOWNSHIP 38 NORTH, RANGE
14 EAST OF THE THIRD PRINCIPAL MERIDIAN, COMMENCING AT THE INTERSECTION
OF THE EAST LINE OF WENTWORTH AVENUE AND THE NORTH LINE OF 51ST STREET
IN SAID CITY, THE POINT OF BEGINNING; THENCE NORTH ALONG SAID EAST
LINE OF WENTWORTH AVENUE, 220 FEET TO A POINT; THENCE EAST AT A RIGHT
ANGLE TO THE LAST DESCRIBED COURSE, 220 FEET TO A POINT THENCE SOUTH
AT A RIGHT ANGLE TO THE LAST DESCRIBED COURSE, 220 FEET TO A POINT OF
INTERSECTION WITH THE NORTH LINE OF 51ST STREET; THENCE WEST ALONG
SAID NORTH LINE OF 51st STREET, 220 FEET TO THE POINT OF BEGINNING,
IN COOK COUNTY, ILLINOIS.

Exhibit A-2

Westchester

## EXHIBIT A -3.

LOTS 1, 2, 3, AND LOT 4 (EXCEPT THE WEST 2.20 FEET THEREOF) LOT 48 AND THE
VACATED ALLEY ADJACENT THERETO AND LOTS 49 AND 50 ALL IN GEORGE F. NIXON
AND COMPANY'S WESTCHESTER IN THE WEST HALF OT HE NORTH WEST QUARTER
OF SECTION 21, TOWNSHIP 39 NORTH, RNAGE 12, EAST OF THE THIRD PRINCIPAL
MERIDIAN, IN COOK COUNTY, ILLINOIS, IN THE VILLAGE OF WESTCHESTER, COOK
COUNTY, ILLINOIS.

130 S. Virginia Street

## EXHIBIT A-4

### LEGAL DESCRIPTION

The Easterly 170.0 feet (as measured along the lot lines) of Lot 3, in Lakeacres, a subdivision of part of the North Half of Section 6, Township 43 North, Range 8, East of the Third Principal Meridian, according to Plat thereof recorded February 26, 1954, as Document #275689 in McHenry County, Illinois.

LESS AND EXCEPT:

That part of the Easterly 170 feet (as measured along the property lines) of Lot 3 in Lakeacres, a subdivision of part of the North Half of Section 6, Township 43 North, Range 8 East of the Third Principal Meridian, according to the Plat thereof recorded February 26, 1954 as Document No. 275689, in Book 11 of Plats, page 100, described as follows:

Beginning at the most northerly corner of Lot 3; thence on an assumed bearing of South 54 degrees 14 minutes 25 seconds West along the Northerly line of said Lot 3, a distance of 7.18 feet to a point; thence South 15 degrees 19 minutes 37 seconds East, a distance of 143.70 feet to a point on a 585.50 foot radius curve, the center of the circle bears North 74 degrees 40 minutes 23 seconds East from said point; thence Southeasterly along said curve 6.29 feet, central angle 00 degrees 36 minutes 57 seconds, to a point on the Southerly line of said Lot 3; thence North 54 degrees 14 minutes 25 seconds East, a distance of 6.90 feet to the Southwesterly line of Virginia Street; thence North 15 degrees 14 minutes 14 seconds West along said Westerly line, a distance of 150.10 feet to the point of beginning, in McHenry County, Illinois.

Parcel #19-06-204-036

Contract

EXHIBIT A-4

6574 N. 76th Street, Milwaukee

Exhibit A-5

That part of Lots One (1), Two (2), Ten (10) and Eleven (11) in Block Seventy-three (73) in Menomonee River Hills East, being a Subdivision of a part of the South East One-quarter (1/4) of Section Twenty-two (22), Township Eight (8) North, Range Twenty-one (21) East, in the City of Milwaukee, Milwaukee County, Wisconsin, which is bounded and described as follows:  Commencing at the Northwest corner of said Block 73; thence South 00° 23' 50" West 150.00 feet to a point; thence South 89° 36' 10" East 150.00 feet to a point; thence North 00° 23' 50" East 150.35 feet to a point on the South line of West Acacia Street; thence West 30.81 feet along the South line of West Acacia Street, being the arc of a curve whose center lies to the North whose radius is 1360.78 feet and whose chord bears South 89° 44' 55" West 30.81 feet to a point; thence North 89° 36' 10" West along the South line of West Acacia Street 119.19 feet to the point of beginning.

EXHIBIT A -5
L/C: 48-0035
Parcel Type: MS

5377 Broadway, merilville

Exhibit A-6

Part of the Northwest Quarter of Section 3, Township 35 North, Range 8
West of the 2nd P.M. in Lake County, Indiana, described as beginning at
a point on the West line of said Northwest Quarter of Section 3 which is
548.6 feet South of the Northwest corner of said Northwest Quarter of Section
3; thence South 89 degrees 21' East a distance of 50 feet to the point or
place of beginning of this legal description; thence continuing South 89
degrees 21' East a distance of 162 feet; thence South and parallel to the
West line of said Northwest Quarter of Section 3 a distance of 144.7 feet; thence
West a distance of 162 feet; thence North 144.7 feet to the point or place
of beginning.

PARCEL II

Part of the Northwest Quarter of Section 3, Township 35 North, Range 8 West
of the Second Principal Meridian, in Lake County, Indiana, being more
particularly described as follows:

Beginning at a point on the centerline of Broadway 373.60 feet South of
the Northwest corner of said Northwest quarter of Section 3; thence South
89 degrees 21 minutes East, 166 feet; thence South 175 feet; thence North
89 degrees 21 minutes West 166 feet to a point on the centerline of
Broadway; thence North along the centerline of Broadway 175 feet to the point
of beginning, subject to the rights of the public and the State of Indiana
in the Westerly 50 feet lying within the right of way of Broadway for road
purposes.

EXHIBIT A -6
L/C: 13-0010
Parcel Type: MS

## Exhibit B

**Restrictive Covenant:**

For a period of 20 years from the date of the deed, the Property may not be used for and Purchaser and any successor will not lease/sell to any tenant/buyer whose primary purpose is the sale of hamburgers, chicken and/or coffee.

In addition, the following restaurants operating under the listed trade names, or operating under any successor trade names, are prohibited:

| | |
|---|---|
| Apolo Burgers | Astro Burgers |
| Atlanta Burgers | A & W |
| Backyard Burgers | Burger Chef |
| Burger King | Burger Street |
| Carl's Jr. | Caribou Coffee |
| Checkers | Cheeburger, Cheeburger |
| Chick-Fil-A | Church's Chicken |
| Crown Burgers | Crystal Burgers |
| Culvers | Dunkin Donuts |
| Friendly's | Hardee's |
| Harold's Chicken | In N Out Burgers |
| Jack-in-the-Box | Jamba Juice |
| KFC | Popeye's Chicken |
| Rally's | Sonic |
| Starbuck's | Steak 'N' Shake |
| Tim Horton's | Whataburger |
| Wendy's | Whitecastle |