IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NOMANBHOY FAMILY LIMITED PARTNERSHIP, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 08 CV 3787 |
| v. | ) ) | Hon. Joan B. Gottschall Mag. Judge Jeffrey Cole |
| McDONALD's CORPORATION, McDONALD's USA, LLC, RICK LEVIN & ASSOCIATES, INC., and RICK LEVIN, | ) ) ) ) | |
| Defendants. | ) | |

## McDONALD'S OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Defendants McDonald's Corporation and McDonald's USA, LLC (collectively "McDonald's") respectfully submit this opposition to plaintiff's motion for a preliminary injunction.

## INTRODUCTION

This is a case where the truth is in the details. Plaintiff has not provided the full and accurate details to this Court, which details demonstrate that a preliminary injunction should not be granted and the TRO should expire by its terms. Plaintiff provides a copy of what it alleges is an agreement for the purchase of five properties ("Nomanbhoy Exhibit A"). Plaintiff alleges that despite this "contract," McDonald's determined instead to sell the properties at a public auction to other buyers at a higher price. Neither allegation is based on a reasonable investigation of the facts. The details of this case demonstrate why the alleged contract is not enforceable and that the parties never reached an agreement on the terms of the sale.

Specifically, plaintiff's brief fails to note key facts, including: (1) plaintiff executed Nomanbhoy Exhibit A when the offer was no longer on the table and not capable of being accepted; (2) plaintiff did not deliver an executed version of Nomanbhoy Exhibit A to McDonald's until after the public auction for those properties occurred; (3) Shabbir Nomanbhoy, plaintiff's representative, and all representatives of the defendants agreed on the evening of June 18 that a revised written document would be sent by McDonald's setting forth the proposed terms of the parties' agreement; and (4) McDonald's sent a revised written document to plaintiff on June 19,

2008, and plaintiff refused to sign that document before the auction – and indeed continued to make additional counteroffers within two hours of the auction. Plaintiff's actions forced McDonald's to end negotiations and proceed with the auction.[1]

In sum, as a matter of law, plaintiff cannot establish a likelihood of success on the merits on its claims for specific performance (count I), injunction (count II), or breach of contract (count III) for three reasons. First, Nomanbhoy's own affidavit and overwhelming evidence confirm that there was no offer and acceptance to form a valid and binding contract; second, any attempt by plaintiff to manufacture a binding contract fails under the Illinois Statute of Frauds; and third, even if Nomanbhoy Exhibit A is the operative "contract", which it is not, plaintiff admits that it failed to perform according to its terms, which itself excuses further performance. Plaintiff also fails to establish the other necessary factors necessary for entering a preliminary injunction.

## FACTUAL BACKGROUND

### 1.    Plaintiff's First Written Offer for $2 Million on June 12, 2008

Plaintiff's first written offer to McDonald's was set forth in a form "Real Estate Sales Contract," which appears to contain Nomanbhoy's signature on plaintiff's behalf and is dated June 12, 2008 (plaintiff's "First Written Offer"). (*See* Exhibit 1 hereto, Affidavit of Mary G. Meyer of McDonald's USA, LLC ("Meyer Aff.") ¶ 10; *see also* First Written Offer, Exhibit 4 hereto (hereinafter "Ex.__.")) Paragraph 14 of the First Written Offer states, in relevant part: "Purchaser's execution <u>and</u> delivery of this Contract is an irrevocable <u>offer</u> to purchase and <u>shall not be binding upon Seller until executed by Seller or Seller's duly authorized agent.</u>" (Ex. 4 ¶ 7.8.) McDonald's did not execute this First Written Offer. (Ex. 1, Meyer Aff. ¶ 10; Ex. 4.) No contract was formed.

### 2.    Plaintiff's Second Written Offer For $ 1.4 Million on June 16, 2008

Plaintiff's next written offer was set forth in a form "Real Estate Sales Contract," which appears to contain Nomanbhoy's signature on plaintiff's behalf and is dated June 16, 2008 (plaintiff's "Second Written Offer"). (Ex. 1, Meyer Aff. ¶ 11; *see also* Second Written Offer, Ex. 5.) Plaintiff's Second Written Offer was entitled "Real Estate Sales Contract – Version 1 with

---

[1] Although plaintiff's brief fails to provide these key facts, its supporting affidavit and supporting exhibits confirm these facts. While the affidavits of Mary Meyer and Bruce Neumann of McDonald's, and Ira Lauter of Rick Levin & Associates, Inc., McDonald's auctioneer (attached in support of this Opposition as Exhibits 1-3) establish that plaintiff's version of the facts is inaccurate and incomplete, this Court need not order an evidentiary hearing because the motion should be denied as a matter of law.

Exhibit A & B-1." (Ex. 5.) McDonald's did not execute the Second Written Offer. (Ex. 1, Meyer Aff. ¶ 11; Ex. 5.) No contract was formed.

> **3.** **Plaintiff's Third Written Offer For $ 1.4 Million on June 17, 2008**

On June 17, 2008, plaintiff sent a revised offer to McDonald's that was set forth in a form "Real Estate Sales Contract," which appears to contain Nomanbhoy's signature on plaintiff's behalf and is dated June 16, 2008 (plaintiff's "Third Written Offer"). (Ex. 1, Meyer Aff. ¶ 12; *see also* Third Written Offer, Ex. 6.) Plaintiff's Third Written Offer was entitled "Real Estate Sales Contract – Version 2 with Exhibit A & B-2." (Ex. 6.) McDonald's did not execute the Third Written Offer. (Ex. 1, Meyer Aff. ¶ 12; Ex. 6.) No contract was formed.

> **4.** **McDonald's Rejects Plaintiff's Third Written Offer for $ 1.4 Million and Proposes New and Additional Terms (the "June 18 a.m. Proposal")**

On June 18, 2008, at 9:47 a.m., Bruce Neumann of McDonald's sent via e-mail a document in response to Plaintiff's Third Written Offer that was entitled "Real Estate Contract – Version 2 with Exhibit A & B" (the "June 18 a.m. Proposal"). (*See* Exhibit 2 hereto, Affidavit of Bruce Neumann of McDonald's Corporation ("Neumann Aff.") ¶ 17.) (A copy of the June 18 a.m. Proposal is attached hereto as Exhibit 7.) The June 18 a.m. Proposal set forth some terms that were the same as Plaintiff's Third Written Offer, including the purchase price of $1.4 million dollars. (Ex. 7 ¶ 2.) The June 18 a.m. Proposal also set forth terms that were different from plaintiff's Third Written Offer, including the earnest money amount, listing the escrow agent as Chicago Title Insurance Company, adding a seller's default penalty clause at 2% *per annum*, and setting forth a broadened restrictive covenant attached thereto at Exhibit B. (*See* Ex. 7 ¶¶ 2.4, 5, 6, 7.8 and 8, respectively, and Exhibit B thereto.) The restrictive covenant set forth that for a period of 20 years, the property may not be used for and "Purchaser ***and any successor*** will not lease/sell to ***any tenant/buyer*** whose primary purpose is the sale of hamburgers, chicken and/or coffee . . . ."[2]

Additionally, paragraph 14 of the June 18 a.m. Proposal stated, in relevant part: "Purchaser's execution <u>and</u> delivery of this Contract is an irrevocable <u>offer</u> to purchase and <u>shall not be binding upon Seller until executed by Seller or Seller's duly authorized agent. Purchaser</u>

---

[2]  Due to McDonald's presence in numerous real estate markets, restrictive covenants which protect McDonald's against its direct and indirect competitors are a key provision in its contracts and often can be a more important provision than the selling price. Any change in McDonald's standard restrictive covenant must be approved by McDonald's senior business executives, and attempts to severely limit it often result in foregoing the contract. (Ex. 2, Neumann Aff. ¶ 7.)

agrees that this offer shall remain irrevocable until 5:00 p.m. Chicago time on Wednesday, June 18." (Ex. 2, Neumann Aff. ¶ 17; Ex. 7 ¶ 14.) (emphasis added). McDonald's Bruce Neumann signed the June 18 a.m. Proposal and sent it to Nomanbhoy. (Ex. 2, Neumann Aff. ¶ 17; Ex. 7.) As set forth more fully below, plaintiff never accepted the proposal and instead made a counterproposal.

### 5.    Nomanbhoy, On Plaintiff's Behalf, Rejects McDonald's June 18 a.m. Proposal and Submits a Further Counter-Offer

As plaintiff confirms, on the morning of June 18, 2008, Neumann sent plaintiff "a Real Estate Sales Contract . . . containing typed inserts and Neumann's initialed changes, for the Five Subject Properties on behalf of the McDonald's," i.e., the June 18 a.m. Proposal. (Nomanbhoy Aff. ¶ 6.) Thereafter, plaintiff admits that the parties "continued to negotiate after [the June 18 a.m. Proposal] was sent, including over price." (See Plaintiff's First Amended Complaint "FAC" ¶ 13; see also Nomanbhoy Aff. ¶¶ 9-11, 13-17.) Specifically, in response to the June 18 a.m. Proposal, plaintiff sought a different price, restrictive covenant, and other terms. (Id.) In short, plaintiff sought a different deal. Nomanbhoy's affidavit and attached exhibits establish that in response to the June 18 a.m. Proposal, he stated: "There are too many changes to contract language that was previously agreed," and that he wanted to "arriv[e] at language that is mutually acceptable. . . (Exhibit G to Nomanbhoy Affidavit; see also Ex. 2, Neumann Aff. ¶ 18.) (emphasis added.) Thus, after Nomanbhoy's e-mail, sent at 11:38 a.m. CST on June 18, the parties continued to make counteroffers, but none was accepted. (Ex. 2, Neumann Aff. ¶¶ 20-21.) No contract was formed.

### 6.    Counteroffers Continue But Final Agreement Is Never Reached

Counteroffers with respect to the terms of a sale for the parcels continued throughout the evening of June 18, 2008. (Nomanbhoy Aff. ¶¶ 9-11, 13-17, 19-20, and Aff. Exs. referenced therein.) Plaintiff's price term plummeted to $1 million, and thereafter was increased to $1.125 million. (Ex. 1, Meyer Aff. ¶ 19; Exhibit 3 hereto, Affidavit of Ira Lauter ("Lauter Aff."), ¶ 21-22.) Even after McDonald's indicated it would not take less than $1.4 million, Nomanbhoy indicated plaintiff would only pay $1.2 million. (Nomanbhoy Aff. ¶¶ 13-14.)

Nomanbhoy not only continued to make counteroffers concerning price, but in addition he continued to make counteroffers regarding the scope of the restrictive covenant. (Ex. 1, Meyer Aff. ¶¶ 20-21; Ex. 2, Neumann Aff. ¶¶ 21-22.) Plaintiff, however, would not agree to McDonald's originally proposed restrictive covenant language. (See Nomanbhoy Aff. ¶¶ 8-9 and Aff. Ex. G.)

Thereafter, Nomanbhoy indicated that he would accept McDonald's proposed restriction, but then simultaneously made a further counteroffer on price.  (*See* Nomanbhoy Aff. ¶ 9 and Aff. Ex. D.)

Throughout the negotiations that extended into the evening of June 18, 2008, one thing remained consistent – the parties intended that a written contract would need to be executed now that plaintiff rejected the June 18 a.m. Proposal.  During conversations in which Nomanbhoy, Mary Meyer and Bruce Neumann of McDonald's and Ira Lauter of Rick Levin & Associates, Inc., McDonald's auctioneer ("RLA"), participated during the early evening of June 18, Neumann indicated that a revised contract would need to be executed by the parties.  (*See* Exs. 1, 2 and 3, ¶¶ 22, 23 and 23, respectively).  Neumann's requirement for a revised document arose in part because the parties' counteroffers continued after plaintiff's rejection of the June 18 a.m. Proposal, McDonald's needed certainty regarding the agreement the parties were attempting to reach, and the auction was scheduled to occur the following day.  (Ex. 1, Meyer Aff. ¶ 22; Ex. 2, Neumann Aff. ¶¶ 23-25.)  Nomanbhoy's affidavit and exhibits from June 18 confirm the parties' intent:

- Lauter writes to Nomanbhoy that he should revise the contract "and send back to me asap and *we will have it signed*."  Lauter further stated that "5:00 p.m. CST is the latest we can get this *executed*."  (Nomanbhoy Aff. Ex. F.)

- Nomanbhoy writes to Lauter:  "Email me *the complete contract with all changes*, and I will sign and send back write [*sic*] away."  (Ex. F, 4:17 p.m. CST/2:17 p.m. PT.)

- Nomanbhoy later writes to Lauter that he "would need the *revised contract, signed, tonight*."  (Nomanbhoy Aff. Ex. I.)

- In response, Lauter writes that if plaintiff would "pay $1.4MIL they *will sign* the contract as agreed and cancel the Auction."  (Ex. I, 7:45 p.m. CST/ 5:45 p.m. PT.)

- Afterwards, at 8:02 p.m. CST/6:02 p.m. PT, Nomanbhoy writes, "please *revise contract* for interest rate, escrow agent, survey and dates."  (Nomanbhoy Aff. Ex. J.) (emphasis added).

On the morning of June 19, consistent with the parties' intent, Neumann from McDonald's sent to Nomanbhoy a revised written proposal for execution (the "June 19 a.m. Proposal").  (Ex. 12.)  If McDonald's had received from plaintiff the signed, revised June 19 a.m. Proposal and the wired money prior to the auction scheduled on June 19, 2008, at 1:00 p.m., McDonald's and plaintiff would have reached an agreement.  (Ex. 2, Neumann Aff. ¶ 31.)  At approximately 10:30 a.m. on June 19, 2008, however, Nomanbhoy informed Lauter on the telephone that he wanted to revise paragraph 14 of the June 19 a.m. Proposal.  (Ex. 3, Lauter Aff. ¶ 36.)  At 11:30 a.m., Neumann e-mailed Nomanbhoy and stated:

> Ira expressed your desire to revise paragraph 14 of the [June 19 a.m. Proposal] contract and alternatively that you were "accepting" the contract from yesterday [June 18 a.m. Proposal] . . . . **The only offer/contract open to you for acceptance is the offer/contract set fort[h] below** [the June 19 a.m. Proposal] **and previously forwarded to you this morning.  All prior offers/contracts have been rejected and are not valid.**

(Ex. 2, Neumann Aff. ¶ 29; Ex. 14.) (emphasis in original.)

Next, Lauter spoke to Nomanbhoy on the telephone approximately one hour before the auction was scheduled and pleaded with Nomanbhoy to sign and send the June 19 a.m. Proposal back to him prior to the 1:00 p.m. auction at the $1.4 million price with all of the other material terms.  (Ex. 1, Meyer Aff. ¶¶ 34-36; Ex. 3, Lauter Aff. ¶ 38.)  Lauter e-mailed plaintiff stating, "Shabbir – as of 12:05 we have not received the contract or wire. . . ."  (Ex. 1, Meyer Aff. ¶¶ 34-36; Ex. 3, Lauter Aff. ¶ 38; Ex. 15; *see also* Nomanbhoy Aff. Ex. O.)

At 12:52 p.m., eight minutes before the auction was scheduled to take place, Lauter again e-mailed Nomanbhoy that they had not received the contract, indicating that he needed to "[p]lease send the contract to all parties on this e-mail ASAP" and that he "look[ed] forward to us receiving [his] contract to get this all wrapped up."  (Ex. 3, Lauter Aff. ¶ 39; Ex. 16.)  Importantly, as plaintiff admits, Nomanbhoy refused to sign or send the June 19 a.m. Proposal *or* any alleged contract before the auction.  (Nomanbhoy Aff. ¶¶ 24-25.)  Accordingly, McDonald's and RLA were forced to sell the parcels at the auction, and the auction resulted in a total sale price of approximately $1.26 million.  (Ex. 1, Meyer Aff. ¶ 37; Ex. 2 Neumann Aff. ¶ 30.)

On June 19, at 4:30 p.m. CST, almost four hours after the auction had commenced, Nomanbhoy emailed McDonald's a copy of the *June 18 a.m. Proposal* that he previously rejected on the morning of June 18, and that now contained Nomanbhoy's initials on the bottom right corner, and stated, in part:

> This contract is the one executed by Bruce yesterday [*i.e.*, the June 18 a.m. Proposal], and which I had informed you yesterday I was accepting…The contract changes you faxed me this morning [*i.e.*, the June 19 a.m. Proposal] are all fine, except the changes at the bottom of item 14…I am willing to accept the other changes to the contract [*i.e.*, the June 19 a.m. Proposal] if you will be so kind as to delete this clause and resend me the contract.

(Ex. 1, Meyer Aff. ¶ 38; Ex. 2, Neumann Aff. ¶ 32; Ex. 17.).  Thus, almost four hours after the auction, Nomanbhoy still was making counteroffers to McDonald's.

In response, on June 19, at 5:53 p.m. CST, Neumann sent to Nomanbhoy an e-mail that set forth the numerous times plaintiff had rejected offers and proposed counteroffers that were not accepted.  Neumann also stated, "I have communicated your current offer (proposing yesterday's rejected offer back to us) [*i.e.*, the June 18 a.m. Proposal] to the proper parties.  Your offer has not been accepted."  (Ex. 2, Neumann Aff. ¶ 34; Ex. 18.)  (emphasis added.)

### 7.  Plaintiff Threatens Negative Publicity And To Tie Up the Properties "For a Long Time"

The next day, on June 20, 2008, at 3:15 p.m., McDonald's received an e-mail from Nomanbhoy threatening litigation and "negative publicity" if McDonald's would not sell the properties to him.  In that e-mail, he stated, in part:

> I will file an injunction so that you are unable to sell the properties in the meantime. You may want to think about the effects of a lawsuit that will tie up these properties for a long time, as well as the associated costs and time for McDonalds.

(Ex. 19.)

Plaintiff's threat and this lawsuit are wrongful.

## ARGUMENT

A preliminary injunction is an "extraordinary remedy" that "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Goodman v. Ill. Dept. of Fin. & Prof'l Regulation,* 430 F.3d 432, 437 (7th Cir. 2005).  The plaintiff has the burden to establish: (1) a reasonable likelihood of success on the merits, (2) irreparable harm in the event the injunction does not issue, (3) no adequate remedy at law, (4) the threatened harm to the plaintiff is greater than the harm to the defendant of granting the injunction, and (5) the granting of a preliminary injunction will not disserve the public interest.  *Am. Dairy Queen Corp. v. Brown-Port Co.*, 621 F.2d 255, 257 (7th Cir. 1980).  Plaintiff has failed to meet its burden and its motion should be denied.

I.    PLAINTIFF HAS FAILED TO SHOW A LIKELIHOOD OF SUCCEEDING ON THE MERITS BECAUSE NO CONTRACT EXISTED AS A MATTER OF LAW.

### A.    Plaintiff Rejected The June 18 a.m. Proposal.

As the Illinois Supreme Court has held, "in order to constitute a contract by offer and acceptance, the acceptance must conform *exactly* to the offer." *Whitelaw v. Brady*, 3 Ill. 2d 583, 589, 121 N.E.2d 785, 789 (1954) (emphasis added).  Any "proposed acceptance that contains terms different from the original offer is not a valid acceptance; rather, such acceptance is treated as a counteroffer requiring an acceptance by the original offeror to create a contract." *Hicks Road*

7

*Corp. v. Marathon Oil Co.*, 1994 WL 327361 at *4 (N.D. Ill. July 6, 1994). (Ex. 21.) Even a minor change to the terms of an agreement is a rejection of the proposed agreement and a counteroffer, which must be accepted by the party making the original offer to be enforced against it. *Whitelaw*, 3 Ill. 2d at 589, 121 N.E.2d at 789; *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 432 (7th Cir. 1993) ("[Plaintiff's] modifications of [defendant's] proposed agreement, however minor, precluded formation of a contract at that point."); *Finnin v. Lindsay, Inc.*, 366 Ill. App. 3d 546, 549, 852 N.E.2d 446, 449 (3rd Dist. 2006) (holding that minor changes to a written agreement by the plaintiff, even though agreed to orally by the parties, constituted a rejection and counteroffer). A party seeking specific performance for the sale of land must show "a greater degree of specificity than is demanded for other purposes." *D'Agostino v. Bank of Ravenswood*, 205 Ill. App. 3d 898, 903, 563 N.E.2d 886, 889 (1st Dist. 1990).

In *Whitelaw*, the defendant (seller) drafted a proposed agreement for the sale of real estate, signed it, and delivered it to the plaintiff (purchaser). *Whitelaw*, 3 Ill. 2d at 584-88, 121 N.E.2d at 786-89. The purchaser purported to accept the terms of the agreement except for the date of acceptance itself, which he changed before delivery to the seller. *Id.* at 588, 121 N.E.2d at 789. The Illinois Supreme Court held that the purported acceptance was insufficient to bind the seller because it did not exactly match the terms of the proposed agreement. *Id.* at 589, 121 N.E.2d at 789; *see also Finnin*, 366 Ill. App. 3d at 549, 852 N.E.2d at 449 (rejecting a purchaser's argument that "non-substantive, typographical modifications" to a proposed agreement for the sale of stock constituted a binding acceptance of the seller's proposed agreement despite the fact that it found that the seller had orally agreed to the changes).

In this case, plaintiff admits that Nomanbhoy did not initial and sign the June 18 a.m. Proposal as required. Rather, Nomanbhoy immediately rejected the proposal and made counteroffers regarding the scope of the restrictive covenant (Nomanbhoy Aff. ¶¶ 8, 9) and the price provided in the June 18 a.m. Proposal. (Nomanbhoy Aff. ¶¶ 9-11, 13-15; *see also* plaintiff's FAC ¶ 13: "[t]he parties had continued to negotiate after [the June 18 a.m. Proposal] was sent, including over price."). Plaintiff's suggestion to change its terms constituted a rejection of that proposal. *Whitelaw*, 3 Ill. 2d at 589, 121 N.E.2d at 789; *Finnin*, 366 Ill. App. 3d at 549, 852 N.E.2d at 449. Once Nomanbhoy rejected the June 18 a.m. Proposal, he could not later choose to accept it. *D'Agostino*, 205 Ill. App. 3d at 902, 563 N.E.2d at 889.

**B.    Plaintiff's Purported Agreement To Certain Terms Does Not Create A Contract.**

After Nomanbhoy's initial rejection of the June 18 a.m. Proposal, Nomanbhoy continued to make counteroffers with different terms. (Nomanbhoy Aff. ¶¶ 9-11, 13-17.) Even if Nomanbhoy agreed to certain terms, such as price, this is not a contract because the parties contemplated that *all* of the terms of the agreement, not just the price, would be agreed and then reduced to writing and subsequently executed by the parties. *See Pft. Roberson, Inc. v. Volvo Truck N.A.*, 420 F.3d 728, 731-33 (7th Cir. 2005) (applying Illinois law). In Illinois, "[w]hen negotiators say that agreement is subject to a more definitive document, Illinois treats this as demonstrating intent not to be bound until that document has been prepared and signed." *Id.* at 731; *see also Interway, Inc. v. Alagna*, 85 Ill. App. 3d 1094, 1100-01, 407 N.E.2d 615, 620-21 (1st Dist. 1980) (affirming dismissal of plaintiff's claim for specific performance, injunction and breach of an asset purchase contract, where the letter of intent alleged to form the agreement stated that the parties were in agreement "subject to" a complete written contract); *Brunette v. Vulcan Materials Co.*, 119 Ill. App. 2d 390, 395, 256 N.E.2d 44, 46 (1st Dist. 1970) (denying plaintiff specific performance of a land sale contract where "[t]he correspondence [between the parties] contain[ed] repeated references to the preparation of a formal contract setting forth the terms of the conveyance.").

In this case, the parties contemplated that a revised contract would be submitted for review and execution. (*See* Nomanbhoy Aff. Exs. F, I, and J; *see also* Ex. 1, Meyer Aff. ¶¶ 22, 26, 28-29, Ex. 2, Neumann Aff. ¶¶ 23-25, and Ex. 3, Lauter Aff. ¶ 23, 28, 32-34.)

**C.    Even If The June 18 a.m. Proposal Was Re-Offered To Plaintiff In Its Entirety On The Evening Of June 18, Plaintiff Again Rejected It And Made A Counteroffer.**

According to Nomanbhoy's affidavit, sometime after 6:02 p.m. PT/8:02 CST, he and Lauter had a conversation during which the idea of a revised contract was scuttled and Lauter allegedly suggested "that we use the [June 18 a.m. Proposal] in the form sent by Neumann that morning." (Nomanbhoy Aff. ¶ 16.) Plaintiff suggests that this alleged conversation revived the June 18 a.m. Proposal and left it open for Nomanbhoy to accept.

Even assuming as true Nomanbhoy's allegation that Lauter made such a representation and intended to revive the June 18 a.m. Proposal, [3] or that Lauter had the authority to make such a statement, both of which are not true and contradicted by the evidence, Nomanbhoy's affidavit

---

[3] This alleged oral statement is expressly denied by Lauter (Ex. 3, Lauter Aff. ¶ 33) and belied by the evidence, including the parties' conduct both before and after this conversation allegedly took place. (Ex. 1, Meyer Aff. ¶¶ 22, 26, 28-29; Ex. 2, Neumann Aff. ¶¶ 23-25; Ex. 3, Lauter Aff. ¶ 23, 28, 32-34.)

reveals that he again rejected that offer and made a counter-offer. (*See* Nomanbhoy Aff. ¶¶ 16-17.) Nomanbhoy did not accept the terms of any revived June 18 a.m. Proposal in their entirety, as required for a valid acceptance. *See Whitelaw*, 3 Ill. 2d at 589, 121 N.E.2d at 789; *Finnin*, 366 Ill. App. 3d at 549, 852 N.E.2d at 449. Rather, he admits that, among other things, he demanded "clarification from McDonald's that RLA would be the escrow agent", as the alleged contract Nomanbhoy now seeks to enforce provides that Chicago Title Insurance Company would serve as the escrow agent. (Nomanbhoy Aff. ¶ 17; Aff. Ex. A, ¶ 5.) As further confirmation that Nomanbhoy's alleged acceptance of Lauter's alleged revival was not unequivocal, even as he communicated to Neumann, Meyer and Lauter at 7:17 p.m. PT/9:17 p.m. CST that "[t]he contract is acceptable" (whichever "contract" that may be), Nomanbhoy demanded a representation from Mary Meyer on McDonald's letterhead as to "which escrow agent will be used." (Nomanbhoy Aff. Ex. L.) Accordingly, Nomanbhoy's alleged "acceptance" was actually a counteroffer, which McDonald's never accepted and authorized after the alleged terms were agreed, and no contract was formed.

**D.     The Alleged June 19 Telephone Conversation Between Nomanbhoy And Lauter Did Not Create A Contract.**

For the same reasons, Nomanbhoy's alleged conversation with Lauter the morning of the June 19 did not create a binding contract, even if taken as true. Nomanbhoy alleges that he called Lauter the morning of the June 19 "to ensure that there were no changes from the way things were as of the prior evening," and that Lauter told him: "No, no, we are OK with the contract, and we are just waiting for the earnest money **with the contract**." (Nomanbhoy Aff. ¶ 21.) (emphasis added.)[4] Even if Nomanbhoy's self-serving allegation were accurate, which it is not, it confirms that McDonald's did not intend to be bound by any agreement until Nomanbhoy *delivered* a signed, written contract as required by the plain terms of the alleged contract. (*Id.*) Nomanbhoy did not deliver *any* document – let alone the only document McDonald's authorized for plaintiff's consideration – until nearly four hours after the auction took place. (Nomanbhoy Aff. ¶ 23; *see also* Nomanbhoy Aff. Ex. O.) Specifically, it was not until 4:30 p.m. CST on June 19 that Neumann received for the first time the *June 18 a.m.* Proposal with Nomanbhoy's initials. (Ex. 2, Neumann Aff. ¶ 32; Ex. 17.)

---

[4]  Lauter denies that he made any of the statements attributed to him in this paragraph. (Ex. 3, Lauter Aff. ¶ 43.)

In short, even if this Court were to accept as true the entire sequence of events as alleged by plaintiff, which is contradicted by the evidence and affidavits, plaintiff has failed to meet its burden.

## II.    PLAINTIFF'S CLAIMS ARE BARRED BY THE STATUTE OF FRAUDS.

Even if plaintiff could demonstrate that a binding offer was accepted on all terms, as opposed to there being a series of counteroffers with no acceptance, plaintiff's claims still fail because there is no written agreement sufficient to satisfy the Illinois Statute of Frauds.

### A.    McDonald's Did Not Sign An Agreement After The Parties Allegedly Reached One.

The Illinois Statute of Frauds provides:

> No action shall be brought to charge any person upon any contract for the sale of lands . . . unless such contract or some memorandum or note thereof shall be in writing, ***and signed by the party to be charged therewith***, or some other person thereunto by him lawfully authorized in writing, signed by such party....

740 ILCS 80/2 (emphasis added).  Thus, to satisfy the Illinois Statute of Frauds, the note or memorandum at issue must be signed by the party charged with the agreement *after* the parties have come to an agreement on all of the essential terms. *Whitelaw*, 3 Ill. 2d at 591.  A party executing a prior, rejected version of the agreement, for example, cannot be bound to the final contract unless the party, or its duly authorized agent, signs the final contract. *Midwest Mfg. Holding, LLC v. Donnelly Corp.*, 1998 WL 59500 at *4 (N.D. Ill. Feb 6, 1998) (Ex. 22); *D'Agostino*, 205 Ill. App. 3d at 903, 563 N.E.2d at 762.

Because plaintiff admits that it rejected the June 18 a.m. Proposal, and the terms of the alleged contract were thereafter changed, plaintiff must show that a final contract was executed after the parties allegedly came to terms.  Plaintiff has not and cannot do so.  Bruce Neumann's signature on the version of the contract attached as Exhibit A to plaintiff's FAC and Nomanbhoy's affidavit was provided before plaintiff rejected the terms of that proposal, as admitted by plaintiff. (*See* Nomanbhoy Aff. ¶¶ 9-11, 13-17; *see also* plaintiff's FAC ¶ 13:  "The parties had continued to negotiate after [the June 18 a.m. Proposal] was sent, including over price.").  As such, under well-settled law, that signature cannot serve to bind McDonald's.  Lauter, the individual that plaintiff alleges re-offered the June 18 a.m. Proposal, never signed the contract either.  (Ex. 3, Lauter Aff. ¶ 19.)  Thus, even if Lauter were authorized to "sign" for McDonald's – as required by the Illinois Statute of Frauds – he never did.

11

**B.     The E-mail Communications Do Not Satisfy The Statute Of Frauds.**

Without identifying the specific communications at issue, plaintiff suggests that the Court should consider "multiple documents" in conjunction with Exhibit A, on the theory that more than one document, when read together, can amount to a binding contract.  (*See* Pl. Mem. at 5.) This argument fails.

Under Illinois law, in order for multiple documents to form a binding agreement sufficient to satisfy the Statute of Frauds, "each writing must refer expressly to the other writing, or the several writings must be so connected, either physically or otherwise, as to show by internal evidence that they relate to the same contract."  *Prodromos v. Poulos*, 202 Ill. App. 3d 1024, 1029, 560 N.E.2d 942, 946 (1st Dist. 1990); *see also Chapman v. Freeport Sec. Co.*, 174 Ill. App. 3d 847, 854-55, 529 N.E.2d 6, 10-11 (2nd Dist. 1988) (rejecting plaintiff's argument that meetings of a corporation's board that referred to "the contract authorized by the Board of Directors at the Board Meeting held in January of 1981" was sufficiently specific to form a binding agreement when read in conjunction with the referenced minutes).  The "writings" presented by plaintiff do not satisfy this threshold requirement.

In this case, like in *Chapman*, the e-mails upon which plaintiff relies refer only to "the contract."  In an e-mail at 5:45 p.m. CST by Lauter, for example, he writes that "If [plaintiff] will pay 1.4 MIL [McDonald's] will sign *the contract* as agreed."  (Ex. 11; *see also* Nomanbhoy Aff. Ex. I.) (emphasis added).  When Meyer writes to confirm the escrow agent, she notes that Nomanbhoy must send "the wire and contract" early the next morning.  (Ex. 11; *see also* Nomanbhoy Aff. Ex. K.)  Because it is not clear from the face of these e-mails that they refer to the June 18 a.m. Proposal or a different "contract", they cannot be read as part of that alleged agreement.

In sum, the very purpose of the Statute of Frauds is to avoid the uncertainty associated with self-serving, after-the-fact statements like those advanced by plaintiff.  *See McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 489, 680 N.E.2d 1347, 1351 (1997) (noting that the Statute of Frauds exists "to protect not just the parties to a contract, but also . . . to protect the fact finder from charlatans, perjurers and the problems of proof accompanying oral contracts."); *Do It Best Corp. v. Passport Software, Inc.*, 2005 WL 743083 at *10-11 (N.D. Ill. Mar. 31, 2005) (same) (holding that multiple letters advanced by plaintiff were not sufficient to form a binding contract for purposes of the Statute of Frauds).  (Ex. 23.)  Here, no final agreement was executed after the e-mail negotiations to which plaintiff refers, and plaintiff cannot rely upon the e-mails as a substitute.

**III.    BY THE PLAIN TERMS OF THE ALLEGED CONTRACT, PLAINTIFF FAILED TO PERFORM HIS OBLIGATIONS UNDER THE ALLEGED CONTRACT, WHICH EXCUSES ANY FURTHER PERFORMANCE.**

Nomanbhoy's Affidavit makes clear that plaintiff did not comply with all essential terms set forth in Nomanbhoy Exhibit A.  As previously set forth, paragraph 14 of the June 18 a.m. Proposal, which plaintiff is indicating he later "accepted" and attached as Exhibit A, states, in relevant part: "Purchaser's execution <u>and</u> delivery of this Contract <u>is an irrevocable offer</u> to purchase and <u>shall not be binding upon Seller until executed by Seller or Seller's duly authorized agent.  Purchaser agrees that this offer shall remain irrevocable until 5:00 p.m. Chicago time on Wednesday, June 18.</u>"

Thus, by the terms of the alleged contract plaintiff seeks to enforce, there was only one manner in which an irrevocable offer could be made, *i.e.*, execution <u>and</u> delivery by plaintiff on or before 5:00 p.m. Chicago time on Wednesday, June 18, 2008, and this did not occur.  (Nomanbhoy Aff. ¶ 23; Ex. 2, Neumann Aff. ¶ 17; Ex. 17.)

**IV.    PLAINTIFF CANNOT ESTABLISH THE REMAINING REQUIREMENTS FOR A PRELIMINARY INJUNCTION.**

**A.    The Balance Of Harms Favors McDonald's.**

The less likely plaintiff's success on the merits, the greater the balance of harms must weigh in plaintiff's favor.  *Ichiyasu v. Christie, Manson & Woods Int'l, Inc.*, 630 F. Supp. 340, 343 (N.D. Ill. 1986).  Because McDonald's has demonstrated that plaintiff has no likelihood of success on the merits, this factor tips in McDonald's favor.

In addition, plaintiff's conclusory position that injunctive relief is a mere "inconvenience" to McDonald's is without merit and does not meet plaintiff's burden.  McDonald's is a worldwide company with a business reputation that is critical to its success.  (Ex. 2, Neumann Aff. ¶ 7.) McDonald's has established procedures by which it conducts its business.  (*Id.* at ¶ 9.) McDonald's enters into and negotiates countless contracts on an annual basis which involve the sale or purchase of real estate.  Accordingly, the contracts McDonald's uses require precise terms and an orderly process.  (*Id.*)  In this case, the parties used a form document that had explicit requirements in terms of how a purchaser makes an offer, how and when acceptance occurs, the precise timing of events, and, importantly, in what specific circumstances an offer and acceptance become binding on McDonald's.  (*Id.*; *see also* Exs. 4, 5, 6, 7 and 18 at ¶ 14.)

13

Plaintiff's request for injunctive relief disrupts the entire process upon which McDonald's endeavors to proceed so that McDonald's enters into only binding legal agreements with confidence and certainty. Plaintiff's improper lawsuit has forced McDonald's to approach five good faith purchasers at auction and advise them that the parcels they purchased are now subject to litigation and prevented five closing from occurring on their originally scheduled dates. (*Id.* at ¶¶ 8, 10.) Plaintiff has failed to establish that the balance of harms favors plaintiff.

## B.     Plaintiff Has An Adequate Remedy At Law.

Plaintiff's conclusory argument that it lacks an adequate legal remedy rings hollow. Plaintiff recorded *lis pendens* notices for each of the five properties. (Pl. Mem. at 6.) Notwithstanding the fact that plaintiff has availed itself of this statutory remedy, plaintiff inexplicably complains that "there is no adequate remedy at law at this time." (Pl. Mem. at 7.) Plaintiff's contention ignores well-settled Illinois law.

It is fundamental that injunctive relief is not available when there is an adequate remedy at law. *Oxequip Health Industs., Inc. v. Canalmar, Inc.*, 94 Ill. App. 3d 955, 958 (1st Dist. 1981); *Schwartz v. Coldwell Banker Title Servs., Inc.*, 178 Ill. App. 3d 971, 975 (2d Dist. 1989) ("If there is an adequate legal . . . remedy which will make plaintiffs whole after trial, a preliminary injunction should not issue."). This rule also applies when the legal remedy is statutory, such as filing a *lis pendens*. *Oxequip,* 94 Ill. App. 3d at 958. The *lis pendens* doctrine places subsequent purchasers of property on notice that the purchased property is the subject of litigation and that the purchaser takes subject to the outcome of the litigation. *Bighorn Capital Inc. v. 1000 SMA, LLC*, No. 05 C 5364, 2005 U.S. Dist. LEXIS 27862, at *7 (N.D. Ill. Nov. 9, 2005). (Ex. 24.) While *lis pendens* is not an injunction, one who obtains an interest in property during the pendency of a suit affecting it is nevertheless bound to the result of that litigation as if he had been a party from the outset. *First Midwest, A Div. of Jacksonville Sav. Bank v. Pogge*, 293 Ill. App. 3d 359, 363 (4th Dist. 1997). As such, "[u]se of *lis pendens* can fully protect [a] plaintiff without any need for seeking equivalent protection through equitable relief" and a preliminary injunction is inappropriate. *Schwartz*, 178 Ill. App. 3d at 976.

In the event title to the five parcels transfers to third-party purchasers, plaintiff could, if successful in this lawsuit, thereafter obtain title from the third party purchasers. *See Oxequip*, 94 Ill. App. 3d at 958. Because an adequate remedy at law exists and plaintiff already has invoked it, plaintiff's motion for injunctive relief should be denied. *Schwartz*, 178 Ill. App. 3d at 975.

### C.    Plaintiff Cannot Establish Irreparable Harm.

Plaintiff's assertion that it will suffer irreparable harm similarly has no merit.  Irreparable harm is defined as "harm that cannot be fully rectified by final judgment after trial."  *Ichiyasu*, 630 F. Supp. at 342.  As set forth above, plaintiff could obtain title from the third party purchasers in the event title to the five parcels transfers to these or other third-party purchasers if plaintiff establishes its entitlement to that remedy.  *See Oxequip*, 94 Ill. App. 3d at 958.  Plaintiff has not sustained its substantial burden of showing irreparable harm.

### D.    A Sufficient Bond Must Issue If This Court Grants A Preliminary Injunction.

Federal Rule 65(c), which governs damages on an injunction bond, requires a bond or equivalent security in order to ensure that a plaintiff is able to pay the damages that a defendant incurs as a result of a wrongfully issued injunction.  *Coyne-Delaney Co., Inc. v. Capital Dev. Bd.*, 717 F.2d 385, 391 (7th Cir. 1983).  Plaintiff's allegations indicate it has plans for the five parcels, "reasonably calculated the profits to be between $5 - $10 million," and seeks damages in an amount "not less than $5 million."  (FAC ¶ 38.)  The good faith purchasers at auction of the five parcels likely have a similar expectation of profits.  Accordingly, by plaintiff's own allegations, in the event this Court enters further injunctive relief, which it should not, the only appropriate bond amount in this case is $10 million.  *Coyne-Delaney*, 717 F.2d at 393-94 (because the bond is a limit of defendant's potential damages, it is better to set the bond too high than too low).

### <u>CONCLUSION</u>

For the foregoing reasons, McDonald's respectfully requests that this Court deny plaintiff's motion for a preliminary injunction and grant all further relief proper in the circumstances.


August 11, 2008                              McDONALD'S CORPORATION and
                                             McDONALD'S USA, LLC

                                             By:    s/ Karina H. DeHayes
                                                    One of Their Attorneys

Karina H. DeHayes
Brian C. Haussmann
TABET DIVITO & ROTHSTEIN LLC
209 S. LaSalle St., 7th Floor
Chicago, IL  60604
Tel:  (312) 762-9450

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NOMANBHOY FAMILY LIMITED PARTNERSHIP, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 08 CV 3787 |
| v. | ) ) | Hon. Joan B. Gottschall Mag. Judge Jeffrey Cole |
| McDONALD's CORPORATION, McDONALD's USA, LLC, RICK LEVIN & ASSOCIATES, INC., and RICK LEVIN, | ) ) ) ) | |
| Defendants. | ) | |

## AFFIDAVIT OF MARY G. MEYER

I, Mary G. Meyer, having been first duly sworn under oath, state as follows:

1.      I am a resident of the State of Illinois and am over eighteen (18) years of age.  I make this affidavit based on my own personal knowledge and, if called upon to do so, could testify competently to the matters described herein.

2.      I make this affidavit on behalf of McDonald's Corporation and McDonald's USA, LLC (collectively, "McDonald's") and in support of McDonald's Opposition to Plaintiff's Motion for a Preliminary Injunction ("McDonald's Opposition," or "Opp.").

3.      I currently hold the position of Regional Real Estate Manager for the Greater Chicago Region at McDonald's USA, LLC.  I have held that position for approximately seven (7) months.

4.      I was one of the persons involved, on McDonald's behalf, in the negotiations with plaintiff Nomanbhoy Family Limited Partnership ("plaintiff") and its representative, Shabbir T.

Nomanbhoy ("Nomanbhoy") regarding the sale of the five parcels of real estate referenced in this litigation. Those five parcels are located at the following addresses: 5057 Wentworth, Chicago, Illinois; 10245 Roosevelt Road, Westchester, Illinois; 130 South Virginia Street, Crystal Lake, Illinois; 6574 North 76th Street, Milwaukee, Wisconsin; and 5377 Broadway, Merrillville, Indiana (collectively "the five parcels"). Additionally, I attended the auction of the five parcels that took place on June 19, 2008, at or around 1:00 p.m. CST.

5.      As part of my duties as Regional Real Estate Manager for the Greater Chicago Region at McDonald's USA, LLC, I consult our Senior Counsel, Bruce Neumann, and others on making offers, counteroffers, draft contracts and other documents related to McDonald's attempts to buy and sell real estate parcels. I also consult with counsel and others on the acceptable business terms for such real estate sales.

### McDonald's Presence in the Marketplace

6.      McDonald's is a Fortune 500 company and an entity well-known not just to businesses around the world but to the general public throughout the world. McDonald's USA, LLC is a wholly-owned subsidiary of McDonald's Corporation. McDonald's enters into and negotiates countless contracts on an annual basis which involve the sale or purchase of real estate. McDonald's is conscious of its reputation in the public domain.

7.      Due to McDonald's presence in many locations in the marketplace, restrictive covenants which protect McDonald's against any and all direct and indirect competitors is a key provision in its real estate contracts and often is a more important provision than selling price. McDonald's standard restrictive covenant prevents the use of a parcel for twenty (20) years as the location of any restaurant. Any change in McDonald's standard restrictive covenant must be

expressly approved by my superiors at McDonald's. Neither Bruce Neumann nor I have the authority to make such a change alone. Attempts to severely limit McDonald's standard restrictive covenant often result in McDonald's not proceeding with the transaction.

## McDonald's Decides to Sell the Five Real Estate Parcels

8.    McDonald's decided to sell the five parcels through a real estate auction on June 19, 2008, at 1:00 p.m. In that regard, it hired Rick Levin & Associates, Inc. ("RLA") to serve as its auctioneer.

9.    Consistent with prior negotiations in which I had been involved on McDonald's behalf, the parties in this case exchanged various form documents and made various changes to the terms of the form documents. Unlike prior negotiations in which I had been involved on McDonald's behalf, Nomanbhoy, on behalf of the plaintiff, attempted to create a fully executed contract after-the-fact for the sale of five parcels of real estate owned by McDonald's when no final agreement was reached. This case involves various proposals, offers and counteroffers that were never accepted.

## Plaintiff's First Written Offer For $2 Million

10.    On or about June 12, 2008, I received a copy of plaintiff's first written offer to purchase the five parcels. (Opp. Exhibit 4.) The offer contained a number of terms, but among them was that the buyer would pay $2 million if the parcels were sold with no restrictive covenant. McDonald's would not agree to sell the parcels without a restrictive covenant, even at the price of $2 million. McDonald's did not accept or execute that written offer.

3

## Plaintiff's Second Written Offer For $1.4 Million

11.    On or about June 16, 2008, I received a copy of plaintiff's second written offer to purchase the five parcels (plaintiff's "Second Written Offer."). Plaintiff's Second Written offer was entitled "Real Estate Sales Contract – Version 1 with Exhibit A & B-1." (Opp. Exhibit 5.) McDonald's did not accept or execute that written offer.

## Plaintiff's Third Written Offer For $1.4 Million

12.    On or about June 17, 2008, I received a copy of plaintiff's third written offer to purchase the five parcels (plaintiff's "Third Written Offer."). Plaintiff's Third Written Offer was entitled "Real Estate Sales Contract – Version 2 with Exhibit A & B-2." (Opp. Exhibit 6.) McDonald's did not accept or execute that written offer.

13.    On June 17, 2008, I instructed Katie Dunworth, a Real Estate Coordinator for the Greater Chicago Region at McDonald's USA, LLC, to type up the language of a proposed restrictive covenant. I sent this proposed language to my superiors for their approval.

14.    On the afternoon of June 17, 2008, I participated in a telephone conference with Nomanbhoy and Ira Lauter ("Lauter") of RLA. We discussed a number of terms of the contract, including the price, the restrictive covenant, amount of the earnest money deposit, the closing date, and a penalty provision that Nomanbhoy requested. In that conversation, Nomanbhoy, Lauter and I each agreed that McDonald's would send an updated document the following morning, on June 18, 2008. Nomanbhoy, Lauter and I agreed and understood that the updated document would be a counter-offer to plaintiff's Third Written Offer, and that no final agreement had been reached.

## The June 18 a.m. Proposal and Rejection by Plaintiff

15.     On June 18, 2008, at 9:47 a.m. CST/7:47 a.m. PT, Bruce Neumann of McDonald's e-mailed a document to Lauter in response to plaintiff's Third Written Offer that was entitled "Real Estate Sales Contract – Version 2 with Exhibit A & B-2" (the "June 18 a.m. Proposal"). (Opp. Exhibit 7.) Nomanbhoy and I were carbon copy recipients of that e-mail. I received a copy of that e-mail at or about the time it was sent.

16.     The June 18 a.m. Proposal contained the restrictive covenant which had been approved by my superiors at McDonald's.

17.     At 11:38 a.m. CST/9:38 a.m. PT, I received as a carbon copy recipient an e-mail from Nomanbhoy sent to Lauter in response to the June 18 a.m. Proposal.  In that e-mail Nomanbhoy indicated "there are too many changes to contract language that was previously agreed" and that he wanted to "arrive[e] at language that is mutually acceptable." Nomanbhoy proposed to fly out to Chicago in order to reach an agreement and asked "McDonalds [to] have all the right decision makers in the room." (Opp. Exhibit 8.)

## Additional Counteroffers as to Terms are Proposed

18.     Throughout the afternoon and evening hours of June 18, 2008, plaintiff and McDonald's continued to negotiate numerous terms for the sale of the five parcels, including the price and the scope of the restrictive covenant.  Plaintiff and McDonald's did not reach a final agreement.

19.     At various times that afternoon, for example, plaintiff offered to pay $1 million, $1.125 million, $1.2 million, and later $1.4 million for the five parcels. (*See* Opp. Exhibit 9.)

Plaintiff conditioned each offer upon the acceptance by McDonald's of various additional conditions and terms, including changes in the scope of the restrictive covenant.

20.    After rejecting the June 18 a.m. Proposal, plaintiff requested that the scope of the restrictive covenant in the June 18 a.m. Proposal be narrowed.  That covenant provided that: "For a period of 20 years from the date of the deed, the Property may not be used for and Purchaser and any successor will not lease/sell to any tenant/buyer whose primary purpose is the sale of hamburgers, chicken and/or coffee . . . ."  (Opp. Exhibit 7, Ex. B.)

21.    As a result, on or before noon CST on June 18, Neumann and I authorized Lauter to communicate to the seller a proposed modification, as follows:  "For a period of 20 years from the date of the deed, the Property may not be used for and Purchaser will not lease/sell to any regional and/or national restaurant chain or user whose primary purpose is the sale of hamburgers, chicken and/or coffee. . . ." (*See* Opp. Exhibit 9.)

22.    On the evening of June 18, 2008, at approximately 5 p.m. CST, I participated in a telephone conference with Nomanbhoy, Neumann and Lauter.  In that telephone conference, Nomanbhoy suggested that Lauter fly to San Francisco that evening to pick up the earnest money from Nomanbhoy.  Neumann and I both responded that it did not make sense for Lauter to fly to San Francisco because the parties still were not in agreement on the essential terms of the contract, and McDonald's still did not have a final written contract that was executed by Nomanbhoy.  Neumann told Nomanbhoy that he would send Nomanbhoy an amended document that Nomanbhoy would need to sign and return to McDonald's.  Neumann stated unequivocally that, if McDonald's did not receive the revised document, as amended by Neumann and executed by Nomanbhoy, before the auction took place, McDonald's would go forward with the auction

and that it would not sell the five parcels to plaintiff. Nomanbhoy indicated that he fully understood that a final document would need to be executed.

23.    Shortly after this conversation, I spoke with my supervisor about selling the five parcels for $1.2 million. He told me that I was not authorized to sell the parcels for less than $1.4 million. I immediately communicated this fact to Lauter, who communicated this via e-mail to Nomanbhoy at 5:36 p.m. CST. (Opp. Exhibit 10.)

24.    At 8:02 p.m. CST/4602 p.m. PT, Nomanbhoy sent Lauter an e-mail agreeing to the price term of $1.4 million and asking that Lauter "Please revise contract for interest rate, escrow agent, survey, and dates." Nomanbhoy also asked for a letter from me or Neumann indicating that RLA would act as the escrow agent and could receive the earnest money. (Opp. Exhibit 11.)

25.    Shortly thereafter, I spoke to Lauter on the telephone. He called me on my cell phone just as I was arriving home. He called to relay the information in Nomanbhoy's 8:02 p.m. CST/6:02 p.m. PT e-mail. Namely, he told me that Nomanbhoy would pay $1.4 million dollars but that he needed a revised contract and a letter from me confirming that RLA would act as the escrow agent. I agreed to send a letter to Lauter.

26.    That evening, between approximately 8:00 and 9:00 p.m. CST, I again spoke to Lauter on the telephone, this time with Nomanbhoy also on telephone. In that conversation, I told Nomanbhoy that Neumann would revise the document and send it to Nomanbhoy early the following morning. Nomanbhoy agreed that he would immediately sign, initial and return the document sent to him on the morning of June 19, and that he would wire the earnest money as soon as possible that morning. I explicitly told Nomanbhoy that the auction would go forward if

7

he did not return the document Neumann would send him in the morning or if RLA did not receive the earnest money in the morning. Nomanbhoy indicated that he understood and that he would send the signed document and earnest money in the morning.

27.    At 8:46 p.m. CST Lauter forwarded me Nomanbhoy's 8:02 p.m. CST/6:02 p.m. PT e-mail, in which Nomanbhoy agreed to the price term of $1.4 million and asked for a letter identifying RLA as the escrow agent. Lauter indicated in that e-mail that I should send the letter confirming RLA's status as escrow agent to Nomanbhoy as well as Lauter. (Opp. Exhibit 11.)

28.    At 8:59 p.m. CST/6:59 p.m. PT I sent Nomanbhoy and Lauter a letter confirming that RLA would act as the escrow agent for the sale of the five parcels. In my cover e-mail, I again confirmed, consistent with our earlier conversation, that McDonald's would "need the wire and contract very early tomorrow, or will have to go forward with the Auction." (Opp. Exhibit 11.) "The contract" that I was referring to was the revised contract that all parties understood Neumann would send, and plaintiff would sign, the following morning. After sending the letter, I shut down my computer and did not check my e-mails again until the following day.

29.    After plaintiff rejected the June 18 a.m. Proposal on the morning of June 18, the parties never contemplated that the June 18 a.m. Proposal that plaintiff had already rejected would form the agreement, or that it would be binding on McDonald's (or for that matter Nomanbhoy). Indeed, the rejected June 18 a.m. Proposal was not discussed in any of the conversations in which I took part, and none of the e-mails that were exchanged referenced the rejected June 18 a.m. proposal. Rather, the parties consistently understood that Neumann would revise a document and that the parties would execute that revised document on the morning of June 19, 2008.

### McDonald's Sends the June 19 a.m. Proposal
### Consistent With Its Discussions With Nomanbhoy

30.     On the morning of June 19, 2008, at approximately 9:09 a.m. CST/ 7:09 a.m. PT, Neumann sent to Nomanbhoy a revised written proposal for execution setting forth the counteroffer and terms discussed the prior evening on June 18, 2008 (the "June 19 a.m. Proposal"). I was a carbon copy recipient of that e-mail. In Neumann's cover e-mail, he indicated that the purchase price was $1.4 million, and the seller's penalty if no closing occurred was 2% per month of the earnest money, and that McDonald's would provide to plaintiff the surveys. It also stated:

> If we do not have the earnest money prior to the auction (or if the auction otherwise occurs), the contract is null and void. (I have inserted this language to make [it] clear that we must have the $ prior to the auction and if the $ comes in so late such that we do not know that the $ has arrived and the [auction] occurs, the contract is void.) I can not be in a situation where I have sold a site to two parties.
>
> Shabbir:
> Please initial on each page next to each of my (BAN) initials (including the bottom corner of each page), send the contract back to us wire the earnest money and inform us of the confirmation number. Thanks Bruce.

(Opp. Exhibit 12.)

31.     The June 19 a.m. Proposal also indicated that the escrow agent was Rick Levin & Associates, Inc. In addition, Neumann modified the language in paragraph 14 to state that "Purchaser agrees that this offer shall remain irrevocable until 2:00 p.m. Chicago time on Thursday, June 19th, 2008." He also added a provision stating: "In the event Seller has not received the Earnest Money before the commencement of the auction of the Properties on June 19, 2008, or if the auction otherwise occurs, this Contract shall be null and void and of no further force or effect." (Opp. Exhibit 12.)

32.     Nomanbhoy refused to sign the document Neumann sent to him on June 19, 2008. Nomanbhoy instead proposed new terms to that document. (*See* Opp. Exhibit 15.)  As an alternative, Nomanbhoy proposed in a conversation with Lauter that the parties utilize the June 18 a.m. Proposal. (*Id.*)  This was the first time that the June 18 a.m. Proposal had been discussed since Nomanbhoy rejected it the morning of June 18.

33.     On June 19, 2008, at 11:30 a.m. CST/9:30 a.m. PT, Neumann e-mailed Nomanbhoy stating:

> "Ira expressed your desire to revise paragraph 14 of the contract and alternatively that you were "accepting" the contract from yesterday…**The only offer/contract open to you for acceptance is the offer/contract set fort[h] below and previously forwarded to you this morning.  All prior offers/contracts have been rejected and are not valid.**

(Opp. Exhibit 14.) (emphasis in original).

I was a carbon copy recipient of this e-mail.

34.     That morning, I traveled to the site of the auction to meet with Ira Lauter.  At approximately noon, Ira and I had lunch together.  At that time, we still had not received either a signed document from Nomanbhoy or the earnest money that he had promised.  As such, Lauter called Nomanbhoy to ask about the document and earnest money.  During that call, I overheard Ira pleading with Nomanbhoy to send a signed document and confirm that the money had been wired before the start of the auction.  I also heard Lauter indicate to Nomanbhoy that Nomanbhoy should be able to send a signed document via facsimile, as it appeared Nomanbhoy was still at his home as evidenced from the sound of a barking dog.  Accordingly, at 12:04 p.m. CST, Lauter e-mailed Nomanbhoy: "Shabbir—as of 12:05 we have not received the contract or wire. Please advise. Thank you, Ira." (Opp. Exhibit 15.)

10

35.    After Lauter spoke with Nomanbhoy and hung up the cellular telephone, Lauter indicated to me that the reason he stated to Nomanbhoy that nothing prevented him from sending a signed document via facsimile was because Nomanbhoy allegedly protested that he was not in a location from where he could send to McDonald's a signed document.  Nomanbhoy told Lauter that he had to take someone to the airport and that he could not send the document at that time. Nomanbhoy suggested that he had already left for the airport, but Lauter informed me he could hear a dog barking in the background and believed Nomanbhoy to be at home.

36.    At 12:52 p.m., eight minutes before the auction was scheduled to take place, Lauter again e-mailed Nomanbhoy that we had not received the document.   Lauter asked Nomanbhoy to "Please send the contract to all parties on this e-mail ASAP." (Opp. Exhibit 16.) I was a carbon copy recipient of that e-mail.  We never received back from plaintiff a copy of the June 19 a.m. Proposal.

37.    Accordingly, at or around 1:00 p.m. CST, McDonald's and RLA were forced to proceed with the auction.   The auction drew bids on each of the five parcels, but only at a combined sale price of approximately $1.26 million.

38.    On June 19, 2008, at 4:30 p.m. CST/2:30 p.m. PT, almost four hours after the auction had commenced, I received, as a carbon copy recipient, an e-mail from Nomanbhoy to Neumann which attached a copy of the *June 18 a.m. Proposal* that Nomanbhoy previously rejected on June 18, and that now contained Nomanbhoy's initials on the bottom right corner. Nomanbhoy's cover e-mail stated, in part:

> This contract is the one executed by Bruce yesterday, and which I had informed you yesterday I was accepting…The contract changes you faxed me this morning are all fine, except the changes at the bottom of item 14…I am willing to accept

the other changes to the contract if you will be so kind as to delete this clause and resend me the contract.

(Opp. Exhibit 17.)

39.    Thus, almost four hours after the auction was scheduled to start, and which already proceeded as Nomanbhoy was aware, Nomanbhoy still was trying to reach an agreement with McDonald's.

40.    In response, on June 19, 2008, at 5:53 p.m. CST, I received as a carbon copy recipient an e-mail Neumann sent to Nomanbhoy that set forth the numerous times plaintiff had rejected offers and proposed counteroffers that were not accepted. Neumann also stated, "I have communicated your current offer (proposing yesterday's rejected offer back to us) [i.e., the June 18 a.m. Proposal] to the proper parties. Your offer has not been accepted. (Opp. Exhibit 18.)

41.    The next day, on June 20, 2008, at 3:15 p.m., I received, as a carbon copy recipient, an e-mail from Nomanbhoy. In that e-mail, he stated, in part:

> I will file an injunction so that you are unable to sell the properties in the meantime. You may want to think about the effects of a lawsuit that will tie up these properties for a long time, as well as the associated costs and time for McDonalds. You may also want to think about the negative publicity resulting from your trying to double sell these properties at auction.

(Opp. Exhibit 19.)

42.    No agreement was ever reached between plaintiff and McDonald's.

43.    Copies of the exhibits referenced in this affidavit are attached to McDonald's Opposition. To the best of my knowledge, information and belief, each such copy is a true and

accurate copy of the referenced document.  Referenced e–mails were sent or received at or about the time indicated in this affidavit and on the e-mails themselves.

FURTHER AFFIANT SAYETH NOT.

MARY G. MEYER

SUBSCRIBED AND SWORN TO
before me this 11 th day of August, 2008.

Notary Public

OFFICIAL SEAL
KATHERINE DUNWORTH
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/27/11

14

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NOMANBHOY FAMILY LIMITED PARTNERSHIP, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 08 CV 3787 |
| v. | ) ) | Hon. Joan B. Gottschall |
| McDONALD's CORPORATION, McDONALD's USA, LLC, RICK LEVIN & ASSOCIATES, INC., and RICK LEVIN, | ) ) ) ) ) | Mag. Judge Jeffrey Cole |
| Defendants. | ) ) | |

## AFFIDAVIT OF BRUCE NEUMANN

I, Bruce Neumann, having been first duly sworn under oath, state as follows:

1.      I am a resident of the State of Illinois and am over eighteen (18) years of age.  I make this affidavit based on my own personal knowledge and, if called upon to do so, could testify competently to the matters described herein.

2.      I make this affidavit on behalf of McDonald's Corporation and McDonald's USA, LLC (collectively, "McDonald's") and in support of McDonald's Opposition to Plaintiff's Motion for a Preliminary Injunction ("McDonald's Opposition" or "Opp.").

3.      I currently hold the position of Senior Counsel of McDonald's Corporation in the Central Division.  I have held that position for approximately Eight (8) years.

4.      I was one of the persons involved, on behalf of McDonald's, in negotiating and authorizing the negotiation of the terms acceptable to McDonald's regarding the sale of the five parcels of real estate referenced in this litigation.  Those five parcels are located at the following addresses: 5057 Wentworth, Chicago, Illinois; 10245 Roosevelt Road, Westchester, Illinois; 130 South Virginia Street, Crystal Lake, Illinois; 6574 North 76th Street, Milwaukee, Wisconsin; and 5377 Broadway, Merrillville, Indiana (collectively "the five parcels").

5.     As part of my duties as Senior Counsel for McDonald's, I prepare offers, counteroffers, draft contracts and other documents related to McDonald's attempts to buy and sell real estate parcels.  In that regard, and on numerous occasions, in order to propose terms or provisions related to offers, counteroffers or draft contracts that McDonald's receives or sends related to the sale of real estate, it is necessary for me to receive guidance or input from other McDonald's employees in order to determine acceptable business terms.

6.     Consistent with prior negotiations in which I had been involved on McDonald's behalf, the parties in this case exchanged various form documents and made various changes to the terms of the form documents.  Unlike prior negotiations in which I had been involved on McDonald's behalf, Nomanbhoy, on behalf of the plaintiff, attempted to manufacture a fully executed contract after-the-fact for the sale of five parcels of real estate owned by McDonald's when no final agreement was reached.  This case involves various proposals, offers and counteroffers that were never accepted and that never culminated in a meeting of the minds.

### McDonald's Presence in the Marketplace

7.     McDonald's is a Fortune 500 company and an entity well-known not just to businesses around the world but to the general public throughout the world.  McDonald's is conscious of its reputation in the public domain.

8.     In this case, plaintiff's lawsuit and misrepresentations of fact have forced me to approach five purchasers at auction and advise them that the parcels they purchased are now subject to litigation.  The litigation already has prevented five closings from going forward on their originally scheduled dates.  In order to close, the five purchasers of the parcels would need to be willing to take the properties subject to all title issues, including any valid *lis pendens*, and subject to this litigation.

2

9.    As a large, public corporation, McDonald's enters into and negotiates countless contracts on an annual basis which involve the sale or purchase of real estate. Accordingly, the contracts McDonald's uses require precise terms and an orderly process. In this case, a form contract was used that had explicit requirements in terms of how a purchaser makes an offer, how and when acceptance occurs, the precise timing of events, and, importantly, in what specific circumstances an offer and acceptance becomes binding on McDonald's.

10.    Plaintiff's request for injunctive relief disrupts the process upon which McDonald's endeavors to proceed, and which allows McDonald's to enter into only binding legal agreements with confidence and certainty.

11.    In addition, due to McDonald's presence in many locations in the marketplace, restrictive covenants which protect McDonald's against any and all direct and indirect competitors are a key provision in its real estate contracts and often can be a more important provision than the selling price. McDonald's standard restrictive covenant prevents the use of a parcel for twenty (20) years as the location of any restaurant. Any change in McDonald's standard restrictive covenant must be expressly approved by senior business executives at McDonald's. Neither Mary Meyer nor I have the authority to make such a change alone. Attempts to severely limit McDonald's standard restrictive covenant often result in McDonald's not proceeding with the transaction.

## McDonald's Decides to Sell the Five Real Estate Parcels

12.    McDonald's decided to sell the five parcels through a public real estate auction. In that regard, it hired Rick Levin & Associates, Inc. ("RLA") to serve as its auctioneer in or about April 2008.

13.    McDonald's hired RLA with the expectation that RLA or its agents would, through use of a competitive public auction or otherwise: (a) accept delivery of and present to us

3

any offers and counteroffers to buy the five parcels, and (b) assist us in communicating with prospective purchasers any offers or counteroffers and notification of issues related to them, until McDonald's signed an agreement reached between McDonald's and the prospective purchaser(s) and all contingencies were satisfied.  Ira Lauter of RLA was an individual who assisted McDonald's in this process.

## The June 18 a.m. Proposal and Rejection by Plaintiff

14.    Mary G. Meyer ("Meyer") is the Regional Real Estate Manager of McDonald's USA, LLC – Greater Chicago Region.  Meyer of McDonald's and Ira Lauter ("Lauter") of RLA were involved in the negotiations with plaintiff's representative, Shabbir T. Nomanbhoy ("Nomanbhoy"), that predated June 18, 2008.

15.    On June 17, 2008, Lauter forwarded to me a copy of a document entitled "Real Estate Sales Contract, Version 2 with Exhibits A & B-2," which appears to contain Nomanbhoy's signature on plaintiff's behalf and is dated June 16, 2008 (plaintiff's "Third Written Offer").  (Opp. Exhibit 6.)  I received plaintiff's Third Written Offer at or about the time that Lauter sent it to me.

16.    I did not have any telephone, e-mail or other discussions with Nomanbhoy prior to the morning of June 18, 2008.

17.    My first communication to Nomanbhoy occurred on the morning of June 18, 2008, at 9:47 a.m. CST/7:47 a.m. PT.  On that morning, I sent to Lauter via e-mail a document in response to plaintiff's Third Written Offer that was entitled "Real Estate Contract – Version 2 with Exhibit A & B-2" (the "June 18 a.m. Proposal").  (Opp. Exhibit 7.)  Nomanbhoy was carbon copied as a recipient of that e-mail.  Specifically, I included the following terms in that proposal:

4

**Terms (emphasis added)**                    **Source (Opposition Exhibit 6)**

| | |
|---|---|
| Price of $1.4 million | June 18 a.m. Proposal, ¶ 2 |
| Restrictive Covenant, which included a provision that for a period of 20 years, the property may not be used for and "Purchaser *and any successor* will not lease/sell to *any tenant/buyer* whose primary purpose is the sale of hamburgers, chicken and/or coffee . . . ." | June 18 a.m. Proposal, ¶ 7.8, and Exhibit B |
| Earnest money of 15% of the purchase price, or $210,000 | June 18 a.m. Proposal, ¶¶ 2.4 and 2.5 |
| Closing to occur July 31, 2008 | June 18 a.m. Proposal, ¶ 6 |
| Surveys supplied by McDonald's only to the extent McDonald's has a copy of such surveys in its possession | June 18 a.m. Proposal, ¶ 8 |
| Escrow Agent is Chicago Title Insurance Company | June 18 a.m. Proposal, ¶ 5 |
| Seller is defined as "McDonald's Corporation or its nominee" | June 18 a.m. Proposal, ¶ 1 |
| McDonald's failure to close as a result of its default provides for penalty of "two *(2%) per annum* on the total earnest money deposit" | June 18 a.m. Proposal, ¶ 6 |
| "Purchaser's *execution and delivery* of this Contract is an irrevocable *offer* to purchase and *shall not be binding* upon Seller until *executed by Seller or Seller's duly authorized agent.* Purchaser agrees that this offer shall remain irrevocable until *5:00 p.m. Chicago time on Wednesday, June 18, 2008.* | June 18 a.m. Proposal, ¶14 |
| "No person has been authorized to make any representation on behalf of Seller." | June 18 a.m. Proposal, ¶ 18 |
| "This Contract sets forth the entire understanding between the parties relating to the transaction described herein, there being no terms, conditions, warranties or representations other than those contained herein." | June 18 a.m. Proposal, ¶ 28 |

(*See* Opp. Exhibit 7.) (emphasis added.)

18.    On June 18, 2008, at or around 11:38 a.m. CST, I received as a carbon copy recipient an e-mail from Nomanbhoy sent to Lauter in response to my June 18 a.m. Proposal. In that e-mail Nomanbhoy indicated "there are too many changes to contract language that was previously agreed" and that he wanted to "arriv[e] at language that is mutually acceptable." Nomanbhoy proposed to fly out to Chicago in order to reach an agreement and asked "McDonalds [to] have all the right decision makers in the room." (Opp. Exhibit 8.)

19.    This was a rejection of the June 18 a.m. Proposal and an indication that a new document would need to be negotiated with "mutually acceptable" language and terms, which would be signed or initialed by McDonald's and plaintiff.

20.    After I received that e-mail, I informed Lauter that he should continue to receive any proposed counteroffers made by plaintiff and to advise me and Meyer of any proposed counteroffers or terms for our consideration. I contemplated that I would need to draft language regarding any acceptable changes and execute or authorize a proposed, revised counteroffer for the sale of the five parcels in the event McDonald's reached an agreement with plaintiff.
I did not authorize Lauter or any RLA agent or affiliate to make any counteroffers or accept any counteroffers that would bind McDonald's to a contract, nor did Ira and I have an understanding that he would do so.

## Additional Counteroffers as to Terms are Proposed

21.    After rejecting the June 18 a.m. Proposal, plaintiff requested that the scope of the restrictive covenant in the June 18 a.m. Proposal be narrowed. That covenant provided that: "For a period of 20 years from the date of the deed, the Property may not be used for and Purchaser and any successor will not lease/sell to any tenant/buyer whose primary purpose is the sale of hamburgers, chicken and/or coffee . . . ."

6

22.    As a result, on or before noon CST on June 18, Meyer and I authorized Lauter to communicate to the seller a proposed modification, as follows: "For a period of 20 years from the date of the deed, the Property may not be used for and Purchaser will not lease/sell to any regional and/or national restaurant chain or user whose primary purpose is the sale of hamburgers, chicken and/or coffee. . . ." (Opp. Exhibit 9.)

23.    On the early evening of June 18, 2008, at approximately 5 p.m. CST, I participated in a telephone conference with Nomanbhoy, Meyer and Lauter. In that telephone conference, Nomanbhoy suggested that Lauter fly to San Francisco that evening to pick up the earnest money from Nomanbhoy. Meyer and I both responded that it did not make sense for Lauter to fly to San Francisco because the parties still were not in agreement on the terms of the contract, and McDonald's still did not have a final written contract that was executed by Nomanbhoy. I told Nomanbhoy that I would send Nomanbhoy an amended document that Nomanbhoy would need to sign and return to McDonald's. I stated unequivocally that, if McDonald's did not receive the revised document, that I would amend and Nomanbhoy would execute, before the auction took place, McDonald's would go forward with the auction and that it would not sell the five parcels to plaintiff. Nomanbhoy indicated that he fully understood that a final contract would need to be executed.

24.    I indicated that a new document would need to be agreed to and authorized by the parties so that the parties would be clear in terms of what terms were being offered and accepted. In addition, because of the various negotiations throughout the day, all parties would thereby understand what the final agreement was. This is consistent with McDonald's practice.

25.    After plaintiff rejected the June 18 a.m. Proposal on the morning of June 18, the parties never contemplated that the June 18 a.m. Proposal that plaintiff had already rejected would form the agreement, or that it would be binding on McDonald's (or for that matter

7

Nomanbhoy).  Indeed, the rejected June 18 a.m. Proposal was not discussed in any of the conversations in which I took part, and none of the e-mails that were exchanged referenced the June 18 a.m. Proposal.  Rather, the parties consistently understood, and I consistently made clear, that I would revise the terms of the document and that the parties would execute that revised document on the morning of June 19, 2008.

### McDonald's Sends the June 19 a.m. Proposal
### Consistent With Its Discussions With Nomanbhoy

26.    On the morning of June 19, 2008, at approximately 9:09 a.m. CST/ 7:09 a.m. PT, I sent to Nomanbhoy a revised written proposal for execution setting forth the counteroffer and terms discussed the prior evening on June 18, 2008 (the "June 19 a.m. Proposal").  In my cover e-mail, I indicated that the purchase price was $1.4 million, and the seller's penalty if no closing occurred was 2% per month of the earnest money, and that McDonald's would provide to plaintiff the surveys.  It also stated:

> If we do not have the earnest money prior to the auction (or if the auction otherwise occurs), the contract is null and void.  (I have inserted this language to make [it] clear that we must have the $ prior to the auction and if the $ comes in so late such that we do not know that the $ has arrived and the [auction] occurs, the contract is void.)  I can not be in a situation where I have sold a site to two parties.

> Shabbir:
> Please initial on each page next to each of my (BAN) initials (including the bottom corner of each page), send the contract back to us wire the earnest money and inform us of the confirmation number.  Thanks Bruce.

(Opp. Exhibit 12.)

27.    Within the June 19 a.m. Proposal, I also indicated that the escrow agent was Rick Levin & Associates, Inc.  In addition, I modified the language in paragraph 14 to state that "Purchaser agrees that this offer shall remain irrevocable until 2:00 p.m. Chicago time on Thursday, June 19th, 2008."  Further, I added a provision stating: "In the event Seller has not received the Earnest Money before the commencement of the auction of the Properties on June

19, 2008, or if the auction otherwise occurs, this Contract shall be null and void and of no further force or effect." (*Id.*)

28. Nomanbhoy refused to sign the document I sent to him on June 19, 2008. At approximately 10:40 a.m. on June 19, 2008, Lauter called my office and spoke to my assistant. My assistant left me a written message that plaintiff refused to sign the June 19 a.m. Proposal and that he had proposed new terms to that proposal. (Opp. Exhibit 13.)

29. On June 19, 2008, at 11:30 a.m. CST/9:30 a.m. PT, I e-mailed Nomanbhoy stating:

> "Ira expressed your desire to revise paragraph 14 of the contract and alternatively that you were "accepting" the contract from yesterday…**The only offer/contract open to you for acceptance is the offer/contract set fort[h] below and previously forwarded to you this morning. All prior offers/contracts have been rejected and are not valid.**

(Opp. Exhibit 14.) (emphasis in original).

30. Nomanbhoy never returned any signed document – whether valid or not – prior to the auction at 1:00 p.m. on June 19, 2008. Accordingly, McDonald's and RLA were forced to proceed to sell the parcels at the auction, and ultimately did so, but only at a sale price of approximately $1.26 million.

31. If McDonald's had received from plaintiff the signed, revised June 19 a.m. Proposal and the wired money prior to the auction scheduled on June 19, 2008, at 1:00 p.m., McDonald's would have reached an agreement.

32. Instead, on June 19, 2008, at 4:30 p.m. CST/2:30 p.m. PT, almost four hours after the auction had commenced, Nomanbhoy emailed me a copy of the *June 18 a.m. Proposal* that he previously rejected on the morning of June 18, and that now contained Nomanbhoy's initials on the bottom right corner. Nomanbhoy's cover e-mail stated, in part:

> This contract is the one executed by Bruce yesterday, and which I had informed you yesterday I was accepting…The contract changes you faxed me this morning

9

are all fine, except the changes at the bottom of item 14...I am willing to accept
the other changes to the contract if you will be so kind as to delete this clause and
resend me the contract.

(Opp. Exhibit 17.)

33.    Thus, almost four hours after the auction was scheduled to start, and which

already proceeded as Nomanbhoy was aware, Nomanbhoy still was trying to reach an agreement

with McDonald's.

34.    In response, on June 19, 2008, at 5:53 p.m. CST, I sent to Nomanbhoy an e-mail

that set forth the numerous times plaintiff had rejected offers and proposed counteroffers that

were not accepted.    I also stated, "I have communicated your current offer (proposing

yesterday's rejected offer back to us) [i.e., the June 18 a.m. Proposal] to the proper parties. Your

offer has not been accepted." (Opp. Exhibit 18.)

35.    The next day, on June 20, 2008, at 3:15 p.m., I received an e-mail from

Nomanbhoy.  In that e-mail, he stated, in part:

> I will file an injunction so that you are unable to sell the properties in the
> meantime.  You may want to think about the effects of a lawsuit that will tie up
> these properties for a long time, as well as the associated costs and time for
> McDonalds.  You may also want to think about the negative publicity resulting
> from your trying to double sell these properties at auction.

(Opp. Exhibit 19.)

36.    No agreement was ever reached between plaintiff and McDonald's.

37.    Copies of the exhibits referenced in this affidavit are attached to McDonald's

Opposition.  To the best of my knowledge, information and belief, each such copy is a true and

accurate copy of the referenced document.  Referenced e-mails were sent or received at or about

the time indicated in this affidavit and on the e-mails themselves.

FURTHER AFFIANT SAYETH NOT.

BRUCE NEUMANN

SUBSCRIBED AND SWORN TO
before me this _8_th day of August, 2008.

Notary Public

OFFICIAL SEAL
ERICA M RUIZ
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/30/10

11

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NOMANBHOY FAMILY LIMITED PARTNERSHIP, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 08 CV 3787 |
| v. | ) ) | Hon. Joan B. Gottschall |
| McDONALD's CORPORATION, McDONALD's USA, LLC, RICK LEVIN & ASSOCIATES, INC., and RICK LEVIN, | ) ) ) ) ) | Mag. Judge Jeffrey Cole |
| Defendants. | ) | |

## AFFIDAVIT OF IRA LAUTER

I, Ira Lauter, having been first duly sworn under oath, state as follows:

1.    I am a resident of the State of Illinois and am over eighteen (18) years of age. I make this affidavit based on my own personal knowledge and, if called upon to do so, could testify competently to the matters described herein.

2.    I currently hold the position of Associate at Rick Levin & Associates, Inc. ("RLA"). I have been employed by RLA in this capacity since January 1, 2008, but have worked with RLA as an independent contractor since approximately 2003.

3.    I make this affidavit in support of McDonald's Opposition to Plaintiff's Motion for Preliminary Injunction ("McDonald's Opposition" or "Opp.").

### Introduction

4.    On behalf of RLA, I assisted McDonald's and received direction from it in negotiating the terms of a prospective sale of five real estate parcels that are referenced in this litigation. Those five parcels are located at the following addresses: 5057

Wentworth, Chicago, Illinois; 10245 Roosevelt Road, Westchester, Illinois; 130 South Virginia Street, Crystal Lake, Illinois; 6574 North 76th Street, Milwaukee, Wisconsin; and 5377 Broadway, Merrillville, Indiana (collectively "the five parcels"). With respect to the properties in Wisconsin and Indiana, we also worked in conjunction with auctioneers licensed in those states.

5.      Additionally, on behalf of RLA, I attended the auction of the five parcels that took place on June 19, 2008, at or around 1:00 p.m. CST.

6.      As part of my duties as an Associate, I typically accept delivery of and present to the seller offers and counteroffers to buy, sell, or lease the seller's property. I also typically assist the seller in development, communicating, negotiating and presenting offers, counteroffers and notices that relate to the offers and counteroffers until an agreement is signed by the seller and purchaser and all contingencies are satisfied.

7.      During typical auctions, RLA conducts a competitive public auction of the property, at which RLA attempts to procure a purchaser or purchasers for the parcel or parcels.

8.      As part of my duties as an Associate, it is necessary for me to receive guidance, input or authorization from the seller or seller's employees to determine acceptable negotiating terms.

9.      Consistent with prior negotiations in which I have been involved, the parties in this case exchanged various form documents and plaintiff and McDonald's made various changes to the terms of the form documents. In this case, RLA provided the form document Real Estate Sales Contract as created by McDonald's that was used by plaintiff's representative, Shabbir T. Nomanbhoy ("Nomanbhoy") to make plaintiff's

2

initial offer. A true and correct copy of the form Real Estate Sales Contract (although not in blank) is attached to McDonald's Opposition Brief as Exhibit 4.

10.     In this circumstance, and based upon my knowledge with respect to the events, at no time were all of the terms being proposed between McDonald's and plaintiff with respect to the five parcels of real estate agreed to; I am not aware of any final written agreement between McDonald's and plaintiff for the sale of the five parcels. On June 19, 2008, RLA publicly auctioned on McDonald's behalf the five real estate parcels for a collective total purchase price approximating $1.26 million.

### Plaintiff's First Written Offer for $2 Million

11.     On June 12, 2008, I received a copy of plaintiff's first written offer to purchase the five parcels. (Opp. Exhibit 4.) The offer contained a number of terms, but among them was that the buyer would pay in excess of $2 million if the parcels were sold with no restrictive covenant. McDonald's would not agree to sell the parcels without a restrictive covenant, even at the price of $2 million. Accordingly, McDonald's did not accept or execute this written offer.

### Plaintiff's Second Written Offer For $1.4 Million

12.     On or about June 16, 2008, I received a copy of plaintiff's second written offer to purchase the five parcels (plaintiff's "Second Written Offer"). Plaintiff's Second Written Offer was entitled "Real Estate Sales Contract – Version 1 with Exhibit A & B-1." (Opp. Exhibit 5.) McDonald's did not accept or execute this written offer.

### Plaintiff's Third Written Offer for $1.4 Million

13.     On or about June 17, 2008, I received a copy of plaintiff's third written offer to purchase the five parcels (plaintiff's "Third Written Offer"). Plaintiff's Third

Written Offer was entitled "Real Estate Sales Contract – Version 2 with Exhibit A & B-2." (Opp. Exhibit 6.)  McDonald's did not accept or execute this written offer.

14.     On the afternoon of June 17, 2008, I participated in a telephone conference with Nomanbhoy and Mary Meyer of McDonald's.  We discussed a number of terms of the document, including the price, the restrictive covenant, amount of the earnest money deposit, the closing date, and a penalty provision that Nomanbhoy requested.  In that conversation, Nomanbhoy, Meyer and I agreed that McDonald's would send an updated document the following morning, on June 18, 2008.  Nomanbhoy, Meyer and I agreed and understood that the updated document would be a counteroffer to plaintiff's Third Written Offer, and that no final agreement had been reached.

### McDonald's Rejects Plaintiff's Third Written Offer for $1.4 Million and Proposes New and Additional Terms (the "June 18 a.m. Proposal")

15.     On June 18, 2008 at 9:47 a.m. CST, Bruce Neumann of McDonald's emailed a document to me in response to plaintiff's Third Written Offer that was entitled "Real Estate Contract – Version 2 with Exhibit A & B" (the "June 18 a.m. Proposal"). (Opp. Exhibit 7.)  I received a copy of that e-mail at or about the time it was sent.  The e-mail lists Nomanbhoy as a carbon copy recipient.

16.     The June 18 a.m. Proposal contained some terms that were contained in plaintiff's Third Written Offer and some terms that were new and additional to the terms in plaintiff's Third Written Offer.

17.     On June 18, 2008, at or around 11:38 a.m. CST, I received an e-mail from Nomanbhoy in response to Neumann's June 18 a.m. Proposal.  In that e-mail Nomanbhoy indicated "there are too many changes to contract language that was previously agreed" and that he wanted to "arrive[e] at language that is mutually acceptable."  Nomanbhoy

proposed to fly out to Chicago in order to reach an agreement and asked "McDonalds [to] have all the right decision makers in the room." (Opp. Exhibit 8.)

18.    I understood Nomanbhoy's 11:38 a.m. CST e-mail to be a rejection of the June 18 a.m. Proposal.

19.    I did not sign the June 18 a.m. Proposal at any time before or after plaintiff's 11:38 a.m. CST e-mail of June 18, nor would I have done so as I did not have authorization to sign any offer or acceptance on McDonald's behalf.

20.    After I received that e-mail, Neumann informed me that I should continue to receive any proposed counteroffers made by plaintiff and to advise McDonald's of any proposed counteroffers or terms for its consideration, consistent with my prior practice. Consistent with my past practice, I did not have any understanding that I would be making any counteroffers or accepting any counteroffers that would bind McDonald's to a contract without McDonald's approval.

### Negotiations Continue Through the Evening of June 18, 2008

21.    Throughout the afternoon and evening hours of June 18, 2008, Nomanbhoy, Meyer and/or Neumann, often through correspondence conveyed by me, continued to negotiate numerous terms for the sale of the five parcels, including the price and the scope of the restrictive covenant. These exchanges are reflected in part in Exhibits 9-11 to McDonald's Opposition and Exhibits D through F to Nomanbhoy's affidavit.

22.    At various times that afternoon, for example, plaintiff offered to pay $1 million, $1.125 million, $1.2 million and later $1.4 million for the five parcels. Plaintiff conditioned each offer upon the acceptance by McDonald's of various additional

conditions and terms, including changes in the scope of the restrictive covenant. These exchanges are reflected in part in Exhibits 9-11 to McDonald's Opposition and Exhibits E and F to Nomanbhoy's affidavit.

23.    On the evening of June 18, 2008, at approximately 5 p.m. CST, I participated in a telephone conference with Nomanbhoy, Neumann, and Meyer. In that telephone conference, Nomanbhoy suggested that I fly to San Francisco that evening to pick up the earnest money from Nomanbhoy. Neumann and Meyer both responded that it did not make sense for me to fly to San Francisco because the parties still were not in agreement on all the terms of the contract, and McDonald's still did not have a final written contract that was executed by the parties. Neumann told Nomanbhoy that he would send Nomanbhoy an amended document that Nomanbhoy would need to sign and return to McDonald's. Neumann stated unequivocally that, if McDonald's did not receive the revised document, as amended by Neumann and executed by Nomanbhoy, along with the earnest money before the auction took place, McDonald's would go forward with the auction and that it would not sell the five parcels to plaintiff. Nomanbhoy acknowledged that he fully understood that a final document would be sent by Neumann and would need to be executed.

24.    Shortly after this conversation, Meyer contacted me to tell me that she had spoken with her supervisor about selling the five parcels for $1.2 million. According to Meyer, she was told that the purchase price should not be less than $1.4 million. I thereafter e-mailed Nomanbhoy at 5:36 p.m. CST that "McDonald's has decided they will not sell for less than [ ] $1,400,000." (Opp. Exhibit 10.)

25.     I spoke to Nomanbhoy after I sent the 5:36 p.m. CST e-mail to discuss the $1.4 million price term.  Nomanbhoy insisted that he should fly out to Chicago to meet with Mary Meyer and her superiors face-to-face.  Nomanbhoy told me that he believed that if he would meet with McDonald's representatives personally, he would be able to convince McDonald's to reduce the price to $1.2 million.  I explained to him that if he was not willing to pay the $1.4 million, flying out to Chicago would be pointless.  He indicated to me that he would not pay $1.4 million.

26.     At 8:02 p.m. CST/6:02 p.m. PT, Nomanbhoy sent me an e-mail agreeing to the price term of $1.4 million and asking that I or McDonald's "Please revise contract for interest rate, escrow agent, survey, and dates."  Nomanbhoy also asked for a letter from Meyer or Neumann indicating that RLA would act as the escrow agent and could receive the earnest money.  (Opp. Exhibit 11.)

27.     Shortly thereafter, I called Meyer on her cell phone to relay the information in Nomanbhoy's 8:02 p.m. CST/6:02 p.m. PT e-mail.  Specifically, I told Meyer that Nomanbhoy would pay $1.4 million dollars but that he wanted a revised document and a letter from Meyer confirming that RLA would act as the escrow agent.  Meyer agreed to send the letter to me.

28.     Later that evening, at approximately 8:30 p.m. CST, I telephoned Meyer, and Nomanbhoy also was on the telephone call.  During that conversation, Meyer told Nomanbhoy that Bruce Neumann would send a revised document to Nomanbhoy early in the morning on June 19.  Nomanbhoy agreed that after he received the revised document on June 19, he would immediately sign, initial, and return the document on the morning of June 19.  He also agreed to wire the earnest money as soon as possible that morning.

Meyer expressly told Nomanbhoy that the auction would go forward if he did not return the document Neumann would send him in the morning or if RLA did not receive the earnest money in the morning. Nomanbhoy acknowledged that he understood and that he would send the signed, revised document and the earnest money in the morning.

29.     At 8:46 p.m. CST, I forwarded to Meyer Nomanbhoy's 8:02 p.m. CST/6:02 p.m. PT e-mail, in which he agreed to the price term of $1.4 million and asked for a letter identifying RLA as the escrow agent. I indicated in my email that Meyer should send the letter confirming RLA's status as an escrow agent to both me and Nomanbhoy. (Opp. Exhibit 11.)

30.     At 8:59 p.m. CST, Meyer sent both Nomanbhoy and me a letter on McDonald's letterhead confirming that RLA would act as the escrow agent for the sale of the five parcels. In Meyer's cover e-mail, she again confirmed, consistent with the parties' earlier conversation, that McDonald's would "need the wire and contract very early tomorrow, or will have to go forward with the Auction." (Opp. Exhibit 11.)

31.     At 10:18 p.m. CST, Neumann sent Nomanbhoy an email confirming that RLA was to act as the escrow agent. I received a copy of that email when it was sent. Neumann's email also confirmed that, "As Mary stated in her e-mail, the earnest money must be wired and received by Rick Levin or the auction will go forward." (Opp. Exhibit 20.)

32.     At 10:48 p.m. CST, I responded to Neumann's e-mail as follows:

> "I also asked [Nomanbhoy] verbally to send us the wire confirmation number first thing.
>
> I would like him to send us back the revised signed contract prior to the 1:00 p.m. auction time with the revised deed restriction and changes incorporated in it.

> Not sure why, however, [Nomanbhoy] is saying he is no
> longer worried about the contract (which has me worried)
> and he will send the money without a new contract as the
> contract is acceptable to him."

(Opp. Exhibit 20.)  The "revised signed contract" I referred to in this e-mail was the document that the parties intended Neumann to circulate the following morning on June 19.

33.     Nomanbhoy alleges in his affidavit that in a telephone conversation with me sometime after 8:00 CST during the evening of June 18, 2008, he asked me to send a fully revised contract containing all the terms the parties had discussed that day.  That statement is accurate.  Nomanbhoy then states, in paragraph 16 of his affidavit, that I suggested that we use the June 18 a.m. Proposal.  That statement is false.  I never suggested that he use the June 18 a.m. Proposal or suggested that the June 18 a.m. Proposal would be a binding agreement.  After the conversation that took place between Meyer, Nomanbhoy and me as set forth in paragraph 30 of this affidavit (approximately 8:30 p.m. CST) but before Nomanbhoy sent the e-mail attached as Exhibit L to Nomanbhoy's affidavit (9:17 p.m. CST/7:17 p.m. PST), I called Nomanbhoy to confirm he received the letter from Meyer indicating that RLA was the escrow agent.  During that call, Nomanbhoy indicated that he did not need a revised contract because the prior contract was fine.  I repeated to him what the parties discussed and agreed to throughout that evening – namely that he needed to sign and send the revised document that Bruce Neumann would send to him the morning of June 19.

34.     After plaintiff rejected the June 18 a.m. Proposal on the morning of June 18, the parties never discussed – and I never understood – that the June 18 a.m. Proposal

would form the agreement, or that it would be binding on McDonald's (or for that matter plaintiff).

### McDonald's June 19 a.m. Proposal

35.    On the morning of June 19, 2008, Neumann sent Nomanbhoy a revised document as we had discussed with Nomanbhoy the prior evening (the "June 19 a.m. Proposal"). (Opp. Exhibit 12.) In the cover e-mail, Neumann explained that he added a provision to paragraph 14 of the document "to make [it] clear that we must have the $ prior to the auction and if the $ comes in so late such that we do not know that the $ has arrived and the auction occurs, the contract is void." (*Id.*)  Neumann stated that McDonald's could not risk putting itself in the position of having "sold" each of the five parcels to more than one buyer. (*Id.*) I received this e-mail, as a carbon copy recipient, at or about the time it was sent.

36.    I spoke to Nomanbhoy on the telephone on the morning of June 19 at approximately 10:30 a.m.  Nomanbhoy told me that he rejected the June 19 a.m. Proposal, and sought to renegotiate the language of paragraph 14 of the June 19 a.m. Proposal.  I called Neumann to tell him of my conversation but was only able to speak to his assistant. I communicated my message to his assistant. (Opp. Exhibit 13.)

37.    At 11:30 a.m. CST, Neumann e-mailed Nomanbhoy that "The only offer/contract open to you for acceptance is the offer/contract set for[h] below and previously forwarded to you this morning. All prior offers/contracts have been rejected and are not valid." (Opp. Exhibit 14.) I received this e-mail, as a carbon copy recipient, at or about the time it was sent.

38.    That morning, I traveled to the site of the auction to meet with Mary
Meyer. At approximately noon, Meyer and I had lunch together. At that time, we still
had not received either a signed document from Nomanbhoy or the earnest money that he
had promised. As such, at or around Noon on June 19, I called Nomanbhoy from my cell
phone to ask about the June 19 a.m. Proposal and earnest money. During that call, I
pleaded with Nomanbhoy to sign the document and confirm that the money had been
wired before the start of the auction. Nomanbhoy protested that he was not in a location
from where he could send to McDonald's a signed document. Nomanbhoy told me that
he had to take his daughter to the airport and that he could not send the document at that
time. Nomanbhoy suggested that he had already left for the airport, but I could hear a
dog barking in the background and believed Nomanbhoy to be at home. At 12:04 p.m.
CST, I e-mailed Nomanbhoy and stated: "Shabbir—as of 12:05 we have not received the
contract or wire. Please advise. Thank you, Ira." (Opp. Exhibit 15.)

39.    At 12:52 p.m., eight minutes before the auction was scheduled to take
place, I again e-mailed Nomanbhoy that we had not received the June 19 a.m. Proposal. I
carbon copied on that e-mail a number of employees from McDonald's, including Mary
Meyer and Bruce Neumann, and also Rick Levin. I indicated that Rick Levin of RLA
was preparing to tell the bidders that there would not be an auction, but that he needed to
"[p]lease send the contract to all parties on this e-mail ASAP" and that I "look[ed]
forward to us receiving [his] contract to get this all wrapped up." (Opp. Exhibit 16.) The
contract to which I was referring in the e-mail was the June 19 a.m. Proposal, the only
document that McDonald's had authorized Nomanbhoy to sign. We never received back
from plaintiff a copy of the June 19 a.m. Proposal.

40.    Accordingly, at or around 1:00 p.m. CST, McDonald's directed RLA to proceed with the auction. The auction drew bids on each of the five parcels, but only at a combined sale price of approximately $1.26 million.

41.    On June 19, 2008, at 4:30 p.m. CST, almost four hours after the auction had commenced, I received as a carbon copy recipient an e-mail from Nomanbhoy to Neumann which attached a copy of the *June 18 a.m. Proposal* that Nomanbhoy previously rejected on June 18, and that now contained Nomanbhoy's initials on the bottom right corner, and stated, in part:

> This contract is the one executed by Bruce yesterday, and which I had informed you yesterday I was accepting...The contract changes you faxed me this morning are all fine, except the changes at the bottom of item 14...I am willing to accept the other changes to the contract if you will be so kind as to delete this clause and resend me the contract.

(Opp. Exhibit 17.)

42.    On June 19, 2008, at or about 5:53 p.m. CST, I received as a carbon copy recipient an e-mail Neumann sent to Nomanbhoy that set forth the numerous times plaintiff had rejected offers and proposed counteroffers that were not accepted. Neumann also stated, "I have communicated your current offer (proposing yesterday's rejected offer back to us) [i.e., the June 18 a.m. Proposal] to the proper parties. Your offer has not been accepted." (Opp. Exhibit 18.)

43.    According to Nomanbhoy's Affidavit paragraph 21, he and I had a telephone conversation during the morning of June 19 a.m. and prior to Neumann sending the June 19 a.m. Proposal. I did not make the statements attributed to me in paragraph 21 of Nomanbhoy's affidavit.

44.    The next day, on June 20, 2008, at 3:15 p.m. I received as a carbon copy recipient an e-mail from Nomanbhoy to Neumann. In that e-mail, Nomanbhoy stated, in part:

> I will file an injunction so that you are unable to sell the properties in the meantime. You may want to think about the effects of a lawsuit that will tie up these properties for a long time, as well as the associated costs and time for McDonalds. You may also want to think about the negative publicity resulting from your trying to double sell these properties at auction.

(Opp. Exhibit 19.)

45.    I do not believe that an agreement for the sale of the parcels was ever reached between plaintiff and McDonald's.

FURTHER AFFIANT SAYETH NOT.

IRA LAUTER

SUBSCRIBED AND SWORN TO
before me this *11* th day of August, 2008.

Notary Public

"OFFICIAL SEAL"
DONNA M. WROBEL
Notary Public, State of Illinois
My Commission Expires 08/10/09

14

# Exhibit 4

3-02-1995 5:44AM    FROM    P. 1

*Attn: IRA LAUTER*
*Fax 847 564 5415*

*Burger*
*Chicken*
*Coffee*
*Breakfast*
*Donuts*

*$500,000 down*
*25%*

*— Sent by email attachment 6/12/08 11:52 pm*
*— I've called to confirm receipt 6/13 11:55am will call again after talking with Seller*

*— IRA LAUTER called 6/13 — plus Donald is very interested!*

## REAL ESTATE SALES CONTRACT

1.  **Parties.**

    **Seller:**  McDonald's Corporation or its nominee
    One McDonald's Plaza
    Oak Brook, Illinois 60523
    Tel.: 630.836.4982
    Fax: 630.836.4804

    **Purchaser:**  *NOMANBHOY ~~ENTERPRISES.com~~ FAMILY LIMITED PARTNERSHIP, OR ITS NOMINEE*
    *11254 MT CREST PLACE*
    *CUPERTINO, CA 95014*
    *TEL: 408 996 8786    CELL: 408 507 7863*
    *EMAIL: SHABBIR. NOMANBHOY @ GMAIL.COM*

2.  **Purchase Price**  *(FOR 5 PROPERTIES)*
    2.1. High Bid Price    $ *2,000,000*
    2.2. Buyer's Premium (3% of 2.1)    $ *60,000*
    2.3. Purchase Price (2.1 + 2.2)    $ *2,060,000*
    2.4. Total Earnest Money Required (10% of 2.3)    $ *206,000*
    2.5. Initial Earnest Money Deposit    $ *206,000*
    2.6. Additional Earnest Money Required (2.4- 2.5)    $
    2.7. Balance of Purchase Price Due at Closing (2.3- 2.4)    $ *1,854,000*

3.  Agreement to Sell and Purchase. Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller, at the price and on the terms set forth herein, the real estate consisting of ~~that parcel~~ of land identified on ~~Rider 1~~ attached to this Contract (the "Property) and more particularly described on Exhibit "A" attached hereto. *(BULK SALE OFFER FOR FIVE PROPERTIES)*

4.  All Cash Transaction. This is an all-cash sale and purchase; and is NOT contingent upon Purchaser obtaining financing even though Purchaser may apply to a lending institution of Purchaser's choice for a mortgage loan. Purchaser understands and agrees that neither their receipt of a commitment from such a lending institution, their acceptance of such a commitment, nor their satisfaction of any condition set forth in such a commitment shall in any way be conditions of Purchaser's obligations under this Contract. Seller makes no representation or warranty as to Purchaser's ability to obtain financing.

5.  Earnest Money.  Purchaser ~~has~~ *which* deposited the Initial Earnest Money set forth in Paragraph 2.5 *upon acceptance (CHECK* ~~and receipt is hereby~~ *copy* ~~acknowledged.~~ The Additional Earnest Money Required set forth in Paragraph 2.6 shall be paid by cash or cashier's check, payable *ATTACHED)* to the order of the Escrow Agent (as set forth on Rider 1 attached to this Real Estate Sales Contract) and received by Escrow Agent on or before noon on Thursday, June 26, 2008, at the offices of Escrow Agent. The Additional Earnest Money Required may be paid by personal check only if paid on the date of the auction at the time this Contract is executed. All earnest money shall be held by Escrow Agent for the benefit of the parties. Purchaser acknowledges that TIME IS OF THE ESSENCE with respect to the payment of any additional earnest money and the closing of this sale. Upon Seller's execution of this Contract, Rick Levin & Associates, Inc. or Rick Levin & Associates, Inc., in conjunction with Rick Levin, licensed Indiana auctioneer, as applicable ("Auctioneer") shall deposit the Earnest Money with the Escrow Agent for the mutual benefit of Purchaser and Seller.

6.  The "Closing"  The purchase and sale of the Property shall be closed (the "Closing") on Tuesday, August 5, 2008, or on such other date as agreed to by the parties. Closing shall take place at an office of Chicago Title Company or such other title company as agreed to between Seller and Purchaser (the "Title Company") at such location as approved by Seller. Purchaser may use the proceeds of a money lender's escrow to pay the balance of the Purchase Price, provided that the terms of the money lender's escrow are not inconsistent with the terms of this Contract or the Escrow Agreement. Purchaser shall deposit, by certified funds, wire transfer or a bank cashiers check made payable to Title Company, all funds necessary to close the transaction contemplated by this Contract and shall promptly deliver and execute all required documents.

*Seller Initials* _____    *PURCHASER* *Oops Initials* _____

3-02-1995 5:45AM    FROM                                                                P. 2

7. **Delivery of Deed.** On the Closing Date, Seller shall convey or cause to be conveyed to Purchaser by recordable Limited or Special Warranty or Trustee's Deed, title to the Property subject only to the following matters ("Permitted Exceptions"):

7.1.    general real estate taxes for the years 2007 and 2008 and subsequent years;

7.2.    covenants, conditions and restrictions of record (including without limitation such easements and restrictions as may be recorded after the date hereof which Seller determines are necessary or appropriate);

7.3.    certain mutually beneficial restrictions and obligations with respect to the proper use, conduct and maintenance of the Property and other property (Purchaser hereby authorizes Seller to record any such restrictions and obligations as covenants affecting the Property and other property *AFTER REVIEW & AGREEMENT BY PURCHASER*)

7.4.    private and/or public utility easements, roads and highways, if any, whether or not of record;

7.5.    all matters which a current, accurate survey of the Property would disclose;

7.6.    applicable zoning and building lines and ordinances;

7.7.    in the event Seller or any entity related to Seller is the owner of or otherwise has an interest in any adjacent property, a reservation to Seller or its nominee of the right and privilege of Seller, its lessees, franchisees, successors and assigns to use and enjoy the benefit of all existing private utilities, drainage areas and access ways of any kind, whatsoever, if any;

7.8.    ~~Purchaser agrees to accept in Seller's deed to Purchaser a restriction prohibiting the Property from being used for restaurant purposes for a period of 20 years from the date of the deed. Purchaser agrees that the restriction shall be a covenant running with the land and be binding upon Purchaser, its heirs, administrators, successors and assigns.~~ *SEE NOTE BELOW*

7.9.    acts done or suffered by Purchaser or by any party claiming by, through or under Purchaser;

7.10.   party wall rights, if any; and

7.11.   all installments of special assessments heretofore levied falling due after date of closing.

8. **Title/Survey.** At least five *BUSINESS* days prior to Closing, Seller shall show to Purchaser or his agent evidence of merchantable title in the intended grantor by delivering a Commitment for Title Insurance issued by the Title Company bearing date on or subsequent to the date of the acceptance of this Contract, in the amount of the Purchase Price subject to no other exceptions than those listed in Paragraph 7 and to general exceptions contained in said commitment. Every Commitment for Title Insurance furnished by Seller hereunder shall be conclusive evidence of title as therein shown. If evidence of title discloses other exceptions, Seller shall have thirty (30) days from Seller's receipt of evidence of title to cure such exceptions and notify Purchaser accordingly, and as to those exceptions which may be removed at closing by payment of money, Seller may have same removed at closing by using the proceeds of sale in payment thereof. Seller ~~has~~ *WILL* deliver ~~a copy of any survey of the property~~ *in Seller's possession* to Purchaser. If Seller is unable to have such defects cured or waived within 30 days, Purchaser may, as its sole remedy, terminate this Contract within 10 days thereafter. In no event shall Seller have any obligation to commence litigation or to expend money to cure or remove any title objections. Seller and Purchaser acknowledge and agree that Seller shall not be obligated to provide any new or updated survey to Purchaser. *SELLER AND PURCHASER EACH THEIR NORMAL AND PRO SHARE OF*

9. **Payments at Closing.** Purchaser shall pay all recording charges, all money lender's charges (including money lender's escrow fees), municipal transaction tax stamps, if applicable, escrow fees and any and all title insurance charges.

10. **Possession.** Purchaser shall be entitled to occupancy and possession of the Property from and after the Closing date provided final payment of the Purchase Price has been made and the Closing has been fully consummated. Prior to Closing, Seller shall have sole control and exclusive possession of the Property.

11. **Prorations.** At closing, Purchaser shall receive, to the extent that they have not been paid, a credit for real estate taxes for 2007 and 2008. In the event the actual amount of the tax bills is unknown, such credit shall be based on 105% of the most recent ascertainable general real estate tax bill for the Property. General real estate taxes shall be prorated to the date of closing. If the real estate tax bill includes additional property owned by Seller, at Closing Purchaser shall give Seller a credit for taxes from the date of Closing through the remainder of the tax year and the parties shall complete a tax division on the Property such that it shall be separately assessed. Prior to such separate assessment, Seller and Purchaser shall each pay their pro rata share of the tax bill based upon the square footage of each parcel. All prorations are final. All other items customarily prorated shall be prorated as of the date of closing.

*BUYERS* [initials]

*PURCHASERS* [initials] [initials]

12. **Intentionally Deleted**

NOTE TO *ITEM* 7.8    WE MAY ACCEPT A RESTRICTION AGAINST DIRECT COMPETITORS OF MCDONALDS, BUT THIS IS TOO BROAD!! (BURGERKING DRIVE THRUS) AND TOO LONG!!

13. Commission/Broker-Agency Disclosure. Seller shall cause to be paid a broker's commission to Auctioneer at closing, as provided in the Exclusive Agreement For Auctioneering Services between the Seller and Auctioneer. The provisions of this paragraph shall survive the closing. Purchaser represents and warrants to Seller that no auctioneer or broker, other than Auctioneer and _____NONE_____ ("Participating Broker") was involved in showing, submitting or selling the Property to Purchaser. Purchaser agrees to indemnify and hold Seller, Auctioneer and Participating Broker, if any, harmless and defend them from any claim relating to Purchaser's purchase of the Property asserted against the Seller or Auctioneer by any broker other than as set forth in this Paragraph 13. The provisions of this Paragraph shall survive the closing. Purchaser acknowledges that Auctioneer and its licensed associates represent the Seller as Seller's agent in the sale of this Property.

14. Irrevocable Offer. Purchaser's execution and delivery of this Contract to Seller is an irrevocable offer to purchase the Property made to Seller and shall not be binding upon Seller until executed by Seller, or Seller's duly authorized agent. Purchaser agrees that this offer *June 16, 2008* shall remain irrevocable until 5:00 p.m. Chicago time on Monday, June 23, 2008. Notification of Seller's acceptance may be given pursuant to the notice provision in this Contract or by telephone. Seller's, of a duly authorized agent of Seller's, failure to notify Purchaser on a timely basis that Seller rejects Purchaser's offer shall not constitute acceptance or rejection of Purchaser's offer, but Purchaser's offer shall then become revocable by Purchaser. If Seller rejects Purchaser's offer or Purchaser's offer is effectively revoked, all deposits made by Purchaser shall be promptly returned to Purchaser.

15. Default.
    15.1.    Purchaser's Default. At Seller's option, Purchaser shall be in default under the terms of this Contract if, in addition to any other default specified herein, Purchaser shall:

        15.1.1. fail to close pursuant to the terms hereof;
        15.1.2. fail to timely make any payment required of Purchaser hereunder;
        15.1.3. reserved;
        15.1.4. fail to appear at the time and place designated by Seller, as provided herein, to close the transaction; or
        15.1.5. fail to make Closing deposits at the times required thereunder.

        15.1.6. If Seller declares Purchaser in default pursuant to the terms herein, or if Purchaser fails or refuses to carry out any other obligation of Purchaser under the terms of this Contract and any supplemental agreements made a part hereof, or Purchaser defaults under any provision hereof, then, at Seller's option, this Contract is terminated, and, upon notice to Purchaser, the earnest money shall be forfeited. Seller may also elect to assert against Purchaser any other remedy available, at law or in equity.

16. Demand For Earnest Money. Purchaser and Seller hereby agree that if Seller makes a demand upon Auctioneer stating that Seller has thereby elected to forfeit Purchaser's earnest money, and demanding that Auctioneer remit to Seller any earnest money deposited by Purchaser with Auctioneer, pursuant to Paragraph 15.1.6, whereupon Auctioneer shall serve notice upon both parties as to same by certified mail, return receipt requested. Purchaser shall have seven (7) days from the date Auctioneer deposits the notice in the U. S. mail with sufficient postage prepaid to (a) cure the default; or (b) object in writing to Auctioneer of the intended disposition of earnest money. The mailing of a notice by certified mail, return receipt requested, shall be sufficient service when the notice is mailed. If Purchaser fails to cure the default or Auctioneer does not receive Purchaser's written objection within said seven (7) day period, then Auctioneer is hereby authorized by Purchaser and Seller to remit same to Seller (reduced by any monies due Auctioneer from Seller, if any), and Purchaser's right under this Contract shall be forfeited, and the Contract shall be terminated without further action by either party or Auctioneer. Seller is then free to sell the Property to any other party.

17. Interpleader. If either party objects to the intended disposition in writing within the aforementioned seven (7) day grace period, then the parties hereto agree that Auctioneer may deposit earnest money, less costs, with the Clerk of the Circuit Court of Cook County by filing an action in the nature of interpleader. The parties agree that Auctioneer may be reimbursed from the earnest money for all costs, including reasonable attorney's fees, relating to the filing of the interpleader and do hereby agree to indemnify, defend and hold Auctioneer harmless from any and all claims and demands, including the payment of reasonable attorney's fees, costs and expenses arising out of such default claims and demands.

SELLER _____                    PURCHASER _____

3-02-1995 5:46AM    FROM                                      P. 4

18. <u>Warranty And Disclaimer Of Warranties.</u>  PURCHASER REPRESENTS THAT EITHER PURCHASER OR A DULY AUTHORIZED AGENT OF PURCHASER HAS INSPECTED, OR WAIVES THE RIGHT TO INSPECT, THE PROPERTY AND VERIFIED THE FACTS AND INFORMATION CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER PRIOR TO EXECUTING THIS CONTRACT.  PURCHASER WARRANTS THAT PURCHASER IS PURCHASING THE PROPERTY, ALL IMPROVEMENTS, FIXTURE, EQUIPMENT AND PERSONAL PROPERTY, THEREOF ON AN "AS-IS, WHERE-IS" BASIS, WITH ALL FAULTS AND WITH NO WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, EITHER ORAL OR WRITTEN, EXCEPT AS EXPRESSLY STATED IN THIS CONTRACT, WHETHER OF HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION OF IMPROVEMENTS, ENVIRONMENTAL CONDITION OR OTHERWISE MADE BY SELLER, AUCTIONEER OR ANY AGENT OF EITHER OF THEM, INCLUDING, BUT NOT LIMITED TO, INFORMATION CONTAINED IN THE SALES BROCHURE, ADVERTISING OR SUPPLEMENTAL BROCHURES. NEITHER SELLER, AUCTIONEER, NOR ANY OF THEIR AGENTS ASSUME ANY LIABILITY FOR INACCURACIES, ERRORS OR OMISSIONS CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER.

PURCHASER'S INITIALS: _____

By executing this Contract, Purchaser expressly represents and agrees that Purchaser is not relying upon any representative warranty or statement by Seller, Auctioneer or its or their sales representatives which differs from the disclosures made in this Contract. Purchaser acknowledges that Purchaser has not relied upon any sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Seller, Auctioneer or others, including, but not limited to, any relating to the description of physical condition of the Property, or the dimensions of the Property or any other physical dimensions thereof, the estimated real estate taxes of the Property, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other data, except as may be specifically represented herein. Purchaser has relied on their own examination and investigation thereof. No person has been authorized to make any representation on behalf of Seller. Purchaser agrees (a) to purchase the Property without offset or any claim against, or liability to, Seller or its agents, whether or not any layout or dimension of the Property or any part thereof, is accurate or correct, and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the Closing.

PURCHASER'S INITIALS _____

19. <u>Notices.</u> All notices herein required shall be in writing and signed by either party, and shall be served on the other party at the addresses set forth in Paragraph 1. The mailing of a notice by registered or certified mail, return receipt requested with sufficient postage prepaid, shall be sufficient service when the notice is mailed. Notices may also be served by a nationally recognized air courier, or personal delivery. Notices sent by air courier shall be deemed delivered on the date of receipt. Either party may change its address for notice purposes by giving notice to that effect in the manner set forth herein, provided such change of address shall not be deemed received until actual receipt thereof by the addressee. Any notices required herein may be sent by and to each party's respective attorney.

20. <u>Attorney Review.</u> PURCHASER REPRESENTS THAT PURCHASER HAS BEEN ADVISED BY THE SELLER AND AUCTIONEER TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS CONTRACT. PURCHSER FURTHER ACKNOWLEDGES THAT HE HAS READ AND UNDERSTANDS EACH AND EVERY PART OF THIS CONTRACT.

21. <u>Property Condition.</u> The parties hereto acknowledge that Auctioneer is not obligated to and has not made any independent investigation of the condition of the Property including, but not limited to, any environmental matters with respect thereto (collectively the "Physical Condition"). The parties hereto further acknowledge that all investigations, reports and information with respect to the Physical Condition, if any, have been prepared by or for the Seller and have been furnished by Auctioneer to Purchaser on behalf of Seller. Seller makes no representation as to the truth or accuracy of any such investigations, reports and/or information.

22. <u>Statutory Compliance.</u> Purchaser and Seller hereby agree to make all disclosures and do all things necessary to comply with the applicable provisions of the Real Estate Settlement Procedures Act of 1974, as amended. Purchaser and Seller agree to make all certifications and do all things necessary to comply with Section 1445 of the Internal Revenue Code at or before the time of Closing.

23. <u>Stamp Taxes.</u> Seller shall furnish a completed declaration signed by the Seller or Seller's agent in the form required by the state and county, and shall furnish any declaration signed by the Seller or Seller's agent or meet other requirements as established by any local ordinance with regard to a transfer or transaction tax.

SELLER _____                    PURCHASER _____

24. **Use of Pronouns.** Wherever appropriate, the singular includes the plural and the masculine includes the feminine or the neuter. The term "Purchaser" shall be interpreted as "Purchasers" if more than one person are purchasing the Property, and their obligations shall be joint and several.

25. **No Assignment.** Purchaser shall not directly or indirectly assign or transfer his rights under this Contract without prior written approval of Seller which may be granted or withheld in the sole and absolute discretion of Seller. Seller may assign this Contract without the consent of Purchaser, subject, however, to Purchaser's rights hereunder. Any attempted assignment or transfer by Purchaser without Seller's prior written consent shall be deemed null and void and shall be considered an event of default by Purchaser subject to the provisions of Paragraph 16.2 of this Contract.

26. **Headings; Exhibits.** The paragraph headings used herein are for the reader's convenience only and they shall not be used to interpret the meaning of the terms set forth herein. Exhibits attached hereto are incorporated as a part of this Contract.

27. **Governing Law.** The parties agree that any litigation or dispute concerning the enforcement of this Contract shall be brought in the State of Illinois, the jurisdiction shall be the county in which the Property is located, and that Illinois law shall govern its interpretation.

28. **Complete Agreement; Severability.** This Contract sets forth the entire understanding between the parties relating to the transactions described herein, there being no terms, conditions, warranties or representations other than those contained herein. This Contract may be amended only in an instrument signed by both parties hereto. The parties intend that faxed signatures and that a faxed Contract containing the signatures (original or faxed) of all parties is binding on the parties. At the request of either party, any faxed document subject to this paragraph shall be re-executed by both parties in an original form. Neither party shall raise the use of a facsimile machine as a defense to this Contract and shall forever waive such defense. If any provision of this Contract is invalid or unenforceable as against any party under certain circumstances, the remainder of this Contract and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Contract, except as otherwise herein provided shall be valid and enforced to the fullest extent permitted by law.

29. **Invalidity.** The invalidity of any covenant, grant, condition or provision of this Contract shall not impair or affect in any manner the validity, enforceability or effect of the remainder of the Contract.

30. **Purchaser's Status.** Purchaser represents and warrants there is nothing in Purchaser's status which could or might preclude or prevent Purchaser from consummating this transaction as herein set forth. Purchaser also agrees that he or she shall not cause any labor or material to be incorporated or delivered to the Property prior to Closing.

31. **Binding Agreement.** The terms and provisions of this contract shall be binding upon the parties hereto and their heirs, administrators, executors, successors, and permitted assigns.

32. **Request for Escrow.** At the request of Seller or Purchaser, evidenced by written notice to the other party at any time prior to the date for delivery of deed hereunder, this sale shall be closed through an escrow with the Title Company, in accordance with the general provisions of the usual form of Deed and Money Escrow Agreement then furnished and in use by said company, with such special provisions inserted in the escrow agreement as may be required to conform with this Contract. Upon the creation of such an escrow, anything herein to the contrary notwithstanding, payment of purchase price and delivery of deed shall be made through the escrow and this Contract and the earnest money shall be deposited in the escrow and Auctioneer shall be made a party to the escrow with regard to commission due. The cost of the escrow shall be paid by the party requesting it.

33. **Other Documents.** Seller agrees to furnish an affidavit of title subject only to those items set forth herein, and an ALTA statement if required by Purchaser's mortgagee, and transfer tax declarations.

34. **Existing Mortgage.** Seller shall have the right to pay off any existing mortgage(s) out of the proceeds of this sale.

35. **Indemnity.** Purchaser covenants to indemnify, defend and hold Seller harmless against any and all losses, claims, damages, liabilities, costs (including reasonable attorney's fees and court costs), and causes of action including, without limitation, those arising from mechanics liens, injuries to person or damage to property, including the Property, suffered or incurred by Seller directly or indirectly, as a result of, the entry onto the Property by Purchaser, Purchaser's agents, contractors, employees, and licensees.

SELLER _____

PURCHASER _____  DATED

38.  Anti-Terrorism Representation and Warranty. Seller and Purchase each represent and warrant that neither they nor the officers and directors controlling Purchaser are acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by the United States Treasury Department as a Specially Designated National and Blocked Person, or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and that they are not engaged in the transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation. Each party hereby agrees to defend, indemnify, and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the foregoing representation and warranty.

**THIS SPACE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.**

IN WITNESS WHEREOF, the parties have executed this Contract on the dates set forth below their signatures.

**SELLER:**                                              PURCHASER:  _NOGRAN BHOY FAMILY LIMITED_
                                                                    _PARTNERSHIP_

McDonald's Corporation                                  Signature _____ by it President, SHABBIR NOMANBHOY_

BY: _____
TITLE: _____                          Signature _____
DATE: _____
                                                        DATE: _June 12, 2008_


**SELLER'S ATTORNEY:**                                  **PURCHASER'S ATTORNEY:**
Bruce Neumann                                           _TO BE DETERMINED_
McDonald's Corporation                                  _____
1 McDonald's Plaza, Dept 067                            _____
Oak Brook, Illinois 60523                               _____
Tel.: 630.623.7556                                      _____
Fax: 630.623.8064                                       _____
                                                        _____

**AUCTIONEER:**
Rick Levin & Associates, Inc. or Rick Levin &
Associates, Inc., in conjunction with Rick Levin,
licensed Indiana auctioneer
1467 North Elston Avenue, 2nd Floor                     **EXHIBITS:**
Chicago, IL 60622
Telephone: 773.252.4500 x223                            Exhibit A: Legal Description
Facsimile: 773.252.4520

EXHIBIT A — LIST OF PROPERTIES

| # | STREET ADDRESS | ~~Legal Description~~ DESCRIPTION |
|---|---|---|
| 1. | 5057 WENTWORTH Av CHICAGO, IL | VACANT LAND — 1.108 ACRES |
| 2. | 10245 ROOSEVELT Rd WESTCHESTER, IL | ~~VACANT~~ LAND — 29,951 SF BUILDING — 21,003F |
| 3. | 130 S. VIRGINIA ST CRYSTAL LAKE, IL | VACANT LAND — 30,445 SF PARCEL # 19-06-204-036 |
| 4. | 6574 N 76ᵗʰ ST MILWAUKEE, WI | ~~BUILDING 3601 SF~~ LAND 22,526 sf |
| 5. | 5377 BROADWAY MERRILVILLE, IN | 1.55 ACRES VACANT LAND |

SELLER _____        PURCHASER _____

# Exhibit 5

## REAL ESTATE SALES CONTRACT  — VERSION 1
### WITH EXHIBIT A & B-1

**1.  Parties.**

Seller:
McDonald's Corporation or its nominee
One McDonald's Plaza
Oak Brook, Illinois 60523
Tel.: 630.836.4982
Fax: 630.836.4804

Purchaser:
*NOMANBHOY FAMILY LIMITED PARTNERSHIP*
*(OR TRUST, OR IRA, ACCOUNTS OF NOMANGHOY FAMILY)*
*11254 MT CREST PLACE*
*CUPERTINO, CA 95014*
*Tel 408 996-8786    cell 408 507-7863*
*Email SHABBIR. NOMANBHOY @ GMAIL.COM*

**2.  Purchase Price**

| | | |
|---|---|---|
| 2.1. High Bid Price | | $ |
| 2.2 Buyer's Premium (3% of 2.1) | *BULK SALE OFFER* | $ |
| 2.3. Purchase Price (2.1 + 2.2) | *FOR 5 PROPERTIES* | $ *1,400,000.00* |
| 2.4. Total Earnest Money Required (10% of 2.3) | | $ *140,000.00* |
| 2.5. Initial Earnest Money Deposit | | $ |
| 2.6. Additional Earnest Money Required (2.4- 2.5) | | $ |
| 2.7. Balance of Purchase Price Due at Closing (2.3- 2.4) | | $ *1,260,000.00* |

**3.    Agreement to Sell and Purchase.**  Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller, at the price and on the terms set forth herein, the real estate consisting of ~~that parcel~~ of land identified on Rider 1 attached to this Contract (the "Property") and more particularly described on Exhibit "A" attached hereto.

**4.    All Cash Transaction.**  This is an all-cash sale and purchase, and is NOT contingent upon Purchaser obtaining financing even though Purchaser may apply to a lending institution of Purchaser's choice for a mortgage loan. Purchaser understands and agrees that neither their receipt of a commitment from such a lending institution, their acceptance of such a commitment, nor their satisfaction of any condition set forth in such a commitment shall in any way be conditions of Purchaser's obligations under this Contract. Seller makes no representation or warranty as to Purchaser's ability to obtain financing.

**5.    Earnest Money.**    Purchaser ~~has deposited~~ *will upon acceptance* the Initial Earnest Money set forth in Paragraph 2.5 ~~and receipt is hereby acknowledged.~~ The Additional Earnest Money Required set forth in Paragraph 2.6 shall be paid by cash or cashier's check, payable to the order of the Escrow Agent (as set forth on Rider 1 attached to this Real Estate Sales Contract) and received by Escrow Agent on or before noon on Thursday, June 26, 2008, at the offices of Escrow Agent. The Additional Earnest Money Required may be paid by personal check only if paid on the date of the auction at the time this Contract is executed. All earnest money shall be held by Escrow Agent for the benefit of the parties. Purchaser acknowledges that TIME IS OF THE ESSENCE with respect to the payment of any additional earnest money and the closing of this sale. Upon Seller's execution of this Contract, Rick Levin & Associates, Inc. or Rick Levin & Associates, Inc., in conjunction with Rick Levin, licensed Indiana auctioneer, as applicable ("Auctioneer") shall deposit the Earnest Money with the Escrow Agent for the mutual benefit of Purchaser and Seller.

**6.    The "Closing".**  The purchase and sale of the Property shall be closed (the "Closing") on Tuesday, August 5, 2008, or on such other date as agreed to by the parties.  Closing shall take place at an office of Chicago Title Company or such other title company as agreed to between Seller and Purchaser (the "Title Company") at such location as approved by Seller.  Purchaser may use the proceeds of a money lender's escrow to pay the balance of the Purchase Price, provided that the terms of the money lender's escrow are not inconsistent with the terms of this Contract or the Escrow Agreement.  Purchaser shall deposit, by certified funds, wire transfer or a bank cashiers check made payable to Title Company, all funds necessary to close the transaction contemplated by this Contract and shall promptly deliver and execute all required documents.

Rx Date/Time      JUN-17-2008(TUE) 01:44              4089962786                      P. 003
04/11/2008  05:01  4089962786              NDMANBHOYS                    PAGE  03

7. **Delivery of Deed.** On the Closing Date, Seller shall convey or cause to be conveyed to Purchaser by recordable Limited or Special Warranty or Trustee's Deed, title to the Property subject only to the following matters ("Permitted Exceptions"):

7.1. general real estate taxes for the years 2007 and 2008 and subsequent years;

7.2. covenants, conditions and restrictions of record (including without limitation such easements and restrictions as may be recorded after the date hereof which Seller determines are necessary or appropriate);

7.3. certain mutually beneficial restrictions and obligations with respect to the proper use, conduct and maintenance of the Property and other property (Purchaser hereby authorizes Seller to record any such restrictions and obligations as covenants affecting the Property and other property)X *AFTER REVIEW & AGREEMENT BY PURCHASER*

7.4. private and/or public utility easements, roads and highways, if any, whether or not of record;

7.5. all matters which a current, accurate survey of the Property would disclose;

7.6. applicable zoning and building lines and ordinances;

7.7. In the event Seller or any entity related to Seller is the owner of or otherwise has an interest in any adjacent property, a reservation to Seller or its nominee of the right and privilege of Seller, its leasees, franchisees, successors and assigns to use and enjoy the benefit of all existing private utilities, drainage areas and access ways of any kind, whatsoever, if any;

7.8. ~~Purchaser agrees to accept in Seller's deed to Purchaser a restriction prohibiting the Property from being used for restaurant purposes for a period of 20 years from the date of the deed. Purchaser agrees that the restriction shall be a covenant running with the land and be binding upon Purchaser, its heirs, administrators, successors and assigns.~~ *SEE ATTACHED RESTRICTIVE*

7.9. acts done or suffered by Purchaser or by any party claiming by, through or under Purchaser; *COVENANT*

7.10. party wall rights, if any; and *EXHIBIT B—1*

7.11. all installments of special assessments heretofore levied falling due after date of closing.

8. **Title/Survey.** At least five *BUSINESS* days prior to Closing, Seller shall show to Purchaser or his agent evidence of merchantable title in the intended grantor by delivering a Commitment for Title Insurance issued by the Title Company bearing date on or subsequent to the date of the acceptance of this Contract, in the amount of the Purchase Price subject to no other exceptions than those listed in Paragraph 7 and to general exceptions contained in said commitment. Every Commitment for Title Insurance furnished by Seller hereunder shall be conclusive evidence of title as therein shown. If evidence of title discloses other exceptions, Seller shall have thirty (30) days from Seller's receipt of evidence of title to cure such exceptions and notify Purchaser accordingly, and as to those exceptions which may be removed at closing by payment of money, Seller may have same removed at closing by using the proceeds of sale in payment thereof. Seller has ~~...~~ delivered a copy of any survey of the property ~~in Seller's possession~~ to Purchaser. If Seller is unable to have such defects cured or waived within 30 days, Purchaser may, as its sole remedy, terminate this Contract within 10 days thereafter. In no event shall Seller have any obligation to commence litigation or to expend money to cure or remove any title objections. Seller and Purchaser acknowledge and agree that Seller shall not be obligated to provide any new or updated survey to Purchaser.

9. **Payments at Closing.** Purchaser shall pay all recording charges, all money lender's charges (including money lender's escrow fees), municipal transaction tax stamps, if applicable, escrow fees and any and all title insurance charges.

10. **Possession.** Purchaser shall be entitled to occupancy and possession of the Property from and after the Closing date provided final payment of the Purchase Price has been made and the Closing has been fully consummated. Prior to Closing, Seller shall have sole control and exclusive possession of the Property.

11. **Prorations.** At closing, Purchaser shall receive, to the extent that they have not been paid, a credit for real estate taxes for 2007 and 2008. In the event the actual amount of the tax bills is unknown, such credit shall be based on 105% of the most recent ascertainable general real estate tax bill for the Property. General real estate taxes shall be prorated to the date of closing. If the real estate tax bill includes additional property owned by Seller, at Closing Purchaser shall give Seller a credit for taxes from the date of Closing through the remainder of the tax year and the parties shall complete a tax division on the Property such that it shall be separately assessed. Prior to such separate assessment, Seller and Purchaser shall each pay their pro rata share of the tax bill based upon the square footage of each parcel. All prorations are final. All other items customarily prorated shall be prorated as of the date of closing.

12. **Intentionally Deleted**

13. **Commission/Broker-Agency Disclosure.** Seller shall cause to be paid a broker's commission to Auctioneer at closing, as provided in the Exclusive Agreement For Auctioneering Services between the Seller and Auctioneer. The provisions of this paragraph shall survive the closing.   Purchaser represents and warrants to Seller that no auctioneer or broker, other than Auctioneer and _____NONE_____ ("Participating Broker") was involved in showing, submitting or selling the Property to Purchaser. Purchaser agrees to indemnify and hold Seller, Auctioneer and Participating Broker, if any, harmless and defend them from any claim relating to Purchaser's purchase of the Property asserted against the Seller or Auctioneer by any broker other than as set forth in this Paragraph 13.  The provisions of this Paragraph shall survive the closing.  Purchaser acknowledges that Auctioneer and its licensed associates represent the Seller as Seller's agent in the sale of this Property.

14. **Irrevocable Offer.** Purchaser's execution and delivery of this Contract is an irrevocable offer to purchase the Property made to Seller and shall not be binding upon Seller until executed by Seller, or Seller's duly authorized agent.  Purchaser agrees that this offer shall remain irrevocable until 5:00 p.m. Chicago time on Monday, June 23, 2008.  Notification of Seller's acceptance may be given pursuant to the notice provision in this Contract or by telephone.  Seller's, or a duly authorized agent of Seller's, failure to notify Purchaser on a timely basis that Seller rejects Purchaser's offer shall not constitute acceptance or rejection of Purchaser's offer, but Purchaser's offer shall then become revocable by Purchaser.  If Seller rejects Purchaser's offer or Purchaser's offer is effectively revoked, all deposits made by Purchaser shall be promptly returned to Purchaser.

15. **Default.**
    15.1.    **Purchaser's Default.** At Seller's option, Purchaser shall be in default under the terms of this Contract if, in addition to any other default specified herein, Purchaser shall:

        15.1.1. fail to close pursuant to the terms hereof;
        15.1.2. fail to timely make any payment required of Purchaser hereunder;
        15.1.3. reserved;
        15.1.4. fail to appear at the time and place designated by Seller, as provided herein, to close the transaction; or
        15.1.5. fail to make Closing deposits at the times required thereunder.

        15.1.6. If Seller declares Purchaser in default pursuant to the terms herein, or if Purchaser fails or refuses to carry out any other obligation of Purchaser under the terms of this Contract and any supplemental agreements made a part hereof, or Purchaser defaults under any provision hereof, then, at Seller's option, this Contract is terminated, and, upon notice to Purchaser, the earnest money shall be forfeited. Seller may also elect to assert against Purchaser any other remedy available, at law or in equity.

16. **Demand For Earnest Money.** Purchaser and Seller hereby agree that if Seller makes a demand upon Auctioneer stating that Seller has thereby elected to forfeit Purchaser's earnest money, and demanding that Auctioneer remit to Seller any earnest money deposited by Purchaser with Auctioneer, pursuant to Paragraph 15.1.6, whereupon Auctioneer shall serve notice upon both parties as to same by certified mail, return receipt requested. Purchaser shall have seven (7) days from the date Auctioneer deposits the notice in the U. S. mail with sufficient postage prepaid to (a) cure the default; or (b) object in writing to Auctioneer of the intended disposition of earnest money.  The mailing of a notice by certified mail, return receipt requested, shall be sufficient service when the notice is mailed.  If Purchaser fails to cure the default or Auctioneer does not receive Purchaser's written objection within said seven (7) day period, then Auctioneer is hereby authorized by Purchaser and Seller to remit same to Seller (reduced by any monies due Auctioneer from Seller, if any), and Purchaser's right under this Contract shall be forfeited, and the Contract shall be terminated without further action by either party or Auctioneer. Seller is then free to sell the Property to any other party.

17. **Interpleader.** If either party objects to the intended disposition in writing within the aforementioned seven (7) day grace period, then the parties hereto agree that Auctioneer may deposit such earnest money, less costs, with the Clerk of the Circuit Court of Cook County by filing an action in the nature of interpleader. The parties agree that Auctioneer may be reimbursed from the earnest money for all costs, including reasonable attorney's fees, relating to the filing of the interpleader and do hereby agree to indemnify, defend and hold Auctioneer harmless from any and all claims and demands, including the payment of reasonable attorney's fees, costs and expenses arising out of such default claims and demands.

18. Warranty And Disclaimer Of Warranties.  PURCHASER REPRESENTS THAT EITHER PURCHASER OR A DULY AUTHORIZED AGENT OF PURCHASER HAS INSPECTED, OR WAIVES THE RIGHT TO INSPECT, THE PROPERTY AND VERIFIED THE FACTS AND INFORMATION CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER PRIOR TO ~~EXECUTING THIS CONTRACT~~.  PURCHASER WARRANTS THAT PURCHASER IS PURCHASING THE PROPERTY, ALL IMPROVEMENTS, FIXTURE, EQUIPMENT AND PERSONAL PROPERTY,  THEREOF ON AN "AS-IS, WHERE-IS" BASIS, WITH ALL FAULTS AND WITH NO WARRANTIES OF ANY KIND, EXPRESS OF IMPLIED, EITHER ORAL OR WRITTEN, EXCEPT AS EXPRESSLY STATED IN THIS CONTRACT, WHETHER OF HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION OF IMPROVEMENTS, ENVIRONMENTAL CONDITION OR OTHERWISE MADE BY SELLER, AUCTIONEER OR ANY AGENT OF EITHER OF THEM, INCLUDING, BUT NOT LIMITED TO, INFORMATION CONTAINED IN THE SALES BROCHURE, ADVERTISING OR  SUPPLEMENTAL BROCHURES.  NEITHER SELLER, AUCTIONEER, NOR ANY OF THEIR AGENTS ASSUME ANY LIABILITY FOR INACCURACIES, ERRORS OR OMISSIONS CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER.

PURCHASER'S INITIALS: _____

By executing this Contract, Purchaser expressly represents and agrees that Purchaser is not relying upon any representative warranty or statement by Seller, Auctioneer or its or their sales representatives which differs from the disclosures made in this Contract. Purchaser acknowledges that Purchaser has not relied upon any sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Seller, Auctioneer or others, including, but not limited to, any relating to the description of physical condition of the Property, or the dimensions of the Property or any other physical dimensions thereof, the estimated real estate taxes of the Property, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other data, except as may be specifically represented herein. Purchaser has relied on their own examination and investigation thereof. No person has been authorized to make any representation on behalf of Seller. Purchaser agrees (a) to purchase the Property without offset or any claim against, or liability to, Seller or its agents, whether or not any layout or dimension of the Property or any part thereof, is accurate or correct, and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error.  The provisions of this paragraph shall survive the Closing.

SELLER AGREES THAT NO MATERIAL DIFFERENCES EXIST FROM RICKLEVIN WEBSITE INFORMATION.

PURCHASER'S INITIALS: _____

19. Notices.  All notices herein required shall be in writing and signed by either party, and shall be served on the other party at the addresses set forth in Paragraph 1.  The mailing of a notice by registered or certified mail, return receipt requested with sufficient postage prepaid, shall be sufficient service when the notice is mailed.  Notices may also be served by a nationally recognized air courier, or personal delivery. Notices sent by air courier shall be deemed delivered on the date of receipt.  Either party may change its address for notice purposes by giving notice to that effect in the manner set forth herein, provided such change of address shall not be deemed received until actual receipt thereof by the addressee.  Any notices required herein may be sent by and to each party's respective attorney.

20. Attorney Review.  PURCHASER REPRESENTS THAT PURCHASER HAS BEEN ADVISED BY THE SELLER AND AUCTIONEER TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS CONTRACT.  PURCHSER FURTHER ACKNOWLEDGES THAT HE HAS READ AND UNDERSTANDS EACH AND EVERY PART OF THIS CONTRACT.

21. Property Condition.  The parties hereto acknowledge that Auctioneer is not obligated to and has not made any independent investigation of the condition of the Property including, but not limited to, any environmental matters with respect thereto (collectively the "Physical Condition").  The parties hereto further acknowledge that all investigations, reports and information with respect to the Physical Condition, if any, have been prepared by or for the Seller and have been furnished by Auctioneer to Purchaser on behalf of Seller. Seller makes no representation as to the truth or accuracy of any such investigations, reports and/or information.

22. Statutory Compliance.  Purchaser and Seller hereby agree to make all disclosures and do all things necessary to comply with the applicable provisions of the Real Estate Settlement Procedures Act of 1974, as amended.  Purchaser and Seller agree to make all certifications and do all things necessary to comply with Section 1445 of the Internal Revenue Code at or before the time of Closing.

23. Stamp Taxes.  Seller shall furnish a completed declaration signed by the Seller or Seller's agent in the form required by the state and county, and shall furnish any declaration signed by the Seller or Seller's agent or meet other requirements as established by any local ordinance with regard to a transfer or transaction tax.

24. Use of Pronouns. Wherever appropriate, the singular includes the plural and the masculine includes the feminine or the neuter. The term "Purchaser" shall be interpreted as "Purchasers" if more than one person are purchasing the Property, and their obligations shall be joint and several.

25. No Assignment. Purchaser shall not directly or indirectly assign or transfer his rights under this Contract without prior written approval of Seller which may be granted or withheld in the sole and absolute discretion of Seller. Seller may assign this Contract without the consent of Purchaser, subject, however, to Purchaser's rights hereunder. Any attempted assignment or transfer by Purchaser without Seller's prior written consent shall be deemed null and void and shall be considered an event of default by Purchaser subject to the provisions of Paragraph 16.2 of this Contract.

26. Headings; Exhibits. The paragraph headings used herein are for the reader's convenience only and they shall not be used to interpret the meaning of the terms set forth herein. Exhibits attached hereto are incorporated as a part of this Contract.

27. Governing Law. The parties agree that any litigation or dispute concerning the enforcement of this Contract shall be brought in the State of Illinois, the jurisdiction shall be the county in which the Property is located, and that Illinois law shall govern its interpretation.

28. Complete Agreement; Severability. This Contract sets forth the entire understanding between the parties relating to the transactions described herein, there being no terms, conditions, warranties or representations other than those contained herein. This Contract may be amended only in an instrument signed by both parties hereto. The parties intend that faxed signatures and that a faxed Contract containing the signatures (original or faxed) of all parties is binding on the parties. At the request of either party, any faxed document subject to this paragraph shall be re-executed by both parties in an original form. Neither party shall raise the use of a facsimile machine as a defense to this Contract and shall forever waive such defense. If any provision of this Contract is invalid or unenforceable as against any party under certain circumstances, the remainder of this Contract and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Contract, except as otherwise herein provided shall be valid and enforced to the fullest extent permitted by law.

29. Invalidity. The invalidity of any covenant, grant, condition or provision of this Contract shall not impair or affect in any manner the validity, enforceability or effect of the remainder of the Contract.

30. Purchaser's Status. Purchaser represents and warrants there is nothing in Purchaser's status which could or might preclude or prevent Purchaser from consummating this transaction as herein set forth. Purchaser also agrees that he or she shall not cause any labor or material to be incorporated or delivered to the Property prior to Closing.

31. Binding Agreement. The terms and provisions of this contract shall be binding upon the parties hereto and their heirs, administrators, executors, successors, and permitted assigns.

32. Request for Escrow. At the request of Seller or Purchaser, evidenced by written notice to the other party at any time prior to the date for delivery of deed hereunder, this sale shall be closed through an escrow with the Title Company, in accordance with the general provisions of the usual form of Deed and Money Escrow Agreement then furnished and in use by said company, with such special provisions inserted in the escrow agreement as may be required to conform with this Contract. Upon the creation of such an escrow, anything herein to the contrary notwithstanding, payment of purchase price and delivery of deed shall be made through the escrow and this Contract and the earnest money shall be deposited in the escrow and Auctioneer shall be made a party to the escrow with regard to commission due. The cost of the escrow shall be paid by the party requesting it.

33. Other Documents. Seller agrees to furnish an affidavit of title subject only to those items set forth herein, and an ALTA statement if required by Purchaser's mortgagee, and transfer tax declarations.

34. Existing Mortgage. Seller shall have the right to pay off any existing mortgage(s) out of the proceeds of this sale.

35. Indemnify. Purchaser covenants to indemnify, defend and hold Seller harmless against any and all losses, claims, damages, liabilities, costs (including reasonable attorney's fees and court costs), and causes of action including, without limitation, those arising from mechanics liens, injuries to person or damage to property, including the Property, suffered or incurred by Seller directly or indirectly, as a result of, the entry onto the Property by Purchaser, Purchaser's agents, contractors, employees, and licensees.

Rx Date/Time      JUN-17-2008(TUE) 01:44          4089962786              P. 007
04/11/2008   05:01   4089962786              NOMANBHOYS            PAGE   07

36.   Anti-Terrorism Representation and Warranty. Seller and Purchase each represent and warrant that neither they nor the officers and directors controlling Purchaser are acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by the United States Treasury Department as a Specially Designated National and Blocked Person, or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and that they are not engaged in the transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation. Each party hereby agrees to defend, indemnify, and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the foregoing representation and warranty.

**THIS SPACE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.**

IN WITNESS WHEREOF, the parties have executed this Contract on the dates set forth below their signatures.

SELLER:                                          PURCHASER:  NOMANBHOY FAMILY LIMITED
                                                                          PARTNERSHIP
McDonald's Corporation                           _____
                                                 Signature  by it President
BY:_____                     SHABBIR NOMANBHOY
TITLE:_____                     _____
DATE:_____                     Signature

                                                 DATE:  June  16,  08

SELLER'S ATTORNEY:                               PURCHASER'S ATTORNEY:
Bruce Neumann                                    To be determined
McDonald's Corporation                           _____
1 McDonald's Plaza, Dept 067                     _____
Oak Brook, Illinois 60523                        _____
Tel.: 630.623.7556                               _____
Fax: 630.623.6064                                _____
                                                 _____
  AUCTIONEER:
    Rick Levin & Associates, Inc. or Rick Levin &
    Associates, Inc., in conjunction with Rick Levin,
    licensed Indiana auctioneer
    1467 North Elston Avenue, 2nd Floor          EXHIBITS:
    Chicago, IL 60622
    Telephone: 773.252.4600 x223                 Exhibit A: Legal Description
    Facsimile:  773.252.4520

Rx Date/Time     JUN-17-2008(TUE) 01:44          4089962786                    P.009
04/11/2008   05:01    4089962786          NOMANBHOYS                   PAGE  09

EXHIBIT A

LIST OF PROPERTIES  — Legal Description  — ALL FORMER McDONALDS RESTAURANTS

| # | ADDRESS | BRIEF DESCRIPTION FROM RICH LEVIN WEBSITE |
|---|---------|-------------------------------------------|
| 1. | 5057 WENTWORTH CHICAGO, IL | VACANT LAND — 1.108 ACRES |
| 2. | 10245 ROOSEVELT RD WESTCHESTER, IL | LAND — 29,951 SF BUILDING — 31005F (UNOCCUPIED) |
| 3. | 130 S. VIRGINIA ST CRYSTAL LAKE, IL | VACANT LAND — 26,000 SF |
| 4. | 6574 N. 76th ST MILWAUKEE, WIS | VACANT LAND — 22,526 SF |
| 5. | 5377 BROADWAY MERRILVILLE, IN | VACANT LAND — 1.55 ACRES (2 PARCELS) |

*EXHIBIT  B — 1*

**Restrictive Covenant:**

*THE FOLLOWING FAST FOOD RESTAURANTS*

Purchaser will not lease/sell to ~~any tenant/buyer~~ whose primary purpose is the sale
of hamburgers, chicken ~~and/or coffee.~~

~~In addition,~~ The following restaurants operating under the listed trade names, or
operating under any successor trade names, are prohibited:

Apolo Burgers  Astro Burgers

Atlanta Burgers  A & W

Backyard Burgers  Burger Chef

Burger King  Burger Street

Carl's Jr.  ~~Caribou Coffee~~

Checkers  Cheeburger, Cheeburger

Chick-Fil-A  Church's Chicken

Crown Burgers  Crystal Burgers

Culvers  ~~Dunkin Donuts~~

~~Friendly's~~  Hardee's

Harold's Chicken  In N Out Burgers

Jack-in-the-Box  ~~Jamba Juice~~

KFC    Popeye's Chicken

Rally's  Sonic

~~Starbuck's~~  Steak 'N' Shake

Tim Horton's  Whataburger

Wendy's   Whitecastle

# Exhibit 6

## REAL ESTATE SALES CONTRACT — VERSION 2
### WITH EXHIBIT A & B2

1. **Parties.**

   **Seller:** McDonald's Corporation or its nominee
   One McDonald's Plaza
   Oak Brook, Illinois 60523
   Tel.: 630.836.4982
   Fax: 630.836.4804

   **Purchaser:** NOMANBHOY FAMILY LIMITED PARTNERSHIP
   (OR TRUST, OR IRA ACCOUNTS OF NOMANBHOY FAMILY)
   11254 MT CREST PLACE
   CUPERTINO, CA 95014
   Tel 408 996-8786    call 408 507-7863
   Email SHABBIR.NOMANBHOY@GMAIL.COM

2. **Purchase Price**
   2.1. High Bid Price                                    $ _____
   2.2. Buyer's Premium (3% of 2.1)   BULK SALE OFFER      $ _____
   2.3. Purchase Price (2.1 + 2.2)    FOR 5 PROPERTIES     $ 1,400,000.00
   2.4. Total Earnest Money Required (10% of 2.3)          $ 140,000.00
   2.5. Initial Earnest Money Deposit                      $ _____
   2.6. Additional Earnest Money Required (2.4- 2.5)       $ _____
   2.7. Balance of Purchase Price Due at Closing (2.3- 2.4) $ 1,260,000.00

3. **Agreement to Sell and Purchase.** Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller, at the price and on the terms set forth herein, the real estate consisting of that parcel of land identified on Rider 1 attached to this Contract (the "Property") and more particularly described on Exhibit "A" attached hereto. EXHIBIT A

4. **All Cash Transaction.** This is an all-cash sale and purchase; and is NOT contingent upon Purchaser obtaining financing even though Purchaser may apply to a lending institution of Purchaser's choice for a mortgage loan. Purchaser understands and agrees that neither their receipt of a commitment from such a lending institution, their acceptance of such a commitment, nor their satisfaction of any condition set forth in such a commitment shall in any way be conditions of Purchaser's obligations under this Contract. Seller makes no representation or warranty as to Purchaser's ability to obtain financing.

5. **Earnest Money.** Purchaser has deposited WILL upon ACCEPTANCE the Initial Earnest Money set forth in Paragraph 2.5 and receipt is hereby acknowledged. The Additional Earnest Money Required set forth in Paragraph 2.6 shall be paid by cash or cashier's check, payable to the order of the Escrow Agent (as set forth on Rider 1 attached to this Real Estate Sales Contract) and received by Escrow Agent on or before noon on Thursday, June 26, 2008, at the offices of Escrow Agent. The Additional Earnest Money Required may be paid by personal check only if paid on the date of the auction at the time this Contract is executed. All earnest money shall be held by Escrow Agent for the benefit of the parties. Purchaser acknowledges that TIME IS OF THE ESSENCE with respect to the payment of any additional earnest money and the closing of this sale. Upon Seller's execution of this Contract, Rick Levin & Associates, Inc. or Rick Levin & Associates, Inc., in conjunction with Rick Levin, licensed Indiana auctioneer, as applicable ("Auctioneer") shall deposit the Earnest Money with the Escrow Agent for the mutual benefit of Purchaser and Seller.

6. **The "Closing"** The purchase and sale of the Property shall be closed (the "Closing") on Tuesday, August 5, 2008, or on such other date as agreed to by the parties. Closing shall take place at an office of Chicago Title Company or such other title company as agreed to between Seller and Purchaser (the "Title Company") at such location as approved by Seller. Purchaser may use the proceeds of a money lender's escrow to pay the balance of the Purchase Price, provided that the terms of the money lender's escrow are not inconsistent with the terms of this Contract or the Escrow Agreement. Purchaser shall deposit, by certified funds, wire transfer or a bank cashiers check made payable to Title Company, all funds necessary to close the transaction contemplated by this Contract and shall promptly deliver and execute all required documents.

7. <u>Delivery of Deed</u>. On the Closing Date, Seller shall convey or cause to be conveyed to Purchaser by recordable Limited or Special Warranty or Trustee's Deed, title to the Property subject only to the following matters ("Permitted Exceptions"):

   7.1. general real estate taxes for the years 2007 and 2008 and subsequent years;

   7.2. covenants, conditions and restrictions of record (including without limitation such easements and restrictions as may be recorded after the date hereof which Seller determines are necessary or appropriate);

   7.3. certain mutually beneficial restrictions and obligations with respect to the proper use, conduct and maintenance of the Property and other property (Purchaser hereby authorizes Seller to record any such restrictions and obligations as covenants affecting the Property and other property)X AFTER REVIEW & AGREEMENT BY PURCHASER

   7.4. private and/or public utility easements, roads and highways, if any, whether or not of record;

   7.5. all matters which a current, accurate survey of the Property would disclose;

   7.6. applicable zoning and building lines and ordinances;

   7.7. in the event Seller or any entity related to Seller is the owner of or otherwise has an interest in any adjacent property, a reservation to Seller or its nominee of the right and privilege of Seller, its lessees, franchisees, successors and assigns to use and enjoy the benefit of all existing private utilities, drainage areas and access ways of any kind, whatsoever, if any;

   7.8. ~~Purchaser agrees to accept in Seller's deed to Purchaser a restriction prohibiting the Property from being used for restaurant purposes for a period of 20 years from the date of the deed. Purchaser agrees that the restriction shall be a covenant running with the land and be binding upon Purchaser, its heirs, administrators, successors and assigns.~~ BUSINESS SEE ATTACHED RESTRICTIVE

   7.9. acts done or suffered by Purchaser or by any party claiming by, through or under Purchaser; COVENANT

   7.10. party wall rights, if any; and EXHIBIT B-2

   7.11. all installments of special assessments heretofore levied falling due after date of closing.

8. <u>Title/Survey</u>. At least five BUSINESS days prior to Closing, Seller shall show to Purchaser or his agent evidence of merchantable title in the intended grantor by delivering a Commitment for Title Insurance issued by the Title Company bearing date on or subsequent to the date of the acceptance of this Contract, in the amount of the Purchase Price subject to no other exceptions than those listed in Paragraph 7 and to general exceptions contained in said commitment. Every Commitment for Title Insurance furnished by Seller hereunder shall be conclusive evidence of title as therein shown. If evidence of title disclose other exceptions, Seller shall have thirty (30) days from Seller's receipt of evidence of title to cure such exceptions and notify Purchaser accordingly, and as to those exceptions which may be removed at closing by payment of money, Seller may have same removed at closing by using the proceeds of sale in payment thereof. Seller has will deliver a copy of any survey of the property in Seller's possession to Purchaser. If Seller is unable to have such defects cured or waived within 30 days, Purchaser may, as its sole remedy, terminate this Contract within 10 days thereafter. In no event shall Seller have any obligation to commence litigation or to expend money to cure or remove any title objections. Seller and Purchaser acknowledge and agree that Seller shall not be obligated to provide any new or updated survey to Purchaser.

9. <u>Payments at Closing</u>. Purchaser shall pay all recording charges, all money lender's charges (including money lender's escrow fees), municipal transaction tax stamps, if applicable, escrow fees and any and all title insurance charges.

10. <u>Possession</u>. Purchaser shall be entitled to occupancy and possession of the Property from and after the Closing date provided final payment of the Purchase Price has been made and the Closing has been fully consummated. Prior to Closing, Seller shall have sole control and exclusive possession of the Property.

11. <u>Prorations</u>. At closing, Purchaser shall receive, to the extent that they have not been paid, a credit for real estate taxes for 2007 and 2008. In the event the actual amount of the tax bills is unknown, such credit shall be based on 105% of the most recent ascertainable general real estate tax bill for the Property. General real estate taxes shall be prorated to the date of closing. If the real estate tax bill includes additional property owned by Seller, at Closing Purchaser shall give Seller a credit for taxes from the date of Closing through the remainder of the tax year and the parties shall complete a tax division on the Property such that it shall be separately assessed. Prior to such separate assessment, Seller and Purchaser shall each pay their pro rata share of the tax bill based upon the square footage of each parcel. All prorations are final. All other items customarily prorated shall be prorated as of the date of closing.

12. <u>Intentionally Deleted</u>

13. Commission/Broker-Agency Disclosure. Seller shall cause to be paid a broker's commission to Auctioneer at closing, as provided in the Exclusive Agreement For Auctioneering Services between the Seller and Auctioneer. The provisions of this paragraph shall survive the closing. Purchaser represents and warrants to Seller that no auctioneer or broker, other than Auctioneer and _____ NONE _____ ("Participating Broker") was involved in showing, submitting or selling the Property to Purchaser. Purchaser agrees to indemnify and hold Seller, Auctioneer and Participating Broker, if any, harmless and defend them from any claim relating to Purchaser's purchase of the Property asserted against the Seller or Auctioneer by any broker other than as set forth in this Paragraph 13. The provisions of this Paragraph shall survive the closing. Purchaser acknowledges that Auctioneer and its licensed associates represent the Seller as Seller's agent in the sale of this Property.

14. Irrevocable Offer. Purchaser's execution and delivery of this Contract to Seller is an irrevocable offer to purchase the Property made to Seller and shall not be binding upon Seller until executed by Seller, or Seller's duly authorized agent. Purchaser agrees that this offer shall remain irrevocable until 5:00 p.m. Chicago time on Monday, June 23, 2008. Notification of Seller's acceptance may be given pursuant to the notice provision in this Contract or by telephone. Seller's, or a duly authorized agent of Seller's, failure to notify Purchaser on a timely basis that Seller rejects Purchaser's offer shall not constitute acceptance or rejection of Purchaser's offer, but Purchaser's offer shall then become revocable by Purchaser. If Seller rejects Purchaser's offer or Purchaser's offer is effectively revoked, all deposits made by Purchaser shall be promptly returned to Purchaser.

15. Default.
    15.1.    Purchaser's Default. At Seller's option, Purchaser shall be in default under the terms of this Contract if, in addition to any other default specified herein, Purchaser shall:

        15.1.1. fail to close pursuant to the terms hereof;
        15.1.2. fail to timely make any payment required of Purchaser hereunder;
        15.1.3. reserved;
        15.1.4. fail to appear at the time and place designated by Seller, as provided herein, to close the transaction; or
        15.1.5. fail to make Closing deposits at the times required thereunder.

        15.1.6. If Seller declares Purchaser in default pursuant to the terms herein, or if Purchaser fails or refuses to carry out any other obligation of Purchaser under the terms of this Contract and any supplemental agreements made a part hereof, or Purchaser defaults under any provision hereof, then, at Seller's option, this Contract is terminated, and, upon notice to Purchaser, the earnest money shall be forfeited. Seller may also elect to assert against Purchaser any other remedy available, at law or in equity.

16. Demand For Earnest Money. Purchaser and Seller hereby agree that if Seller makes a demand upon Auctioneer stating that Seller has thereby elected to forfeit Purchaser's earnest money, and demanding that Auctioneer remit to Seller any earnest money deposited by Purchaser with Auctioneer, pursuant to Paragraph 15.1.6, whereupon Auctioneer shall serve notice upon both parties as to same by certified mail, return receipt requested. Purchaser shall have seven (7) days from the date Auctioneer deposits the notice in the U.S. mail with sufficient postage prepaid to (a) cure the default; or (b) object in writing to Auctioneer of the intended disposition of earnest money. The mailing of a notice by certified mail, return receipt requested, shall be sufficient service when the notice is mailed. If Purchaser fails to cure the default or Auctioneer does not receive Purchaser's written objection within said seven (7) day period, then Auctioneer is hereby authorized by Purchaser and Seller to remit same to Seller (reduced by any monies due Auctioneer from Seller, if any), and Purchaser's right under this Contract shall be forfeited, and the Contract shall be terminated without further action by either party or Auctioneer. Seller is then free to sell the Property to any other party.

17. Interpleader. If either party objects to the intended disposition in writing within the aforementioned seven (7) day grace period, then the parties hereto agree that Auctioneer may deposit earnest money, less costs, with the Clerk of the Circuit Court of Cook County by filing an action in the nature of interpleader. The parties agree that Auctioneer may be reimbursed from the earnest money for all costs, including reasonable attorney's fees, relating to the filing of the interpleader and do hereby agree to indemnify, defend and hold Auctioneer harmless from any and all claims and demands, including the payment of reasonable attorney's fees, costs and expenses arising out of such default claims and demands.

18. Warranty And Disclaimer Of Warranties.  PURCHASER REPRESENTS THAT EITHER PURCHASER OR A DULY AUTHORIZED AGENT OF PURCHASER HAS INSPECTED, OR WAIVES THE RIGHT TO INSPECT, THE PROPERTY AND VERIFIED THE FACTS AND INFORMATION CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER PRIOR TO ~~EXECUTING THIS CONTRACT~~.  PURCHASER WARRANTS THAT PURCHASER IS PURCHASING THE PROPERTY, ALL IMPROVEMENTS, FIXTURE, EQUIPMENT AND PERSONAL PROPERTY, THEREOF ON AN "AS-IS, WHERE-IS" BASIS, WITH ALL FAULTS AND WITH NO WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, EITHER ORAL OR WRITTEN, EXCEPT AS EXPRESSLY STATED IN THIS CONTRACT, WHETHER OF HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION OF IMPROVEMENTS, ENVIRONMENTAL CONDITION OR OTHERWISE MADE BY SELLER, AUCTIONEER OR ANY AGENT OF EITHER OF THEM, INCLUDING, BUT NOT LIMITED TO, INFORMATION CONTAINED IN THE SALES BROCHURE, ADVERTISING OR SUPPLEMENTAL BROCHURES. NEITHER SELLER, AUCTIONEER, NOR ANY OF THEIR AGENTS ASSUME ANY LIABILITY FOR INACCURACIES, ERRORS OR OMISSIONS CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER.

PURCHASER'S INITIALS:

By executing this Contract, Purchaser expressly represents and agrees that Purchaser is not relying upon any representative warranty or statement by Seller, Auctioneer or its or their sales representatives which differs from the disclosures made in this Contract. Purchaser acknowledges that Purchaser has not relied upon any sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Seller, Auctioneer or others, including, but not limited to, any relating to the description of physical condition of the Property, or the dimensions of the Property or any other physical dimensions thereof, the estimated real estate taxes of the Property, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other data, except as may be specifically represented herein. Purchaser has relied on their own examination and investigation thereof. No person has been authorized to make any representation on behalf of Seller. Purchaser agrees (a) to purchase the Property without offset or any claim against, or liability to, Seller or its agents, whether or not any layout or dimension of the Property or any part thereof, is accurate or correct, and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the Closing.

SELLER AGREES THAT NO MATERIAL DIFFERENCES EXIST FROM RICK LEVIN WEBSITE INFORMATION.

PURCHASER'S INITIALS

19. Notices.  All notices herein required shall be in writing and signed by either party, and shall be served on the other party at the addresses set forth in Paragraph 1. The mailing of a notice by registered or certified mail, return receipt requested with sufficient postage prepaid, shall be sufficient service when the notice is mailed. Notices may also be served by a nationally recognized air courier, or personal delivery. Notices sent by air courier shall be deemed delivered on the date of receipt. Either party may change its address for notice purposes by giving notice to that effect in the manner set forth herein, provided such change of address shall not be deemed received until actual receipt thereof by the addressee. Any notices required herein may be sent by and to each party's respective attorney.

20. Attorney Review.  PURCHASER REPRESENTS THAT PURCHASER HAS BEEN ADVISED BY THE SELLER AND AUCTIONEER TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS CONTRACT. PURCHSER FURTHER ACKNOWLEDGES THAT HE HAS READ AND UNDERSTANDS EACH AND EVERY PART OF THIS CONTRACT.

21. Property Condition.  The parties hereto acknowledge that Auctioneer is not obligated to and has not made any independent investigation of the condition of the Property including, but not limited to, any environmental matters with respect thereto (collectively the "Physical Condition"). The parties hereto further acknowledge that all investigations, reports and information with respect to the Physical Condition, if any, have been prepared by or for the Seller and have been furnished to Purchaser on behalf of Seller. Seller makes no representation as to the truth or accuracy of any such investigations, reports and/or information.

22. Statutory Compliance.  Purchaser and Seller hereby agree to make all disclosures and do all things necessary to comply with the applicable provisions of the Real Estate Settlement Procedures Act of 1974, as amended. Purchaser and Seller agree to make all certifications and do all things necessary to comply with Section 1445 of the Internal Revenue Code at or before the time of Closing.

23. Stamp Taxes.  Seller shall furnish a completed declaration signed by the Seller or Seller's agent in the form required by the state and county, and shall furnish any declaration signed by the Seller or Seller's agent or meet other requirements as established by any local ordinance with regard to a transfer or transaction tax.

24. **Use of Pronouns.** Wherever appropriate, the singular includes the plural and the masculine includes the feminine or the neuter. The term "Purchaser" shall be interpreted as "Purchasers" if more than one person are purchasing the Property, and their obligations shall be joint and several.

25. **No Assignment.** Purchaser shall not directly or indirectly assign or transfer his rights under this Contract without prior written approval of Seller which may be granted or withheld in the sole and absolute discretion of Seller. Seller may assign this Contract without the consent of Purchaser, subject, however, to Purchaser's rights hereunder. Any attempted assignment or transfer by Purchaser without Seller's prior written consent shall be deemed null and void and shall be considered an event of default by Purchaser subject to the provisions of Paragraph 16.2 of this Contract.

26. **Headings; Exhibits.** The paragraph headings used herein are for the reader's convenience only and they shall not be used to interpret the meaning of the terms set forth herein. Exhibits attached hereto are incorporated as a part of this Contract.

27. **Governing Law.** The parties agree that any litigation or dispute concerning the enforcement of this Contract shall be brought in the State of Illinois, the jurisdiction shall be the county in which the Property is located, and that Illinois law shall govern its interpretation.

28. **Complete Agreement; Severability.** This Contract sets forth the entire understanding between the parties relating to the transactions described herein, there being no terms, conditions, warranties or representations other than those contained herein. This Contract may be amended only in an instrument signed by both parties hereto. The parties intend that faxed signatures and that a faxed Contract containing the signatures (original or faxed) of all parties is binding on the parties. At the request of either party, any faxed document subject to this paragraph shall be re-executed by both parties in an original form. Neither party shall raise the use of a facsimile machine as a defense to this Contract and shall forever waive such defense. If any provision of this Contract is invalid or unenforceable as against any party under certain circumstances, the remainder of this Contract and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Contract, except as otherwise herein provided shall be valid and enforced to the fullest extent permitted by law.

29. **Invalidity.** The invalidity of any covenant, grant, condition or provision of this Contract shall not impair or affect in any manner the validity, enforceability or effect of the remainder of the Contract.

30. **Purchaser's Status.** Purchaser represents and warrants there is nothing in Purchaser's status which could or might preclude or prevent Purchaser from consummating this transaction as herein set forth. Purchaser also agrees that he or she shall not cause any labor or material to be incorporated or delivered to the Property prior to Closing.

31. **Binding Agreement.** The terms and provisions of this contract shall be binding upon the parties hereto and their heirs, administrators, executors, successors, and permitted assigns.

32. **Request for Escrow.** At the request of Seller or Purchaser, evidenced by written notice to the other party at any time prior to the date for delivery of deed hereunder, this sale shall be closed through an escrow with the Title Company, in accordance with the general provisions of the usual form of Deed and Money Escrow Agreement then furnished and in use by said company, with such special provisions inserted in the escrow agreement as may be required to conform with this Contract. Upon the creation of such an escrow, anything herein to the contrary notwithstanding, payment of purchase price and delivery of deed shall be made through the escrow and this Contract and the earnest money shall be deposited in the escrow and Auctioneer shall be made a party to the escrow with regard to commission due. The cost of the escrow shall be paid by the party requesting it.

33. **Other Documents.** Seller agrees to furnish an affidavit of title subject only to those items set forth herein, and an ALTA statement if required by Purchaser's mortgagee, and transfer tax declarations.

34. **Existing Mortgage.** Seller shall have the right to pay off any existing mortgage(s) out of the proceeds of this sale.

35. **Indemnity.** Purchaser covenants to indemnify, defend and hold Seller harmless against any and all losses, claims, damages, liabilities, costs (including reasonable attorney's fees and court costs), and causes of action including, without limitation, those arising from mechanics liens, injuries to person or damage to property, including the Property, suffered or incurred by Seller directly or indirectly, as a result of, the entry onto the Property by Purchaser, Purchaser's agents, contractors, employees, and licensees.

38.  Anti-Terrorism Representation and Warranty. Seller and Purchase each represent and warrant that neither they nor the officers and directors controlling Purchaser are acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by the United States Treasury Department as a Specially Designated National and Blocked Person, or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and that they are not engaged in the transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation. Each party hereby agrees to defend, indemnify, and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the foregoing representation and warranty.

THIS SPACE INTENTIONALLY LEFT BLANK.  SIGNATURE PAGE FOLLOWS.

IN WITNESS WHEREOF, the parties have executed this Contract on the dates set forth below their signatures.

**SELLER:**

McDonald's Corporation

BY:_____
TITLE:_____
DATE:_____

**SELLER'S ATTORNEY:**
Bruce Naumann
McDonald's Corporation
1 McDonald's Plaza, Dept 067
Oak Brook, Illinois 60523
Tel.: 630.623.7556
Fax: 630.623.8064

**AUCTIONEER:**
Rick Levin & Associates, Inc. or Rick Levin &
Associates, Inc., in conjunction with Rick Levin,
licensed Indiana auctioneer
1467 North Elston Avenue, 2nd Floor
Chicago, IL 60622
Telephone: 773.252.4500 x223
Facsimile: 773.252.4520

**PURCHASER:** NOMANBHOY FAMILY LIMITED
PARTNERSHIP

Signature _by its President_
SHABBIR NOMANBHOY

Signature

DATE: June 16, 08

**PURCHASER'S ATTORNEY:**
To be determined
_____
_____
_____
_____
_____
_____

**EXHIBITS:**

Exhibit A: Legal Description

**EXHIBIT A**

LIST OF PROPERTIES  — Legal Description —  ALL FORMER MCDONALDS RESTAURANTS

| # | ADDRESS | BRIEF DESCRIPTION FROM RICH LEVIN WEBSITE | Value of Property |
|---|---------|-------------------------------------------|-------------------|
| 1. | 5057 WENTWORTH CHICAGO, IL | VACANT LAND — 1.108 ACRES | |
| 2. | 10245 ROOSEVELT RD WESTCHESTER, IL | LAND — 29,951 SF  BUILDING — 3,100 SF (UNOCCUPIED) | |
| 3. | 130 S. VIRGINIA ST CRYSTAL LAKE, IL | VACANT LAND — 26,000 SF | |
| 4. | 6574 N. 76th ST MILWAUKEE, WIS | VACANT LAND — 22,526 SF | |
| 5. | 5377 BROADWAY MERRILVILLE, IN | VACANT LAND — 1.55 ACRES (2 PARCELS) | |

*EXHIBIT B-20*

**Restrictive Covenant:**

Purchaser will not lease/sell to ~~any tenant/buyer~~ *THE FOLLOWING FAST FOOD RESTAURANTS* whose primary purpose is the sale of hamburgers, chicken and/or coffee.

~~In addition,~~ The following restaurants operating under the listed trade names, or operating under any successor trade names, are prohibited:

Apolo Burgers  Astro Burgers

Atlanta Burgers A & W

Backyard Burgers Burger Chef

Burger King  Burger Street

Carl's Jr.  Caribou Coffee

Checkers  Cheeburger, Cheeburger

Chick-Fil-A  Church's Chicken

Crown Burgers Crystal Burgers

Culvers  Dunkin Donuts

Friendly's  Hardee's

Harold's Chicken In N Out Burgers

Jack-in-the-Box Jamba Juice

KFC  Popeye's Chicken

Rally's  Sonic

Starbuck's  Steak 'N' Shake

Tim Horton's  Whataburger

Wendy's  Whitecastle

# Exhibit 7

Printed by Bruce Neumann



**Bruce Neumann/mcd/us**
06/18/2008 09:47 AM

**To**  "Ira lauter" <ira@ricklevin.com>

**cc**  mary.meyer@us.mcd.com, rick@ricklevin.com, Keith Magnuson/mcd/us@MCDUS, Tamara Flagg/mcd/us@MCDUS, Katherine A Dunworth/mcd/us, Doris Murray-Norris/mcd/us, shabbir.nomanbhoy@gmail.com

**bcc**

**Subject**  Re: FW: Fwd: Bulk-purchase all-cash offer for Five McDonalds properties

Ira:

Attached is the contract signed by McDonald's.

We have made a few minor changes consistent with the discussions you had with Mary Meyer. The basic changes are:
the earnest money to 15%,
Closing by July 31, 2008
If we fail to close by this date, we will pay the buyer 2% on the earnest money, prorated to the closing date or termination
The restrictive covenant has been slightly changed and attached as Exhibit B
The legal descriptions are attached as Exhibit A-2 through A-6

If the contract is acceptable to the buyer, the changes need to be initialed, the contract signed, the earnest money wired.

Please let us know if you have any questions.

Thanks
Bruce

CORPLEGAL-#492761-v1-Real_Estate_Contract__-_Chicago_Auction_Sites.PDF

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••
*Bruce A. Neumann*
*Director - Senior Counsel*
*Corporate Strategy*
*Central Division*
*McDonald's Corporation*
*2915 Jorie Boulevard – Dept 282*
*Oak Brook, IL 60523*
*Email:  bruce.neumann@us.mcd.com*
*(630) 623-7556 Direct Dial*

*Printed by Bruce Neumann*

*(630) 623-8064 Facsimile*
**************************************************************

## REAL ESTATE SALES CONTRACT — VERSION 2
### WITH EXHIBIT A & B-2

1. **Parties.**

   **Seller:**
   McDonald's Corporation or its nominee
   One McDonald's Plaza
   Oak Brook, Illinois 60523
   Tel.: 630.836.4882
   Fax: 630.836.4804

   **Purchaser:**
   NOMANBHOY FAMILY LIMITED PARTNERSHIP
   (OR TRUST, OR IRA, ACCOUNTS OF NOMANBHOY FAMILY)
   11254 MT CREST PLACE
   CUPERTINO, CA 95014
   Tel 408 996-8786    call 408 507-7863
   Email SHABBIR.NOMANBHOY@GMAIL.COM

2. **Purchase Price**
   2.1. High Bid Price
   2.2. Buyer's Premium (3% of 2.1)          BULK SALE OFFER        $
   2.3. Purchase Price (2.1 + 2.2)           FOR 5 PROPERTIES       $
   2.4. Total Earnest Money Required (18% of 2.3)                   $  1,400,000.00
   2.5. Initial Earnest Money Deposit   15%                         $  140,000.00      $210,000.00
   2.6. Additional Earnest Money Required (2.4 - 2.6)               $ 210,000.00
   2.7. Balance of Purchase Price Due at Closing (2.3-2.4)          $ -0-
                                                                    $  1,260,000.00   $1,190,000.00

3. **Agreement to Sell and Purchase.** Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller, at the price and on the terms set forth herein, the real estate consisting of the parcel of land identified on Rider 1 attached to this Contract (the "Property") and more particularly described on Exhibit "A" attached hereto.

4. **All Cash Transaction.** This is an all-cash sale and purchase; and is NOT contingent upon Purchaser obtaining financing even though Purchaser may apply to a lending institution of Purchaser's choice for a mortgage loan. Purchaser understands and agrees that neither their receipt of a commitment from such a lending institution, their acceptance of such a commitment, nor their satisfaction of any condition set forth in such a commitment shall in any way be conditions of Purchaser's obligations under this Contract. Seller makes no representation or warranty as to Purchaser's ability to obtain financing.

5. **Earnest Money.** Purchaser has deposited WILL UPON ACCEPTANCE. The Additional Earnest Money Required set forth in Paragraph 2.6 shall be paid by cash or cashier's check, payable to the order of the Escrow Agent (as set forth on Rider 1 attached to this Real Estate Sales Contract) and received by Escrow Agent on or before noon on Thursday, June 26, 2008, at the offices of Escrow Agent. The Additional Earnest Money Required may be paid by personal check only if paid on the date of the auction at the time the Contract is executed. All earnest money shall be held by Escrow Agent for the benefit of the parties. Purchaser acknowledges that TIME IS OF THE ESSENCE with respect to the payment of any additional earnest money and the closing of this sale. Upon Seller's execution of this Contract, Rick Levin & Associates, Inc. or Rick Levin & Associates, Inc., in conjunction with Rick Levin, licensed Indiana auctioneer, as applicable ("Auctioneer") shall deposit the Earnest Money with the Escrow Agent for the mutual benefit of Purchaser and Seller.

   Chicago Title Insurance Company

6. **The "Closing"** The purchase and sale of the Property shall be closed (the "Closing") on Thursday, July 31, 2008 Friday, August 1, 2008, or on such other date as agreed to by the parties. Closing shall take place at an office of Chicago Title Company or such other title company as agreed to between Seller and Purchaser (the "Title Company") at such location as approved by Seller. Purchaser may use the proceeds of a money lender's escrow to pay the balance of the Purchase Price, provided that the terms of the money lender's escrow are not inconsistent with the terms of this Contract or the Escrow Agreement. Purchaser shall deposit, by certified funds, wire transfer or a bank cashiers check made payable to Title Company, all funds necessary to close the transaction contemplated by this Contract and shall promptly deliver and execute all required documents.

*If due to Seller's default hereunder, Seller fails to close on or before July 31, 2008, Seller shall pay to Purchaser a penalty of two (2%) percent per annum on the total earnest money deposit, prorated to the earlier of the actual closing date, or the termination of this contract.

7.   <u>Delivery of Deed.</u> On the Closing Date, Seller shall convey or cause to be conveyed to Purchaser by recordable Limited or Special Warranty or Trustee's Deed, title to the Property subject only to the following matters ("Permitted Exceptions"):

   7.1.   general real estate taxes for the years 2007 and 2008 and subsequent years;

   7.2.   covenants, conditions and restrictions of record (including without limitation such easements and restrictions as may be recorded after the date hereof which Seller determines are necessary or appropriate);

   7.3.   certain mutually beneficial restrictions and obligations with respect to the proper use, conduct and maintenance of the Property and other property (Purchaser hereby authorizes Seller to record any such restrictions and obligations as covenants affecting the Property and other property)✗ *AFTER REVIEW/ AGREEMENT BY PURCHASER*

   7.4.   private and/or public utility easements, roads and highways, if any, whether or not of record;

   7.5.   all matters which a current, accurate survey of the Property would disclose;

   7.6.   applicable zoning and building lines and ordinances;

   7.7.   in the event Seller or any entity related to Seller is the owner of or otherwise has an interest in any adjacent property, a reservation to Seller or its nominee of the right and privilege of Seller, its lessees, franchisees, successors and assigns to use and enjoy the benefit of all existing private utilities, drainage areas and access ways of any kind, whatsoever, if any;     *BAN*

   7.8.   ~~Purchaser agrees to accept in Seller's deed to Purchaser, the Restrictive Covenant set forth on~~ *Purchaser agrees to accept Seller's Deed to Purchaser the Restrictive Covenant set forth on* ~~purposes for a period of 30 years from the date of the deed. Purchaser agrees that the restriction shall be a covenant~~ *Exhibit B.* ~~running with the land and be binding upon Purchaser, its heirs, administrators, successors and assigns.~~ *SEE ATTACHED*

   7.9.   acts done or suffered by Purchaser or by any party claiming by, through or under Purchaser;     *RESTRICTIVE*

   7.10.  party wall rights, if any; and     *COVENANT*

   7.11.  all installments of special assessments heretofore levied falling due after date of closing.     *EXHIBIT B----*

8.   <u>Title/Survey.</u>  . At least five days *BUSINESS* prior to Closing, Seller shall show to Purchaser or his agent evidence of merchantable title in the intended grantor by delivering a Commitment for Title Insurance issued by the Title Company bearing date on or subsequent to the date of the acceptance of this Contract, in the amount of the Purchase Price subject to no other exceptions than those listed in Paragraph 7 and to general exceptions contained in said commitment. Every Commitment for Title Insurance furnished by Seller hereunder shall be conclusive evidence of title as therein shown. If evidence of title disclose other exceptions, Seller shall have thirty (30) days from Seller's receipt of evidence of title to cure such exceptions and notify Purchaser accordingly, and as to those exceptions which may be removed at closing by payment of money, Seller may have same removed at closing by using the proceeds of sale in payment thereof. Seller has *will* delivered a copy of any survey of the property. ~~Seller's possession to Purchaser.~~ If Seller is unable to have such defects cured or *To the extent* waived within 30 days, Purchaser may, as its sole remedy, terminate the Contract within 10 days thereafter. In no event shall Seller have *Seller has a cop* any obligation to commence litigation or to expend money to cure or remove any title objections. Seller and Purchaser acknowledge and *of such surveys* agree that Seller shall not be obligated to provide any new or updated survey to Purchaser.     *in its possessio*
     *BAN*

9.   <u>Payments at Closing.</u>  Purchaser shall pay all recording charges, all money lender's charges (including money lender's escrow fees), municipal transaction tax stamps, if applicable, escrow fees and any and all title insurance charges.

10.  <u>Possession.</u> Purchaser shall be entitled to occupancy and possession of the Property from and after the Closing date provided final payment of the Purchase Price has been made and the Closing has been fully consummated.  Prior to Closing, Seller shall have sole control and exclusive possession of the Property.

11.  <u>Prorations.</u> At closing, Purchaser shall receive, to the extent that they have not been paid, a credit for real estate taxes for 2007 and 2008. In the event the actual amount of the tax bills is unknown, such credit shall be based on 105% of the most recent ascertainable general real estate tax bill for the Property. General real estate taxes shall be prorated to the date of closing. If the real estate tax bill includes additional property owned by Seller, at Closing Purchaser shall give Seller a credit for taxes from the date of Closing through the remainder of the tax year and the parties shall complete a tax division so that it shall be separately assessed. Prior to such separate assessment, Seller and Purchaser shall each pay their pro rata share of the tax bill based upon the square footage of each parcel. All prorations are final.  All other items customarily prorated shall be prorated as of the date of closing.

12.  <u>Intentionally Deleted</u>

13. **Commission/Broker-Agency Disclosure.** Seller shall cause to be paid a broker's commission to Auctioneer at closing, as provided in the Exclusive Agreement For Auctioneering Services between the Seller and Auctioneer. The provisions of this paragraph shall survive the closing.  Purchaser represents and warrants to Seller that no auctioneer or broker, other than Auctioneer and _____ ANDIE_  ("Participating Broker") was involved in showing, submitting or selling the Property to Purchaser. Purchaser agrees to indemnify and hold Seller, Auctioneer and Participating Broker, if any, harmless and, defend them from any claim relating to Purchaser's purchase of the Property asserted against the Seller or Auctioneer by any broker other than as set forth in this Paragraph 13. The provisions of this Paragraph shall survive the closing.  Purchaser acknowledges that Auctioneer and its licensed associates represent the Seller as Seller's agent in the sale of this Property.

14. **Irrevocable Offer.** Purchaser's execution and delivery of this Contract to Seller is an irrevocable offer to purchase the Property made to Seller and shall not be binding upon Seller until executed by Seller, or Seller's duly authorized agent. Purchaser agrees that this offer shall remain irrevocable until 5:00 p.m. Chicago time on *Wednesday, June 18* 2008. Notification of Seller's acceptance may be given pursuant to the notice provision in this Contract or by telephone. Seller's, or a duly authorized agent of Seller's, failure to notify Purchaser on a timely basis that Seller rejects Purchaser's offer shall not constitute acceptance or rejection of Purchaser's offer, but Purchaser's offer shall then become revocable by Purchaser. If Seller rejects Purchaser's offer or Purchaser's offer is effectively revoked, all deposits made by Purchaser shall be promptly returned to Purchaser.

15. **Default.**

    15.1.  **Purchaser's Default.** At Seller's option, Purchaser shall be in default under the terms of this Contract if, in addition to any other default specified herein, Purchaser shall:

        15.1.1. fail to close pursuant to the terms hereof;
        15.1.2. fail to timely make any payment required of Purchaser hereunder;
        15.1.3. reserved;
        15.1.4. fail to appear at the time and place designated by Seller, as provided herein, to close the transaction; or
        15.1.5. fail to make Closing deposits at the times required thereunder.

        15.1.6. If Seller declares Purchaser in default pursuant to the terms herein, or if Purchaser fails or refuses to carry out any other obligation of Purchaser under the terms of this Contract and any supplemental agreements made a part hereof, or Purchaser defaults under any provision hereof, then, at Seller's option, this Contract is terminated, and, upon notice to Purchaser, the earnest money shall be forfeited. Seller may also elect to assert against Purchaser any other remedy available, at law or in equity.

16. **Demand For Earnest Money.** Purchaser and Seller hereby agree that if Seller makes a demand upon Auctioneer stating that Seller has thereby elected to forfeit Purchaser's earnest money, and demanding that Auctioneer remit to Seller any earnest money deposited by Purchaser with Auctioneer, pursuant to Paragraph 15.1.6, whereupon Auctioneer shall serve notice upon both parties as to same by certified mail, return receipt requested. Purchaser shall have seven (7) days from the date Auctioneer deposits the notice in the U. S. mail with sufficient postage prepaid to (a) cure the default; or (b) object in writing to Auctioneer of the intended disposition of earnest money.  The mailing of a notice by certified mail, return receipt requested, shall be sufficient service when the notice is mailed.  If Purchaser fails to cure the default or Auctioneer does not receive Purchaser's written objection within said seven (7) day period, then Auctioneer is hereby authorized by Purchaser and Seller to remit same to Seller (reduced by any monies due Auctioneer from Seller, if any), and Purchaser's right under this Contract shall be forfeited, and the Contract shall be terminated without further action by either party or Auctioneer.  Seller is then free to sell the Property to any other party.

17. **Interpleader.** If either party objects to the intended disposition in writing within the aforementioned seven (7) day grace period, then the parties hereto agree that Auctioneer may deposit earnest money, less costs, with the Clerk of the Circuit Court of Cook County by filing an action in the nature of interpleader.  The parties agree that Auctioneer may be reimbursed from the earnest money for all costs, including reasonable attorney's fees, relating to the filing of the interpleader and do hereby agree to indemnify, defend and hold Auctioneer harmless from any and all claims and demands, including the payment of reasonable attorney's fees, costs and expenses arising out of such default claims and demands.

18. <u>Warranty And Disclaimer Of Warranties.</u> **PURCHASER REPRESENTS THAT EITHER PURCHASER OR A DULY AUTHORIZED AGENT OF PURCHASER HAS INSPECTED, OR WAIVES THE RIGHT TO INSPECT, THE PROPERTY AND VERIFIED THE FACTS AND INFORMATION CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER PRIOR TO EXECUTING THIS CONTRACT. PURCHASER WARRANTS THAT PURCHASER IS PURCHASING THE PROPERTY, ALL IMPROVEMENTS, FIXTURE, EQUIPMENT AND PERSONAL PROPERTY, THEREOF ON AN "AS-IS, WHERE-IS" BASIS, WITH ALL FAULTS AND WITH NO WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, EITHER ORAL OR WRITTEN, EXCEPT AS EXPRESSLY STATED IN THIS CONTRACT, WHETHER OF HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION OF IMPROVEMENTS, ENVIRONMENTAL CONDITION OR OTHERWISE MADE BY SELLER, AUCTIONEER OR ANY AGENT OF EITHER OF THEM, INCLUDING, BUT NOT LIMITED TO, INFORMATION CONTAINED IN THE SALES BROCHURE, ADVERTISING OR SUPPLEMENTAL BROCHURES. NEITHER SELLER, AUCTIONEER, NOR ANY OF THEIR AGENTS ASSUME ANY LIABILITY FOR INACCURACIES, ERRORS OR OMISSIONS CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER.** PURCHASER'S INITIALS:

By executing this Contract, Purchaser expressly represents and agrees that Purchaser is not relying upon any representative warranty or statement by Seller, Auctioneer or its or their sales representatives which differs from the disclosures made in this Contract. Purchaser acknowledges that Purchaser has not relied upon any sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Seller, Auctioneer or others, including, but not limited to, any relating to the description of physical condition of the Property, or the dimensions of the Property or any other physical dimensions thereof, the estimated real estate taxes of the Property, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other data, except as may be specifically represented herein. Purchaser has relied on their own examination and investigation thereof. No person has been authorized to make any representation on behalf of Seller. Purchaser agrees (a) to purchase the Property without offset or any claim against, or liability to, Seller or its agents, whether or not any layout or dimension of the Property or any part thereof, is accurate or correct, and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the Closing.

SELLER AGREES THAT NO MATERIAL DIFFERENCES EXIST FROM
RICK LEVIN WEBSITE INFORMATION.

PURCHASER'S INITIALS:

19. <u>Notices.</u> All notices herein required shall be in writing and signed by either party, and shall be served on the other party at the addresses set forth in Paragraph 1. The mailing of a notice by registered or certified mail, return receipt requested with sufficient postage prepaid, shall be sufficient service when the notice is mailed. Notices may also be served by a nationally recognized air courier, or personal delivery. Notices sent by air courier shall be deemed delivered on the date of receipt. Either party may change its address for notice purposes by giving notice to that effect in the manner set forth herein, provided such change of address shall not be deemed received until actual receipt thereof by the addressee. Any notices required herein may be sent by and to each party's respective attorney.

20. <u>Attorney Review.</u> **PURCHASER REPRESENTS THAT PURCHASER HAS BEEN ADVISED BY THE SELLER AND AUCTIONEER TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS CONTRACT. PURCHSER FURTHER ACKNOWLEDGES THAT HE HAS READ AND UNDERSTANDS EACH AND EVERY PART OF THIS CONTRACT.**

21. <u>Property Condition.</u> The parties hereto acknowledge that Auctioneer is not obligated to and has not made any independent investigation of the condition of the Property including, but not limited to, any environmental matters with respect thereto (collectively the "Physical Condition"). The parties hereto further acknowledge that all investigations, reports and information with respect to the Physical Condition, if any, have been prepared by or for the Seller and have been furnished by Auctioneer to Purchaser on behalf of Seller. Seller makes no representation as to the truth or accuracy of any such investigations, reports and/or information.

22. <u>Statutory Compliance.</u> Purchaser and Seller hereby agree to make all disclosures and do all things necessary to comply with the applicable provisions of the Real Estate Settlement Procedures Act of 1974, as amended. Purchaser and Seller agree to make all certifications and do all things necessary to comply with Section 1445 of the Internal Revenue Code at or before the time of Closing.

23. <u>Stamp Taxes.</u> Seller shall furnish a completed declaration signed by the Seller or Seller's agent in the form required by the state and county, and shall furnish any declaration signed by the Seller or Seller's agent or meet other requirements as established by any local ordinance with regard to a transfer or transaction tax.

24. Use of Pronouns. Wherever appropriate, the singular includes the plural and the masculine includes the feminine or the neuter. The term "Purchaser" shall be interpreted as "Purchasers" if more than one person are purchasing the Property, and their obligations shall be joint and several.

25. No Assignment. Purchaser shall not directly or indirectly assign or transfer his rights under this Contract without prior written approval of Seller which may be granted or withheld in the sole and absolute discretion of Seller. Seller may assign this Contract without the consent of Purchaser, subject, however, to Purchaser's rights hereunder. Any attempted assignment or transfer by Purchaser without Seller's prior written consent shall be deemed null and void and shall be considered an event of default by Purchaser subject to the provisions of Paragraph 15.2 of this Contract.

26. Headings; Exhibits. The paragraph headings used herein are for the reader's convenience only and they shall not be used to interpret the meaning of the terms set forth herein. Exhibits attached hereto are incorporated as a part of this Contract.

27. Governing Law. The parties agree that any litigation or dispute concerning the enforcement of this Contract shall be brought in the State of Illinois, the jurisdiction shall be the county in which the Property is located, and that Illinois law shall govern its interpretation.

28. Complete Agreement; Severability. This Contract sets forth the entire understanding between the parties relating to the transactions described herein, there being no terms, conditions, warranties or representations other than those contained herein. This Contract may be amended only in an instrument signed by both parties hereto. The parties intend that faxed signatures and that a faxed Contract containing the signatures (original or faxed) of all parties is binding on the parties. At the request of either party, any faxed document subject to this paragraph shall be re-executed by both parties in an original form. Neither party shall raise the use of a facsimile machine as a defense to this Contract and shall forever waive such defense. If any provision of this Contract is invalid or unenforceable as against any party under certain circumstances, the remainder of this Contract and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Contract, except as otherwise herein provided shall be valid and enforced to the fullest extent permitted by law.

29. Invalidity. The invalidity of any covenant, grant, condition or provision of this Contract shall not impair or affect in any manner the validity, enforceability or affect of the remainder of the Contract.

30. Purchaser's Status. Purchaser represents and warrants there is nothing in Purchaser's status which could or might preclude or prevent Purchaser from consummating this transaction as herein set forth. Purchaser also agrees that he or she shall not cause any labor or material to be incorporated or delivered to the Property prior to Closing.

31. Binding Agreement. The terms and provisions of this contract shall be binding upon the parties hereto and their heirs, administrators, executors, successors, and permitted assigns.

32. Request for Escrow. At the request of Seller or Purchaser, evidenced by written notice to the other party at any time prior to the date for delivery of deed hereunder, this sale shall be closed through an escrow with the Title Company, in accordance with the general provisions of the usual form of Deed and Money Escrow Agreement then furnished and in use by said company, with such special provisions inserted in the escrow agreement as may be required to conform with this Contract. Upon the creation of such an escrow, anything herein to the contrary notwithstanding, payment of purchase price and delivery of deed shall be made through the escrow and this Contract and the earnest money shall be deposited in the escrow and Auctioneer shall be made a party to the escrow with regard to commission due. The cost of the escrow shall be paid by the party requesting it.

33. Other Documents. Seller agrees to furnish an affidavit of title subject only to those items set forth herein, and an ALTA statement if required by Purchaser's mortgagee, and transfer tax declarations.

34. Existing Mortgage. Seller shall have the right to pay off any existing mortgage(s) out of the proceeds of this sale.

35. Indemnity. Purchaser covenants to indemnify, defend and hold Seller harmless against any and all losses, claims, damages, liabilities, costs (including reasonable attorney's fees and court costs), and causes of action including, without limitation, those arising from mechanics liens, injuries to person or damage to property, including the Property, suffered or incurred by Seller directly or indirectly, as a result of, the entry onto the Property by Purchaser, Purchaser's agents, contractors, employees, and licensees.

36.  Anti-Terrorism Representation and Warranty. Seller and Purchase each represent and warrant that neither they nor the officers and directors controlling Purchaser are acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by the United States Treasury Department as a Specially Designated National and Blocked Person, or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and that they are not engaged in the transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation. Each party hereby agrees to defend, indemnify, and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the foregoing representation and warranty.

**THIS SPACE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.**

IN WITNESS WHEREOF, the parties have executed this Contract on the dates set forth below their signatures.

SELLER:

McDonald's Corporation

BY: _Bruce Neumann_
TITLE: _Senior Counsel_
DATE: _June 18, 2008_

SELLER'S ATTORNEY:
Bruce Neumann
McDonald's Corporation
1 McDonald's Plaza, Dept 067
Oak Brook, Illinois 60523
Tel: 630.623.7556
Fax: 630.623.8064

AUCTIONEER:
Rick Levin & Associates, Inc. or Rick Levin &
Associates, Inc., in conjunction with Rick Levin,
licensed Indiana auctioneer
1467 North Elston Avenue, 2nd Floor
Chicago, IL 60622
Telephone: 773.252.4500 x223
Facsimile:  773.252.4520

PURCHASER: _NOMANBHOY FAMILY LIMITED PARTNERSHIP_

Signature _by its President_
_SHABBIR NOMANBHOY_

Signature

DATE: _June 16, 08_

PURCHASER'S ATTORNEY:
_To be determined_

EXHIBITS:

Exhibit A:  Legal Description

Rx Date/Time        JUN-17-2008(TUE) 01:50          4089962786                    P.008
04/11/2008   05:07   4089962786                 NOMANBHOYS                  PAGE   08

EXHIBIT A –¹

LIST OF PROPERTIES   ~~Legal Description~~ — ALL FORMER McDONALDS RESTAURANTS

| # | ADDRESS | BRIEF DESCRIPTION FROM RICK LEVIN WEBSITE |
|---|---------|--------------------------------------------|
| 1. | 5057 WENTWORTH CHICAGO, IL | VACANT LAND — 1,108 ACRES  *Value of Property* |
| 2. | 10245 ROOSEVELT RD WESTCHESTER, IL | LAND — 29,951 SF  BUILDING — 2,100 SF (UNOCCUPIED) |
| 3. | 130 S. VIRGINIA ST CRYSTAL LAKE, IL | VACANT LAND — 26,000 SF |
| 4. | 6574 N. 76ᵗʰ ST MILWAUKEE, WIS | VACANT LAND — 22,526 SF |
| 5. | 5377 BROADWAY MERRILVILLE, IN | VACANT LAND — 1.55 ACRES (2 PARCELS) |

6057 S. Wentworth, Chicago

LC 012-1061 FILE NO. 8591

THAT PART OF THE NORTHEAST 1/4 OF SECTION 9, TOWNSHIP 38 NORTH, RANGE
14 EAST OF THE THIRD PRINCIPAL MERIDAN, COMMENCING AT THE INTERSECTION
OF THE EAST LINE OF WENTWORTH AVENUE AND THE NORTH LINE OF 51ST STREET
IN SAID CITY, THE POINT OF BEGINNING; THENCE NORTH ALONG SAID EAST
LINE OF WENTWORTH AVENUE, 220 FEET TO A POINT; THENCE EAST AT A RIGHT
ANGLE TO THE LAST DESCRIBED COURSE, 220 FEET TO A POINT THENCE SOUTH
AT A RIGHT ANGLE TO THE LAST DESCRIBED COURSE, 220 FEET TO A POINT OF
INTERSECTION WITH THE NORTH LINE OF 51ST STREET; THENCE WEST ALONG
SAID NORTH LINE OF 51st STREET, 220 FEET TO THE POINT OF BEGINNING,
IN COOK COUNTY, ILLINOIS.

Exhibit A-2

westchester

EXHIBIT A -2

LOTS 1, 2, 3, AND LOT 4 (EXCEPT THE WEST 2.20 FEET THEREOF) LOT 48 AND THE VACATED ALLEY ADJACENT THERETO AND LOTS 49 AND 50 ALL IN GEORGE F. NIXON AND COMPANY'S WESTCHESTER IN THE WEST HALF OT HE NORTH WEST QUARTER OF SECTION 21, TOWNSHIP 39 NORTH, RNAGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, IN THE VILLAGE OF WESTCHESTER, COOK COUNTY, ILLINOIS.

130 S. Virginia Street

EXHIBIT A-4

LEGAL DESCRIPTION

The Easterly 170.0 feet (as measured along the lot lines) of Lot 3, in Lakeacres, a subdivision of part of the North Half of Section 6, Township 43 North, Range 8, East of the Third Principal Meridian, according to Plat thereof recorded February 26, 1954, as Document #275689 in McHenry County, Illinois.

LESS AND EXCEPT:

That part of the Easterly 170 feet (as measured along the property lines) of Lot 3 in Lakeacres, a subdivision of part of the North Half of Section 6, Township 43 North, Range 8 East of the Third Principal Meridian, according to the Plat thereof recorded February 26, 1954 as Document No. 275689, in Book 11 of Plats, page 100, described as follows:

Beginning at the most northerly corner of Lot 3; thence on an assumed bearing of South 54 degrees 14 minutes 25 seconds West along the Northerly line of said Lot 3, a distance of 7.18 feet to a point; thence South 15 degrees 19 minutes 37 seconds East, a distance of 143.70 feet to a point on a 585.50 foot radius curve, the center of the circle bears North 74 degrees 40 minutes 23 seconds East from said point; thence Southeasterly along said curve 6.29 feet, central angle 00 degrees 36 minutes 57 seconds, to a point on the Southerly line of said Lot 3; thence North 54 degrees 14 minutes 25 seconds East, a distance of 6.90 feet to the Southwesterly line of Virginia Street; thence North 15 degrees 14 minutes 14 seconds West along said Westerly line, a distance of 150.10 feet to the point of beginning, in McHenry County, Illinois.

Parcel #19-06-204-036

Contract

EXHIBIT A - 4

6574 N. 76th Street, Milwaukee

Exhibit A-5

That part of Lots One (1), Two (2), Ten (10) and Eleven (11) in Block Seventy-three (73) in Menomonee River Hills East, being a Subdivision of a part of the South East One-quarter (1/4) of Section Twenty-two (22), Township Eight (8) North, Range Twenty-one (21) _____ in the City of Milwaukee, Milwaukee County, Wisconsin, which is bounded and described as follows:  Commencing at the Northwest corner of said Block 73; thence South 00° .29' ____ West 150.00 feet to a point; thence South 89° 36' 10" East 150.00 feet to a point; _____ North 00° 23' 50" East 150.35 feet to a point on the South line of West Acacia Street; thence West 30.81 feet along the South line of West Acacia Street, being the arc of __ curve whose center lies to the North whose radius is 1360.78 feet and whose chord bears South 89° 44' 55" West 30.81 feet to a point; thence North 89° 36' 10" West along  the South line of West Acacia Street 119.19 feet to the point of beginning..

5377 Broadway, merrillville

Exhibit A-6

Part of the Northwest Quarter of Section 3, Township 35 North, Range 8
West of the 2nd P.M. in Lake County, Indiana, described as beginning at
a point on the West line of said Northwest Quarter of Section 3 which is
548.6 feet South of the Northwest corner of said Northwest Quarter of Section
3; thence South 89 degrees 21' East a distance of 50 feet to the point or
place of beginning of this legal description; thence continuing South 89
degrees 21' East a distance of 162 feet; thence South and parallel to the
West line of said Northwest Quarter of Section 3 a distance of 144.7 feet; thence
West a distance of 162 feet; thence North 144.7 feet to the point or place
of beginning.


PARCEL II

Part of the Northwest Quarter of Section 3, Township 35 North, Range 8 West
of the Second Principal Meridian, in Lake County, Indiana, being more
particularly described as follows:

Beginning at a point on the centerline of Broadway 373.60 feet South of
the Northwest corner of said Northwest quarter of Section 3; thence South
89 degrees 21 minutes East, 166 feet; thence South 175 feet; thence North
89 degrees 21 minutes West 166 feet to a point on the centerline of
Broadway; thence North along the centerline of Broadway 175 feet to the point
of beginning, subject to the rights of the public and the State of Indiana
in the Westerly 50 feet lying within the right of way of Broadway for road
purposes.



## Exhibit B

**Restrictive Covenant:**

For a period of 20 years from the date of the deed, the Property may not be used for and Purchaser and any successor will not lease/sell to any tenant/buyer whose primary purpose is the sale of hamburgers, chicken and/or coffee.

In addition, the following restaurants operating under the listed trade names, or operating under any successor trade names, are prohibited:

| | |
|---|---|
| Apolo Burgers | Astro Burgers |
| Atlanta Burgers | A & W |
| Backyard Burgers | Burger Chef |
| Burger King | Burger Street |
| Carl's Jr. | Caribou Coffee |
| Checkers | Cheeburger, Cheeburger |
| Chick-Fil-A | Church's Chicken |
| Crown Burgers | Crystal Burgers |
| Culvers | Dunkin Donuts |
| Friendly's | Hardee's |
| Harold's Chicken | In N Out Burgers |
| Jack-in-the-Box | Jamba Juice |
| KFC | Popeye's Chicken |
| Rally's | Sonic |
| Starbuck's | Steak 'N' Shake |
| Tim Horton's | Whataburger |
| Wendy's | Whitecastle |

# Exhibit 8

*Printed by Bruce Neumann.*



**"Shabbir Nomanbhoy "**
**<shabbir.nomanbhoy @gmail.**
**com>**

06/18/2008 11:38 AM

To  "Ira lauter" <ira@ricklevin.com>

cc  "bruce.neumann@us.mcd.com"
    <bruce.neumann@us.mcd.com>, mary.meyer@us.mcd.com,
    rick@ricklevin.com, keith.magnuson@us.mcd.com,
    tamara.flagg@us.mcd.com,
    katherine.dunworth@us.mcd.com,
    doris.murray-norris@us.mcd.com

bcc

Subject  Re: FW: Fwd: Bulk-purchase all-cash offer for Five
         McDonalds properties

Ira,

There are too many changes to contract language that was previously
agreed. I had understood from your emails we were only negotiating on
price and earnest money, after you conveyed to me yesterday that all
language was acceptable as written to McDonalds.

At this point, I believe that the best way to handle this is if I
catch a flight this afternoon, and we have a meeting tomorrow morning
at 8am at a location convenient to Bruce and Mary in Chicago. I will
bring cashiers checks for the earnest money deposit.

I am willing to work with McDonalds at arriving at language that is
mutually acceptable, but given the last few days, I dont believe this
can be done on the phone. I will come there at no obligation to
McDonalds or yourself, and I hope we can work this out in the morning
before the auction is scheduled to start. The only thing I ask is that
McDonalds have all the right decision makers in the room!

Please let me know if a meeting can be arranged. I am on my way to get
the checks made at Fidelity in Palo Alto, but you can reach me on my
cell at 408-507-7863.

Sincerely,

Shabbir Nomanbhoy

On 6/18/08, bruce.neumann@us.mcd.com <bruce.neumann@us.mcd.com> wrote:
>
> Ira:
>
> Attached is the contract signed by McDonald's.
>
> We have made a few minor changes consistent with the discussions you had
> with Mary Meyer.  The basic changes are:
> the earnest money to 15%,
> Closing by July 31, 2008

*Printed by Bruce Neumann.*

```
>  If we fail to close by this date, we will pay the buyer 2% on the earnest
>  money, prorated to the closing date or termination
>  The restrictive covenant has been slightly changed and attached as Exhibit
>  B
>  The legal descriptions are attached as Exhibit A-2 through A-6
>
>  If the contract is acceptable to the buyer, the changes need to be
>  initialed, the contract signed, the earnest money wired.
>
>  Please let us know if you have any questions.
>
>  Thanks
>  Bruce
>
>
>  (See attached file:
>  CORPLEGAL-#492761-v1-Real_Estate_Contract__-_Chicago_Auction_SItes.PDF)
>
>
>  ***********************************************************
>. Bruce A. Neumann
>  Director - Senior Counsel
>  Corporate Strategy
>  Central Division
>  McDonald's Corporation
>  2915 Jorie Boulevard - Dept 282
>  Oak Brook, IL 60523
>  Email:  bruce.neumann@us.mcd.com
>  (630) 623-7556 Direct Dial
>  (630) 623-8064 Facsimile
>  ***********************************************************
>
>  The information contained in this e-mail and any accompanying documents is
>  confidential, may be privileged, and is intended solely for the person
and/or
>  entity to whom it is addressed (i.e. those identified in the "To" and "cc"
>  box). They are the property of McDonald's Corporation. Unauthorized
review,use,
>  disclosure, or copying of this communication, or any part thereof, is
strictly
>  prohibited and may be unlawful. If you have received this e-mail in error,
>  please return the e-mail and attachments to the sender and delete the
e-mail
>  and attachments and any copy from your system. McDonald's thanks you for
your
>  cooperation.
>
>
```

# Exhibit 9

Printed by Bruce Neumann



**"Ira lauter"**
**<ira@ricklevin.com>**
06/18/2008 04:41 PM

To  <bruce.neumann@us.mcd.com>

cc  <mary.meyer@us.mcd.com>, "'Rick Levin'"
    <rick@ricklevin.com>

bcc

Subject  ·FW: FW: URGENT: Action required: Auction Sale Terms -
Restaurant Restriction.

Bruce-

Please call me to discuss.

Thank you,

Ira
(312) 925-0900

-----Original Message-----
From: Shabbir Nomanbhoy [mailto:shabbir.nomanbhoy@gmail.com]
Sent: Wednesday, June 18, 2008 4:18 PM
To: Ira lauter
Subject: Re: FW: URGENT: Action required: Auction Sale Terms - Restaurant
Restriction.

OK, Ira, Deal!

Remember that they will supply the survey, and the interest is 2% per
month,if they delay closing.

Are you sure you want me to make changes? Will Mcdonalds accept my
changes, or will they want the clean contract? Maybe its better to
have them make changes, especially as the covenant is only on email.
Email me the complete contract with all changes, and I will sign and
send back right away. Meanwhile i am calling fedex for pickup.

The contract says checks should be made out to chicago title company
as escrow agent, not Rick Levin and associates. Please clarify on
contract.

I still need to speak with Bruce, as he is the signor on the contract.
Please advise when I can call him. Also, please send me the signed
contract from Mcdonalds authorizing Rick Levin as auctioneer/agent.

Thanks.

Shabbir


Shabbir

On 6/18/08, Ira lauter <ira@ricklevin.com> wrote:
> McDonald's will not accept less than $1,200,000 which is half way between
>  the $1,000,000 and the original $1,4000,000.
>
> We will need a Cashier's Check for $300,000 made payable to the Rick Levin &
> Associates, Inc. Escrow Account sent via Fed Ex with 8:30 am delivery
> tomorrow.
>
> Please revise the $1,400,000 contract to $1,200,000 and send back to me asap
> and we will have it signed.
>
> We are running out of time.
>
> 5:00pm CST is the latest we can get this executed.
>
>
> Thank you,
>
> Ira
> (312) 925-0900
>
> -----Original Message-----
> From: Shabbir Nomanbhoy [mailto:shabbir.nomanbhoy@gmail.com]
>
> Sent: Wednesday, June 18, 2008 3:26 PM
> To: Ira lauter
> Subject: Re: FW: URGENT: Action required: Auction Sale Terms - Restaurant
> Restriction.
>
> Ira,
> Lets meet in the middle. $1,125,000.
>
> We will need to figure out how to get the money over. Do you want me
> to come, or do you want to make a trip to San Francisco?
>
> Shabbir
>
> On 6/18/08, Ira lauter <ira@ricklevin.com> wrote:
> > Shabbir-
> >
> > While McDonald's understands your frustration, they would like to
> consummate
> > a transaction with you.
> >
> > McDonald's has authorized me to counter your offer at $1,250,000 with
no

```
> > further negotiations.
> >
> > Please advise.
> >
> >
> > Thank you,
> >
> > Ira
> > (312) 925-0900
> >
> >
> > -----Original Message-----
> > From: Shabbir Nomanbhoy [mailto:shabbir.nomanbhoy@gmail.com]
> > Sent: Wednesday, June 18, 2008 2:40 PM
> > To: Ira lauter
> > Subject: Re: FW: URGENT: Action required: Auction Sale Terms -
Restaurant
> > Restriction.
> >
> >
> > Hello Ira,
> >
> > I am very disappointed with McDonalds refusal to meet with me to
> > discuss the last minute changes they made to the contract, after
> > agreeing on the language previously.
> >
> > Nevertheless, I will give this my last shot: I am willing to accept
> > the language shown below in the restrictive covenent, if the price is
> > reduced to $1 million.
> >
> > Let me know.
> >
> > Shabbir
> >
> >
> >
> > On 6/18/08, Ira lauter <ira@ricklevin.com> wrote:
> > > Shabbir-
> > >
> > > Please advise your thoughts of the following restriction.
> > >
> > > Thank you,
> > >
> > > Ira
> > > (312) 925-0900
> > >
> > >
> > >
> > > The restriction would read as follows:
> > >
> > > For a period of 20 years from the date of the deed, the Property
```

Printed by Bruce Neumann

```
may
> not
> > be
> > > used for and Purchaser will not lease/sell to any regional and/or
> > national
> > > restaurant chain or user whose primary purpose is the sale of
> hamburgers,
> > > chicken and/or coffee.
> > >
> > > In addition, the following restaurants operating under the listed
> trade
> > >                           names, or operating under any successor
trade
> > >                           names, are prohibited:
> > >
> > >                           Apolo Burgers      Astro Burgers
> > >                           Atlanta Burgers    A & W
> > >                           Backyard Burgers   Burger Chef
> > >                           Burger King        Burger Street
> > >                           Carl's Jr.         Caribou Coffee
> > >                           Checkers           Cheeburger, Cheeburger
> > >                           Chick-Fil-A        Church's Chicken
> > >                           Crown Burgers      Crystal Burgers
> > >                           Culvers            Dunkin Donuts
> > >                           Friendly's         Hardee's
> > >                           Harold's Chicken   In N Out Burgers
> > >                           Jack-in-the-Box    Jamba Juice
> > >                           KFC                Popeye's Chicken
> > >                           Rally's            Sonic
> > >                           Starbuck's         Steak 'N' Shake
> > >                           Tim Horton's            Whataburger
> > >                           Wendy's            Whitecastle
> > >
> > >
> > > The information contained in this e-mail and any accompanying
> documents
> > is
> > > confidential, may be privileged, and is intended solely for the
person
> > > and/or
> > > entity to whom it is addressed (i.e. those identified in the "To"
and
> > > "cc"
> > > box). They are the property of McDonald's Corporation. Unauthorized
> > > review,use,
> > > disclosure, or copying of this communication, or any part thereof,
is
> > > strictly
> > > prohibited and may be unlawful. If you have received this e-mail in
> > error,
> > > please return the e-mail and attachments to the sender and delete
```

Printed by Bruce Neumann

```
the
> >  e-mail
> >  >  and attachments and any copy from your system. McDonald's thanks
you
> for
> >  >  your
> >  >  cooperation.
> >  >
> >  >
> >  >
> >
> >
> >
>
>
>
```

# Exhibit 10

Printed by Bruce Neumann



"Ira lauter"
<Ira@ricklevin.com>

06/18/2008 05:36 PM

To    "'Shabbir Nomanbhoy'" <shabbir.nomanbhoy@gmail.com>

cc

bcc

Subject    McDonald's has Decided they will only Accept $1,400,000


Shabbir-

McDonald's has decided they will not sell for less than a $1,400,000.

Thank you,

Ira

# Exhibit 11

*Printed by Bruce Neumann*



**Mary Meyer/mcd/us**
06/18/2008 08:59 PM

To  ira@ricklevin.com, shabbir.nomanbhoy@gmail.com

cc  "Rick Levin" <rick@ricklevin.com>, Bruce Neumann/mcd/us/MCDUS

bcc

Subject  Re: Fw: McDonald's has Decided they will only Accept $1,400,000 

Ira & Shabbir,

Attached is the letter acknowledging that Rick Levin & Associates, Inc. represents McDonald's in this transaction. We will need the wire and contract very early tomorrow, or will have to go forward with the Auction.



Shabbir Nomanbhoy Letter 061808.doc.zip

Mary G. Meyer
**Regional Real Estate Manager**
**Greater Chicago Region**
McDonald's USA, LLC
4320 Winfield Road, Suite 400
Warrenville, IL 60555
Phone: (630) 836-4951
Fax: (630) 836-4804
e-mail: mary.meyer@us.mcd.com
"Ira Lauter" <ira@ricklevin.com>



**"Ira Lauter"**
<ira@ricklevin.com>

06/18/2008 08:46 PM

| Please respond to |
| ira@ricklevin.com |

To  "Mary Meyer" <mary.meyer@us.mcd.com>

cc  "Rick Levin" <rick@ricklevin.com>

Subject  Fw: McDonald's has Decided they will only Accept $1,400,000

Mary-

Shabbir has asked that you copy him directly on the letter.

Thank you,

Ira

Printed by Bruce Neumann

Ira Lauter
Rick Levin & Associates, Inc.
1467 N Elston, 2nd Floor
Chicago, IL 60622
Office: 773-252-4500 Ext. 230
Cell: 312-890-3982
Fax: 773-252-4520


-----Original Message-----
From: "Shabbir Nomanbhoy" <shabbir.nomanbhoy@gmail.com>

Date: Wed, 18 Jun 2008 18:02:30
To:ira@ricklevin.com
Subject: Re: McDonald's has Decided they will only Accept $1,400,000


Ira,

OK. I will pay $1.4 mill for the 5 properties.

Please revise contract for interest rate, escrow agent, survey, and dates.

The most important thing I need is a cover letter on Mcdonalds
letterhead, from either Bruce or Mary, saying you are the escrow agent
and for me to wire the earnest money of $210,000 to your account# XYZ
at bank ABC.

Thanks

Shabbir

On 6/18/08, Ira Lauter <ira@ricklevin.com> wrote:
> Shabbir-
>
> As we discussed, McDonald's will only sell the properties for a combined
$1,400,000.
>
> If you will pay 1.4 MIL they will sign the contract as agreed and cancel
the Auction.
>
> Please advise if you will pay 1.4 MIL?
>
>
> Best regards,
>
> Ira
>
> Ira Lauter
> Rick Levin & Associates, Inc.
> 1467 N Elston, 2nd Floor

*Printed by Bruce Neumann*

```
> Chicago, IL 60622
> Office: 773-252-4500 Ext. 230
> Cell: 312-890-3982
> Fax: 773-252-4520
>
>
> -----Original Message-----
> From: "Shabbir Nomanbhoy" <shabbir.nomanbhoy@gmail.com>
>
>
> Date: Wed, 18 Jun 2008 17:26:42
> To:ira@ricklevin.com
> Subject: Re: McDonald's has Decided they will only Accept $1,400,000
>
>
> Ira,
>
> Its too late to fly out there or do fedex, as we are past both deadlines.
>
> I am willing to do the deal at 1.2 million as they agreed earlier. I
> would wire the money to  the escrow account first thing tomorrow
> morning at 8am, and it would reach you before 1pm.
>
> I would need the revised contract, signed, tonight. I also need on
> McDonalds letterhead that you are the escrow agent, and showing the
> escrow account info in that same letter.
>
> Please advise.
>
> Shabbir
>
>
>
> On 6/18/08, Ira Lauter <ira@ricklevin.com> wrote:
> > Shabbir-
> >
> > As we discussed, Mary will meet with you tomorrow in the morning if you
will pay 1.4 MIL for all 5 properties.
> >
> > Please advise your decision.
> >
> > Best regards,
> >
> > Ira
> >
> >
> > Ira Lauter
> > Rick Levin & Associates, Inc.
> > 1467 N Elston, 2nd Floor
> > Chicago, IL 60622
> > Office: 773-252-4500 Ext. 230
```

*Printed by Bruce Neumann*

```
>  >  Cell: 312-890-3982
>  >  Fax: 773-252-4520
>  >
>  >
>  >
>  >  -----Original Message-----
>  >  From: "Shabbir Nomanbhoy" <shabbir.nomanbhoy@gmail.com>
>  >
>  >  Date: Wed, 18 Jun 2008 16:15:13
>  >  To:"Ira lauter" <ira@ricklevin.com>
>  >  Subject: Re: McDonald's has Decided they will only Accept $1,400,000
>  >
>  >
>  >  Hello Ira
>  >  This is a moving target!
>  >  I would appreciate your calling me to let me know what happened this
time.
>  >  There is still an opportunity to save the deal (at 1.2mil). I can fluy
>  >  out there if you call me in forty five minutes. Or I can wire the
>  >  money tomorrow morning, if I have the contract revised and signed
>  >  tonight.
>  >  Shabbir
>  >
>  >  On 6/18/08, Ira lauter <ira@ricklevin.com> wrote:
>  >  >
>  >  > .
>  >  >
>  >  >
>  >  > Shabbir-
>  >  >
>  >  >
>  >  > McDonald's has decided they will not sell for less than a $1,400,000.
>  >  >
>  >  >
>  >  > Thank you,
>  >  >
>  >  >
>  >  > Ira
>  >  >
>  >  >
>  >
>
```



McDonald's USA, LLC – Chicago Region
4320 Winfield Road, Suite 400
Warrenville, IL 60555
Phone: 630-836-9090
Fax: 630-836-9191

June 18, 2008


Mr. Shabbir Nomanbhoy


RE:  Rick Levin & Associates, Inc.

Dear Shabbir:

Per your request, this letter hereby acknowledges that Ira Lauter and Rick Levin &
Associates, Inc. represent McDonald's USA, LLC in the sale of the 5 McDonald's excess
properties we have been negotiating the past several days.

Please wire earnest money funds as follows:  North Bank 501 N Clark St. Chicago, IL
60610 ; Rick Levin & Associates Inc  account # 411309500, aba # 071001368.

Regards,

Mary G. Meyer

Mary G. Meyer
Regional Real Estate Manager

cc:  Ira Lauter, Rick Levin & Associates, Inc.
     Rick Levin, Rick Levin & Associates, Inc.
     Bruce Neumann

# Exhibit 12

*Printed by Bruce Neumann*

----- Forwarded by Bruce Neumann/mcd/us on 06/19/2008 11:07 AM -----



| | | |
|---|---|---|
| **Bruce Neumann/mcd/us** | | |
| 06/19/2008 09:09 AM | To | "Shabbir Nomanbhoy" <shabbir.nomanbhoy@gmail.com> |
| | cc | ira@ricklevin.com |
| | Subject | Fw: Revised Contract |



| | | |
|---|---|---|
| **Bruce Neumann/mcd/us** | | |
| 06/19/2008 09:03 AM | To | "Ira lauter" <ira@ricklevin.com>, shabbir.namanbhoy@gmail.com |
| | cc | Mary Meyer/mcd/us@MCDUS, Doris Murray-Norris/mcd/us@MCDUS |
| | Subject | Revised Contract |

Attached is the revised contract.

The purchase price is $1.4 Mil
Penalty if we do not close is 2% per month of the earnest money
We provide surveys.
If we do not have the earnest money prior to the auction (or if the auction otherwise occurs), the contract is null and void.  (I have inserted this language to make if clear that we must have the $ prior to the auction and if the $ comes in so late such that we do not know that the $ has arrived and the action occurs, the contract is void.)  I can not be in a situation where I have sold a site to two parties.

Shabbir:
Please initial on each page next to each of my (BAN) initials (including the bottom corner of each page),
send the contract back to us
wire the earnest money and inform us of the confirmation number.

Thanks
Bruce

CORPLEGAL-#493297-v1-Real_Estate_Contract_-_Chicago_Auction_-_June_19__2008.PDF

*Printed by Bruce Neumann*

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••
*Bruce A. Neumann*
*Director - Senior Counsel*
*Corporate Strategy*
*Central Division*
*McDonald's Corporation*
*2915 Jorie Boulevard – Dept 282*
*Oak Brook, IL 60523*
*Email:  bruce.neumann@us.mcd.com*
*(630) 623-7556 Direct Dial*
*(630) 623-8064 Facsimile*
••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

Rx Date/Time    JUN-17-2008(.. E) 16:42    4089962786    P.002
04/11/2008  19:59  4089962786    NOMANBHOYS    PAGE  02

## REAL ESTATE SALES CONTRACT — *VERSION 2*
### *WITH EXHIBIT A & B-2*

1. **Parties.**

   Seller:        McDonald's Corporation or its nominee
                  One McDonald's Plaza
                  Oak Brook, Illinois 60523
                  Tel.: 630.836.4882
                  Fax: 630.836.4604

   Purchaser:     *NOMANBHOY FAMILY LIMITED PARTNERSHIP*
                  *(OR TRUST, OR IRA, ACCOUNTS OF NOMANBHOY FAMILY)*
                  *11254 MT CREST PLACE*
                  *CUPERTINO, CA 95014*
                  *Tel 408 996-8786    call 408 507-7863*
                  *Email SHABBIR, NOMANBHOY @ GMAIL.COM*

2. **Purchase Price**
2.1  ~~High Bid Price~~                                        *BULK SALE OFFER*  $
2.2  ~~Buyer's Premium (3% of 2.1)~~                           *FOR 5 PROPERTIES* $
2.3  ~~Purchase Price (2.1 + 2.2)~~                            $ ~~1,400,000.00~~
2.4  Total Earnest Money Required (15% of 2.3)                 $ ~~140,000.00~~  $210,000.00
2.5  Initial Earnest Money Deposit                             $ $210,000.00
2.6  Additional Earnest Money Required (2.4 - 2.5)             $ -0-
2.7  Balance of Purchase Price Due at Closing (2.3 - 2.4)      $ ~~1,260,000.00~~  $1,190,000.00

3. **Agreement to Sell and Purchase.**  Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller, at the price and on the terms set forth herein, the real estate consisting of that parcel of land identified on ~~Rider 1~~ attached to this Contract (the "Property") and more particularly described on Exhibit 'A' attached hereto.  *EXHIBIT A*

4. **All Cash Transaction.**  This is an all-cash sale and purchase; and is NOT contingent upon Purchaser obtaining financing even though Purchaser may apply to a lending institution of Purchaser's choice for a mortgage loan. Purchaser understands and agrees that neither their receipt of a commitment from such a lending institution, their acceptance of such a commitment, nor their satisfaction of any condition set forth in such a commitment shall in any way be conditions of Purchaser's obligations under this Contract.  Seller makes no representation or warranty as to Purchaser's ability to obtain financing.

5. **Earnest Money.**  Purchaser ~~has deposited~~ *WILL UPON ACCEPTANCE* the Initial Earnest Money set forth in Paragraph 2.5 ~~and receipt is hereby acknowledged~~.  The Additional Earnest Money Required set forth in Paragraph 2.6 shall be paid by cash or cashier's check, payable to the order of the Escrow Agent(s) ~~set forth on Rider 4 attached to this Real Estate Sales Contract~~ and received by Escrow Agent on or before noon on Thursday, June 26, 2008, at the offices of Escrow Agent.  The Additional Earnest Money Required may be paid by personal check only if paid on the date of the auction at the time this Contract is executed.  All earnest money shall be held by Escrow Agent for the benefit of the parties.  Purchaser acknowledges that TIME IS OF THE ESSENCE with respect to the payment of any additional earnest money and the closing of this sale. Upon Seller's execution of this Contract, Rick Lavin & Associates, Inc. or Rick Lavin & Associates, Inc., in conjunction with Rick Lavin, licensed Indiana auctioneer, as applicable ("Auctioneer") shall deposit the Earnest Money with the Escrow Agent for the mutual benefit of Purchaser and Seller.

~~Chicago Title Insurance Company~~
*Rick Levin & Associates, Inc.*

6. **The "Closing".**  The purchase and sale of the Property shall be closed (the "Closing") on ~~Tuesday, August 5, 2008~~, *Thursday, July 31, 2008* or on such other date as agreed to by the parties.  Closing shall take place at an office of Chicago Title Company or such other title company as agreed to between Seller and Purchaser (the "Title Company") at such location as approved by Seller.  Purchaser may use the proceeds of a money lender's escrow to pay the balance of the Purchase Price, provided that the terms of the money lender's escrow are not inconsistent with the terms of this Contract or the Escrow Agreement.  Purchaser shall deposit, by certified funds, wire transfer or a bank cashier's check made payable to Title Company, all funds necessary to close the transaction contemplated by this Contract and promptly deliver and execute all required documents.

*If due to Seller's default hereunder, Seller fails to close on or before July 31, 2008, Seller shall pay to Purchaser a penalty of two (2%) percent per ~~annum~~ on the total earnest money deposit, prorated to the earlier of the actual closing date, or the termination of this contract.  *Month*
*1 of 14*

7.   **Delivery of Deed.** On the Closing Date, Seller shall convey or cause to be conveyed to Purchaser by recordable Limited or Special Warranty or Trustee's Deed, title to the Property subject only to the following matters ("Permitted Exceptions"):

   7.1.   general real estate taxes for the years 2007 and 2008 and subsequent years;

   7.2.   covenants, conditions and restrictions of record (including without limitation such easements and restrictions as may be recorded after the date hereof which Seller determines are necessary or appropriate);

   7.3.   certain mutually beneficial restrictions and obligations with respect to the proper use, conduct and maintenance of the Property and other property (Purchaser hereby authorizes Seller to record any such restrictions and obligations as covenants affecting the Property and other property) ✗ *AFTER REVIEW & AGREEMENT BY PURCHASER*

   7.4.   private and/or public utility easements, roads and highways, if any, whether or not of record;

   7.5.   all matters which a current, accurate survey of the Property would disclose;

   7.6.   applicable zoning and building lines and ordinances;

   7.7.   in the event Seller or any entity related to Seller is the owner of or otherwise has an interest in any adjacent property, a reservation to Seller or its nominee of the right and privilege of Seller, its lessees, franchisees, successors and assigns to use and enjoy the benefit of all existing private utilities, drainage areas and access ways of any kind, whatsoever, if any; *[initials]*

   7.8.   ~~Purchaser agrees to accept in Seller's deed to Purchaser a restriction prohibiting the Property from being used for restaurant purposes for a period of 20 years from the date of the deed. Purchaser agrees that the restriction shall be a covenant running with the land and be binding upon Purchaser, its heirs, administrators, successors and assigns.~~ *Purchaser agrees to accept in Seller's deed to Purchaser the Restrictive Covenant set forth on Exhibit B. SEE ATTACHED*

   7.9.   acts done or suffered by Purchaser or by any party claiming by, through or under Purchaser; *RESTRICTIVE*

   7.10.   party wall rights, if any; and *COVENANT*

   7.11.   all installments of special assessments heretofore levied falling due after date of closing. *EXHIBIT B=2*

8.   **Title/Survey.** At least five *business* days prior to Closing, Seller shall show to Purchaser or his agent, evidence of merchantable title in the intended grantor by delivering a Commitment for Title Insurance issued by the Title Company bearing date on or subsequent to the date of the acceptance of the Contract, in the amount of the Purchase Price subject to no other exceptions than those listed in Paragraph 7 and to general exceptions contained in said commitment. Every Commitment for Title Insurance furnished by Seller hereunder shall be conclusive evidence of title as therein shown. If evidence of title discloses other exceptions, Seller shall have thirty (30) days from Seller's receipt of evidence of title to cure such exceptions and notify Purchaser accordingly, and as to those exceptions which may be removed at closing by payment of money, Seller may have same removed at closing by using the proceeds of sale in payment thereof, Seller has to *[has to (handwritten)]* delivered a copy of any survey of the property ~~in Seller's possession to Purchaser.~~ If Seller is unable to have such defects cured or ~~to the extent~~ waived within 30 days, Purchaser may, as its sole remedy, terminate this Contract within 10 days thereafter. In no event shall Seller have ~~Seller has a copy~~ any obligation to commence litigation or to expend money to cure or remove any title objections. Seller and Purchaser acknowledge and ~~of such surveys~~ agree that Seller shall not be obligated to provide any new or updated survey to Purchaser. ~~in its possession,~~ *[initials]*

9.   **Payments at Closing.** Purchaser shall pay all recording charges, all money lender's charges (including money lender's escrow fees), municipal transaction tax stamps, if applicable, escrow fees and any and all title insurance charges.

10.   **Possession.** Purchaser shall be entitled to occupancy and possession of the Property from and after the Closing date provided final payment of the Purchase Price has been made and the Closing has been fully consummated. Prior to Closing, Seller shall have sole control and exclusive possession of the Property.

11.   **Prorations.** At closing, Purchaser shall receive, to the extent that they have not been paid, a credit for real estate taxes for 2007 and 2008. In the event the actual amount of the tax bills is unknown, such credit shall be based on 105% of the most recent ascertainable general real estate tax bill for the Property. General real estate taxes shall be prorated to the date of closing. If the real estate tax bill includes additional property owned by Seller, at Closing Purchaser shall give Seller a credit for taxes from the date of Closing through the remainder of the tax year and the parties shall complete a tax division on the Property such that it shall be separately assessed. Prior to such separate assessment, Seller and Purchaser shall each pay their pro rata share of the tax bill based upon the square footage of each parcel. All prorations are final. All other items customarily prorated shall be prorated as of the date of closing.

12.   **Intentionally Deleted**

2

*[initials]*

13. **Commission/Broker-Agency Disclosure.** Seller shall cause to be paid a broker's commission to Auctioneer at closing, as provided in the Exclusive Agreement For Auctioneering Services between the Seller and Auctioneer. The provisions of this paragraph shall survive the closing. Purchaser represents and warrants to Seller that no auctioneer or broker, other than Auctioneer and _____NONE_____ ("Participating Broker") was involved in showing, submitting or selling the Property to Purchaser. Purchaser agrees to indemnify and hold Seller, Auctioneer and Participating Broker, if any, harmless and defend them from any claim relating to Purchaser's purchase of the Property asserted against the Seller or Auctioneer by any broker other than as set forth in this Paragraph 13. The provisions of this Paragraph shall survive the closing. Purchaser acknowledges that Auctioneer and its licensed associates represent the Seller as Seller's agent in the sale of this Property.

14. **Irrevocable Offer.** Purchaser's execution and delivery of this Contract to Seller is an irrevocable offer to purchase the Property made to Seller and shall not be binding upon Seller until executed by Seller, or Seller's duly authorized agent. Purchaser agrees that this offer shall remain irrevocable until 2:00 p.m. Chicago time on *Thursday June 19th*. Notification of Seller's acceptance may be given pursuant to the notice provision in this Contract or by telephone. Seller's, or a duly authorized agent of Seller's, failure to notify Purchaser on a timely basis that Seller rejects Purchaser's offer shall not constitute acceptance or rejection of Purchaser's offer, but Purchaser's offer shall then become revocable by Purchaser. If Seller rejects Purchaser's offer or Purchaser's offer is effectively revoked, all deposits made by Purchaser shall be promptly returned to Purchaser. In the event Seller has not received the Earnest Money before the commencement of the auction of the Properties on June 19, 2008, or if the auction otherwise occurs this Contract shall be null and void and of no further force or effect.

15. **Default.**

15.1.    **Purchaser's Default.** At Seller's option, Purchaser shall be in default under the terms of this Contract if, in addition to any other default specified herein, Purchaser shall:

15.1.1. fail to close pursuant to the terms hereof;

15.1.2. fail to timely make any payment required of Purchaser hereunder;

15.1.3. reserved;

15.1.4. fail to appear at the time and place designated by Seller, as provided herein, to close the transaction; or

15.1.5. fail to make Closing deposits at the times required thereunder.

15.1.6. If Seller declares Purchaser in default pursuant to the terms herein, or if Purchaser fails or refuses to carry out any other obligation of Purchaser under the terms of this Contract and any supplemental agreements made a part hereof, or Purchaser defaults under any provision hereof, then, at Seller's option, this Contract is terminated, and, upon notice to Purchaser, the earnest money shall be forfeited. Seller may also elect to assert against Purchaser any other remedy available, at law or in equity.

16. **Demand For Earnest Money.** Purchaser and Seller hereby agree that if Seller makes a demand upon Auctioneer stating that Seller has thereby elected to forfeit Purchaser's earnest money, and demanding that Auctioneer remit to Seller any earnest money deposited by Purchaser with Auctioneer, pursuant to Paragraph 15.1.6, whereupon Auctioneer shall serve notice upon both parties as to same by certified mail, return receipt requested. Purchaser shall have seven (7) days from the date Auctioneer deposits the notice in the U. S. mail with sufficient postage prepaid to (a) cure the default; or (b) object in writing to Auctioneer of the intended disposition of earnest money. The mailing of a notice by certified mail, return receipt requested, shall be sufficient service when the notice is mailed. If Purchaser fails to cure the default or Auctioneer does not receive Purchaser's written objection within said seven (7) day period, then Auctioneer is hereby authorized by Purchaser and Seller to remit same to Seller (reduced by any monies due Auctioneer from Seller, if any), and Purchaser's right under this Contract shall be forfeited, and the Contract shall be terminated without further action by either party or Auctioneer. Seller is then free to sell the Property to any other party.

17. **Interpleader.** If either party objects to the intended disposition in writing within the aforementioned seven (7) day grace period, then the parties hereto agree that Auctioneer may deposit earnest money, less costs, with the Clerk of the Circuit Court of Cook County by filing an action in the nature of interpleader. The parties agree that Auctioneer may be reimbursed from the earnest money for all costs, including reasonable attorney's fees, relating to the filing of the interpleader and do hereby agree to indemnify, defend and hold Auctioneer harmless from any and all claims and demands, including the payment of reasonable attorney's fees, costs and expenses arising out of such default claims and demands.

3

18. <u>Warranty And Disclaimer Of Warranties.</u> PURCHASER REPRESENTS THAT EITHER PURCHASER OR A DULY AUTHORIZED AGENT OF PURCHASER HAS INSPECTED, OR WAIVES THE RIGHT TO INSPECT, THE PROPERTY AND VERIFIED THE FACTS AND INFORMATION CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER PRIOR TO ~~EXECUTING THIS CONTRACT~~. PURCHASER WARRANTS THAT PURCHASER IS PURCHASING THE PROPERTY, ALL IMPROVEMENTS, FIXTURE, EQUIPMENT AND PERSONAL PROPERTY, THEREOF ON AN "AS-IS, WHERE-IS" BASIS, WITH ALL FAULTS AND WITH NO WARRANTIES OF ANY KIND, EXPRESS OF IMPLIED, EITHER ORAL OR WRITTEN, EXCEPT AS EXPRESSLY STATED IN THIS CONTRACT, WHETHER OF HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION OF IMPROVEMENTS, ENVIRONMENTAL CONDITION OR OTHERWISE MADE BY SELLER, AUCTIONEER OR ANY AGENT OF EITHER OF THEM, INCLUDING, BUT NOT LIMITED TO, INFORMATION CONTAINED IN THE SALES BROCHURE, ADVERTISING OR SUPPLEMENTAL BROCHURES, NEITHER SELLER, AUCTIONEER, NOR ANY OF THEIR AGENTS ASSUME ANY LIABILITY FOR INACCURACIES, ERRORS OR OMISSIONS CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER.

PURCHASER'S INITIALS:

By executing this Contract, Purchaser expressly represents and agrees that Purchaser is not relying upon any representative warranty or statement by Seller, Auctioneer or its or their sales representatives which differs from the disclosures made in this Contract. Purchaser acknowledges that Purchaser has not relied upon any sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Seller, Auctioneer or others, including, but not limited to, the description of physical condition of the Property, or the dimensions of the Property or any other physical dimensions thereof, the estimated real estate taxes of the Property, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other data, except as may be specifically represented herein. Purchaser has relied on their own examination and investigation thereof. No person has been authorized to make any representation on behalf of Seller. Purchaser agrees (a) to purchase the Property without offset or any claim against, or liability to, Seller or its agents, whether or not any layout or dimension of the Property or any part thereof, is accurate or correct, and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the Closing.

 SELLER AGREES THAT NO MATERIAL DIFFERENCES EXIST FROM RICK LEVIN WEBSITE INFORMATION.

PURCHASER'S INITIALS

19. <u>Notices.</u> All notices herein required shall be in writing and signed by either party, and shall be served on the other party at the addresses set forth in Paragraph 1. The mailing of a notice by registered or certified mail, return receipt requested with sufficient postage prepaid, shall be sufficient service when the notice is mailed. Notices may also be served by a nationally recognized air courier, or personal delivery. Notices sent by air courier shall be deemed delivered on the date of receipt. Either party may change its address for notice purposes by giving notice to that effect in the manner set forth herein, provided such change of address shall not be deemed received until actual receipt thereof by the addressee. Any notices required herein may be sent by and to each party's respective attorney.

20. <u>Attorney Review.</u> PURCHASER REPRESENTS THAT PURCHASER HAS BEEN ADVISED BY THE SELLER AND AUCTIONEER TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS CONTRACT. PURCHSER FURTHER ACKNOWLEDGES THAT HE HAS READ AND UNDERSTANDS EACH AND EVERY PART OF THIS CONTRACT.

21. <u>Property Condition.</u> The parties hereto acknowledge that Auctioneer is not obligated to and has not made any independent investigation of the condition of the Property including, but not limited to, any environmental matters with respect thereto (collectively the "Physical Condition"). The parties hereto further acknowledge that all investigations, reports and information with respect to the Physical Condition, if any, have been prepared by or for the Seller and have been furnished by Auctioneer to Purchaser on behalf of Seller. Seller makes no representation as to the truth or accuracy of any such investigations, reports and/or information.

22. <u>Statutory Compliance.</u> Purchaser and Seller hereby agree to make all disclosures and do all things necessary to comply with the applicable provisions of the Real Estate Settlement Procedures Act of 1974, as amended. Purchaser and Seller agree to make all certifications and do all things necessary to comply with Section 1445 of the Internal Revenue Code at or before the time of Closing.

23. <u>Stamp Taxes.</u> Seller shall furnish a completed declaration signed by the Seller or Seller's agent in the form required by the state and county, and shall furnish any declaration signed by the Seller or Seller's agent or meet other requirements as established by any local ordinance with regard to a transfer or transaction tax.

4



24. **Use of Pronouns.** Wherever appropriate, the singular includes the plural and the masculine includes the feminine or the neuter. The term "Purchaser" shall be interpreted as "Purchasers" if more than one person are purchasing the Property, and their obligations shall be joint and several.

25. **No Assignment.** Purchaser shall not directly or indirectly assign or transfer his rights under this Contract without prior written approval of Seller which may be granted or withheld in the sole and absolute discretion of Seller. Seller may assign this Contract without the consent of Purchaser, subject, however, to Purchaser's rights hereunder. Any attempted assignment or transfer by Purchaser without Seller's prior written consent shall be deemed null and void and shall be considered an event of default by Purchaser subject to the provisions of Paragraph 16.2 of this Contract.

26. **Headings; Exhibits.** The paragraph headings used herein are for the reader's convenience only and they shall not be used to interpret the meaning of the terms set forth herein. Exhibits attached hereto are incorporated as a part of this Contract.

27. **Governing Law.** The parties agree that any litigation or dispute concerning the enforcement of this Contract shall be brought in the State of Illinois, the jurisdiction shall be the county in which the Property is located, and that Illinois law shall govern its interpretation.

28. **Complete Agreement; Severability.** This Contract sets forth the entire understanding between the parties relating to the transactions described herein, there being no terms, conditions, warranties or representations other than those contained herein. This Contract may be amended only in an instrument signed by both parties hereto. The parties intend that faxed signatures and that a faxed Contract containing the signatures (original or faxed) of all parties is binding on the parties. At the request of either party, any faxed document subject to this paragraph shall be re-executed by both parties in an original form. Neither party shall raise the use of a facsimile machine as a defense to this Contract and shall forever waive such defense. If any provision of this Contract is invalid or unenforceable as against any party under certain circumstances, the remainder of this Contract and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Contract, except as otherwise herein provided shall be valid and enforced to the fullest extent permitted by law.

29. **Invalidity.** The invalidity of any covenant, grant, condition or provision of this Contract shall not impair or affect in any manner the validity, enforceability or effect of the remainder of the Contract.

30. **Purchaser's Status.** Purchaser represents and warrants there is nothing in Purchaser's status which could or might preclude or prevent Purchaser from consummating this transaction as herein set forth. Purchaser also agrees that he or she shall not cause any labor or material to be incorporated or delivered to the Property prior to Closing.

31. **Binding Agreement.** The terms and provisions of this contract shall be binding upon the parties hereto and their heirs, administrators, executors, successors, and permitted assigns.

32. **Request for Escrow.** At the request of Seller or Purchaser, evidenced by written notice to the other party at any time prior to the date for delivery of deed hereunder, this sale shall be closed through an escrow with the Title Company, in accordance with the general provisions of the usual form of Deed and Money Escrow Agreement then furnished and in use by said company, with such special provisions inserted in the escrow agreement as may be required to conform with this Contract. Upon the creation of such an escrow, anything herein to the contrary notwithstanding, payment of purchase price and delivery of deed shall be made through the escrow and this Contract and the earnest money shall be deposited in the escrow and Auctioneer shall be made a party to the escrow with regard to commission due. The cost of the escrow shall be paid by the party requesting it.

33. **Other Documents.** Seller agrees to furnish an affidavit of title subject only to those items set forth herein, and an ALTA statement if required by Purchaser's mortgagee, and transfer tax declarations.

34. **Existing Mortgage.** Seller shall have the right to pay off any existing mortgage(s) out of the proceeds of this sale.

35. **Indemnity.** Purchaser covenants to indemnify, defend and hold Seller harmless against any and all losses, claims, damages, liabilities, costs (including reasonable attorney's fees and court costs), and causes of action including, without limitation, those arising from mechanics liens, injuries to person or damage to property, including the Property, suffered or incurred by Seller directly or indirectly, as a result of, the entry onto the Property by Purchaser, Purchaser's agents, contractors, employees, and licensees.

Rx Date/Time     JUN-17-2008(TUE) 01:50                    4089962786                            P. 006
     04/11/2008   05:07   4089962786                   NOMANBHOYS                        PAGE   06

38.  Anti-Terrorism Representation and Warranty. Seller and Purchase each represent and warrant that neither they nor the officers and directors controlling Purchaser are acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by the United States Treasury Department as a Specially Designated National and Blocked Person, or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and that they are not engaged in the transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation. Each party hereby agrees to defend, indemnify, and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the foregoing representation and warranty.

> THIS SPACE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.

Rx Date/Time      JUN-17-2008(TUE) 01:50          4089962786              P. 007
   04/11/2008   05:07   4089962786                NOMANBHOYS            PAGE  07

IN WITNESS WHEREOF, the parties have executed this Contract on the dates set forth below their signatures.

SELLER:                                    PURCHASER:   NOMANBHOY FAMILY LIMITED
                                                              PARTNERSHIP
McDonald's Corporation
                                           Signature    Nomanbhoy
BY: Bruce Neuman                                        by its President
TITLE: Senior Counsel                                   SHABBIR NOMANBHOY
DATE: June 18, 2008                        Signature

                                           DATE: June 16, 08


SELLER'S ATTORNEY:                         PURCHASER'S ATTORNEY:
Bruce Neumann                              To be determined
McDonald's Corporation
1 McDonald's Plaza, Dept 067
Oak Brook, Illinois  60523
Tel.: 630.623.7556
Fax 630.623.8064

AUCTIONEER:
   Rick Levin & Associates, Inc. or Rick Levin &
   Associates, Inc., in conjunction with Rick Levin,
   licensed Indiana auctioneer
   1467 North Elston Avenue, 2nd Floor      EXHIBITS:
   Chicago, IL  60622
   Telephone: 773.252.4500 x223             Exhibit A:  Legal Description
   Facsimile:  773.252.4520

7

BN

Rx Date/Time    JUN-17-2008(TUE) 01:50        4089952786            P.008
04/11/2008  05:07   4089952786            NOMANBHOYS        PAGE  08

EXHIBIT A -1

LIST OF PROPERTIES  ~~Legal Description~~ — ALL FORMER McDONALDS RESTAURANTS

| # | ADDRESS | BRIEF DESCRIPTION FROM RICK LEVIN WEBSITE | Value of Property |
|---|---------|--------------------------------------------|-------------------|
| 1. | 5057 WENTWORTH CHICAGO, IL | VACANT LAND — 1.108 ACRES | |
| 2. | 10245 ROOSEVELT RD WESTCHESTER, IL | LAND — 29,951 SF BUILDING — 2,100 SF (UNOCCUPIED) | |
| 3. | 130 S. VIRGINIA ST CRYSTAL LAKE, IL | VACANT LAND — 26,000 SF | |
| 4. | 6574 N. 76th ST MILWAUKEE, WIS | VACANT LAND — 22,526 SF | |
| 5. | 5377 BROADWAY MERRILVILLE, IN | VACANT LAND — 1.55 ACRES (2 PARCELS) | |

8

5057 S. Wentworth, Chicago

LC 012-1061    FILE NO. 8591

THAT PART OF THE NORTHEAST 1/4 OF SECTION 9, TOWNSHIP 38 NORTH, RANGE
14 EAST OF THE THIRD PRINCIPAL MERIDAN, COMMENCING AT THE INTERSECTION
OF THE EAST LINE OF WENTWORTH AVENUE AND THE NORTH LINE OF 51ST STREET
IN SAID CITY, THE POINT OF BEGINNING; THENCE NORTH ALONG SAID EAST
LINE OF WENTWORTH AVENUE, 220 FEET TO A POINT; THENCE EAST AT A RIGHT
ANGLE TO THE LAST DESCRIBED COURSE, 220 FEET TO A POINT THENCE SOUTH
AT A RIGHT ANGLE TO THE LAST DESCRIBED COURSE, 220 FEET TO A POINT OF
INTERSECTION WITH THE NORTH LINE OF 51ST STREET; THENCE WEST ALONG
SAID NORTH LINE OF 51st STREET, 220 FEET TO THE POINT OF BEGINNING,
IN COOK COUNTY, ILLINOIS.

Exhibit A-2

9

*westchester*

EXHIBIT A -2

LOTS 1, 2, 3, AND LOT 4 (EXCEPT THE WEST 2.20 FEET THEREOF) LOT 48 AND THE
VACATED ALLEY ADJACENT THERETO AND LOTS 49 AND 50 ALL IN GEORGE F. NIXON
AND COMPANY'S WESTCHESTER IN THE WEST HALF OT HE NORTH WEST QUARTER
OF SECTION 21, TOWNSHIP 39 NORTH, RNAGE 12, EAST OF THE THIRD PRINCIPAL
MERIDIAN, IN COOK COUNTY, ILLINOIS, IN THE VILLAGE OF WESTCHESTER, COOK
COUNTY, ILLINOIS.

C:\Documents and Settings\TMaccarthy\Local Settings\Temporary Internet Files\OLK301\Contract (final 06 30 05).doc
EXHIBIT A

10

130 S. Virginia Street

EXHIBIT A -4

LEGAL DESCRIPTION

The Easterly 170.0 feet (as measured along the lot lines) of Lot 3, in Lakeacres, a subdivision of part of the North Half of Section 6, Township 43 North, Range 8, East of the Third Principal Meridian, according to Plat thereof recorded February 26, 1954, as Document #275689 in McHenry County, Illinois.

LESS AND EXCEPT:

That part of the Easterly 170 feet (as measured along the property lines) of Lot 3 in Lakeacres, a subdivision of part of the North Half of Section 6, Township 43 North, Range 8 East of the Third Principal Meridian, according to the Plat thereof recorded February 26, 1954 as Document No. 275689, in Book 11 of Plats, page 100, described as follows:

Beginning at the most northerly corner of Lot 3; thence on an assumed bearing of South 54 degrees 14 minutes 25 seconds West along the Northerly line of said Lot 3, a distance of 7.18 feet to a point; thence South 15 degrees 19 minutes 37 seconds East, a distance of 143.70 feet to a point on a 585.50 foot radius curve, the center of the circle bears North 74 degrees 40 minutes 23 seconds East from said point; thence Southeasterly along said curve 6.29 feet, central angle 00 degrees 36 minutes 57 seconds, to a point on the Southerly line of said Lot 3; thence North 54 degrees 14 minutes 25 seconds East, a distance of 6.90 feet to the Southwesterly line of Virginia Street; thence North 15 degrees 14 minutes 14 seconds West along said Westerly line, a distance of 150.10 feet to the point of beginning, in McHenry County, Illinois.

Parcel #19-06-204-036

Contract                                    EXHIBIT A - 4

11



6574 N. 76th Street, Milwaukee

Exhibit A-5

That part of Lots One (1), Two (2), Ten (10), and Eleven (11) in Block Seventy-three (73) in Menomonee River Hills East, being a Subdivision of a part of the South East One-quarter (1/4) of Section Twenty-two (22), Township Eight (8) North, Range Twenty-one (21) East, in the City of Milwaukee, Milwaukee County, Wisconsin, which is bounded and described as follows: Commencing at the Northwest corner of said Block 73; thence South 00° 23' West 150.00 feet to a point; thence South 89° 36' 10" East 150.00 feet to a point; thence North 00° 23' 50" East 150.35 feet to a point on the South line of West Acacia Street; thence West 30.81 feet along the South line of West Acacia Street, being the arc of a curve whose center lies to the North whose radius is 1360.78 feet and whose chord bears South 89° 44' 55" West 30.81 feet to a point; thence North 89° 36' 10" West along the South line of West Acacia Street 119.19 feet to the point of beginning.

EXHIBIT A -5
L/C: 48-0035
Parcel Type: MS

5377 Broadway, memilville

Exhibit A-6

Part of the Northwest Quarter of Section 3, Township 35 North, Range 8
West of the 2nd P.M. in Lake County, Indiana, described as beginning at
a point on the West line of said Northwest Quarter of Section 3 which is
548.6 feet South of the Northwest corner of said Northwest Quarter of Section
3; thence South 89 degrees 21' East a distance of 50 feet to the point or
place of beginning of this legal description; thence continuing South 89
degrees 21' East a distance of 162 feet; thence South and parallel to the
West line of said Northwest Quarter of Section 3 a distance of 144.7 feet; thence
West a distance of 162 feet; thence North 144.7 feet to the point or place
of beginning.

PARCEL II

Part of the Northwest Quarter of Section 3, Township 35 North, Range 8 West
of the Second Principal Meridian, in Lake County, Indiana, being more
particularly described as follows:

Beginning at a point on the centerline of Broadway 373.60 feet South of
the Northwest corner of said Northwest quarter of Section 3; thence South
89 degrees 21 minutes East, 166 feet; thence South 175 feet; thence North
89 degrees 21 minutes West 166 feet to a point on the centerline of
Broadway; thence North along the centerline of Broadway 175 feet to the point
of beginning, subject to the rights of the public and the State of Indiana
in the Westerly 50 feet lying within the right of way of Broadway for road
purposes.

EXHIBIT A -6
L/C: 13-0013
Parcel Type: MS

13

BRN

*B∧N*

## Exhibit B

### Restrictive Covenant

For a period of 20 years from the date of the deed, the Property may not be used for and Purchaser will not lease/sell to any regional and/or national restaurant chain or user whose primary purpose is the sale of hamburgers, chicken and/or coffee.

In addition, the following restaurants operating under the listed trade names, or operating under any successor trade names, are prohibited:

| | |
|---|---|
| Apolo Burgers | Astro Burgers |
| Atlanta Burgers | A & W |
| Backyard Burgers | Burger Chef |
| Burger King | Burger Street |
| Carl's Jr. | Caribou Coffee |
| Checkers | Cheeburger, Cheeburger |
| Chick-Fil-A | Church's Chicken |
| Crown Burgers | Crystal Burgers |
| Culvers | Dunkin Donuts |
| Friendly's | Hardee's |
| Harold's Chicken | In N Out Burgers |
| Jack-in-the-Box | Jamba Juice |
| KFC | Popeye's Chicken |
| Rally's | Sonic |
| Starbuck's | Steak 'N' Shake |
| Tim Horton's | Whataburger |
| Wendy's | Whitecastle |

*B∧N*

# Exhibit 13

**M MESSAGE**

To _Bruce_

☐ Urgent

Date _6/19/08_     Time _10:40_     A.M. P.M.

From _IRA_

Of _____

Phone _312-925-0900_

☐ Telephoned          ☑ Please call
☐ Came to see you     ☐ Wants to see you
☐ Returned your call  ☐ Will call again

Message _Buyer refuses to sign new contract. He wants the word "agent" added in front. I marked the contract showing the proposed changes._

Signed _____

13.  Commission/Broker-Agency Disclosure.  Seller shall cause to be paid a broker's commission to Auctioneer at closing, as provided in the Exclusive Agreement For Auctioneering Services between the Seller and Auctioneer.  The provisions of this paragraph shall survive the closing.  Purchaser represents and warrants to Seller that no auctioneer or broker, other than Auctioneer and _____ANDRE_____ ("Participating Broker") was involved in showing, submitting or selling the Property to Purchaser. Purchaser agrees to indemnify and hold Seller, Auctioneer and Participating Broker, if any, harmless and defend them from any claim relating to Purchaser's purchase of the Property asserted against the Seller or Auctioneer by any broker other than as set forth in this Paragraph 13.  The provisions of this Paragraph shall survive the closing.  Purchaser acknowledges that Auctioneer and its licensed associates represent the Seller as Seller's agent in the sale of this Property.

*2:00 P.M. ✓*   *Wednesday, June 19   ✓ Thursday June 19th ✓*

14.  Irrevocable Offer.  Purchaser's execution and delivery of this Contract to Seller is an irrevocable offer to purchase the Property made to Seller and shall not be binding upon Seller until executed by Seller, or Seller's duly authorized agent.  Purchaser agrees that this offer shall remain irrevocable until ~~12:00~~ p.m. Chicago time on ~~Monday, June 23,~~ 2008.  Notification of Seller's acceptance may be given pursuant to the notice provision in this Contract or by telephone.  Seller's, or a duly authorized agent of Seller's, failure to notify Purchaser on a timely basis that Seller rejects Purchaser's offer shall not constitute acceptance or rejection of Purchaser's offer, but Purchaser's offer shall then become revocable by Purchaser.  If Seller rejects Purchaser's offer or ~~Purchaser's offer is effectively revoked, all~~ deposits made by Purchaser shall be promptly returned to Purchaser. *In the event Seller has not received the Earnest Money before the commencement of the auction of the Properties on June 19, 2008,* ~~or is the auction otherwise~~

*agent ✓ ✓ BAN*

*Remove*

15.  Default.  ~~occurs~~ this Contract shall be null and void and of no further force or effect.

15.1.   Purchaser's Default.  At Seller's option, Purchaser shall be in default under the terms of this Contract if, in addition to any other default specified herein, Purchaser shall:

15.1.1.  fail to close pursuant to the terms hereof;
15.1.2.  fail to timely make any payment required of Purchaser hereunder;
15.1.3.  reserved;
15.1.4.  fail to appear at the time and place designated by Seller, as provided herein, to close the transaction; or
15.1.5.  fail to make Closing deposits at the times required thereunder.

15.1.6. If Seller declares Purchaser in default pursuant to the terms herein, or if Purchaser fails or refuses to carry out any other obligation of Purchaser under the terms of this Contract and any supplemental agreements made a part hereof, or if Purchaser defaults under any provision hereof, then, at Seller's option, this Contract is terminated, and, upon notice to Purchaser, the earnest money shall be forfeited.  Seller may also elect to assert against Purchaser any other remedy available, at law or in equity.

16.  Demand For Earnest Money.  Purchaser and Seller hereby agree that if Seller makes a demand upon Auctioneer stating that Seller has thereby elected to forfeit Purchaser's earnest money, and demanding that Auctioneer remit to Seller any earnest money deposited by Purchaser with Auctioneer, pursuant to Paragraph 15.1.6, whereupon Auctioneer shall serve notice upon both parties as to same by certified mail, return receipt requested.  Purchaser shall have seven (7) days from the date Auctioneer deposits the notice in the U. S. mail with sufficient postage prepaid to (a) cure the default; or (b) object in writing to Auctioneer of the intended disposition of earnest money.  The mailing of a notice by certified mail, return receipt requested, shall be sufficient service when the notice is mailed.  If Purchaser fails to cure the default or Auctioneer does not receive Purchaser's written objection within said seven (7) day period, then Auctioneer is hereby authorized by Purchaser and Seller to remit same to Seller (reduced by any monies due Auctioneer from Seller, if any), and Purchaser's right under this Contract shall be forfeited, and the Contract shall be terminated without further action by either party or Auctioneer.  Seller is then free to sell the Property to any other party.

17.  Interpleader.  If either party objects to the intended disposition in writing within the aforementioned seven (7) day grace period, then the parties hereto agree that Auctioneer may deposit earnest money, less costs, with the Clerk of the Circuit Court of Cook County by filing an action in the nature of interpleader.  The parties agree that Auctioneer may be reimbursed from the earnest money for all costs, including reasonable attorney's fees, relating to the filing of the interpleader and do hereby agree to indemnify, defend and hold Auctioneer harmless from any and all claims and demands, including the payment of reasonable attorney's fees, costs and expenses arising out of such default claims and demands.

3

*BAN*

# Exhibit 14

*Printed by Bruce Neumann*



**Bruce Neumann/mcd/us**
06/19/2008 11:30 AM

**To** "Shabbir Nomanbhoy" <shabbir.nomanbhoy@gmail.com>

**cc** "Ira lauter" <ira@ricklevin.com>, Mary Meyer/mcd/us@MCDUS, Doris Murray-Norris/mcd/us@MCDUS

**bcc** Bruce Neumann/mcd/us

**Subject** Fw: Revised Contract

Shabbir:

Ira expressed your desire to revise paragraph 14 of the contract and alternatively that you were "accepting" the contract from yesterday.

I want to make sure that I am very clear and that you understand McDonald's position.

The only offer/contract open to you for acceptance is the offer/contract set fort below and previously forwarded to you this morning. All prior offers/contracts have been rejected and are not valid.

You must have the earnest money delivered to Rick Levin's account this morning. Our discussions with you are occurring only hours prior to the scheduled auction. I can not put McDonald's or Rick Levin in a situation where you continue to claim that the earnest money has been wired, we have not received it and are then forced to decide whether to cancel the auction with the hope that the earnest money will arrive or move forward with the auction and risk "selling" the site to two parties. If the earnest money comes in so late that we do not know that we have it, we must have the right to move forward with the auction and all offers/contracts with you are automatically terminated. If we were to receive your earnest money after the auction had commenced, it would be promptly returned to you.

It is currently 11:30 Central time. The auction is scheduled for 1:00 today. If you have wired the earnest money, you must provide us with the confirmation number immediately.

Bruce Neumann

********************************************************************
*Bruce A. Neumann*
*Director - Senior Counsel*
*Corporate Strategy*
*Central Division*
*McDonald's Corporation*
*2915 Jorie Boulevard – Dept 282*
*Oak Brook, IL 60523*
*Email:  bruce.neumann@us.mcd.com*
*(630) 623-7556 Direct Dial*
*(630) 623-8064 Facsimile*
********************************************************************

# Exhibit 15



**"Ira Lauter"**
**<ira@ricklevin.com>**

06/19/2008 12:04 PM

| Please respond to |
| ira@ricklevin.com |

To    "Bruce Neumann" <bruce.neumann@us.mcd.com>, "Shabbir
      Nomanbhoy" <shabbir.nomanbhoy@gmail.com>

cc    "Mary Meyer" <mary.meyer@us.mcd.com>,
      doris.murray-norris@us.mcd.com, "Rick Levin"
      <rick@ricklevin.com>

bcc

Subject    Re: Revised Contract


Shabbir-

As of 12:05 we have not received the contract or wire.

Please advise.

Thank you,

Ira

Ira Lauter
Rick Levin & Associates, Inc.
1467 N Elston, 2nd Floor
Chicago, IL 60622
Office: 773-252-4500 Ext. 230
Cell: 312-890-3982
Fax: 773-252-4520


-----Original Message-----
From: bruce.neumann@us.mcd.com

Date: Thu, 19 Jun 2008 11:30:40
To:"Shabbir Nomanbhoy" <shabbir.nomanbhoy@gmail.com>
Cc:"Ira lauter"
<ira@ricklevin.com>,mary.meyer@us.mcd.com,doris.murray-norris@us.mcd.com
Subject: Fw: Revised Contract



Shabbir:

Ira expressed your desire to revise paragraph 14 of the contract and
alternatively that you were "accepting" the contract from yesterday.

I want to make sure that I am very clear and that you understand McDonald's
position.

The only offer/contract open to you for acceptance is the offer/contract

*Printed by Bruce Neumann*

set fort below and previously forwarded to you this morning.  All prior offers/contracts have been rejected and are not valid.

You must have the earnest money delivered to Rick Levin's account this morning.  Our discussions with you are occurring only hours prior to the scheduled auction.  I can not put McDonald's or Rick Levin in a situation where you continue to claim that the earnest money has been wired, we have not received it and are then forced to decide whether to cancel the auction with the hope that the earnest money will arrive or move forward with the auction and risk "selling" the site to two parties.  If the earnest money comes in so late that we do not know that we have it, we must have the right to move forward with the auction and all offers/contracts with you are automatically terminated.  If we were to receive your earnest money after the auction had commenced, it would be promptly returned to you.

It is currently 11:30 Central time.  The auction is scheduled for 1:00 today.  If you have wired the earnest money, you must provide us with the confirmation number immediately.

Bruce Neumann


```
***************************************************************
Bruce A. Neumann
Director - Senior Counsel
Corporate Strategy
Central Division
McDonald's Corporation
2915 Jorie Boulevard - Dept 282
Oak Brook, IL 60523
Email:  bruce.neumann@us.mcd.com
(630) 623-7556 Direct Dial
(630) 623-8064 Facsimile
***************************************************************
```

----- Forwarded by Bruce Neumann/mcd/us on 06/19/2008 11:07 AM -----

|  |  |  |  |
|---|---|---|---|
| Bruce Neumann/mcd/us | | | |
| 06/19/2008 09:09 AM | "Shabbir Nomanbhoy" <shabbir.nomanbhoy@gmail.com> | To | |
| | ira@ricklevin.com | cc | |
| | Fw: Revised Contract | Subject | |

Bruce
Neumann/mcd/us

06/19/2008 09:03
AM

To
"Ira lauter" <ira@ricklevin.com>,
shabbir.namanbhoy@gmail.com

cc
Mary Meyer/mcd/us@MCDUS, Doris
Murray-Norris/mcd/us@MCDUS

Subject
Revised Contract

Attached is the revised contract.

The purchase price is $1.4 Mil
Penalty if we do not close is 2% per month of the earnest money
We provide surveys.
If we do not have the earnest money prior to the auction (or if the auction
otherwise occurs), the contract is null and void.  (I have inserted this
language to make if clear that we must have the $ prior to the auction and
if the $ comes in so late such that we do not know that the $ has arrived
and the action occurs, the contract is void.)  I can not be in a situation
where I have sold a site to two parties.

Shabbir:
Please initial on each page next to each of my (BAN) initials (including
the bottom corner of each page),
send the contract back to us
wire the earnest money and inform us of the confirmation number.

Thanks
Bruce

(See attached file:
CORPLEGAL-#493297-v1-Real_Estate_Contract_-_Chicago_Auction_-_June_19__2008.PD

F)

```
**************************************************************
Bruce A. Neumann
Director - Senior Counsel
Corporate Strategy
Central Division
McDonald's Corporation
2915 Jorie Boulevard - Dept 282
Oak Brook, IL 60523
Email:  bruce.neumann@us.mcd.com
(630) 623-7556 Direct Dial
(630) 623-8064 Facsimile
**************************************************************
```

The information contained in this e-mail and any accompanying documents is
confidential, may be privileged, and is intended solely for the person and/or
entity to whom it is addressed (i.e. those identified in the "To" and "cc"
box). They are the property of McDonald's Corporation. Unauthorized
review,use,
disclosure, or copying of this communication, or any part thereof, is strictly
prohibited and may be unlawful. If you have received this e-mail in error,
please return the e-mail and attachments to the sender and delete the e-mail
and attachments and any copy from your system. McDonald's thanks you for your
cooperation.

# Exhibit 16

Printed by Bruce Neumann



"Ira Lauter"
<Ira@ricklevin.com>

06/19/2008 12:52 PM

Please respond to
ira@ricklevin.com

To   "Bruce Neumann" <bruce.neumann@us.mcd.com>, "Shabbir
     Nomanbhoy" <shabbir.nomanbhoy@gmail.com>
cc   "Mary Meyer" <mary.meyer@us.mcd.com>,
     doris.murray-norris@us.mcd.com, "Rick Levin"
     <rick@ricklevin.com>
bcc

Subject   Re: Revised Contract

Shabbir-

Rick is contacting the bank to confirm the wire.

Rick is also preparing to tell bidders that there is no auction.

I am going down to a lower level in a hotel next to O'hare Airport where we
were to conduct the auction.

Please send the contract to all parties on this e-mail ASAP.

I look forward to us receiving your contract to get this all wrapped up.

Thank you,

Ira

Ira Lauter
Rick Levin & Associates, Inc.
1467 N Elston, 2nd Floor
Chicago, IL 60622
Office: 773-252-4500 Ext. 230
Cell: 312-890-3982
Fax: 773-252-4520


-----Original Message-----
From: "Ira Lauter" <ira@ricklevin.com>

Date: Thu, 19 Jun 2008 17:04:39
To:"Bruce Neumann" <bruce.neumann@us.mcd.com>,"Shabbir Nomanbhoy"
<shabbir.nomanbhoy@gmail.com>
Cc:"Mary Meyer" <mary.meyer@us.mcd.com>,doris.murray-norris@us.mcd.com,"Rick
Levin" <rick@ricklevin.com>
Subject: Re: Revised Contract


Shabbir-

As of 12:05 we have not received the contract or wire.

Printed by Bruce Neumann

Please advise.

Thank you,

Ira

Ira Lauter
Rick Levin & Associates, Inc.
1467 N Elston, 2nd Floor
Chicago, IL 60622
Office: 773-252-4500 Ext. 230
Cell: 312-890-3982
Fax: 773-252-4520


-----Original Message-----
From: bruce.neumann@us.mcd.com

Date:"Thu, 19 Jun 2008 11:30:40
To:"Shabbir Nomanbhoy" <shabbir.nomanbhoy@gmail.com>
Cc:"Ira lauter"
<ira@ricklevin.com>,mary.meyer@us.mcd.com,doris.murray-norris@us.mcd.com
Subject: Fw: Revised Contract


Shabbir:

Ira expressed your desire to revise paragraph 14 of the contract and
alternatively that you were "accepting" the contract from yesterday.

I want to make sure that I am very clear and that you understand McDonald's
position.

The only offer/contract open to you for acceptance is the offer/contract
set fort below and previously forwarded to you this morning.  All prior
offers/contracts have been rejected and are not valid.

You must have the earnest money delivered to Rick Levin's account this
morning.  Our discussions with you are occurring only hours prior to the
scheduled auction.  I can not put McDonald's or Rick Levin in a situation
where you continue to claim that the earnest money has been wired, we have
not received it and are then forced to decide whether to cancel the auction
with the hope that the earnest money will arrive or move forward with the
auction and risk "selling" the site to two parties.  If the earnest money
comes in so late that we do not know that we have it, we must have the
right to move forward with the auction and all offers/contracts with you
are automatically terminated.  If we were to receive your earnest money
after the auction had commenced, it would be promptly returned to you.

Printed by Bruce Neumann

It is currently 11:30 Central time.  The auction is scheduled for 1:00
today.  If you have wired the earnest money, you must provide us with the
confirmation number immediately.

Bruce Neumann


```
****************************************************************
Bruce A. Neumann
Director - Senior Counsel
Corporate Strategy
Central Division
McDonald's Corporation
2915 Jorie Boulevard - Dept 282
Oak Brook, IL 60523
Email:  bruce.neumann@us.mcd.com
(630) 623-7556 Direct Dial
(630) 623-8064 Facsimile
****************************************************************
```

----- Forwarded by Bruce Neumann/mcd/us on 06/19/2008 11:07 AM -----

Bruce
Neumann/mcd/us

06/19/2008 09:09                To
AM              "Shabbir Nomanbhoy"
                <shabbir.nomanbhoy@gmail.com>

                ira@ricklevin.com                cc

                                Subject
                Fw: Revised Contract


Bruce
Neumann/mcd/us

06/19/2008 09:03                To
AM              "Ira lauter" <ira@ricklevin.com>,
                shabbir.namanbhoy@gmail.com

Printed by Bruce Neumann

                                                          cc
                    Mary Meyer/mcd/us@MCDUS, Doris
                    Murray-Norris/mcd/us@MCDUS
                                              Subject
                    Revised Contract




Attached is the revised contract.

The purchase price is $1.4 Mil .
Penalty if we do not close is 2% per month of the earnest money
We provide surveys.
If we do not have the earnest money prior to the auction (or if the auction
otherwise occurs), the contract is null and void.  (I have inserted this
language to make if clear that we must have the $ prior to the auction and
if the $ comes in so late such that we do not know that the $ has arrived
and the action occurs, the contract is void.)  I can not be in a situation
where I have sold a site to two parties.

Shabbir:
Please initial on each page next to each of my (BAN) initials (including
the bottom corner of each page),
send the contract back to us
wire the earnest money and inform us of the confirmation number.

Thanks
Bruce

(See attached file:
CORPLEGAL-#493297-v1-Real_Estate_Contract_-_Chicago_Auction_-_June_19__2008.PD
F)



***********************************************************
Bruce A. Neumann
Director - Senior Counsel
Corporate Strategy
Central Division
McDonald's Corporation
2915 Jorie Boulevard - Dept 282

Printed by Bruce Neumann

Oak Brook, IL 60523
Email: bruce.neumann@us.mcd.com
(630) 623-7556 Direct Dial
(630) 623-8064 Facsimile
***************************************************************

The information contained in this e-mail and any accompanying documents is
confidential, may be privileged, and is intended solely for the person and/or
entity to whom it is addressed (i.e. those identified in the "To" and "cc"
box). They are the property of McDonald's Corporation. Unauthorized
review,use,
disclosure, or copying of this communication, or any part thereof, is strictly
prohibited and may be unlawful. If you have received this e-mail in error,
please return the e-mail and attachments to the sender and delete the e-mail
and attachments and any copy from your system. McDonald's thanks you for your
cooperation.

# Exhibit 17



**"Shabbir Nomanbhoy"**
**<shabbir.nomanbhoy@gmail.c**
**om>**

06/19/2008 04:30 PM

To    "bruce.neumann@us.mcd.com"
        <bruce.neumann@us.mcd.com>

cc    "Ira lauter" <ira@ricklevin.com>, mary.meyer@us.mcd.com,
        doris.murray-norris@us.mcd.com, "Rick Levin"
        <rick@ricklevin.com>

bcc

Subject    Re: Fw: Revised Contract

Dear Ira, Bruce and Mary,

Attached is the copy of the contract you requested back with my
initials. I am glad to send this to you for your records, even though
there is no requirement to do so to make it effective.

This contract is the one executed by Bruce yesterday, and which I had
informed you yeterday I was accepting, and on the basis of which I
sent  a wire this morning for $210,000.00 to Rick Levin & Associates.
Ira acknowledged receiving the money. You should have received the
money by about 12-30pm in chicago, as my bank called me at 10-15am in
CA, and I promptly called Ira with the Federal reserve confirmation
number. Again, I was happy to accomodate your request and wire you the
money earlier than required in the contract.

The contract changes you faxed me this morning are all fine, except
the changes at the bottom of item 14, which would allow you to
unilaterally resell the properties at auction. At this time,
hopefully, this is all moot, so I am willing to accept the other
changes to the contract, if you will be so kind as to delete this
clause, and resend me the contract.

I understand from Ira you went ahead with the auction, with reserve,
even though you did receive my wire. I am glad you had the reserve,
and hope that you will exercise that and let the auction participants
know you had sold the properties to me. I expect you to perform to the
contract, as I have subsequently received letters of intent on two of
the properties, and they are already promised.

Please inform me of the closing date and place. As I had mentioned
earlier, I will not be available from July3 to 21 inclusive. My
preferred date for closing is July 31. Please also inform me the
contact person for my lawyer for closing matters. Thanks.

Please cal me with any questions.

Sincerely,

Shabbir Nomanbhoy


On 6/19/08, bruce.neumann@us.mcd.com <bruce.neumann@us.mcd.com> wrote:
>
>
> Shabbir:
>
> Ira expressed your desire to revise paragraph 14 of the contract and
> alternatively that you were "accepting" the contract from yesterday.
>

> I want to make sure that I am very clear and that you understand McDonald's
> position.
>
> The only offer/contract open to you for acceptance is the offer/contract
> set fort below and previously forwarded to you this morning.  All prior
> offers/contracts have been rejected and are not valid.
>
> You must have the earnest money delivered to Rick Levin's account this
> morning.  Our discussions with you are occurring only hours prior to the
> scheduled auction.  I can not put McDonald's or Rick Levin in a situation
> where you continue to claim that the earnest money has been wired, we have
> not received it and are then forced to decide whether to cancel the auction
> with the hope that the earnest money will arrive or move forward with the
> auction and risk "selling" the site to two parties.  If the earnest money
> comes in so late that we do not know that we have it, we must have the
> right to move forward with the auction and all offers/contracts with you
> are automatically terminated.  If we were to receive your earnest money
> after the auction had commenced, it would be promptly returned to you.
>
> It is currently 11:30 Central time.  The auction is scheduled for 1:00
> today.  If you have wired the earnest money, you must provide us with the
> confirmation number immediately.
>
> Bruce Neumann
>
>
>
>
>
> *****************************************************************
> Bruce A. Neumann
> Director - Senior Counsel
> Corporate Strategy
> Central Division
> McDonald's Corporation
> 2915 Jorie Boulevard - Dept 282
> Oak Brook, IL 60523
> Email:  bruce.neumann@us.mcd.com
> (630) 623-7556 Direct Dial
> (630) 623-8064 Facsimile
> *****************************************************************
>
>
>
> ----- Forwarded by Bruce Neumann/mcd/us on 06/19/2008 11:07 AM -----
>
>
>              Bruce
>              Neumann/mcd/us
>                                                                      To
>
>              06/19/2008 09:09        "Shabbir Nomanbhoy"
>              AM                      <shabbir.nomanbhoy@gmail.com>
>                                                                      cc
>                                      ira@ricklevin.com
>                                                                 Subject
>                                      Fw: Revised Contract
>
>
>
>
>

```
>
>
>
>
>
>
>
>
>
>             Bruce
>             Neumann/mcd/us
>                                                                    To
>             06/19/2008 09:03      "Ira lauter" <ira@ricklevin.com>,
>             AM                    shabbir.namanbhoy@gmail.com
>                                                                    cc
>                                   Mary Meyer/mcd/us@MCDUS, Doris
>                                   Murray-Norris/mcd/us@MCDUS
>                                                               Subject
>                                   Revised Contract
>
>
>
>
>
>
>
>
>
> Attached is the revised contract.
>
> The purchase price is $1.4 Mil
> Penalty if we do not close is 2% per month of the earnest money
> We provide surveys.
> If we do not have the earnest money prior to the auction (or if the auction
> otherwise occurs), the contract is null and void.  (I have inserted this
> language to make if clear that we must have the $ prior to the auction and
> if the $ comes in so late such that we do not know that the $ has arrived
> and the action occurs, the contract is void.)  I can not be in a situation
> where I have sold a site to two parties.
>
> Shabbir:
> Please initial on each page next to each of my (BAN) initials (including
> the bottom corner of each page),
> send the contract back to us
> wire the earnest money and inform us of the confirmation number.
>
> Thanks
> Bruce
>
> (See attached file:
>
CORPLEGAL-#493297-v1-Real_Estate_Contract_-_Chicago_Auction_-_June_19__2008.PD
F)
>
>
>
>
>
>
> ***************************************************************
> Bruce A. Neumann
> Director - Senior Counsel
```

```
>   Corporate Strategy
>   Central Division
>   McDonald's Corporation
>   2915 Jorie Boulevard - Dept 282
>   Oak Brook, IL 60523
>   Email:  bruce.neumann@us.mcd.com
>   (630) 623-7556 Direct Dial
>   (630) 623-8064 Facsimile
>   ************************************************************
>
>   The information contained in this e-mail and any accompanying documents is
>   confidential, may be privileged, and is intended solely for the person and/or
>   entity to whom it is addressed (i.e. those identified in the "To" and "cc"
>   box). They are the property of McDonald's Corporation. Unauthorized review,use,
>   disclosure, or copying of this communication, or any part thereof, is strictly
>   prohibited and may be unlawful. If you have received this e-mail in error,
>   please return the e-mail and attachments to the sender and delete the e-mail
>   and attachments and any copy from your system. McDonald's thanks you for your
>   cooperation.
>
>
```

initialled.pdf

Rx Date/Time    JUN-17-2008(TUE) 16:42        4089962786            P.002
04/11/2008  19:59   4089962786        NOMANBHOYS            PAGE  02

## REAL ESTATE SALES CONTRACT – *VERSION 2*
*WITH EXHIBIT A & B2*

1. **Parties.**

    Seller:        McDonald's Corporation or its nominee
                One McDonald's Plaza
                Oak Brook, Illinois 60523
                Tel.: 630.636.4982
                Fax: 630.636.4804

    Purchaser:    *NOMANBHOY FAMILY LIMITED PARTNERSHIP*

                *(OR TRUST, OR IRA ACCOUNTS OF NOMANBHOY FAMILY)*

                *11254 MT CREST PLACE*

                *CUPERTINO, CA 95014*

                *Tel 408 996-8786    call 408 507-7863*
                *Email SHABBIR.NOMANBHOY@GMAIL.COM*

| | | |
|---|---|---|
| 2. **Purchase Price** | | |
| 2.1. High Bid Price | *BULK SALE OFFER* | $ |
| 2.2. Buyer's Premium (3% of 2.1) | *FOR 5 PROPERTIES* | $ |
| 2.3. Purchase Price (2.1 + 2.2) | | $ *1,400,000.00* |
| 2.4. Total Earnest Money Required (10% of 2.3) | | $ ~~210,000~~ $210,000.00 |
| 2.5. Initial Earnest Money Deposit | 15% | $ 210,000.00 |
| 2.6. Additional Earnest Money Required (2.4- 2.5) | | $ -0- |
| 2.7. Balance of Purchase Price Due at Closing (2.3- 2.4) | | $ ~~1,260,000~~ $1,190,000.00 |

3. **Agreement to Sell and Purchase.** Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller, at the price and on the terms set forth herein, the real estate consisting of ~~that parcel of land identified on Rider 1~~ attached to this Contract (the "Property) and more particularly described on Exhibit "A" attached hereto. *EXHIBIT A*

4. **All Cash Transaction.** This is an all-cash sale and purchase; and is NOT contingent upon Purchaser obtaining financing even though Purchaser may apply to a lending institution of Purchaser's choice for a mortgage loan. Purchaser understands and agrees that neither their receipt of a commitment from such a lending institution, their acceptance of such a commitment, nor their satisfaction of any condition set forth in such a commitment shall in any way be conditions of Purchaser's obligations under this Contract. Seller makes no representation or warranty as to Purchaser's ability to obtain financing.

5. **Earnest Money.** Purchaser ~~has~~ *WILL UPON ACCEPTANCE* deposited the Initial Earnest Money set forth in Paragraph 2.5 ~~and receipt is hereby~~ acknowledged. The Additional Earnest Money Required set forth in Paragraph 2.6 shall be paid by cash or cashier's check, payable to the order of the Escrow Agent ~~set forth on Rider 1 attached to this Real Estate Sales Contract~~ and received by Escrow Agent on or before noon on Thursday, June 26, 2008, at the offices of Escrow Agent. The Additional Earnest Money Required may be paid by personal check only if paid on the date of the auction at the time this Contract is executed. All earnest money shall be held by Escrow Agent for the benefit of the parties. Purchaser acknowledges that TIME IS OF THE ESSENCE with respect to the payment of any additional earnest money and the closing of this sale. Upon Seller's execution of this Contract, Rick Levin & Associates, Inc. or Rick Levin & Associates, Inc., in conjunction with Rick Levin, licensed Indiana auctioneer, as applicable ("Auctioneer") shall deposit the Earnest Money with the Escrow Agent for the mutual benefit of Purchaser and Seller.

    *hicago Title nsurance ompany*

6. **The "Closing".** The purchase and sale of the Property shall be closed (the "Closing") on ~~Tuesday, August 5, 2008,~~ *Thursday, July 31, 2008* or on such other date as agreed to by the parties. Closing shall take place at an office of Chicago Title Company or such other title company as agreed to between Seller and Purchaser (the "Title Company") at such location as approved by Seller. Purchaser may use the proceeds of a money lender's escrow to pay the balance of the Purchase Price, provided that the terms of the money lender's escrow are not inconsistent with the terms of this Contract and the Escrow Agreement. Purchaser shall deposit, by certified funds, wire transfer or a bank cashiers check made payable to Title Company, all funds necessary to close the transaction contemplated by this Contract and shall promptly deliver and execute all required documents.

*If due to Seller's default hereunder, Seller fails to close on or before July 31, 2008, Seller shall pay to Purchaser a penalty of two (2%) percent per annum on the total earnest money deposit, prorated to the earlier of the actual closing date, or the termination of this contract.*

7. Delivery of Deed. On the Closing Date, Seller shall convey or cause to be conveyed to Purchaser by recordable Limited or Special Warranty or Trustee's Deed, title to the Property subject only to the following matters ("Permitted Exceptions"):

7.1. general real estate taxes for the years 2007 and 2008 and subsequent years;

7.2. covenants, conditions and restrictions of record (including without limitation such easements and restrictions as may be recorded after the date hereof which Seller determines are necessary or appropriate);

7.3. certain mutually beneficial restrictions and obligations with respect to the proper use, conduct and maintenance of the Property and other property (Purchaser hereby authorizes Seller to record any such restrictions and obligations as covenants affecting the Property and other property); *AFTER REVIEW & APPROVAL BY PURCHASER*

7.4. private and/or public utility easements, roads and highways, if any, whether or not of record;

7.5. all matters which a current, accurate survey of the Property would disclose;

7.6. applicable zoning and building lines and ordinances;

7.7. in the event Seller or any entity is the owner of or otherwise has an interest in any adjacent property, a reservation to Seller or its nominee of the right and privilege of Seller, its lessees, franchisees, successors and assigns to use and enjoy the benefit of all existing private utilities, drainage areas and access ways of any kind, whatsoever, if any. *BAN*

7.8. ~~Purchaser agrees to accept in Seller's deed to Purchaser a covenant prohibiting the Property from being used for restaurant purposes for a period of 20 years from the date of the deed. Purchaser agrees that the restriction shall be a covenant running with the land and be binding upon Purchaser, its heirs, administrators, successors and assigns.~~ Purchaser agrees to accept in Seller's deed to Purchaser, the Restrictive Covenant set forth o... Exhibit B. *SEE ATTACHED RESTRICTIVE COVENANT EXHIBIT B.—2*

7.9. acts done or suffered by Purchaser or by any party claiming by, through or under Purchaser;

7.10. party wall rights, if any; and

7.11. all installments of special assessments heretofore levied falling due after date of closing.

8. Title/Survey. At least five *BUSINESS* days prior to Closing, Seller shall show to Purchaser or his agent evidence of merchantable title in the intended grantor by delivering a Commitment for Title Insurance issued by the Title Company bearing date on or subsequent to the date of the acceptance of this Contract, in the amount of the Purchase Price subject to no other exceptions than those listed in Paragraph 7 and to general exceptions contained in said commitment. Every Commitment for Title Insurance furnished by Seller hereunder shall be conclusive evidence of title as therein shown. If evidence of title disclose other exceptions, Seller shall have thirty (30) days from Seller's receipt of evidence of title to cure such exceptions and notify Purchaser accordingly, and as to those exceptions which may be removed at closing by payment of money, Seller may have same removed at closing by using the proceeds of sale in payment thereof. Seller has ~~to be delivered a copy of any survey of the property in Seller's possession~~ to Purchaser. If Seller is unable to have such defects cured or *To the extent* waived within 30 days, Purchaser may, as its sole remedy, terminate this Contract within 10 days thereafter. In no event shall Seller have *Seller has a c...* any obligation to commence litigation or to expend money to cure or remove any title objections. Seller and Purchaser acknowledge and *of such survey* agree that Seller shall not be obligated to provide any new or updated survey to Purchaser. *in its possess... BAN*

9. Payments at Closing. Purchaser shall pay all recording charges, all money lender's charges (including money lender's escrow fees), municipal transaction tax stamps, if applicable, escrow fees and any and all title insurance charges.

10. Possession. Purchaser shall be entitled to occupancy and possession of the Property from and after the Closing date provided final payment of the Purchase Price has been made and the Closing has been fully consummated. Prior to Closing, Seller shall have sole control and exclusive possession of the Property.

11. Prorations. At closing, Purchaser shall receive, to the extent that they have not been paid, a credit for real estate taxes for 2007 and 2008. In the event the actual amount of the tax bills is unknown, such credit shall be based on 105% of the most recent ascertainable general real estate tax bill for the Property. General real estate taxes shall be prorated to the date of closing. If the real estate tax bill includes additional property owned by Seller, at Closing Purchaser shall give Seller a credit for taxes from the date of Closing through the remainder of the tax year and the parties shall complete a tax division on the Property such that it shall be separately assessed. Prior to such separate assessment, Seller and Purchaser shall each pay their pro rata share of the tax bill based upon the square footage of each parcel. All prorations are final. All other items customarily prorated shall be prorated as of the date of closing.

12. Intentionally Deleted

*6/18*

13. Commission/Broker-Agency Disclosure. Seller shall cause to be paid a broker's commission to Auctioneer at closing, as provided in the Exclusive Agreement For Auctioneering Services between the Seller and Auctioneer. The provisions of this paragraph shall survive the closing.  Purchaser represents and warrants to Seller that no auctioneer or broker, other than Auctioneer and _____AYDEE_____ ("Participating Broker") was involved in showing, submitting or selling the Property to Purchaser. Purchaser agrees to indemnify and hold Seller, Auctioneer and Participating Broker, if any, harmless and defend them from any claim relating to Purchaser's purchase of the Property asserted against the Seller or Auctioneer by any broker other than as set forth in this Paragraph 13. The provisions of this Paragraph shall survive the closing.  Purchaser acknowledges that Auctioneer and its licensed associates represent the Seller as Seller's agent in the sale of this Property.

14. Irrevocable Offer. Purchaser's execution and delivery of this Contract to Seller is an irrevocable offer to purchase the Property made to Seller and shall not be binding upon Seller until executed by Seller, or Seller's duly authorized agent. Purchaser agrees that this offer shall remain irrevocable until 5:00 p.m. Chicago time on Monday, June 23, 2008. Notification of Seller's acceptance may be given pursuant to the notice provision in this Contract or by telephone. Seller's, or a duly authorized agent of Seller's, failure to notify Purchaser on a timely basis that Seller rejects Purchaser's offer shall not constitute acceptance or rejection of Purchaser's offer, but Purchaser's offer shall then become revocable by Purchaser.  If Seller rejects Purchaser's offer or Purchaser's offer is effectively revoked, all deposits made by Purchaser shall be promptly returned to Purchaser.

15. Default.
        15.1.    Purchaser's Default. At Seller's option, Purchaser shall be in default under the terms of this Contract if, in addition to any other default specified herein, Purchaser shall:

                15.1.1. fail to close pursuant to the terms hereof;
                15.1.2. fail to timely make any payment required of Purchaser hereunder;
                15.1.3. reserved;
                15.1.4. fail to appear at the time and place designated by Seller, as provided herein, to close the transaction; or
                15.1.5. fail to make Closing deposits at the times required thereunder.

                15.1.6. If Seller declares Purchaser in default pursuant to the terms herein, or if Purchaser fails or refuses to carry out any other obligation of Purchaser under the terms of this Contract and any supplemental agreements made a part hereof, or Purchaser defaults under any provision hereof, then, at Seller's option, this Contract is terminated, and, upon notice to Purchaser, the earnest money shall be forfeited. Seller may also elect to assert against Purchaser any other remedy available, at law or in equity.

16. Demand For Earnest Money. Purchaser and Seller hereby agree that if Seller makes a demand upon Auctioneer stating that Seller has thereby elected to forfeit Purchaser's earnest money, and demanding that Auctioneer remit to Seller any earnest money deposited by Purchaser with Auctioneer, pursuant to Paragraph 15.1.6, whereupon Auctioneer shall serve notice upon both parties as to same by certified mail, return receipt requested. Purchaser shall have seven (7) days from the date Auctioneer deposits the notice in the U. S. mail with sufficient postage prepaid to (a) cure the default; or (b) object in writing to Auctioneer of the intended disposition of earnest money. The mailing of a notice by certified mail, return receipt requested, shall be sufficient service when the notice is mailed. If Purchaser fails to cure the default or Auctioneer does not receive Purchaser's written objection within said seven (7) day period, then Auctioneer is hereby authorized by Purchaser and Seller to remit same to Seller (reduced by any monies due Auctioneer from Seller, if any), and Purchaser's right under this Contract shall be forfeited, and the Contract shall be terminated without further action by either party or Auctioneer. Seller is then free to sell the Property to any other party.

17. Interpleader. If either party objects to the intended disposition in writing within the aforementioned seven (7) day grace period, then the parties hereto agree that Auctioneer may deposit earnest money, less costs, with the Clerk of the Circuit Court of Cook County by filing an action in the nature of interpleader. The parties agree that Auctioneer may be reimbursed from the earnest money for all costs, including reasonable attorney's fees, relating to the filing of the interpleader and do hereby agree to indemnify, defend and hold Auctioneer harmless from any and all claims and demands, including the payment of reasonable attorney's fees, costs and expenses arising out of such default claims and demands.

18. Warranty And Disclaimer Of Warranties. **PURCHASER REPRESENTS THAT EITHER PURCHASER OR A DULY AUTHORIZED AGENT OF PURCHASER HAS INSPECTED, OR WAIVES THE RIGHT TO INSPECT, THE PROPERTY AND VERIFIED THE FACTS AND INFORMATION CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER PRIOR TO ~~EXECUTING THIS CONTRACT~~. PURCHASER WARRANTS THAT PURCHASER IS PURCHASING THE PROPERTY, ALL IMPROVEMENTS, FIXTURE, EQUIPMENT AND PERSONAL PROPERTY, THEREOF ON AN "AS-IS, WHERE-IS" BASIS, WITH ALL FAULTS AND WITH NO WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, EITHER ORAL OR WRITTEN, EXCEPT AS EXPRESSLY STATED IN THIS CONTRACT, WHETHER OF HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION OF IMPROVEMENTS, ENVIRONMENTAL CONDITION OR OTHERWISE MADE BY SELLER, AUCTIONEER OR ANY AGENT OF EITHER OF THEM, INCLUDING, BUT NOT LIMITED TO, INFORMATION CONTAINED IN THE SALES BROCHURE, ADVERTISING OR SUPPLEMENTAL BROCHURES. NEITHER SELLER, AUCTIONEER, NOR ANY OF THEIR AGENTS ASSUME ANY LIABILITY FOR INACCURACIES, ERRORS OR OMISSIONS CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER.** PURCHASER'S INITIALS:

By executing this Contract, Purchaser expressly represents and agrees that Purchaser is not relying upon any representative warranty or statement by Seller, Auctioneer or its or their sales representatives which differs from the disclosures made in this Contract. Purchaser acknowledges that Purchaser has not relied upon any sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Seller, Auctioneer or others, including, but not limited to, any relating to the description of physical condition of the Property, or the dimensions of the Property or any other physical dimensions thereof, the estimated real estate taxes of the Property, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other data, except as may be specifically represented herein. Purchaser has relied on their own examination and investigation thereof. No person has been authorized to make any representation on behalf of Seller. Purchaser agrees (a) to purchase the Property without offset or any claim against, or liability to, Seller or its agents, whether or not any layout or dimension of the Property or any part thereof, is accurate or correct, and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the Closing.

*SELLER AGREES THAT NO MATERIAL DIFFERENCES EXIST FROM RICK LEVIN WEBSITE INFORMATION.* PURCHASER'S INITIALS:

19. Notices. All notices herein required shall be in writing and signed by either party, and shall be served on the other party at the addresses set forth in Paragraph 1. The mailing of a notice by registered or certified mail, return receipt requested with sufficient postage prepaid, shall be sufficient service when the notice is mailed. Notices may also be served by a nationally recognized air courier, or personal delivery. Notices sent by air courier shall be deemed delivered on the date of receipt. Either party may change its address for notice purposes by giving notice to that effect in the manner set forth herein, provided such change of address shall not be deemed received until actual receipt thereof by the addressee. Any notices required herein may be sent by and to each party's respective attorney.

20. Attorney Review. PURCHASER REPRESENTS THAT PURCHASER HAS BEEN ADVISED BY THE SELLER AND AUCTIONEER TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS CONTRACT. PURCHSER FURTHER ACKNOWLEDGES THAT HE HAS READ AND UNDERSTANDS EACH AND EVERY PART OF THIS CONTRACT.

21. Property Condition. The parties hereto acknowledge that Auctioneer is not obligated to and has not made any independent investigation of the condition of the Property including, but not limited to, any environmental matters with respect thereto (collectively the "Physical Condition"). The parties hereto further acknowledge that all investigations, reports and information with respect to the Physical Condition, if any, have been prepared by or for the Seller and have been furnished by Auctioneer to Purchaser on behalf of Seller. Seller makes no representation as to the truth or accuracy of any such investigations, reports and/or information.

22. Statutory Compliance. Purchaser and Seller hereby agree to make all disclosures and do all things necessary to comply with the applicable provisions of the Real Estate Settlement Procedures Act of 1974, as amended. Purchaser and Seller agree to make all certifications and do all things necessary to comply with Section 1445 of the Internal Revenue Code at or before the time of Closing.

23. Stamp Taxes. Seller shall furnish a completed declaration signed by the Seller or Seller's agent in the form required by the state and county, and shall furnish any declaration signed by the Seller or Seller's agent or meet other requirements as established by any local ordinance with regard to a transfer or transaction tax.

24. Use of Pronouns. Wherever appropriate, the singular includes the plural and the masculine includes the feminine or the neuter. The term "Purchaser" shall be interpreted as "Purchasers" if more than one person are purchasing the Property, and their obligations shall be joint and several.

25. No Assignment. Purchaser shall not directly or indirectly assign or transfer his rights under this Contract without prior written approval of Seller which may be granted or withheld in the sole and absolute discretion of Seller. Seller may assign this Contract without the consent of Purchaser, subject, however, to Purchaser's rights hereunder. Any attempted assignment or transfer by Purchaser without Seller's prior written consent shall be deemed null and void and shall be considered an event of default by Purchaser subject to the provisions of Paragraph 16.2 of this Contract.

26. Headings; Exhibits. The paragraph headings used herein are for the reader's convenience only and they shall not be used to interpret the meaning of the terms set forth herein. Exhibits attached hereto are incorporated as a part of this Contract.

27. Governing Law. The parties agree that any litigation or dispute concerning the enforcement of this Contract shall be brought in the State of Illinois, the jurisdiction shall be the county in which the Property is located, and that Illinois law shall govern its interpretation.

28. Complete Agreement Severability. This Contract sets forth the entire understanding between the parties relating to the transactions described herein, there being no terms, conditions, warranties or representations other than those contained herein. This Contract may be amended only in an instrument signed by both parties hereto. The parties intend that faxed signatures and that a faxed Contract containing the signatures (original or faxed) of all parties is binding on the parties. At the request of either party, any faxed document subject to this paragraph shall be re-executed by both parties in an original form. Neither party shall raise the use of a facsimile machine as a defense to this Contract and shall forever waive such defense. If any provision of this Contract is invalid or unenforceable as against any party under certain circumstances, the remainder of this Contract and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Contract, except as otherwise herein provided shall be valid and enforced to the fullest extent permitted by law.

29. Invalidity. The invalidity of any covenant, grant, condition or provision of this Contract shall not impair or affect in any manner the validity, enforceability or effect of the remainder of the Contract.

30. Purchaser's Status. Purchaser represents and warrants there is nothing in Purchaser's status which could or might preclude or prevent Purchaser from consummating this transaction as herein set forth. Purchaser also agrees that he or she shall not cause any labor or material to be incorporated or delivered to the Property prior to Closing.

31. Binding Agreement. The terms and provisions of this contract shall be binding upon the parties hereto and their heirs, administrators, executors, successors, and permitted assigns.

32. Request for Escrow. At the request of Seller or Purchaser, evidenced by written notice to the other party at any time prior to the date for delivery of deed hereunder, this sale shall be closed through an escrow with the Title Company, in accordance with the general provisions of the usual form of Deed and Money Escrow Agreement then furnished and in use by said company, with such special provisions inserted in the escrow agreement as may be required to conform with this Contract. Upon the creation of such an escrow, anything herein to the contrary notwithstanding, payment of purchase price and delivery of deed shall be made through the escrow and this Contract and the earnest money shall be deposited in the escrow and Auctioneer shall be made a party to the escrow with regard to commission due. The cost of the escrow shall be paid by the party requesting it.

33. Other Documents. Seller agrees to furnish an affidavit of title subject only to those items set forth herein, and an ALTA statement if required by Purchaser's mortgagee, and transfer tax declarations.

34. Existing Mortgage. Seller shall have the right to pay off any existing mortgage(s) out of the proceeds of this sale.

35. Indemnity. Purchaser covenants to indemnity, defend and hold Seller harmless against any and all losses, claims, damages, liabilities, costs (including reasonable attorney's fees and court costs), and causes of action including, without limitation, those arising from mechanics liens, injuries to person or damage to property, including the Property, suffered or incurred by Seller directly or indirectly, as a result of, the entry onto the Property by Purchaser, Purchaser's agents, contractors, employees, and licensees.

36. Anti-Terrorism Representation and Warranty. Seller and Purchase each represent and warrant that neither they nor the officers and directors controlling Purchaser are acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by the United States Treasury Department as a Specially Designated National and Blocked Person, or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and that they are not engaged in the transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation. Each party hereby agrees to defend, indemnify, and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the foregoing representation and warranty.

THIS SPACE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.

IN WITNESS WHEREOF, the parties have executed this Contract on the dates set forth below their signatures.

SELLER:                                                PURCHASER:   NOMANBHOY FAMILY LIMITED
                                                                              PARTNERSHIP
McDonald's Corporation
                                                       Signature  by its President
BY: Bruce Neumann                                                   SHABBIR NOMANBHOY
TITLE: Senior Counsel                                  Signature
DATE: June 18, 2008
                                                       DATE: June 16, 08

SELLER'S ATTORNEY:                                     PURCHASER'S ATTORNEY:
Bruce Neumann                                               To be determined
McDonald's Corporation
1 McDonald's Plaza, Dept 067
Oak Brook, Illinois 60523
Tel.: 630.623.7556
Fax: 630.623.8064

AUCTIONEER:
    Rick Levin & Associates, Inc. or Rick Levin &
    Associates, Inc., in conjunction with Rick Levin,
    licensed Indiana auctioneer
    1467 North Elston Avenue, 2nd Floor               EXHIBITS:
    Chicago, IL 60622
    Telephone: 773.252.4500 x223                      Exhibit A: Legal Description
    Facsimile:  773.252.4520

6/18

EXHIBIT A -1

LIST OF PROPERTIES   ~~Legal Description~~ — ALL FORMER McDONALDS RESTAURANTS

| # | ADDRESS | BRIEF DESCRIPTION FROM RICH LEVIN WEBSITE |
|---|---------|-------------------------------------------|
| 1. | 5057 WENTWORTH CHICAGO, IL | VACANT LAND — 1.108 ACRES  Value of Property |
| 2. | 10245 ROOSEVELT RD WESTCHESTER, IL | LAND — 29,951 SF  BUILDING — 2,100 SF (UNOCCUPIED) |
| 3. | 130 S. VIRGINIA ST CRYSTAL LAKE, IL | VACANT LAND — 26,000 SF |
| 4. | 6574 N. 76th ST MILWAUKEE, WIS | VACANT LAND — 22,526 SF |
| 5. | 5377 BROADWAY MERRILVILLE, IN | VACANT LAND — 1.55 ACRES (2 PARCELS) |

6|18

5057 S. Wentworth, Chicago

LC 012-1061    FILE NO. 8591

THAT PART OF THE NORTHEAST 1/4 OF SECTION 9, TOWNSHIP 38 NORTH, RANGE
14 EAST OF THE THIRD PRINCIPAL MERIDAN, COMMENCING AT THE INTERSECTION
OF THE EAST LINE OF WENTWORTH AVENUE AND THE NORTH LINE OF 51ST STREET
IN SAID CITY, THE POINT OF BEGINNING; THENCE NORTH ALONG SAID EAST
LINE OF WENTWORTH AVENUE, 220 FEET TO A POINT; THENCE EAST AT A RIGHT
ANGLE TO THE LAST DESCRIBED COURSE, 220 FEET TO A POINT THENCE SOUTH
AT A RIGHT ANGLE TO THE LAST DESCRIBED COURSE, 220 FEET TO A POINT OF
INTERSECTION WITH THE NORTH LINE OF 51ST STREET; THENCE WEST ALONG
SAID NORTH LINE OF 51st STREET, 220 FEET TO THE POINT OF BEGINNING,
IN COOK COUNTY, ILLINOIS.

Exhibit A-2

Westchester

EXHIBIT A -3

LOTS 1, 2, 3, AND LOT 4 (EXCEPT THE WEST 2.20 FEET THEREOF) LOT 48 AND THE VACATED ALLEY ADJACENT THERETO AND LOTS 49 AND 50 ALL IN GEORGE F. NIXON AND COMPANY'S WESTCHESTER IN THE WEST HALF OT HE NORTH WEST QUARTER OF SECTION 21, TOWNSHIP 39 NORTH, RNAGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, IN THE VILLAGE OF WESTCHESTER, COOK COUNTY, ILLINOIS.

*130 S. Virginia Street*

EXHIBIT A -4

LEGAL DESCRIPTION

The Easterly 170.0 feet (as measured along the lot lines) of Lot 3, in Lakeacres, a subdivision of part of the North Half of Section 6, Township 43 North, Range 8, East of the Third Principal Meridian, according to Plat thereof recorded February 26, 1954, as Document #275689 in McHenry County, Illinois.

LESS AND EXCEPT:

That part of the Easterly 170 feet (as measured along the property lines) of Lot 3 in Lakeacres, a subdivision of part of the North Half of Section 6, Township 43 North, Range 8 East of the Third Principal Meridian, according to the Plat thereof recorded February 26, 1954 as Document No. 275689, in Book 11 of Plats, page 100, described as follows:

Beginning at the most northerly corner of Lot 3;  thence on an assumed bearing of South 54 degrees 14 minutes 25 seconds West along the Northerly line of said Lot 3, a distance of 7.18 feet to a point;  thence South 15 degrees 19 minutes 37 seconds East, a distance of 143.70 feet to a point on a 585.50 foot radius curve, the center of the circle bears North 74 degrees 40 minutes 23 seconds East from said point;  thence Southeasterly along said curve 6.29 feet, central angle 00 degrees 36 minutes 57 seconds, to a point on the Southerly line of said Lot 3; thence North 54 degrees 14 minutes 25 seconds East, a distance of 6.90 feet to the Southwesterly line of Virginia Street;  thence North 15 degrees 14 minutes 14 seconds West along said Westerly line, a distance of 150.10 feet to the point of beginning, in McHenry County, Illinois.

Parcel #19-06-204-036

6574 N. 76th Street, Milwaukee

Exhibit A-5

That part of Lots One (1), Two (2), Ten (10), and Eleven (11) in Block Seventy-three (73) in Menomonee River Hills East, being a Subdivision of a part of the South East One-quarter (1/4) of Section Twenty-two (22), Township Eight (8) North, Range Twenty-one (21) East, in the City of Milwaukee, Milwaukee County, Wisconsin, which is bounded and described as follows: Commencing at the Northwest corner of said Block 73; thence South 00° 23' 50" West 150.00 feet to a point; thence South 89° 36' 10" East 150.00 feet to a point; thence North 00° 23' 50" East 150.35 feet to a point on the South line of West Acacia Street; thence West 30.81 feet along the South line of West Acacia Street, being the arc of a curve whose center lies to the North whose radius is 1360.78 feet and whose chord bears South 89° 44' 55" West 30.81 feet to a point; thence North 89° 36' 10" West along the South line of West Acacia Street 119.19 feet to the point of beginning.

**EXHIBIT A -5**
L/C: 48-0035
Parcel Type: MS

*5377 Broadway, merrillville*

*Exhibit A-6*

Part of the Northwest Quarter of Section 3, Township 35 North, Range 8
West of the 2nd P.M. in Lake County, Indiana, described as beginning at
a point on the West line of said Northwest Quarter of Section 3 which is
548.6 feet South of the Northwest corner of said Northwest Quarter of Section
3; thence South 89 degrees 21' East a distance of 50 feet to the point or
place of beginning of this legal description; thence continuing South 89
degrees 21' East a distance of 162 feet; thence South and parallel to the
West line of said Northwest Quarter of Section 3 a distance of 144.7 feet; thence
West a distance of 162 feet; thence North 144.7 feet to the point or place
of beginning.


PARCEL II

Part of the Northwest Quarter of Section 3, Township 35 North, Range 8 West
of the Second Principal Meridian, in Lake County, Indiana, being more
particularly described as follows:

Beginning at a point on the centerline of Broadway 373.60 feet South of
the Northwest corner of said Northwest quarter of Section 3; thence South
89 degrees 21 minutes East, 166 feet; thence South 175 feet; thence North
89 degrees 21 minutes West 166 feet to a point on the centerline of
Broadway; thence North along the centerline of Broadway 175 feet to the point
of beginning, subject to the rights of the public and the State of Indiana
in he Westerly 50 feet lying within the right of way of Broadway for road
purposes.

EXHIBIT A -6
L/C: 13-0013
Parcel Type: MS

## Exhibit B

**Restrictive Covenant:**

For a period of 20 years from the date of the deed, the Property may not be used for and Purchaser and any successor will not lease/sell to any tenant/buyer whose primary purpose is the sale of hamburgers, chicken and/or coffee.

In addition, the following restaurants operating under the listed trade names, or operating under any successor trade names, are prohibited:

| | |
|---|---|
| Apolo Burgers | Astro Burgers |
| Atlanta Burgers | A & W |
| Backyard Burgers | Burger Chef |
| Burger King | Burger Street |
| Carl's Jr. | Caribou Coffee |
| Checkers | Cheeburger, Cheeburger |
| Chick-Fil-A | Church's Chicken |
| Crown Burgers | Crystal Burgers |
| Culvers | Dunkin Donuts |
| Friendly's | Hardee's |
| Harold's Chicken | In N Out Burgers |
| Jack-in-the-Box | Jamba Juice |
| KFC | Popeye's Chicken |
| Rally's | Sonic |
| Starbuck's | Steak 'N' Shake |
| Tim Horton's | Whataburger |
| Wendy's | Whitecastle |

# Exhibit 18

*Printed by Bruce Neumann*



**Bruce Neumann/mcd/us**
06/19/2008 05:53 PM

To   "Shabbir Nomanbhoy" <shabbir.nomanbhoy@gmail.com>
cc   "Ira lauter" <ira@ricklevin.com>, mary.meyer@us.mcd.com,
     rick@ricklevin.com, keith.magnuson@us.mcd.com,
     doris.murray-norris@us.mcd.com
bcc  Bruce Neumann/mcd/us
Subject  McDonald's Properties📄

Shabbir:

<u>You do not have an agreement or contract with McDonald's.</u>

Our offer that was proposed yesterday was rejected by you.   The e-mail immediately below is one
example of your rejection of the offer.

The revised offer that we proposed this morning was also rejected by you.  In the telephone discussion
between you and Ira Lauter at approximately 10:35 a.m. central time this morning you rejected the new
proposal.

In my 11:30 a.m. e-mail to you, I clearly stated that all prior offers were not valid, had been revoked, and
that the only available offer was that which had previously been sent to you at 9:03 and 9:09 a.m.  This
offer provided that if the auction occurred, the offer and contract was null and void.

As you mentioned in your 4:30 p.m. e-mail, the auction proceeded as scheduled.

<u>You do not have a contract or any other agreement with McDonald's.</u>

I have communicated your current offer (proposing yesterday's rejected offer back to us) to the proper
parties.

<u>Your offer has not been accepted.</u>

When a decision is made whether to accept or reject your offer, it will be communicated to you.

*************************************************************
*Bruce A. Neumann*
*Director - Senior Counsel*
*Corporate Strategy*
*Central Division*
*McDonald's Corporation*
*2915 Jorie Boulevard – Dept 282*
*Oak Brook, IL 60523*
*Email:  bruce.neumann@us.mcd.com*
*(630) 623-7556 Direct Dial*
*(630) 623-8064 Facsimile*
*************************************************************

# Exhibit 19

*Printed by Bruce Neumann*

 "Shabbir Nomanbhoy"
&lt;shabbir.nomanbhoy@gmail.c
om&gt;
06/20/2008 03:15 PM

To  "bruce.neumann@us.mcd.com"
&lt;bruce.neumann@us.mcd.com&gt;
cc  doris.murray-norris@us.mcd.com, "Ira lauter"
&lt;ira@ricklevin.com&gt;, keith.magnuson@us.mcd.com,
mary.meyer@us.mcd.com, rick@ricklevin.com
bcc

Subject  Re: McDonald's Properties

Dear Bruce,

We have a contract, and I intend to pursue that. I will have my
lawyers contact you, and if  the contract is not honored, I will file
suit to enforce. I will file an injunction so that you are unable to
sell the properties to others in the meantime.

You may want to think about the effects of a lawsuit that will tie up
these properties for a long time, as well as the associated costs and
time for McDonalds. You may also want to think about the negative
publicity resulting from your trying to double sell these properties
at auction.

A better alternative is for all parties is to abide by the contract. I
would like to settle this amicably if at all possible. Please contact
me if you have a proposal for that.

Shabbir Nomanbhoy

On 6/20/08, bruce.neumann@us.mcd.com <bruce.neumann@us.mcd.com> wrote:
>
> Shabbir:
>
> Thank you for your interest in the McDonald's Properties that were offered
> for auction.   We are rejecting  your counter offer.
>
> At the current time we are not interested in pursuing a possible agreement
> or transaction with you.
>
> Below is a brief summary of a few of the events over the past few days.
>
> On Wednesday evening you were informed that our offer to you was for $1.4
> million, plus various other terms.  You immediately rejected this offer.
> Approximately 3 hours later you made a counter-offer by contacting Ira

*Printed by Bruce Neumann*

> Lauter and stating that you would now accept the terms contained in our
> prior offer.  We did not and do not accept your "counter offer".
>
> On Thursday morning we extended another offer to you.  I followed-up on
> this offer with an e-mail to you stating that the only offer available to
> you was the Thursday morning offer.  You rejected this offer and responded
> by initialling and returning the Wednesday evening offer.  As stated above,
> this offer was no longer valid and was not available for acceptance by you.
>
> In summary, all of our offers to you were rejected and we rejected all of
> your counter offers to us.
>
> It is my understanding that you wired money to Rick Levin & Associates.
> You may want to contact them to discuss matter.
>
> Again, thank you for your interest.  However, we are not interested in and
> will not be pursuing any further discussions nor entering into a
> transaction with you.
>
> Sincerely,
>
> Bruce Neumann
>
>
>
>
>
>
>
>
> *******************************************************
> Bruce A. Neumann
> Director - Senior Counsel
> Corporate Strategy
> Central Division
> McDonald's Corporation
> 2915 Jorie Boulevard - Dept 282
> Oak Brook, IL 60523
> Email:  bruce.neumann@us.mcd.com
> (630) 623-7556 Direct Dial
> (630) 623-8064 Facsimile
> *******************************************************
>
> The information contained in this e-mail and any accompanying documents is
> confidential, may be privileged, and is intended solely for the person and/or
> entity to whom it is addressed (i.e. those identified in the "To" and "cc"
> box). They are the property of McDonald's Corporation. Unauthorized review,use,

*Printed by Bruce Neumann*

```
>  disclosure, or copying of this communication, or any part thereof, is
strictly
>  prohibited and may be unlawful. If you have received this e-mail in error,
>  please return the e-mail and attachments to the sender and delete the
e-mail
>  and attachments and any copy from your system. McDonald's thanks you for
your
>  cooperation.
>
```

# Exhibit 20

Printed by Bruce Neumann



| | "Ira Lauter"<br><ira@ricklevin.com><br>06/18/2008 10:48 PM<br>**Please respond to**<br>**ira@ricklevin.com** | To | "Bruce Neumann" <bruce.neumann@us.mcd.com> |
|---|---|---|---|
| | | cc | "Rick Levin" <rick@ricklevin.com>, "Mary Meyer"<br><mary.meyer@us.mcd.com> |
| | | bcc | |
| | | Subject | Re: FW: Fwd: Bulk-purchase all-cash offer for Five<br>McDonalds properties |

Bruce-

I also asked him verbally to send us the wire confirmation number first thing.

I would like him to send us back the revised signed contract prior to the
1:00pm Auction time with the revised deed restriction and changes incorporated
in it.

Not sure why, however, Shabbir is saying he is no longer worried about the
contract (which has me worried) and he will send the money without a new
contract as the contract is acceptable to him.

Thank you and have a good night.

Ira
Ira Lauter
Rick Levin & Associates, Inc.
1467 N Elston, 2nd Floor
Chicago, IL 60622
Office: 773-252-4500 Ext. 230
Cell: 312-890-3982
Fax: 773-252-4520


-----Original Message-----
From: bruce.neumann@us.mcd.com

Date: Wed, 18 Jun 2008 22:18:30
To:"Shabbir Nomanbhoy" <shabbir.nomanbhoy@gmail.com>
Cc:"Ira lauter" <ira@ricklevin.com>,mary.meyer@us.mcd.com,"rick"
<rick@ricklevin.com>,keith.magnuson@us.mcd.com,tamara.flagg@us.mcd.com,katheri
ne.dunworth@us.mcd.com,doris.murray-norris@us.mcd.com
Subject: Re: FW: Fwd: Bulk-purchase all-cash offer for Five McDonalds
properties


Rick Levin will be the escrow agent.

As Mary stated in her e-mail, the earnest money must be wired and received by
Rick Levin or the auction will go forward.

You need to have your wire go out first thing in the morning and inform us of
the wire confirmation number.

Bruce Neumann


----- Original Message -----
From: "Shabbir Nomanbhoy" [shabbir.nomanbhoy@gmail.com]
Sent: 06/18/2008 07:17 PM MST
To: Bruce Neumann
Cc: "Ira lauter" <ira@ricklevin.com>; Mary Meyer; rick@ricklevin.com; Keith
Magnuson; Tamara Flagg; Katherine Dunworth; Doris Murray-Norris
Subject: Re: FW: Fwd: Bulk-purchase all-cash offer for Five McDonalds
properties


Bruce, Mary, Ira

The contract is acceptable, as I indicated to Ira. I am waiting for
Mary to  clarify, on McDonalds letterhead, which escrow agent will be
used (I understand you want a change to Rick Levin Asociates, though
contract says Chicago Title.) and where I should send the earnest
money.
I am happy to accomodate your request to wire the earnest money
tomorrow morning, even though the contract mentions a date of june 26
for earnest money receipt. If you prefer, there is a Chicago Title Co
office near my house in Saratoga, CA, that we could use.


Sincerely,
Shabbir Nomanbhoy

On 6/18/08, bruce.neumann@us.mcd.com <bruce.neumann@us.mcd.com> wrote:
>
> Ira:
>
> Attached is the contract signed by McDonald's.
>
> We have made a few minor changes consistent with the discussions you had
> with Mary Meyer.  The basic changes are:
> the earnest money to 15%,
> Closing by July 31, 2008
> If we fail to close by this date, we will pay the buyer 2% on the earnest
> money, prorated to the closing date or termination
> The restrictive covenant has been slightly changed and attached as Exhibit
> B
> The legal descriptions are attached as Exhibit A-2 through A-6
>

Printed by Bruce Neumann

```
> If the contract is acceptable to the buyer, the changes need to be
> initialed, the contract signed, the earnest money wired.
>
> Please let us know if you have any questions.
>
> Thanks
> Bruce
>
>
> (See attached file:
> CORPLEGAL-#492761-v1-Real_Estate_Contract__-_Chicago_Auction_SItes.PDF)
>
>
> ********************************************************
> Bruce A. Neumann
> Director - Senior Counsel
> Corporate Strategy
> Central Division
> McDonald's Corporation
> 2915 Jorie Boulevard - Dept 282
> Oak Brook, IL 60523
> Email:  bruce.neumann@us.mcd.com
> (630) 623-7556 Direct Dial
> (630) 623-8064 Facsimile
> ********************************************************
>
> The information contained in this e-mail and any accompanying documents is
> confidential, may be privileged, and is intended solely for the person
> and/or
> entity to whom it is addressed (i.e. those identified in the "To" and "cc"
> box). They are the property of McDonald's Corporation. Unauthorized
review,use,
> disclosure, or copying of this communication, or any part thereof, is
strictly
> prohibited and may be unlawful. If you have received this e-mail in error,
> please return the e-mail and attachments to the sender and delete the
e-mail
> and attachments and any copy from your system. McDonald's thanks you for
your
> cooperation.
>
>
```

The information contained in this e-mail and any accompanying documents is
confidential, may be privileged, and is intended solely for the person and/or
entity to whom it is addressed (i.e. those identified in the "To" and "cc"
box). They are the property of McDonald's Corporation. Unauthorized
review,use,
disclosure, or copying of this communication, or any part thereof, is strictly
prohibited and may be unlawful. If you have received this e-mail in error,

*Printed by Bruce Neumann*

please return the e-mail and attachments to the sender and delete the e-mail
and attachments and any copy from your system. McDonald's thanks you for your
cooperation.

# Exhibit 21

Westlaw.

Not Reported in F.Supp.                                                      Page 1
Not Reported in F.Supp., 1994 WL 327361 (N.D.Ill.)
**1994 WL 327361 (N.D.Ill.)**

**H**

Hicks Road Corp. v. Marathon Oil Co.
N.D.Ill. 1994
Only the Westlaw citation is currently available.
   United States District Court, N.D. Illinois, Eastern
                        Division.
        HICKS ROAD CORPORATION, Plaintiff,
                           v.
        MARATHON OIL COMPANY, Defendant.
                    **No. 93 C 3409.**

                     July 6, 1994.


               OPINION AND ORDER

NORGLE, District Judge:
*1 Before the court is the motion of plaintiff Hicks
Road Corporation ("Hicks") for summary judgment
on Count II. For the following reasons, the motion
is denied.


                  FACTS[FN1]

On July 14, 1971, Hicks' predecessor and defendant
Marathon Oil Company ("Marathon") entered into
a lease agreement which authorized Marathon to
erect and operate a service station in Mount Pro-
spect, Illinois ("service station"). The lease expired
on March 31, 1992. Marathon's twenty years of op-
eration of its petroleum-related business contamin-
ated the soil and ground water underneath and
nearby the service station. The extent of the con-
tamination remains an issue.

Upon discovering the contamination, Hicks and
Marathon negotiated certain terms and reduced
their understanding to a written agreement titled
"Agreement and License to Enter Private Property"
("Agreement"). The purpose of the Agreement was
to grant Marathon access to the service station for a
period of six months to perform remediation.

On August 24, 1992, a duly authorized agent of

Marathon signed the Agreement and the next day
submitted the same to Hicks for its counter-signa-
ture and acceptance. When the Agreement was sent
to Hicks, the preamble of the Agreement stated that
"THIS AGREEMENT AND LICENSE TO ENTER
PRIVATE PROPERTY ... is made and entered into
as of the *24th* day of August, 1992, by and between
[Hicks], ... and [Marathon]." (Compl. Ex. B at 1.)
(Emphasis in original.) Paragraph 4 of the Agree-
ment, however, provides as follows:

[Marathon] is hereby granted a license to enter
upon the [service station] commencing August ___,
1992 in order to complete the Remedial Work. Said
License shall expire on the sooner to occur of the
date hereof, unless said time period is hereafter ex-
tended in writing by [Hicks] in its sole discretion.
[Marathon] shall pay [Hicks] a license fee of five
hundred dollars ($500.00) per month due and pay-
able on the 1st day of each month during the term
of the License. Said fee will be prorated for any
partial month. [Hicks] covenants, subject to any
preexisting rights of third parties, that during the
term of said license, [Hicks] will not lease the Prop-
erty for a term commencing during the term hereof,
or grant a license to currently use the Property, to
any person or entity other than [Marathon].

(Compl. Ex. B at 2.) The date of commencement
under paragraph 4 remained blank when Marathon
mailed the Agreement to Hicks.

On October 9, 1992, forty-six days after Marathon
signed the Agreement, a duly authorized agent of
Hicks counter-signed the Agreement and inserted
"24" in the aforementioned blank in paragraph 4.
Hicks then mailed the counter-signed Agreement on
October 9, 1992, to Marathon. On October 13,
1992, Marathon received the counter-signed Agree-
ment. (*See* Def.'s 12(N) Stmt. Ex. 1.)

On November 20, 1992, Bob Francus, an employee
of Marathon who was asked to provide the Real Es-
tate Department with guidelines on the remediation

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 327361 (N.D.Ill.)
**1994 WL 327361 (N.D.Ill.)**

Page 2

effort, transmitted a six page facsimile to Hicks. The cover sheet for the facsimile contained a hand written note which states "Cannot complete cleanup per time frame on 8/24/92 Agreement. Need to get time frame ammended [sic]." (Pl.'s Summ.J.Mot. Ex. A at 1.) The pages attached to the cover sheet were copies of various inter-office correspondence and letters containing various estimates on the time necessary to complete the remediation process at the service station.

*2 After Hicks sent the counter-signed Agreement to Marathon, Marathon made no attempts to gain access to the service station or perform any of the remediation work specified in the body of the Agreement. Subsequently, on June 9, 1993, Hicks filed a complaint against Marathon, and under Count II, Hicks alleges that Marathon breached the terms of the Agreement by failing to complete the remediation work within six months. In the instant motion, Hicks asserts that Marathon breached the material terms of the Agreement as a matter of law.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Associated Milk P roducers, Inc. v. Meadow Gold Dairies, Inc.,* No. 93-1350, 1994 WL 265162, at *2 (7th Cir. June 17, 1994). Even though all reasonable inferences are drawn in favor of the party opposing the motion, *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1440 (7th Cir.1992), presenting only a scintilla of evidence will not suffice to oppose a motion for summary judgment. *Brownell v. Figel,* 950 F.2d 1285, 1289 (7th Cir.1991). Nor will some metaphysical doubt as to the material facts suffice. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

Moreover, the disputed facts must be those that might affect the outcome of the suit to properly preclude summary judgment, *First Ind. Bank v. Baker,* 957 F.2d 506, 508 (7th Cir.1992), and a dispute about a material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party is required to go beyond the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to designate specific facts showing a genuine issue for trial. *Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

The pivotal factual issue raised in the instant motion for summary judgment is whether the Agreement became a binding contract on October 9, 1992.[FN2] To resolve this issue, the court must consider the necessary elements for contract formation, rather than the general principles governing contract construction. *See Martin v. Government Employees Ins. Co.,* 206 Ill.App.3d 1031, 565 N.E.2d 197, 199 (Ill.App.Ct.1990). A contract is formed only after there is an offer, acceptance, and consideration. *Serpe v. Williams,* 776 F.Supp. 1285, 1287 (N.D.Ill.1991); *Faulkner v. Gilmore,* 251 Ill.App.3d 34, 621 N.E.2d 908, 912 (Ill.App.Ct.1993). The burden of proving the necessary elements to contract formation is on the party seeking to enforce the agreement. *Commonwealth Edison Co. v. Industrial Comm'n,* 167 Ill.App.3d 229, 521 N.E.2d 159, 161 (Ill.App.Ct.1988).

*3 Marathon does not contest that there was an offer and proper consideration for the Agreement; however, Marathon argues that there was never a timely acceptance of its offer. In support, Marathon refers to the facts that it signed the Agreement and mailed it to Hicks on August 25, 1992, but did not receive the counter-signed Agreement from Hicks until October 13, 1992: almost seven weeks after the Agreement was sent to Hicks. Thus, Marathon argues that the offer contained in the Agreement lapsed before Hicks accepted the terms of the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 327361 (N.D.Ill.)
**1994 WL 327361 (N.D.Ill.)**

Page 3

Agreement.

Under Illinois law, "[i]f an offer does not state a definite time for acceptance, it lapses if not accepted within a reasonable time." *Kirchhoff v. Rosen,* 227 Ill.App.3d 870, 592 N.E.2d 371, 376 (Ill.App.Ct.), *appeal denied,*146 Ill.2d 629, 602 N.E.2d 455 (1992). In *Kirchhoff,* the offeror indicated that it expected a response to its offer within seven days. *Kirchhoff,* 592 N.E.2d at 374. Relying on this factor, the plaintiff in *Kirchhoff* argued that the offer was only good for seven days, and the defendants' failure to accept the offer within that prescribed period resulted in lapse of the offer by operation of time. *Id.* at 376. The appellate court disagreed. The *Kirchhoff* court held that the seven day response period was not an expiration date for the offer; rather, it was merely a method of acceptance not precluding an alternative method of acceptance. *Id.* Accordingly, the *Kirchhoff* court concluded that the offer in that case did not specify a definite time for acceptance and, thus, subject to acceptance within a reasonable period of time. *Id.*

Whether an acceptance was made within a reasonable period "depends upon a multiplicity of circumstances." *Zaniecki v. P.A. Bergner & Co. of Illinois,* 143 Ill.App.3d 668, 493 N.E.2d 419, 423 (Ill.App.Ct.1986). In *Kirchhoff,* the defendants accepted the plaintiff's offer within eighteen days. *Kirchhoff,* 592 N.E.2d at 376. Additionally, after the defendants communicated their acceptance, the plaintiff did nothing to indicate to the defendants that the offer had expired. *Id.* Furthermore, the offer did not suggest to the defendants that the time was of the essence. *Id.* Relying on these factors, the *Kirchhoff* court held as a matter of law that the offer was accepted within a reasonable period of time. *Id.*

In contrast, the court in *Zaniecki,* declined to hold as a matter of law that the plaintiff's acceptance of the offer nine months later was reasonable. *Zaniecki,* 493 N.E.2d at 423. The *Zaniecki* court instead held that the issue of reasonableness should be resolved by the trier of fact. *Id.*

In this case, Hicks counter-signed the Agreement approximately seven weeks after it was mailed by Marathon. Nonetheless, the actual time taken by the offeree to accept is not dispositive of whether the original offer expired before the acceptance as indicated by *Kirchhoff* and *Zaniecki.* There are other factors the court must consider. The offer made by Marathon was not an offer Hicks did not expect. In fact, after the revelation of the contamination, the parties actively negotiated the terms of the Agreement, and Hicks anticipated the arrival of the written offer. The Agreement contained terms agreed upon by the parties. Further, the preamble to the Agreement stated the date of August 24, 1992, and also, paragraph 4 of the Agreement indicated the month of August 1992. From these factors, one may reasonably conclude that Marathon expected Hicks' acceptance immediately after the receipt of the Agreement in August 1992. Yet, Hicks failed to respond to the offer until seven weeks after the offer was tendered.

**\*4** Nonetheless, as held by the *Kirchhoff* court, an offeror's expectation is not a proper measure for the life of the offer. Marathon does not dispute that it never specified a period of time in which the offer must be accepted. Further, there is no indication from the terms of the Agreement that time was of the essence. The purpose of the Agreement was to perform remediation at the service station. Marathon does not adduce any evidence that its access to the service station during the latter part of August or early part of September 1992 was crucial to the performance of the contract. Under these circumstances, Marathon's offer, tendered on August 25, 1992, remained open for a reasonable period of time.

But before resolving the related issue of whether Hicks' acceptance was timely made, the court must first address the issue of whether the proposed acceptance was a valid acceptance or a counteroffer. Under Illinois law, it is axiomatic that a proposed acceptance that contains terms different from the original offer is not a valid acceptance; rather, such

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 327361 (N.D.Ill.)
**1994 WL 327361 (N.D.Ill.)**

acceptance is treated as a counteroffer requiring an acceptance by the original offeror to create a contract. *Dawson v . General Moto rs Corp.,* 977 F.2d 369, 374 (7th Cir.1992). "Illinois law demands that an acceptance 'comply strictly with the terms of the offer[.]' " *Venture Associates v. Zenith Data Systems,* 987 F.2d 429, 432 (7th Cir.1993) (quoting *Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.,* 137 Ill.App.3d 550, 484 N.E.2d 1178, 1185 (Ill.App.Ct.1985)). Even a minor change in the terms of the offer invalidates the acceptance. *Id.*

Pursuant to this rule, commonly referred to as the "mirror image rule," Hicks' proposed acceptance was a counteroffer, not a valid acceptance. When Marathon mailed the Agreement to Hicks, paragraph 4 contained an unfixed term: the commencement date for the six-month period. Viewing the uncontested facts in favor of Marathon, the nonmovant, the court must infer that the reason Marathon left the commencement date blank was so that Hicks would counter-sign the Agreement and contemporaneously fill in the blank with the date of the acceptance. Under this method of acceptance, the delay in Hicks' signature would not shorten the six-month period of access.

Hicks, however, inserted the date of August 24, 1992, when it executed the Agreement instead of fixing the date of commencement at October 9, 1992, the date of Hicks' counter-signature. Understandably, the date of August 24, 1992, may have been inserted to be consistent with the date reflected in the preamble of the Agreement. Nevertheless, pre-dating the commencement date materially changed the terms of the contract and the inherent purpose of entering into the Agreement. By predating the commencement date, Marathon had less than six months time of access to the service station when it received the Agreement on October 13, 1992. Furthermore, the terms as prescribed by Hicks required Marathon to compensate Hicks at the rate of $500 per month for the license to enter beginning on August 24, 1992, rather than on October 9, 1992. The mirror image rule dictates that on October 9, 1992, Hicks rejected the original offer made on August 25, 1992, and instead tendered a counteroffer which Marathon did not accept. *See Venture,* 9 87 F.2d at 432. Thus, the proposed acceptance on October 9, 1992, did not complete the formation of a contract between Hicks and Marathon on October 9, 1992.

**\*5** Further, "a rejected offer cannot be revived by later acceptance." *D'Agostino v. Bank of Ravenswood,* 205 Ill.App.3d 898, 563 N.E.2d 886, 889 (Ill.App.Ct.1990), *appeal denied,* 137 Ill.2d 664, 571 N.E.2d 147 (1991). Hicks' communication to Marathon that Hicks would provide additional time to complete the six month clean-up does not remedy the invalid acceptance. This only amounted to an offer which required Marathon's acceptance. Because the proposed acceptance was not a valid acceptance, the court need not resolve the issue of whether the proposed acceptance was made within a reasonable period.

### *CONCLUSION*

For the foregoing reasons, the motion for summary judgment on Count II is denied.

IT IS SO ORDERED.

> FN1. The following uncontested facts are drawn from the statements submitted by the parties in accordance with the Rules of the United States District Court for the Northern District of Illinois ("Local Rules") 12(M) and 12(N). The court will consider only those statements that are in compliance with the Local Rules. Furthermore, additional facts of the case may be found in the court's earlier opinion, *Hicks v. Marathon,* No. 93 C 3409, slip op. (N.D.Ill. June 30, 1994), addressing Hicks' motion for partial judgment on the pleadings.

> FN2. The court will apply Illinois law to resolve the issue presented in this motion.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1994 WL 327361 (N.D.Ill.)
**1994 WL 327361 (N.D.Ill.)**


       *See Hicks,* slip op. at 3-4.
N.D.Ill. 1994
Hicks Road Corp. v. Marathon Oil Co.
Not Reported in F.Supp., 1994 WL 327361 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 22

Westlaw.

Not Reported in F.Supp.                                                                                                            Page 1
Not Reported in F.Supp., 1998 WL 59500 (N.D.Ill.)
**1998 WL 59500 (N.D.Ill.)**

H
Midwest Mfg. Holding, L.L.C. v. Donnelly Corp.
N.D.Ill.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
MIDWEST MANUFACTURING HOLDING,
L.L.C. and I.P. Acquisitions, L.L.C ., Plaintiffs,
v.
DONNELLY CORPORATION, Donnelly Techno-
logy, Inc., and Donn-Tech, Inc., Defendants.
No. 97 C 0638.

Feb. 6, 1998.

MEMORANDUM OPINION AND ORDER

HOLDERMAN, J.
*1 Plaintiffs, Midwest Manufacturing Holding,
L.L.C. and I.P. Acquisitions, L.L.C., filed a three-
count amended complaint against defendants, Don-
nelly Corporation, Donnelly Technology, Inc., and
Donn-Tech, Inc., alleging breach of contract (Count
I), breach of the duty to negotiate in good faith
(Count II), and promissory estoppel (Count III).
Judge Alesia, who previously presided in this case,
dismissed Count II of plaintiffs' amended complaint
on August 28, 1997. Defendants have filed a mo-
tion for summary judgment pursuant to Rule 56 of
the Federal Rules of Civil Procedure against the re-
maining counts in plaintiffs' amended complaint,
Counts I and III. For the following reasons, defend-
ants' motion for summary judgment is GRANTED.

BACKGROUND [FN1]

> FN1. The background comes from the
> parties' Local Rule 12M and 12N state-
> ments of material facts and accompanying
> exhibits.

During the Spring of 1996, plaintiff Midwest Man-
ufacturing Holding, L.L.C. ("Midwest") ap-
proached and began negotiating with defendant
Donnelly Corporation ("Donnelly") about Midw-
est's possible purchase of Donnelly's Information
Products Division. The parties spent the next sever-
al months negotiating the terms for the possible
transaction. Over the course of the negotiations, the
parties entered into three different letters of intent.
The final letter of intent was dated October 28,
1996. This letter outlined the general terms of a
transaction, subject to modification by the parties,
and called for the parties to execute a definitive
agreement by December 15, 1996, subject to the ap-
proval of both parties' board of directors. If an
agreement was not reached by December 15, 1996,
the letter of intent would be considered terminated
and the transaction deemed abandoned. On Decem-
ber 6, 1996, the Donnelly board of directors ratified
the letter of intent and authorized William Jellison,
Donnelly's acting chief financial officer and vice
president of financial operations, and Dwane
Baumgardner, Donnelly's chairman of the board of
directors and chief executive officer, to continue
negotiations of behalf of Donnelly and for either
Mr. Jellison or Mr. Baumgardner to execute the
documents necessary to consummate the sale.

Although the parties failed to reach an agreement
by the December 15, 1996 deadline, both parties
continued to negotiate during the remainder of
December 1996 and in January 1997 towards a final
agreement with the same essential terms as in the
letter of intent. The negotiations involved the con-
tinual drafting and redrafting of seven documents
necessary to close the transaction: (1) Asset Pur-
chase Agreement; (2) Lease; (3) Transition Ser-
vices and Consulting Agreement; (4) Employee
Leasing Agreement; (5) Sharing Agreement; (6)
Environmental Agreement; and (7) Technology
Transfer and License Agreement. Since Mr. Jellison
was scheduled to be in and out of the country for
several weeks, after changes to the draft documents
were made on January 10, 1997, Midwest's counsel
sent Mr. Jellison a set of signature pages for many

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 59500 (N.D.Ill.)
**1998 WL 59500 (N.D.Ill.)**

of the agreements anticipating that the transaction could close in Mr. Jellison's absence if an agreement was reached and authorized delivery was made. The signature pages were accompanied only by a cover page to each draft agreement and a memorandum from Midwest's counsel to Mr. Jellison instructing him to sign the signature pages and deliver them to Donnelly's attorneys. Mr. Jellison signed the signature pages on January 11, 1997 and sent them to Donnelly's attorneys with both parties' understanding that merely signing the pages did not mean that Mr. Jellison was committing Donnelly before an agreement was reached or that authorized delivery to Midwest was not necessary. None of the signed pages were ever delivered to Midwest because at the time Mr. Jellison signed, material terms of the documents necessary to close the transaction were still open and needed to be resolved.

**\*2** On January 14, 1997, counsel for Donnelly and counsel for Midwest met to revise all of the documents. Upon completion, counsel for Donnelly and counsel for Midwest sent the draft documents to corporate representatives of Donnelly and Midwest, stating in an attached memorandum that the documents were almost complete and identifying additional outstanding, material issues that needed to be resolved by the parties. On January 17, 1997, a representative from Midwest spoke on the telephone with Mr. Jellison and an attorney for Donnelly in an effort to resolve the outstanding, material issues. Plaintiffs allege that during this telephone conversation the parties resolved the outstanding, material issues and Mr. Jellison orally agreed on behalf of Donnelly to consummate the transaction on Monday, January 20, 1997, or soon thereafter since Monday was a holiday, provided the additional changes were made. Defendants deny that the parties resolved the outstanding, material issues or that Mr. Jellison could have bound Donnelly without the documents being in final form, reviewed by both parties, signed, and exchanged. As a result of that conversation, on Saturday, January 18, 1997 Midwest's attorneys marked-up draft versions of the agreements and made changes pursuant to the further negotiations.

Over the weekend, however, Mr. Baumgardner came to the conclusion that Donnelly should not sell its business to Midwest. At a Donnelly board of directors meeting on Sunday, January 19, 1997, the board voted not to go forward with the transaction. Mr. Jellison telephoned Midwest's representatives that evening to tell them that Donnelly would not sell to Midwest. Before notifying Midwest that Donnelly was no longer interested in pursuing the transaction, Donnelly did not have a chance to review the documents that plaintiffs claim are the final documents because the documents were completed by plaintiffs' counsel after January 19, 1997.

The draft of the Asset Purchase Agreement that plaintiffs claim best embodies the agreement Mr. Jellison allegedly agreed to enter into on behalf of Donnelly expressly states that it is not binding on either party until it is executed and delivered to each party. Both parties intended that before the transaction became final and binding on the parties, each would have an opportunity to review the final documents and attend a closing where the final documents were signed. Donnelly reserved any obligation to be bound to the contemplated transaction until an authorized representative of Donnelly executed and delivered to Midwest the seven agreements. This never occurred. No definitive agreements were ever presented to either parties' board of directors. The last versions of the agreements were not even drafted before the Donnelly board of directors rejected the transaction. The final written form of the definitive versions of the seven agreements did not exist on or before January 19, 1997. Specifically, the Lease agreement never contained a description of the property that was covered by the agreement.

### STANDARD OF REVIEW

**\*3** Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the af-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 59500 (N.D.Ill.)
**1998 WL 59500 (N.D.Ill.)**

Page 3

fidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511.

## ANALYSIS

Defendants have moved for summary judgment on Counts I and III of plaintiffs' amended complaint. Defendants have set forth basically three arguments in support of their motion for summary judgment on plaintiffs' Count I breach of contract claim: (1) lack of authority; (2) no meeting of the minds; and (3) statute of frauds. Defendants set forth basically three arguments in support of their motion for summary judgment on plaintiffs' Count III promissory estoppel claim: (1) lack of authority; (2) no detrimental reliance; and (3) statute of frauds. Defendants' third argument that plaintiffs' Counts I and III are barred by the statute of frauds is dispositive. Therefore, this court will not address defendants' other arguments in support of their motion for summary judgment.

In Judge Alesia's opinion and order of August 28,

1997, the court determined plaintiffs' Count I breach of contract claim, which consists of, among other things, a ten-year lease with an additional five-year option, is subject to the general statute of frauds which requires a writing for contracts that involve the transfer of real estate, including a lease for a term longer than one year. *Midwest Mfg. Holding, L.L.C. v. Donnelly Corp.,* 975 F.Supp. 1061, 1068 (N.D.Ill.1997). The general statute of frauds applicable in this case is codified under Illinois law at 740 ILCS 80/2. Plaintiffs do not dispute Judge Alesia's determination that the breach of contract claim is subject to the statute of frauds and Judge Alesia's finding is the law of this case. *See generally Waid v. Merrill Area Pub. Sch.,* 130 F.3d 1268, 1272 (7th Cir.1997). Plaintiffs' Count III promissory estoppel claim is also subject to the statute of frauds and plaintiffs make no argument disputing this determination. *McInerney v. Charter Golf, Inc.,* 176 Ill.2d 482, 223 Ill.Dec. 911, 680 N.E.2d 1347, 1352 (Ill.1997).

*\*4 Defendants argue that the alleged agreement involved in this case was not sufficiently reduced to writing and signed to satisfy the statute of frauds. Defendants contend that the signature pages executed by Mr. Jellison are from earlier drafts of the alleged agreement, precede the alleged final agreement, and therefore cannot be considered sufficient to satisfy the statute of frauds. Plaintiffs maintain that Mr. Jellison's execution of the blank signature pages is sufficient to satisfy the statute of frauds.

The Illinois statute of frauds, 740 ILCS 80/2, states that no action may be brought against a person based on a contract for a lease that lasts for longer than one year unless the contract is in writing and signed by the party to be charged. Three requirements must be satisfied to avoid a properly raised statute of frauds defense: (1) there must be a written memorandum or note on one or more documents; (2) the documents collectively must contain a description of the property and the terms and conditions of sale, including price and manner of payment; and (3) the memorandum or note must con-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 59500 (N.D.Ill.)
**1998 WL 59500 (N.D.Ill.)**

Page 4

tain the signature of the party to be charged. *Pro-dromos v. Poulos,* 202 Ill.App.3d 1024, 148 Ill.Dec. 345, 560 N.E.2d 942, 946 (Ill.App. 1st Dist.1990).

This court cannot conclude that there existed a final contract between the parties in this case that satisfies the statute of frauds. Plaintiffs acknowledge that additional, outstanding, material issues still remained open and needed to be resolved by the parties on January 11, 1997, the date on which Mr. Jellison executed the blank signature pages. Plaintiffs argue that Mr. Jellison knew that there were open issues regarding the agreements when he signed the pages. Plaintiffs contend that those issues could have been and should have been resolved so that the signature pages should be considered enforceable. No mutually acceptable terms, however, had been reached at the time of Mr. Jellison's signature of the blank draft signature pages. Plaintiffs and defendants merely had been engaged in negotiations with one another. Plaintiffs admit that Mr. Jellison executed the signature pages not because any definitive agreement had been made between the parties, but merely as a convenience so that if and when any final agreement was reached, a contract was entered into by the parties, and Mr. Jellison was out of the country, defendants' attorneys could still close the deal with the signature pages. But this never happened. *See Johnson v. Wallden,* 342 Ill. 201, 173 N.E. 790, 793 (Ill.1930) (finding that deed delivered to attorney to hold until parties instructed attorney to deliver the deed was insufficient to satisfy the statute of frauds since no delivery occurred).

That the parties had written draft agreements does not lead to the conclusion that a final, enforceable, written agreement was entered into by the parties. Defendants terminated further negotiations and refused to close the deal prior to any formation of any final written contract. Mr. Jellison executed blank signature pages from drafts of the various agreements. The version of the draft signature pages that Mr. Jellison executed are not representative of the version of the agreements that plaintiffs allege rep-

resent the final contract to which plaintiffs claim the parties agreed. The pages Mr. Jellison executed are from at least two prior versions of the draft agreements. Plaintiffs admit that the version of the draft agreements that Mr. Jellison executed needed to be, and, in fact were, revised due to open, material issues. Therefore, the version of the agreements Mr. Jellison signed are not the same as the alleged final version to which plaintiffs seek to hold defendants liable. Thus, there is no evidence that Mr. Jellison ever executed any contract with plaintiffs on behalf of defendants or that the act of him signing the blank pages evidences his intention to enter into a binding contract. Plaintiffs cannot show any intention on the part of defendants to be bound by the written draft documents which is necessary under the statute of frauds. *Brunette v. Vulcan Materials Co.,* 119 Ill.App.2d 390, 256 N.E.2d 44, 47 (Ill .App. 1st Dist.1970). Furthermore, Mr. Jellison never even delivered the executed signature pages to plaintiffs, further evidencing the fact that there was never an agreement to enter into a written contract. Plaintiffs' breach of contract and promissory estoppel claims are, therefore, prohibited by the statute of frauds since negotiations between plaintiffs and defendants had not ripened into an enforceable contract and had not become binding on defendants. *Flannery v. Marathon Oil Co.,* 75 Ill.App.3d 690, 31 Ill.Dec. 504, 394 N.E.2d 706, 709 (Ill.App. 1st Dist.1979); *Besinger v. National Tea Co.,* 1 Ill.App.3d 589, 275 N.E.2d 226, 231 (Ill.App. 1st Dist.1971).

**\*5** That plaintiffs believe that Mr. Jellison may have allegedly orally agreed to resolve the remaining, outstanding, material issues by telephone on January 17, 1997, does not satisfy the statute of frauds since the agreement must be in writing and signed by the party to be charged. Any alleged oral agreement would be unenforceable as a matter of law. *Sherwin v. Ault,* 219 Ill.App.3d 213, 161 Ill.Dec. 877, 579 N.E.2d 425, 428 (Ill.App.3d Dist.1991). *See also Ceres Ill., Inc. v. Illinois Scrap Processing, Inc.,* 130 Ill.App.3d 798, 86 Ill.Dec. 48, 474 N.E.2d 1245, 1248 (Ill.App. 1st

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

.ed in F.Supp.
.ported in F.Supp., 1998 WL 59500 (N.D.Ill.)
*6 WL 59500 (N.D.Ill.)

Dist.1984) (stating no contract is formed when re-duction of the agreement to writing and formal exe-cution is a condition precedent to completion even if the actual terms have been agreed upon), *aff'd,* 114 Ill.2d 133, 102 Ill.Dec. 379, 500 N.E.2d 1 (Ill.1986). Since Mr. Jellison executed the signature pages on January 11, 1997, the version of the draft agreements he signed could not have contained all of the alleged, material, agreed upon issues that were essential to the contract. Plaintiffs admit that the final documents that they believe best embody the alleged agreement and contract between the parties did not exist until after January 19, 1997, after defendants' board of directors rejected enter-ing into the sale with plaintiffs. Since the final con-tract did not exist in writing until after January 19, 1997 and the version of the agreements executed by Mr. Jellison contained open, material issues that still needed to be resolved, there could not have been an enforceable contract that was signed by de-fendants. Thus defendants' statute of frauds defense is valid.

Defendants also contend that plaintiffs' alleged fi-nal documents are not indicative of any mutually acceptable agreement between the parties since the documents did not contain an adjustment to the pur-chase price based on the balance sheet on the day of closing. Thus, defendants maintain that an essential agreed upon term of the contract, the price, was never reduced to writing, let alone one that was signed by defendants. *See D'Agostino v. Bank of Ravenswood,* 205 Ill.App.3d 898, 150 Ill.Dec. 759, 563 N.E.2d 886, 889 (Ill.App. 1st Dist.1990) (holding that a contract fails to comply with the statute of frauds when one of the essential terms of the contract, namely price, was never reduced to writing and signed by the party to be charged). In addition, the contents of the agreements not only were not finalized at the time of Mr. Jellison's sig-nature of the blank pages, but the content of all the versions of the documents stated that defendants would have the chance to review the documents be-fore finalizing the agreement, that the signature pages of Mr. Jellison would not be considered bind-ing until they were delivered to plaintiffs' counsel, and that the versions of the documents were drafts and would need to be produced in final form. Both parties agree that these events never occurred, thus further demonstrating a failure to meet the statute of frauds. *See Crum v. Krol,* 99 Ill.App.3d 651, 54 Ill.Dec. 864, 425 N.E.2d 1081, 1084 (Ill.App. 1st Dist.1981) (stating if a writing indicates that an agreement to sell realty is subject to final approval by a third party, and is otherwise contingent upon the execution of a formal contract, the writing may be deemed insufficient under the statute of frauds). "Where the intent of the parties is that neither will be legally bound until the execution and delivery of a formal agreement, then no contract comes into ex-istence until such execution and delivery." *Leekha v. Wentcher,* 224 Ill.App.3d 342, 166 Ill.Dec. 599, 586 N.E.2d 557, 561 (Ill.App. 1st Dist.1991). The documents themselves, which plaintiffs allege con-stitute the written contract, demonstrate that no en-forceable agreement had yet been reached between the parties. *Culbertson v. Carruthers,* 66 Ill.App.3d 47, 22 Ill.Dec. 810, 383 N.E.2d 618, 624 (Ill.App. 5th Dist .1978).

*6 Moreover, both sides agree that the Lease agree-ment never contained a description of the property covered by the agreement. Plaintiffs state that the parties contemplated that a description of the prop-erty was to be included in the final form of the lease had a closing taken place and that there was not a dispute as to which property was involved. This argument misses the point that the statute of frauds requires a description of the property in-volved in the transaction in order to constitute a sufficient writing that meets the statute of frauds. Parol evidence may not be used to supply a miss-ing, essential term. *Bartsch v. Gordon N. Plumb, Inc.,* 138 Ill.App.3d 188, 92 Ill.Dec. 862, 485 N.E.2d 1105, 1112 (Ill.App. 1st Dist.1985).

Since there is no complete writing that has been signed by defendants, the party to be charged, Counts I and III of plaintiffs' amended complaint cannot survive defendants' motion for summary

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 59500 (N.D.Ill.)
**1998 WL 59500 (N.D.Ill.)**

Page 6

judgment.

### CONCLUSION

Based on the above stated reasons, defendants' motion for summary judgment is GRANTED. This case is dismissed in its entirety. All other pending motions are moot.

N.D.Ill.,1998.
Midwest Mfg. Holding, L.L.C. v. Donnelly Corp.
Not Reported in F.Supp., 1998 WL 59500 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 23

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

Page 1

**H**
Do It Best Corp. v. Passport Software, Inc.
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
DO IT BEST CORP., Plaintiff,
v.
PASSPORT SOFTWARE, INC., Defendant
PASSPORT SOFTWARE, INC., Counter-Plaintiff,
v.
DO IT BEST CORP., Counter-Defendant.
**No. 01 C 7674.**

March 31, 2005.

Daniel Paul Albers, Amy Lovell Wilson, Jonathan
Paul Froemel, Marc Steven Silver, Barnes &
Thornburg, Chicago, IL, for Plaintiff.
Forrest L. Ingram, Martin B. Tucker, Forrest L. In-
gram, P.C., Donald L. Johnson, Johnson Law Firm,
Julie Ann Boynton, Law Offices of Julie Ann
Boynton, Robert C. Heist, R. Connor & Associates,
P.C., Richard Francis O'Malley, Elizabeth Wylie
Milnikel, Kyle David Rettberg, Sidley Austin
Brown & Wood LLP, Chicago, IL, Robert J.
Emery, Law Offices of Robert Emery, Glenview,
IL, D. Randall Brown, Barnes & Thornburg, Fort
Wayne, IN, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

PALLMEYER, J.
*1 Plaintiff/Counter-Defendant Do It Best Corp.,
("DIB" or "Do It Best"), an Indiana corporation,
operates a hardware cooperative of some 4500
member stores. Defendant/Counter-Plaintiff Pass-
port Software, Inc., ("Passport" or "PSI"), an
Illinois corporation, is a licensed reseller of certain
point-of-sale software owned by RealWorld Cor-
poration. On January 19, 1989, Passport and Do It
Best entered into a written Dealer License Agree-
ment by which Passport licensed the Real Wold
software to Do It Best in return for royalty pay-

ments. Over the years from January 1994 through
February 2001, Passport provided DIB with custom
modifications to the licensed software. DIB con-
tends it purchased these modifications. Passport in-
sists that although DIB paid development fees to
PSI for some of the modifications, DIB did not ever
purchase software and only had rights to use the
Passport software pursuant to the license.

The software furnished to DIB by PSI included a
copyright notice, and PSI now holds federally-re-
gistered copyrights in the software at issue in this
case. In late September 2000, PSI learned that DIB
had deleted copies of PSI's copyright notice from
what PSI claims is licensed software and was dis-
tributing the software without permission and
without paying license fees. PSI issued a notice of
default, and this lawsuit followed. DIB seeks a de-
claration that it is not in breach of the parties' 1989
agreement, and PSI has countersued, asserting
claims against DIB and its general counsel, Thomas
Burroughs. After voluntarily dismissing certain of
those claims, PSI filed a Third Amended Counter-
claim in which it charged DIB with breach of con-
tract (Count I); trade secret misappropriation
(Count II); civil conspiracy (Count VI); copyright
infringement (Count VII); fraud (Count IX); viola-
tions of the Lanham Act (Count XI) and tortious in-
terference with contract (Count XII). In addition,
PSI claimed that Burroughs is guilty of contributory
copyright infringement (Count X). In an earlier
opinion, this court dismissed the fraud claim, but
denied Defendants' motions to dismiss the contrib-
utory copyright infringement claim, the Lanham
Act claim, and the tortious interference claim.

Nine motions for summary judgment are now be-
fore the court. In six separately-filed motions, DIB
seeks judgment in its favor on PSI's trade secret,
civil conspiracy, copyright infringement, breach of
contract, tortious interference, and Lanham Act
claims. In a seventh motion, DIB also seeks partial
summary judgment on PSI's claims for damages.
PSI has filed its own cross-motions for summary

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

judgment on the copyright infringement claim and Lanham Act claims. In this opinion, the court addresses the motions for summary judgment on copyright infringement, breach of contract, trade secret misappropriation, civil conspiracy, and damages.

### FACTS

An introduction to the facts at issue here is set forth in this court's opinion on DIB's motion to dismiss. *See Do It Best Corp. v. Passport Software, Inc.,* No. 01 C 7674, 2004 WL 1660814 (N.D.Ill. July 23, 2004). Recognizing that the facts Passport alleged in its counterclaim were presumed true at that stage-a presumption that Passport no longer enjoys-the court nevertheless refers the reader to that earlier opinion for context. For each of their nine motions for summary judgment, the parties have submitted separate Local Rule 56.1 Statements, many of which contain the same information. The exhibits, stacked together, reach nearly the waist of a tall female judge. Rather than attempting to create one comprehensive narrative from the parties' multiple submissions, the court will present a brief synopsis here, and identify more specific facts relevant to each motion together with the analysis of that motion.

**\*2** PSI is engaged in the business of developing and licensing business software. In the 1980's, PSI entered into an agreement with RealWorld Corporation under which PSI was licensed to use certain RealWorld software, to modify and enhance that software and, to the extent of such modifications, to add PSI's own copyright and trade secrets notices to those of RealWorld. (Master Distributor Agreement, PSI Exhibit G, ¶¶ 4.4, 12.1.) The relationship between PSI and DIB began in 1989, when the parties entered into a Dealer License under which PSI delivered a version of the RealWorld software that PSI had enhanced and converted to a programming language compatible with DIB's business. DIB distributed the program to hundreds of its member stores. Beginning in 1992, PSI developed

modifications and enhancements to the program at DIB's request, and DIB itself also modified and enhanced the program. Under the terms of the Dealer License, all of those enhancements, regardless of their authorship, were subject to the terms of the License, in which PSI and RealWorld retained rights in the copyrights and trade secrets in the software. (Dealer License for RealWorld Software, PSI Exhibit I, ¶¶ 6.1, 6.2.)

The Dealer License provided for a five-year term, renewable under certain circumstances for an additional five years. Although DIB now asserts that the agreement terminated in 1994, the parties' business dealings continued; both parties continued to enhance and modify the software including, in 1996 and 1997, modifications to render the code "Y2K-compliant." PSI obtained copyright protection over this version of the software, now known as "RW2000®," in 2002. (Copyright registrations, PSI Exhibits D, F.) In August or September 2000, DIB requested PSI to propose a price for DIB's purchase of an "unlimited right" to the software. RealWorld offered to sell its rights for $200,000, (Undated e-mail message from Ellen Saley, PSI Exhibit FFF), and PSI offered to sell DIB an unlimited right to use the enhanced software for $1.8 million. DIB made a counteroffer of $250,000 and asked PSI to assist in determining which portions of the software were owned by RealWorld and which by PSI. (Wygant Letter of 9/19/00, PSI Exhibit GGG; Williams memorandum of 9/20/00, PSI Exhibit HHH.) In the course of doing so, PSI claims it learned for the first time that DIB had copied code written by PSI and was using it in a module without paying license fees for that module. (Miller Letter of 10/2/00, PSI Exhibit LLL.)

Still later, PSI discovered that DIB was engaged in direct negotiations with RealWorld's successor corporation, Great Plains Software, Inc., for purchase of RealWorld's source code. (Undated Schafer e-mail, PSI Exhibit OOO.) On November 30, 2000, DIB and Great Plains entered into an agreement by which Great Plains sold software to DIB for

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

$150,000 and agreed to "cooperate in good faith in any litigation" between DIB and PSI concerning the rights in the software. (Great Plains Source Code License Agreement, DIB Exhibit 2, ¶¶ 2(d)(iv)(a), 9(b).) DIB did not in fact use the software it had purchased from Great Plains, however. Karla Wygant, DIB's manager of retail data processing, testified that she compared the Great Plains software with the PSI source code DIB had been using, and placed the Great Plains software in a file cabinet. DIB continued using the software furnished by PSI. (Wygant Dep., PSI Exhibit L, at 23:8-25:17.) In February 2001, DIB advised PSI it would no longer provide a royalty report reflecting its sublicensing of software because "we are no longer buying product from you."(Gibson e-mail message, 2/8/02, PSI Exhibit PPP.)

**\*3** In a certified mail letter of February 14, 2001, PSI declared DIB in default under the January 19, 1989 Dealer License and terminated its relationship with DIB based on DIB's failure to report sublicenses and failure to pay royalties. (Miller Letter, 2/14/01, PSI Exhibit J.) On May 14, 2001, Great Plains terminated the licensing agreement that its predecessor, RealWorld, had entered into with PSI. (Schafer Letter, 5/14/01, PSI Exhibit LLLL.) Great Plains sent a copy of the termination of letter to DIB, whose general counsel, Thomas Burroughs, commented that "[p]erhaps, termination of the relationship will cause" PSI, which Burroughs characterized as "totally unrealistic and unreasonable" to "have a change of heart," ( presumably concerning PSI's demand for royalties from DIB). (Burroughs e-mail message, PSI Exhibit NNNN.)

On October 4, 2001, DIB filed this lawsuit seeking a declaratory judgment that it is not in breach of any legal obligations to PSI. DIB now seeks summary judgment on several of PSI's counterclaims. In this opinion, the court addresses DIB's motion for summary judgment on PSI's copyright infringement, breach of contract, and trade secret infringement claims, as well as DIB's motion for partial summary judgment on damages issues.

*DISCUSSION*

I. Copyright Infringement

In Count VII of its Third Amended Counterclaim, PSI alleges that, since February 14, 2001, DIB has made, used and distributed PSI's copyrighted software without PSI's consent and is therefore guilty of copyright infringement. The Copyright Act of 1976 protects original works of authorship fixed in a tangible medium of expression. 17 U.S.C. § 102(a). The protection extends to a broad array of subject matter including pictorial, graphic, sculptural and literary works, 17 U.S.C. § 102(a)(1), which includes computer programs. *qad. inc. v. ALN Associates, Inc.,* 974 F.2d 834, 835 (7th Cir.1992).

DIB seeks summary judgment on PSI's copyright infringement claim for three reasons: First, that DIB enjoys an "irrevocable implied license" to use PSI's software; second, that DIB is a joint author of the software; and third, that PSI is guilty of misuse of its registrations. (DIB's Memorandum of Law in Support of Its Motion for Summary Judgment on Passport's Copyright Infringement Claim, at 1.) The court considers those arguments in turn.[FN1]

> FN1. In a 27-page response brief, PSI responded to each of the three arguments. DIB's Reply Memorandum nevertheless shrilly asserts that PSI "waived any argument" challenging DIB's purported defense that the source code at issue here is not copyrightable. Having again reviewed DIB's opening memorandum, the court finds no reference there to an argument that the PSI source code is not original. As noted, the opening memorandum presented arguments of implied license, joint authorship, and misuse of registrations, and did not explicitly challenge the originality of PSI's work. The court concludes that PSI did not waive the matter by failing to respond to an argument not made in DIB's opening brief. On receipt of DIB's reply

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                                   Page 4
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

memorandum, PSI filed a motion seeking leave to file a supplemental pleading on the issue of copyrightability, should the court reach that issue. As the court determines DIB did not properly present it. PSI's Motion to File Adjunct Pleading Relating to the Copyrightability of its Software (Doc. No. 266) will be denied as moot.

A. Irrevocable Implied License

DIB argues, first, that PSI granted it an implied license to use source code, including source code in Passport's copyright registrations, with its member stores. The Seventh Circuit has recognized that a nonexclusive license may be granted orally, or may even be implied from conduct. *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 (7th Cir.1996). The existence of an implied license is an affirmative defense to a claim of copyright infringement. *Id.* DIB bears the burden of proving the existence of an implied license. *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.,* 322 F.3d 26, 40 (1st Cir.2003). To do so, DIB must show that (1) DIB requested creation of the work; (2) PSI created it and delivered it to DIB; and (3) PSI intended that DIB copy and distribute the work. *Kennedy v. National Juvenile Detention Ass'n,* 187 F.3d 690, 694 (7th Cir.1999); *see also Shaver,* 74 F.3d at 776.

**\*4** Of these factors, the first two are essentially undisputed. PSI created and modified the custom software and provided it to DIB. The record shows, however, that there is no evidence that PSI intended for DIB to use the source code outside the parameters of the parties' written agreement. Indeed, PSI contends, the existence of an express license agreement precludes proof of any implied license. *See Slamecka v. Empire Kosher Poultry, Inc.,* 290 F.Supp.2d 934, 939 (N.D.Ill.2003) (quoting other case law for the proposition that an "implied in fact contract will not be recognized if there is an express contract between the parties concerning the same subject on which the implied contract claim rests"); *Mahurkar v. C.R. Bard, Inc.,* No. 92 C 4803, 1993 WL 259446 at \*10 n. 4 (N.D.Ill. July 6, 2003)

(recognizing this principle in a patent license dispute).

There is ample evidence in the record that DIB officers believed that DIB's rights to use the software at issue here derived from written agreements. It is undisputed that the parties entered into an express license agreement, the Dealer License, in 1994, with a five-year renewable term. In its answer to the Third Amended Counterclaim, DIB admitted that it executed the Agreement dated January 19, 1989, (Answer, PSI Exhibit C, ¶ 20.) By its terms, the Dealer License covered source code bearing PSI's proprietary notice (and that of Real World, the originator of the software), as well as "any subsequent corrections, enhancements or modifications to the items which Licensor may furnish to Licensee during the terms of this License."(Dealer License, PSI Exhibit I, ¶ 1.3.) The Dealer License provided that PSI and Real World retained all copyright, trade secrets and other proprietary rights in the software. (*Id.* ¶ 3.2.)The Dealer License anticipated the payment of fees by DIB for a "non-exclusive license to use ... the RealWorld proprietary computer software items" and included a schedule of additional fees to be paid for distribution of the software to additional parties. (*Id* page 1; Royalty Schedule A.)

The License was scheduled to expire in 1994, but there is evidence that through Gary Zoller, its manager of retail data services, DIB agreed to continue operating under the terms of the Dealer License, at least until 1999. (Zoller Dep., PSI Exhibit O, at 18.) In two 1999 letters, John Snider, DIB's Vice President of Information Technology, referred to the "ten-year anniversary of the Dealer License" for the software. (Snider Letters, PSI Exhibits P, TT.) In a letter to Great Plains dated February 15, 2001, DIB's general counsel Thomas Burroughs stated his belief that the License had expired in 1999. (Burroughs Letter, PSI Exhibit Q.) Further, in hundreds of agreements that DIB made with its member stores from 1989 through 2000, DIB acknowledged that it was granting sublicenses "pursuant to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)

**2005 WL 743083 (N.D.Ill.)**

Page 5

a license agreement we have with Passport Software, Inc." and that "[a]ll copyright and other proprietary rights in portions of the Software enhanced by PSI or [DIB] are and remain the valuable property of the respective companies."(Appendix 2 to representative contracts dated 1989 through 2000, PSI Exhibits BB through LL.)

**\*5** This court agrees with PSI that the parties' execution of the Dealer License, and DIB's explicit acknowledgment and adherence to its terms, are inconsistent with an implied license arising from the parties' conduct. The fact that DIB approached PSI in August or September 2000 seeking to purchase unlimited rights in the software is powerful evidence that DIB did not at that time believe it already possessed such rights. Notably, in its Third Amended Complaint, PSI alleges that DIB's unauthorized use of the copyrighted software began on February 14, 2001. On that date, PSI sent DIB a notice of default, demanding that DIB pay fees and charges and royalties PSI claimed were due under the Dealer License. (Notice of Default, PSI Exhibit J.) In determining whether an implied license exists, the court must consider objective evidence of the parties' intent. *Meisner Brem Corp. v. Mitchell,* 313 F.Supp.2d 13, 16 (D.N.H.2004), citing *Danielson,* 322 F.3d at 42.The February 14, 2001 letter constitutes a clear indication that at least as of that date, PSI had no intention to permit DIB's continued use of the software. At a minimum, the court concludes there are disputes of fact on the issue of whether PSI delivered software to DIB with the intent that DIB could continue using and distributing that software, without payment of royalties, after the termination of their agreement.

As noted earlier, PSI not only opposes DIB's motion for summary judgment on the copyright infringement issue, but has filed its own motion for summary judgment on Count VII. Where parties file cross-motions for summary judgment, the court is required to adopt a "Janus-like perspective," viewing the facts for purposes of each motion through the lens most favorable to the non-moving

party. *See Granzow v. Eagle Food Centers, Inc.,* 27 F.Supp.2d 1105, 1106 (N.D.Ill.1998). This approach sometimes requires denial of both motions. *Id.* Based on the evidence described above, a jury could find that DIB understood that it was bound by the terms of the Dealer License, at least through January 1999, and that PSI did not intend to permit DIB's use of the copyrighted work under any implied license prior to that date.

The court is far less certain of PSI's intentions after that date. PSI knew or should have known that by its terms, the Dealer License expired at the latest by January 1999, but PSI has offered no explanation for its failure to take steps to renegotiate the license or retrieve its copyrighted software from DIB at that time. Indeed, PSI apparently made no effort to enforce the requirements for renewal even in 1994 but continued performing programming on the software to meet DIB's needs. John Snider of DIB has testified that as of January 1999, he was "confused whether the dealer license was in effect technically."(Snider Dep., DIB Ex. 41, at 37:12-13.) John Miller, PSI's President, has asserted that "PSI operated under the terms of the Dealer License from 1989 through March 2001," (Miller Aff. ¶ 67), but PSI has not offered evidence that DIB officials understood that the Dealer License itself-as opposed to other individual licenses or agreements or oral commitments-continued in force. Nor has PSI explained how it was that PSI was unaware that "DIB had not been complying with all of the provisions of the Dealer License" before PSI "discovered" this fact in "mid to late 2000." (*Id.* ¶ 68.)*Cf. Viacom Int'l Inc. v . Fanzine Int'l Inc.,* No . 98 CIV. 7448, 2000 WL 1854903 at \*5 (S.D.N.Y. July 12, 2000) ("[F]ailure by the copyright owner to object to reproduction of copyrighted works may provide the basis for implying a nonexclusive license, but this basis for an implied license is available only when the owner's silence is coupled with knowledge of the copying.") As DIB points out, PSI officials acknowledged that PSI prepared and provided custom programming, including software designed to address "Y2K" problems, for distribution by DIB to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

its members. (DIB Reply Memorandum in Support of its Motion for Summary Judgment on Passport's Copyright Infringement Claim, at 8-9, citing deposition transcripts of John and Muriel Miller.) The court does not agree with DIB that the fact that it paid PSI for this programming requires the conclusion that an implied license arose; PSI might well have intended for the custom programming to be covered by the terms of the Dealer License or by other writings. Because PSI apparently did not arrange for a renewal of that written agreement, however, a reasonable trier of fact might conclude that it intended for DIB to distribute the work pursuant to an implied license after January 1999.

*6 Viewing the evidence in the light most favorable to each side on the other's motion, the court concludes there are disputes of fact concerning the existence of an implied license after January 1999.

B. Joint Authorship

In the alternative to its implied license argument, DIB contends that it is a joint author of PSI's copyrighted software. Both parties agree concerning the relevant legal standards. To qualify as a joint author, DIB must show (1) that the parties intended to be joint authors at the time the work was created and (2) that each author's contribution to the work is independently copyrightable. *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1068-71 (7th Cir.1994); *see also* 17 U.S.C. § 101. The court need not address the second prong of this test because it concludes that there are disputes of material fact concerning the first prong.

The language of a written agreement between the parties can constitute evidence of their intentions concerning co-authorship. *Thomson v. Larson,* 147 F.3d 195, 204 (2d Cir.1998). As described in part above, the terms of the Dealer License are plainly at odds with DIB's contention that both parties intended for DIB to be a co-author of the software. Paragraph 3.2 of the Dealer License notes that the "Licensed Software embodies substantial creative

efforts of both RealWorld and PSI," but makes no mention of any contribution on the part of DIB. (Dealer License, PSI Exhibit I, at 3.2.) In that same paragraph, the agreement provides that "[a]ll copyright ... and other intellectual and proprietary rights in the Licensed Software are and remain the valuable property of RealWorld and PSI...."(*Id.*)Paragraph 1.3 of the agreement explains that the copyrighted software, referred to at this point as "Sublicensed Software" inclu des not only the source code originally delivered to DIB in 1989, but also "any subsequent corrections, enhancements of modifications to the items...."(*Id.* ¶ 1.3(d).) DIB was entitled, under the language of the Dealer License, to "modify and enhance the Licensed Software," but the use of such software "whether modified or enhanced ... shall remain subject to all of the terms and conditions of this Agreement."(*Id.* ¶¶ 6.1, 6.2.)

In addition, the language of agreements between DIB and hundreds of its member stores for use of the software is inconsistent with its claim of joint authorship. *Cf. Erickson,* 13 F.3d at 1072 (noting that licensing agreement between copyright holder and a third party undermined plaintiff's claim of joint authorship). In an appendix to its form agreement, DIB warned its member stores that copyrights in the software "are and remain the valuable property of [RealWorld Corporation]." (E.g., Appendix 2 to Computer Software License Agreement between DIB and Wannemakers, PSI Exhibit CC.) DIB explicitly asserted that it acted as an "independent contractor" with respect to PSI and was "not PSI's nor RWC's agent, partner, franchisee, joint venturer or employee."(*Id.*)

*7 Joint authorship is an affirmative defense to a claim of copyright infringement. *SHL Imaging, Inc. v. Artisan House, Inc.,* 117 F.Supp.2d 301, 314 (S.D.N.Y.2000). The court concludes DIB has not met its burden of establishing that there are no disputes of fact on this matter.

C. Misuse

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

Finally, DIB intends that PSI has misused its copyright registrations by seeking to extend its copyright protection over software to which it has no rights. As it does with respect to the issues of implied license and joint authorship, DIB bears the burden of proof on this matter.

The defense of copyright misuse "bars a culpable plaintiff from prevailing on an action for the infringement of the misused copyright."*Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970, 972 (4th Cir.1990). The defense recognizes that "copyright law [seeks] to increase the store of human knowledge and arts by awarding ... authors with the exclusive rights to their works for a limited time ... [but] the granted monopoly power does not extend to property not covered by the ... copyright."*Id.* at 976.As the Ninth Circuit observed in *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1027 (9th Cir.2001), most of the cases that recognize this defense "involve unduly restrictive licensing schemes." Indeed, in the Seventh Circuit, copyright misuse is ordinarily analyzed under conventional antitrust principles. *USM Corp. v. SPS Techs., Inc.,* 694 F.2d 505, 512 (7th Cir.1982); *see Data General Corp. v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1186 n. 63 (1st Cir.1994); *Cha mberlain Group, Inc. v. Skylink Techs., Inc.,* 381 F.3d 1178, 1201 (Fed.Cir.2004) ("Because nothing in Seventh Circuit law contradicts *Data General,* we similarly conclude that it is the standard that the Seventh Circuit would most likely follow.") As the Supreme Court has stated: "The Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next." ' *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 479 n. 29, 112 S.Ct. 2072, 119 L.Ed.2d 265, (1992) (quoting *Times-Picayune Publ'g Co. v. United States,* 345 U.S. 594, 611, 73 S.Ct. 872, 97 L.Ed. 1277 (1953)).

DIB here does not credibly assert that PSI is guilty of using its copyright to restrain DIB's use of non-

copyrighted material, or of other anticompetitive conduct. Instead, DIB appears to suggest that PSI's copyright registrations contained intentional misrepresentations in that they failed to identify other authors of the source code Passport was seeking to register.[FN2]DIB urges that Passport has no right to charge DIB with infringing source code that RealWorld or DIB itself authored.

> FN2. DIB points out that intentional misrepresentations can invalidate a copyright registration. (DIB's Reply Memorandum in Support of its Motion for Summary Judgment on PSI's Copyright Infringement Claim, at 16.) The court does not understand DIB to be arguing that the court should find PSI's copyrights invalid, however. In any event, a finding of misuse does not ordinarily invalidate a copyright. *Alcatel USA, Inc. v. DGI Technologies, Inc.,* 166 F.3d 772, 793 n. 81 (5th Cir.1999), citing *Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970, 972 (4th Cir.1990).

As this court understands PSI's claims, however, PSI is not seeking to bar DIB from using source code which DIB authored. Nor is the court persuaded that there are no disputes of fact concerning DIB's copyright misuse defense. The case on which DIB chiefly relies, *qad. inc. v. ALN Assocs., Inc.,* 770 F.Supp. 1261 (N.D.Ill.1991), *a ff'd,*974 F.2d 834 (7th Cir.1992), is instructive but distinguishable. In *qad,* the district court initially granted plaintiff's motion to preliminarily enjoin a competitor's use of the plaintiff's copyrighted software program. Later, the court granted summary judgment in favor of the defendant competitor after it concluded that plaintiff's witnesses had made misrepresentations at the preliminary injunction hearing: specifically, they falsely claimed the software at issue was a completely original work, of which plaintiff wrote "every line ... from scratch," and that defendant could only have obtained the code by direct copying of that original work. 770 F.Supp.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

Page 8

at 1267.Instead, the court concluded, plaintiff qad had "copied much of the selection, order, arrangement and definitions of fields" from software developed by a third party, but failed to identify its own software as a derivative work, or to acknowledge that defendant itself could have obtained the code from the third party source.*Id.* at 1263.

**\*8** DIB has identified no similar misrepresentations on the part of PSI. In its own copyright applications, PSI clearly indicated that it was seeking registration of a derivative work and identified Real-World software as the work from which PSI's own code was derived. (Copyright Registration, PSI Exhibit F.) PSI notes, further, that PSI's agreement with RealWorld authorized PSI to "modify and enhance the Licensed Software," combine it with other software, convert it for use in another programming language, or otherwise create derivative works. (Master Distributor Agreement for Real-World So ftware, PSI Exhibit G, ¶ 12.1.) Federal regulations permit the depositing of "identifying portions," rather than copies, of computer programs for which copyright protection is sought, 37 C.F.R. § 202.20(c)(2)(vii)(A), and case law recognizes that a copyright may cover a program that includes previously known source code. *Computer Assocs. Int'l v. Quest Software, Inc.,* 333 F.Supp.2d 688, 697 (N.D.Ill.2004) (Moran, J.) *See also Harris Custom Builders, Inc. v. Hoffmeyer,* 834 F.Supp. 256, 260 (N.D.Ill.1993) (distinguishing *qad.* on the basis that plaintiff there had not disclosed a prior work in its copyright application).

DIB makes much of the fact that PSI's copyright registrations "incorporate source code that was written by Passport, Do It Best, and RealWorld."(DIB's Memorandum of Law in Support of Its Motion for Summary Judgment on Passport's Copyright Infringement Claim, at 16.) As noted earlier, however, under the terms of the 1994 License Agreement, DIB had rights to modify or enhance the software provided by PSI, but PSI and Real-World retained copyrights in that enhanced software. RealWorld might have some basis to com-

plain about PSI's copyright claims, but the court concludes that DIB is not entitled to summary judgment on the basis of the purported misuse defense.

II. Breach of Contract

In Count I, PSI charges DIB with breach of contract. PSI's theory is that the Dealer License that the parties entered into in 1989 continued until March 2001, 30 days after PSI issued a notice of termination. The language of the Dealer License itself is inconsistent with this theory. It provides:

> This license shall be in effect ... and shall be valid until termination as provided below, or until a point in time five years hence, whichever occurs first.... [Y]ou [DIB] may renew this Agreement at the end of the five year term for an additional five year term provided you pay the then current renewal fee and sign the then current Renewal Source Code License Agreement.

(Dealer License, PSI Exhibit 1, ¶ 9.1.) Further, the Dealer License prohibits any modification that is not "in writing and signed by the party against whom such is sought to be enforced."(*Id.* ¶ 10.9.)It is undisputed that DIB never paid a renewal fee, nor did DIB sign an agreement to extend or modify the 1989 Dealer License. (Miller Dep., DIB Exhibit 3, at 101:11-20, 264:5-10.) DIB argues that these undisputed facts require judgment in its favor on PSI's breach of contract claim. In assessing this motion, the court considers whether there are disputes of fact concerning an alleged oral extension of the Dealer Agreement, and whether enforcement of such an oral agreement is barred by the statute of frauds.

A. Alleged Oral Extension

**\*9** PSI urges that the absence of a signed extension agreement is not fatal here. Illinois law permits the parties to a written contract to alter or modify its terms by a subsequent oral agreement even where the terms of the contract appear to preclude such a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

modification. *Tadros v. Kuzmak,* 277 Ill.App.3d 301, 312, 213 Ill.Dec. 905, 660 N.E.2d 162, 170 (1st Dist.1995) (collecting cases). Where, as here, a written contract contains a provision banning oral modifications, a party seeking to establish that such a provision is waived must offer clear and convincing evidence of such a waiver. *See Czapla v. Commerz Futures, LLC,* 114 F.Supp.2d 715, 718 (N.D.Ill.2000) (citing *Roboserve, Inc. v. Kato Kagaku Co.,* 78 F.3d 266, 277 (7th Cir.1996).

In support of its argument that an oral agreement existed, PSI relies heavily on the testimony of Gary Zoller, who in 1994 served as manager of retail data services for DIB. Zoller testified that DIB continued to operate under the agreement after 1994. (Zoller Dep., PSI Exhibit O, at 18:8-9.) According to Zoller, "We had conversations with Passport, John Miller [PSI's President], and we were assured we could continue to resell the product under the license agreement."(*Id.* at 20:15-19.)Further, as described above, in two letters he wrote in 1999, DIB's Vice President, John Snider, referred to the "ten-year anniversary of the Dealer License" for the software. (Snider Letters, PSI Exhibits P, TT.) In addition, in February 2001, DIB's general counsel, Thomas Burroughs, expressed his belief that the License had expired in 1999, not in 1994. (Burroughs Letter, PSI Exhibit Q.) PSI notes, as well, the references to a "license agreement we have with Passport Software," that appear in DIB licenses with its member stores continuing into the year 2000. (Appendix 2 to representative contracts dated 1989 through 2000, PSI Exhibits BB through LL.)

As DIB emphasizes, however, there is substantial evidence that casts doubt on the assertion that the parties understood their relationship was governed by the Dealer License. For example, the parties entered into written agreements for custom programming of the software at issue here without making any mention of the Dealer License. A May 11, 1994 document, signed by Gary Zoller and John Miller, is characterized as a "working agreement between [DIB and PSI] covering the development

of three software products for [DIB] by Passport Software."(5/11/94 agreement, DIB Exhibit 37.) No mention of the Dealer License, or of any contractual relationship, appears within that document. A March 24, 1994 letter from Paul Erbe of PSI "confirm[s] [PSI's] arrangements to assist [DIB] with the further development and support" of its retailing software and explains "our [PSI's] policy to bill clients monthly for costs incurred plus out-of-pocket expenses."It makes no reference to the Dealer License or to any royalties owing under that license. (Erbe letter 3/24/94, DIB Exhibit 38.) An August 1, 2000 letter from Muriel Spencer of PSI to Chuck Thatcher of DIB expresses PSI's anticipation of "rekindling a productive working relationship," proposes the development of a new computer module, and sets out a pricing table for purchases of the module over a five-year period, again without any reference to the parties' Dealer License or to any existing contractual relationship. (Spencer letter 8/1/00, DIB Exhibit 39.)

B. Statute of Frauds

**\*10** Even if the court recognizes Mr. Zoller's communications as sufficient to create a dispute of fact concerning an oral extension agreement, DIB argues that the statute of frauds bars the enforcement of such an agreement. The Illinois statute of frauds precludes enforcement of oral contracts that cannot be performed within a year of their making. 740 ILCS 80/1; *McInerney v. Charter Golf, Inc.,* 176 Ill.2d 482, 489, 223 Ill.Dec. 911, 680 N.E.2d 1347, 1351 (1997). The statute applies in cases like this one, involving a purported oral extension of a written contract which cannot be performed within one year.[FN3]*Dickens v. Quincy College Corp.,* 245 Ill.App.3d 1055, 1059, 185 Ill.Dec. 822, 615 N.E.2d 381, 384 (4th Dist.1993). As the *McInerney* court explained:

> FN3. PSI does not argue that the alleged oral extension of the Dealer License is not of this nature.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

The period of one year, although arbitrary, recognizes that with the passage of time evidence becomes stale and memories fade. The statute proceeds from the legislature's sound conclusion that while the technical elements of a contract may exist, certain contracts should not be enforced absent a writing. It functions more as an evidentiary safeguard than as a substantive rule of contract. As such, the statute exists to protect not just the parties to a contract, but also-perhaps more importantly-to protect the fact finder from charlatans, perjurers and the problems of proof accompanying oral contracts.
*Id.* at 489, 223 Ill.Dec. 911, 680 N.E.2d at 1351.

There is no suggestion here that PSI, or any of its witnesses, are "charlatans or perjurers." But this case presents obvious problems of proof. DIB insists there was no continuing obligation under the License Agreement and that it agreed, instead, to make individual purchases of custom programming and licensing on a project-by-project basis. PSI insists the Dealer License continued to control the parties' relationship, but offers no evidence of the precise terms of that agreement, nor any explanation for its failure ever to collect royalty fees from DIB, to insist that DIB sign a renewal agreement, or even to make reference to the License Agreement in its correspondence with DIB.[FN4] As another judge of this court has observed, "While the plaintiff might have been comfortable with proceeding somewhat informally in its dealings with defendant, it cannot later expect the court to complete the negotiation process and arrive at terms on its behalf."*Doyle's Const. & Remodeling, Inc. v. Wendy's Int'l, Inc.,* 144 F.Supp.2d 969, 975 (N.D.Ill.2001), citing *J.F. McKinney & Assocs. v. General Electric Inv. Corp.,* 183 F.3d 619, 622 (7th Cir.1999).

> FN4. DIB notes, further, that as Gary Zoller explained, PSI always used DIB's then-current software when it worked on any new programming and was therefore always aware of the source code DIB was

using and sublicensing to its members. (DIB's Memorandum of Law in Support of its Motion for Summary Judgment on Passport's Breach of Contract Claim, at 11-12, citing Zoller Dep., DIB Exhibit 19, at 41:25-42:10.) Yet until 2001, PSI never suggested that DIB was in breach of any agreement between the parties. The court is uncertain how was that PSI did not, prior to September 2000, discover DIB's alleged misuse of its code, but concludes that disputes of fact preclude summary judgment on DIB's laches defense.

PSI urges that certain exceptions to the statute of frauds are available here. First, PSI notes the letters written by John Snider of DIB in January and March 1999 in which he refers to the "ten year anniversary" of the Dealer License. Snider's January letter refers to the possibility that the parties' relationship might "need[ ] to be modified," and his March letter opines that the parties ought not "be limited by the historical agreement."In a letter written on February 15, 2001, the day after PSI notified DIB of default, General Counsel Thomas Burroughs advised RealWorld's successor of his "belief that the agreement expired by its own terms in 1999."PSI correctly observes that the writing necessary to satisfy the statute of frauds need not be a single document, *Bower v. Jones,* 978 F.2d 1004, 1008 (7th Cir.1992), and need not be " 'in and of itself the contract in question ...*so long as the intention of the parties can be established.*" ' *Dresser Indus., Inc. v. Pyrrhus AG,* 936 F.2d 921, 929 (7th Cir.1991) (quoting *Yorkville Nat'l Bank v. Schaefer,* 71 Ill.App.3d 137, 140, 27 Ill.Dec. 263, 388 N.E.2d 1312, 1315 (2d Dist.1979)). PSI recognizes that the documents on which it relies to satisfy the statute of frauds must enable the court to determine all the terms of the bargain. (Passport Software Inc.'s Response in Opposition to the Motion of Do It Best Corporation for Summary Judgment on Passport's Breach of Contract Claim, at 6.)

*11 In the court's view, the Snider and Burroughs

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

letters do not meet that test. Mr. Snider's letters are ambiguous; although he refers to the "anniversary" of the Dealer License, he does not acknowledge explicitly that its terms continued to govern the parties' dealings; in fact, his March letter refers to the agreement as "historical." Mr. Burroughs's 2001 letter to Great Plains observes that the Dealer License "had a five year initial term, and was subject to one renewal term of five years," supporting Burroughs's belief that the agreement had expired in 1999. Contrary to PSI's characterization of this letter as one that "confirms the existence of the oral contract,"(*id.* at 8, 27 Ill.Dec. 263, 388 N.E.2d 1312), this letter refers only to the parties' written agreement. At best, Burroughs's letter could constitute an admission that the Dealer License continued in force until 1999; it does not support PSI's contention that the License continued indefinitely.

The court turns, then, to PSI's remaining arguments; that compliance with the statute of frauds is excused under the doctrines of part performance or full performance. Under the full performance doctrine, an oral agreement may be enforced according to its terms if it has been fully performed by the party seeking enforcement. *Strzelecki v. Schwarz Paper Co.,* 824 F.Supp. 821, 825 (N.D.Ill.1993), citing *Meyer v. Logue,* 100 Ill.App.3d 1039, 1043-44, 56 Ill.Dec. 707, 427 N.E.2d 1253, 1256 (1st Dist.1981). Full performance renders the statute of frauds inapplicable because it "constitutes strong evidence that a contract existed."*Greenberger, Krauss & Tenenbaum v. Catalfo,* 293 Ill.App.3d 88, 96, 687 N.E.2d 153,159 (1st Dist.1997), citing *Meyer,* 100 Ill.App.3d at 1043-44, 56 Ill.Dec. 707, 427 N.E.2d at 1256.Partial performance is another basis for an exception to the statute of frauds. The doctrine of partial performance is "rooted in the equitable concept of reliance,"*Dickens,* 245 Ill.App.3d at 1061, 185 Ill.Dec. 822, 615 N.E.2d at 385, and applies "to cases where there [have] been such acts of performance by the party" so that it "cannot be restored to [its] original position."*Gibbons v. Stillwell,* 149 Ill.App.3d 411, 415-16, 102 Ill.Dec. 864, 500 N.E.2d 965, 969 (5th

Dist.1986).

PSI has not been specific about precisely what activities constitute "performance" for this purpose. Presumably PSI includes its own failure to prohibit DIB from continuing to use its software or to notify DIB that the Dealer License was terminated; but the court is unwilling to characterize PSI's silence and failure to act as "performance" that binds DIB to the terms of an agreement. PSI also performed additional programming and software development in the years after 1994. DIB insists PSI did this work pursuant to additional individual agreements and that DIB paid PSI on a project-by-project basis for this additional work. Although PSI contends that all of the additional programming was a function of the Dealer License, its witnesses acknowledged that DIB paid it for all of that additional programming (John Miller Dep., DIB Exhibit 3, at 174:9-176.23; Muriel Miller Dep., DIB Exhibit 13, at 79:14-80.15; 84:4-86:10), and there is no evidence that the programming work itself constituted evidence of the continuing existence of the Dealer License. PSI points out that it continued to assign serial numbers for DIB's member stores, but there is no evidence that PSI attempted to collect license fees or royalties on these sublicenses. Thus, in the court's view, PSI's purported "full performance" does not constitute evidence that the Dealer License Agreement continued in effect after 1999.

**\*12** To the extent PSI invokes the "partial performance" doctrine as a basis for an exception to the requirement of a writing, the court notes that this doctrine supports only equitable relief and is inapplicable where, as here, the party asserting the existence of a contract seeks money damages. *Trustmark Ins. Co. v. General Cologne Life Re Ins. Co. of Am.,* No. 00 C 1926, 2004 WL 1745777 (N.D.Ill. Aug.2, 2004), citing *Payne v. Mill Race Inn,* 152 Ill.App.3d 269, 278, 105 Ill.Dec. 324, 504 N.E.2d 193, 199-200 (2d Dist.1987) (doctrine of partial performance applies only where "it is impossible or impractical to ... compensate the performing party for what he has parted with, or for the value of his

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 12
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

performance"); *Gibbons,* 149 Ill.App.3d at 416, 102 Ill.Dec. 864, 500 N.E.2d at 969 (refusing to apply doctrine of part performance where "the plaintiff had an adequate remedy at law for damages"); *Cherry Payment Sys., Inc. v. Rogers,* No. 92 C 5918, 1995 WL 584062, at *3 (N.D.Ill. Oct.3, 1995) (noting that under Illinois law, "the availability of damages to compensate [the performing party] ... will ordinarily preclude reliance on the equitable doctrine of partial performance."). As this court understands the claims, PSI seeks monetary damages for DIB's alleged breach of contract. The part performance doctrine is not applicable in this context.

DIB's motion for summary judgment on PSI's breach of contract claim is denied with respect to the period until January 1999, and otherwise granted.

III. Trade Secret Misappropriation

Computer software may constitute trade secrets and may be entitled to trade secret protection where the owner has taken appropriate steps to protect the secrecy of the information. *Computer A ssocs. Int'l v. Quest Software, Inc.,* 333 F.Supp.2d 688, 695 (N.D.Ill.2004); *see CM AX/Cleveland, Inc. v. UCR, Inc.,* 804 F.Supp. 337 (M.D.Ga.1992); *Liberty American Ins. Group, Inc. v. WestPoint Underwriters, L.L.C.,* 199 F.Supp.2d 1271 (M.D.Fla.2001); *Electronic Data Systems Corp. v. Heinemann,* 268 Ga. 755, 493 S.E.2d 132 (Ga.1997). DIB's sole argument for summary judgment in its favor on this claim is PSI's purported failure to identify its trade secrets with the appropriate degree of specificity. In *IDX Systems Corp. v. Epic Systems Corp.,* 285 F.3d 581 (7th Cir.2002), a provider of medical business management software attempted to enforce trade secret rights against a competitor and former customer, identifying, as its trade secret, " 'a 43-page description of the methods and processes underlying and the interrelationships among various features making up IDX's software package'."*Id.* at 583.Affirming

summary judgment in favor of defendants on this claim, the Seventh Circuit had little difficulty concluding that this broad description is not nearly specific enough to qualify for trade secret protection under Wisconsin law.

DIB contends PSI's description of its trade secret is similarly overbroad. In response to DIB's initial interrogatories on this matter, PSI claimed its trade secrets are "the processes and methodologies encompassed in" forty features of the licensed software. (Answers to Interrogatories, DIB Exhibit 10, at 4.) In a supplemental answer, PSI reduced the features in which it claimed trade secret protection from 40 to 28 (Supplemental Interrogatory Answer, DIB Exhibit 11) but furnished, in addition, 831 pages of source code which it contends is protected material. According to DIB, these 831 pages "include every line of code in Do It Best's CS2000 system ever authored by Passport, without regard to the value or secrecy of any of the lines of code."(DIB's Memorandum of Law in Support of Summary Judgment on Passport's Trade Secret Misappropriation Claim, at 5.) Indeed, John Miller, President of PSI and PSI's designated Rule 30(b)(6) witness on this issue, acknowledged that "most, if not all" of the projects that Passport worked on for Do It Best are, in PSI's view, trade secrets. (Miller Dep., DIB Exhibit 3, at 198:14-22.) Even more broadly, Mr. Miller testified that PSI's trade secrets include "the design, the structure, the programming methods, and the integration of that code within the body of code, so it's the way in which we solved business problems."(*Id.* at 196:16-20.)

*13 DIB urges that this description is simply too broad to support trade secret protection under the Seventh Circuit's standards. For example, in the *IDX Systems* case, where the plaintiff claimed a 43-page document describing the "methods and processes underlying" its software was a sufficiently specific description, the court responded:

No, it isn't. These 43 pages describe the software; although the document was created for this litigation, it does not separate the trade secrets from

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

the other information that goes into any software package. Which aspects are known to the trade, and which are not? That's vital under the statutory definition. Likewise, IDX's tender of the complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets.

*Id.* at 583-84.In *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1266 (7th Cir.1992), plaintiff claimed that certain manufacturing techniques were trade secrets. Reversing a jury verdict against individuals who had been employed by plaintiff's material supplier, the court explained that plaintiff had identified no commercially valuable adaptations of the well known manufacturing techniques and was not entitled to trade dress protection for those techniques. *Id.* at 1266.As the *IDX Systems* court explained, *Composite Marine* stands for the proposition that a plaintiff seeking trade dress protection "must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition."285 F.3d at 584, citing *Composite Marine,* 962 F.2d at 1266.

Passport's submissions come dangerously close to doing exactly that. In its response to DIB's motion for summary judgment on this claim, PSI instructs that "to determine PSI's trade secret, [DIB] need merely look at the lines of code which PSI identified and *examine the design, structure, and programming techniques and the integration* into the code which DIB is using...." (Passport Software, Inc.'s Response in Opposition to the Motion of Do It Best Corporation for Summary Judgment on Passport's Trade Secret Misappropriation Claim, at 10.) Passport correctly notes language in *Thermodyne Food Service Prods., Inc. v. McDonald's Corp.,* 940 F.Supp. 1300, 1305 (N.D.Ill.1996) that recognizes the possible trade secret status of "a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process design and operation of which in unique combination affords a competitive ad-

vantage...." The court there recognized a trade secret in the "interrelationship" of otherwise unprotectable component parts." *Id.* at 1305 n. 5.

The court here harbors some doubt as to whether PSI's identification of every line of code it developed for DIB is sufficiently specific as a description of its trade secrets. The court does recognize, however, that PSI's submissions differ from those criticized in some of the case law. PSI did identify specific lines of code and specific software features for which it claims protection. This differs markedly from *Lynchval Sys. Inc. v. Chicago Consulting Actuaries, Inc.,* No. 95 C 1490, 1998 WL 151814 (N.D.Ill. Mar.27, 1998), which DIB argues supports its position here. In *Lynchval,* the plaintiff was unable to identify any "computer printouts, formulae, memoranda, or any other tangible technical data," identifying its trade secrets, nor to show "how, when and by whom" its purportedly protected programs were developed.

**\*14** The court recognizes that DIB may have other objections to PSI's claim of trade secret protection for the software at issue in this case. Without more information (including, possibly, expert testimony concerning the nature of PSI's disclosure of code here), the court denies DIB's motion for judgment in its favor on the defense of lack of specificity.

IV. Civil Conspiracy

Count VI of PSI's Third Amended Counterclaim charges DIB with civil conspiracy. Its allegations in support of that claim focus on DIB's conduct in interfering with PSI's relationship with Great Plains and PSI's rights to use the RealWorld software. In response to DIB's motion for summary judgment on this claim, PSI describes its theory differently:

DIB and Great Plains, each for its own motive, knowingly and voluntarily participated in a common scheme to allow DIB to continue to use the software which PSI had delivered to DIB under the terms of the Dealer License and which each

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

knew was an enhanced version of the RealWorld software which contained PSI's copyrighted code.

(Passport Software Inc.'s Memorandum of Law in Opposition to the Motion of Do It Best Corporation for Summary Judgment on Passport's Civil Conspiracy Claim, at 1.) As thus constructed, DIB correctly characterizes PSI's claim as one of conspiracy to infringe. DIB argues in its reply memorandum that such a claim is preempted, citing *Higher Gear Group, Inc. v. Rockenbach Chevrolet Sales, Inc.,* 223 F.Supp.2d 953 (N.D.Ill.2002). Specifically, Judge Castillo observed there that a "cause of action for civil conspiracy exists only if one of the parties to the agreement commits a tort in furtherance of the agreement."*Id.* at 959, citing *Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 63, 206 Ill.Dec. 636, 645 N.E.2d 888, 894 (1994). The tort at issue in *Higher Gear* was a claim of tortious interference which was itself a claim that the defendant had created software that "closely functioned and resembled" and therefore infringed plaintiff's licensed software. *Id.* at 959.Like the tortious interference claim itself, Judge Castillo concluded that the plaintiff's civil conspiracy claim was preempted by federal copyright law.

The court concludes that PSI's civil conspiracy arguments rest on a "tort" of copyright infringement. As such, that claim appears to be preempted. Because DIB made this argument for the first time in its reply brief, however, the court recognizes that PSI is entitled to respond to this argument, if it wishes to do so. DIB's motion for summary judgment on the civil conspiracy claim is therefore granted without prejudice. PSI will be free to move for reconsideration if it wishes to submit argument on this issue only.

## V. Damages

Passport claims that it is entitled to a variety of damages in this case, including (1) maintenance fees that DIB collected for providing technical support to its members; (2) damages incurred from the date the parties' relationship began in January 1989 through March 2004; and (3) statutory damages and attorneys' fees under the Federal Copyright Act. 17 U.S.C. § 412. DIB argues that under the express terms of the Dealer License, Passport is not entitled to any maintenance fees. DIB also argues that Passport cannot recover damages incurred prior to 2001, the year in which DIB's wrongful conduct allegedly began. Finally, DIB claims that statutory damages are unavailable under the Copyright Act because the alleged infringement commenced before Passport registered its copyright.

### A. Maintenance Fees

**\*15** Passport's damages expert, Darren Guccione, submitted an expert report stating that Passport is entitled to "monthly maintenance charge[s] of $200 per store that was to be earned by Passport as the new licensor and service provider for DIB's member-stores."Guccione also included revenues DIB generated from maintenance fees in his unjust enrichment analysis. DIB argues that this analysis is flawed because none of DIB's members had an obligation to seek monthly maintenance from Passport either before or after the relationship between Passport and DIB ended. (Do It Best's Memorandum of Law in Support of its Motion for Partial Summary Judgment on Damages (hereinafter "DIB Damages Mem."), at 6.) DIB first points to paragraph 9.6 of the Dealer License, which expressly provides that DIB could continue to support its members after the License expired:

> Upon termination of this License by expiration of its terms or pursuant to paragraph 9.2, [Do It Best] may apply in writing to [Passport] for permission to retain one copy of the Licensed Software for the sole purpose of supporting [Do It Best's] sublicensees. Upon termination of this License pursuant to paragraph 9.4, [Do It Best] may apply in writing directly to RealWorld for permission to retain one copy of the Licensed Software for the sole purpose of supporting [Do It Best's] sublicensees.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 15
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

(Dealer License ¶ 9.6.) In addition, Passport's President, John Miller, admitted in his deposition that sublicensees were not obligated to use Passport for support. (Miller Dep., at 239.) Passport advances several theories to demonstrate that it is entitled to maintenance fees, none of which is persuasive.

### 1. Recovery Under the Copyright Act

Passport first suggests that DIB's revenues from the maintenance fees somehow derived from its infringing activities and are thus a compensable component of damages arising from DIB's copyright infringement. (PSI Damages Resp., at 2.) [FN5]"Copyright law allows a copyright owner to recover his actual damages and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."*Ocean Atlantic Woodland Corp. v. DRH Cambridge Homes, Inc.,* 262 F.Supp.2d 923, 927 (N.D.Ill.2003) (citing 17 U.S.C. § 504(b)). A copyright owner's right to recover an accused infringer's profits is "limited to profits flowing from the infringing activities."*Id.* (citing *Leigh v. Engle,* 727 F.2d 113, 138 (7th Cir.1984)).

> FN5. Passport Software, Inc.'s Response in Opposition to the Motion of Do It Best Corporation for Partial Summary Judgment on Passport's Damage Claim is cited as "PSI Damages Resp., at ___."

Passport claims that the maintenance fees constitute such recoverable profits because "the charges to members for support and maintenance [are] mandatory when a member purchases software," and because "the vast majority of all members continue to receive support and maintenance."(Pl. Damages Resp., at 4.) The problem with this argument is that under the Dealer License, DIB was entitled to maintenance fees under its own relationship with member stores, relationships that were expressly contemplated by the Dealer License. In other words, the maintenance fees were not a product of allegedly infringing activities. *Ocean Atlantic*

*Woodland,* 262 F.Supp.2d at 927.

**\*16** Also unpersuasive is Passport's assertion that DIB "profited from infringing PSI's copyrighted software including bundling it with other products and services including support and maintenance."(Pl. Damages Resp., at 5-6.) Passport offers the analogy, drawn from *Bucklew v. Hawkins, Ash, Baptie & Co.,* 329 F.3d 923 (7th Cir.2003), of a defendant that copyrights a book verbatim and then offers to give the book to customers for free as long as they pay $25 for a bookmark that cost the defendant 10 cents and has a fair market value of 50 cents. (*Id.* at 3) (citing *Bucklew,* 329 F.3d at 933.)As the *Bucklew* court explained, "[t]o hold in such a case that the defendant's profits from infringement were zero would approve a formula for evading copyright law."*Bucklew,* 329 F.3d at 933.In this case, conversely, there is no evidence that DIB set the maintenance fees artificially above the market rate in an effort to reallocate profits from infringing activity. Nor has Passport shown how the fees were "bundled" to any infringing activity such that DIB improperly profited from them. Indeed, as discussed above, Passport contends that DIB's furnishing of the software to its member stores was authorized until 2001 by the Dealer License. Under that theory, at least from 1989 through 2001, there was no infringing activity. Thus, Passport is not entitled to maintenance fees as a component of damages under the Copyright Act.

### 2. Recovery Under the Trade Secrets Act

Passport next argues that it is entitled to recover maintenance fees as a component of damages for DIB's trade secret misappropriation. Under the Illinois Trade Secrets Act ("ITSA"), damages may include "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."765 ILCS 1065/4. Defendants may be liable under the Act "even if the defendants created a new product, if they could not have done so without use of the trade secret."*Hexagon Pack-*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

Page 16

*aging Corp. v. Manny Gutterman & Assocs. Inc.,* 120 F.Supp.2d 712 (N.D.Ill.2000) (citing *Mangren Research and Dev. Corp. v. National Chemical Co.,* 87 F.3d 937, 944 (7th Cir.1996)). Passport claims that "like copyright infringement, [Passport] is entitled to unjust enrichment caused by DIB's misappropriation of [Passport's] trade secrets which had been delivered to DIB under the terms of the Dealer License."(Pl. Damages Resp., at 6-7.)

As with the copyright infringement theory of recovery, Passport has not shown how DIB's alleged misappropriation of trade secrets was related to its provision of maintenance services. Passport offers numerous facts that purportedly establish a violation of the ITSA, but there is nothing to tie that alleged violation to DIB's provision of maintenance services to its members. PSI does not suggest such services would not have been provided absent misuse of its trade secrets. Thus, the ITSA does not provide a basis for recovering maintenance fees.

3. Recovery Under the Lanham Act

*17 Passport's attempt to recover maintenance fees under § 35 of the Lanham Act, 15 U.S.C. § 1117, also fails. Passport correctly notes that

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office ... shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

15 U.S.C. § 1117. Aside from this quote, however, Passport offers only the conclusory assertion that "[s]ince support and maintenance fees were an element of DIB's profits, [Passport] is entitled under the Lanham Act to such fees considered as a part of its damage claim."(Pl. Damages Resp., at 19.) This is wholly insufficient to withstand summary judg-

ment on this issue.

4. Recovery for Breach of Contract

As yet another theory in support of its claim for maintenance fees, PSI argues that this claim flows from DIB's breach of contract. Specifically, PSI contends that upon termination of the Dealer License, PSI was entitled to step into DIB's shoes and would have the right to perform maintenance and service on the software for DIB's member stores. Passport cites paragraph 9.5 of the Dealer License, which provides:

Upon termination of the Dealer License for any reason whatsoever, then: (b) for all Sublicensees [sic] issued hereunder by Dealer, such sublicensees shall be permitted the continued and uninterrupted use of the Object Code and User Manual(s) of the sublicensed items for the balance of the term of their Sublicenses provided that said sublicensees are not and will not be in default thereunder, and that all of Dealer's rights (but none of its obligations) relating to the Licensed Software under such sublicenses shall automatically be assigned to Licensor (or directly to Real World if Licensor's License has been terminated);....

Dealer License ¶ 9.5. Passport claims that "[o]ne of the rights which DIB had relating to the Licensed Software was the right to receive maintenance and support payments from members," and that "DIB's right to receive these support and maintenance fees accrued to [Passport] upon termination of the parties' agreement."(Pl. Damages Resp., at 9-10.)

DIB's challenge to this theory focuses on the fact that the Dealer License itself does not mention DIB's provision of maintenance and service to its member stores.[FN6] Paragraph 9.5 does, however, anticipate that rights under the sublicenses with member stores would be assigned to PSI on termination, and the Support Services Agreement between DIB and its members calls for monthly payment for

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

Page 17

"support services" provided by DIB for its members' equipment. The court is uncertain whether this reference to payment for support services is what the parties understand as "maintenance fees." The court notes, further, that John Miller of DIB acknowledged in his testimony that sublicensees would not have been obligated, on termination of the Dealer License, to rely on Passport for maintenance services. (Miller Dep., DIB Exhibit 3, at 239:12-15.) Further, although neither party has specifically explained the function and nature of maintenance fees, the court presumes they are payments for services actually rendered by DIB and did not constitute a disguised royalty payment. If the court is correct, then any amounts owed PSI under this theory would have to be offset by the expense and cost PSI would have incurred in providing the services themselves. Nevertheless, DIB has not argued that Passport's claim for maintenance fees for breach of contract is speculative; DIB objects that any such claim fails as a matter of law. The court overrules this objection without prejudice to other arguments DIB may make in response to this claim for damages. Its motion for summary judgment on this theory is denied.

> FN6. DIB argues that Passport's reliance on paragraph 9.5 of the Dealer License is misplaced, but perhaps this is because both parties (apparently inadvertently) omitted certain language in that paragraph when they quoted it in their briefs. (*See* PSI's Response in Opposition to the Motion of Do It Best Corporation for Partial Summary Judgment on Passport's Damage Claim, at 9; Plaintiff's Reply in Support of its Motion for Summary Judgment on Damages, at 5.)

B. Pre-Breach/Pre-Violation Damages

*18 Under any of the damages theories PSI has proffered, DIB argues, it is not entitled to recover damages for activity prior to the alleged breach of contract or other violation of PSI's rights. The court agrees. As reflected in PSI's answers to interrogat-

ories, it claims that DIB's misappropriation of its trade secrets has occurred "[s]ince about March 14, 2001."(PSI's Supplemental Interrogatory Responses, PSI Exhibit TTT, at 14.) To the extent PSI now asserts it learned that DIB's trade secrets misappropriation began much earlier, that claim is inconsistent with its interrogatory responses and is therefore barred. Similarly, PSI acknowledged in its interrogatory answers that DIB was using PSI's copyrighted property with PSI's consent "[p]rior to February 14, 2001."(*Id.* at 17.)

In its opening memorandum on damages, DIB argued that, contrary to the opinion of PSI's expert witness, PSI is entitled to no lost profits under its breach of contract theory for any periods prior to the breach. (DIB's Memorandum of Law in Support of Its Motion for Partial Summary Judgment on Damages, at 9.) Although the court recognizes that there are disputes concerning when, if at all, a contract breach occurred, PSI has not responded to this argument and, indeed, concedes that it is not seeking recovery for damages prior to any breach.

DIB's objection to recovery of amounts for pre-breach/pre-violation conduct is, therefore, sustained.

C. Statutory Damages

DIB claims that Passport is not entitled to statutory damages under the Copyright Act because DIB's alleged infringement commenced before Passport registered its copyright. Section 412 of the Act provides:

> In any action under this title, other than an action brought for a violation of the rights of the author under section 106A(a) or an action instituted under section 411(b), no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for-
>
> (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 18
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

(2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412. By denying an award of statutory damages and attorney's fees to parties that fail to promptly register their copyrights, Congress sought to encourage such copyright registration. *See Singh v. Famous Overseas, Inc.,* 680 F.Supp. 533, 536 (E.D.N.Y.1988). Passport alleges that DIB began infringing its copyrights on February 14, 2001. Passport did not file its copyright registrations, however, until more than a year later on May 29, 2002. Thus, DIB argues, Passport is not entitled to any statutory damages under § 412. (DIB Damages Mem., at 10-11.)

Passport concedes that statutory damages are generally unavailable when infringement occurs prior to registration, but argues that "DIB engaged in new infringements after the registration of [Passport's] copyrights which entitles it to maintain a right to elect statutory or actual damages on the post-registration infringements."(PSI Damages Resp., at 14.) Citing several district court cases from other jurisdictions, Passport claims that where there are differences between pre-registration and post-registration infringing activities, a plaintiff may recover statutory damages for the "new" post-registration violations. (*Id.*) (citing *Mason v. Montgomery Data, Inc.,* 741 F.Supp. 1282, 1285 (S.D.Tex.1990) ("A 'new' or 'separate' basis for the award of statutory damages is created ... where there is a difference between pre-and post-registration infringing activities."); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.,* 609 F.Supp. 1325, 1331 (E.D.Pa.1985).) Passport argues that DIB committed such new and distinct post-registration acts of infringement after 2002 because Karla Wygant, DIB's development manager of retail data processing, testified that DIB continued using code written by Passport even after purchasing source directly from Great Plains.

*19 DIB notes that several courts have rejected the argument that post-registration acts of infringement satisfy § 412 even when the first alleged infringement occurred prior to registration. In *Singh,* for example, the plaintiffs, musicians and composers of Indian music, claimed that the defendant, a company that manufactured and sold in the United States cassette recordings of Indian performances, committed copyright infringement by selling 1800 of the plaintiffs' cassettes without a license. 680 F.Supp. at 534.The plaintiffs sought statutory damages under 17 U.S.C. § 504(c), but the defendant argued that such damages were not available in light of § 412 because it had manufactured and sold cassettes in 1983, before the plaintiffs applied for a copyright of their work on July 27, 1984. *Id.* at 535.The plaintiffs insisted that they were entitled to statutory damages for each separate infringing sale made after July 1984 because each "commenced" on the day of its perpetration as contemplated by § 412. *Id.*

In rejecting this argument, the court first looked to the legislative history of § 412, noting that "Congress' evident purpose was to induce those owning copyrightable works to register them properly."*Id.* In the court's view,

> [t]he means chosen was to deny the "extraordinary" remedies of statutory damages and attorney's fees where registration is not promptly made. The threat of such a denial would hardly provide a significant motivation to register early if the owner of the work could obtain those remedies for acts of infringement taking place after a belated registration.

*Id.* at 536.The court thus held that the manufacture and sale of the cassettes in 1983 "commenced" an "infringement" within the meaning of § 412, and since the plaintiffs did not register their copyright until July 1984, they were not entitled to statutory damages. *Id. See also Joseph J. Legat Architects, P.C. v. U.S. Dev. Corp.,* No. 84 C 8803, 1991 WL 38714, at *11 (N.D.Ill. Mar.20, 1991) (noting that "if Congress had intended to permit recovery for

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

acts of infringement which occurred prior to registration, then it could have used the word 'occurred,' rather than the word 'commenced' "); *Mason,* 741 F.Supp. at 1286 (plaintiffs alleging copyright infringement of their map sheets were not entitled to statutory damages where the defendants "[we]re accused of committing the same activity each time, for the same purpose, and using the same copyrighted material" both before and after the registration).

Passport urges that this case is more analogous to Iowa *State Univ. Research Foundation, Inc. v. American Broadcasting Cos.,* 475 F.Supp. 78 (S.D.N.Y.1979), in which the defendant used the plaintiff's copyrighted film about an Olympic wrestler on three separate occasions in three different ways. First, the defendant used the material in a broadcast of a preview for the defendant's Olympic television coverage. *Id.* at 80.Second, the defendant used the material in the broadcast of a two and one-half minute segment during the Olympic coverage. Finally, the defendant used the material in a "Superstars" television program. *Id.*

**\*20** The court concluded that each broadcast constituted a separate act of infringement. In reaching this conclusion, the court relied on the "heterogeneity" test, which looks to differences in advertisers, financial arrangements, locales, audiences, and other "significant variables" to determine whether successive infringements are so similar that they should be treated as one continuing infringement. *Id.* at 82.The court found it significant that the broadcasts occurred at least two days and as much as nineteen months apart, and that the two broadcasts closest together in time were directed to different audiences during different parts of the day for different purposes. *Id.*

In this case, it is undisputed that DIB first infringed Passport's copyright before Passport filed a copyright registration. Even assuming that Passport is entitled to statutory damages for "new" and "distinct" acts of infringement occurring after registration, it is not clear to the court what those "new"

acts are in this case. Passport alleges that DIB infringed its copyrighted software in the same manner both before and after registration. The mere fact that Karla Wygant replaced code written by Passport with code written by Great Plains does not establish that DIB was committing a different activity for a different purpose after the registration than it was committing before the registration. *Cf. Mason,* 741 F.Supp. at 1286.

Unless PSI has evidence of independent acts of infringement that post-date May 2002, it may not be entitled to any recovery on its copyright claim.

*CONCLUSION*

For the reasons set forth herein, Plaintiff-Counter-Defendant Do It Best's motion for summary judgment on Defendant-Counter-Plaintiff Passport's trade secret misappropriation claim (Doc. No. 182) is denied. Its motion for summary judgment on the civil conspiracy claim (Doc. No. 183) is granted without prejudice to reconsideration. DIB's motion for partial summary judgment on Passport's damages claims (Doc. No. 184) is granted in part and denied in part. Its motion for summary judgment on Passport's copyright claim (Doc. No. 185) is denied. Its motion for summary judgment on Passport's breach of contract claim (Doc. No. 186) is granted in part and denied in part. Passport's motion for partial summary judgment of liability on the copyright claim (Doc. No. 189) is denied, and its motion for leave to file adjunct pleading relating to copyrightability (Doc. No. 266) is denied as moot.

N.D.Ill.,2005.
Do It Best Corp. v. Passport Software, Inc.
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 24

LEXSEE 2005 U.S. DIST. LEXIS 27862



Analysis
As of: Aug 11, 2008

**BIGHORN CAPITAL INC., et al., Plaintiffs, v. 1000 SMA, LLC., et al., Defendants.**

**No. 05 C 5364**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2005 U.S. Dist. LEXIS 27862*

**November 9, 2005, Decided**
**November 9, 2005, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part *Bighorn Capital, Inc. v. 1000 SMA, L.L.C., 2006 U.S. Dist. LEXIS 19628 (N.D. Ill., Mar. 30, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, a real estate finance firm, a consulting firm, and an investment company, filed a suit against defendants, the trustee of a land trust and the trust's beneficiaries, asserting claims arising out of a loan agreement for a condominium development project. Defendants moved to cancel the lis pendens notice that plaintiffs had placed against the real property that was to be developed, the title to which was owned by the trust.

**OVERVIEW:** The beneficiaries, who were real estate developers, obtained financing for the condominium project through plaintiffs. Plaintiffs alleged that the beneficiaries had significantly overstated the value of the property and had breached their obligations under the loan agreement. They filed the suit after defendants refused to reform the loan agreement and contracted to sell the property to a third party. Plaintiffs sought to reform the loan agreement or to recover damages. They recorded a lis pendens notice pursuant to *735 Ill. Comp. Stat. 5/2-1901*. Defendants moved to cancel the lis pendens, contending that plaintiffs could not record a lis pendens notice because the loan agreement did not transfer an interest in real estate, plaintiffs had an adequate remedy at law, and plaintiffs were unlikely to prevail on the merits. The court held that plaintiffs properly filed the lis pendens notice; they were seeking equitable relief in a matter involving real estate, and the court had jurisdiction over both the parties and the res involved in the suit. The notice would not prevent the beneficiaries from selling the property; the third party were merely put on notice as to plaintiffs' claims.

**OUTCOME:** The court denied defendants' motion to cancel the lis pendens notice.

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Lis Pendens*
*Real Property Law > Priorities & Recording > Lis Pendens*
[HN1] "Lis pendens" means a pending suit. Under the lis pendens doctrine, anyone who purchases or otherwise acquires an interest in property involved in litigation takes such interest subject to the outcome of the litigation. Under the doctrine of lis pendens, one who

2005 U.S. Dist. LEXIS 27862, *

obtains an interest in property during the pendency of a suit affecting it is bound to the result of that litigation as if he had been a party from the outset. A lis pendens is not an injunction, as it does not formally restrain sale, conveyance or purchase.

*Civil Procedure > Remedies > Lis Pendens > Notices*
*Real Property Law > Nonmortgage Liens > Lien Priorities*
*Real Property Law > Priorities & Recording > Lis Pendens*
[HN2] Under Illinois law, a party to a lawsuit may file a lis pendens notice in every condemnation proceeding, proceeding to sell the real estate of a decedent to pay debts, or any other action seeking equitable relief, affecting or involving real estate. *735 Ill. Comp. Stat. 5/2-1901.* The effect of a properly filed lis pendens notice is to give constructive notice to every person subsequently acquiring an interest in or a lien on the property affected thereby, and every such person acquiring an interest or a lien not in possession of the property, and whose interest or lien is not shown of record at the time of filing such notice, shall be deemed a subsequent purchaser and shall be bound by the proceedings to the same extent and in the same manner as if he or she were a party thereof.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Civil Procedure > Remedies > Lis Pendens*
*Real Property Law > Priorities & Recording > Lis Pendens*
[HN3] State law governs the creation and cancellation of lis pendens in both federal and state courts.

*Civil Procedure > Remedies > Lis Pendens*
*Real Property Law > Priorities & Recording > Lis Pendens*
[HN4] The doctrine of lis pendens, as codified, serves to: (1) avoid endless litigation of property rights precipitated by transfers of interests; (2) protect parties to the litigation from persons who acquire an interest in the subject matter of the litigation during the pendency of litigation, such as would preclude the court from granting the relief requested; and (3) protect purchasers by giving them notice that the land which they are buying might be affected by a judgment entered in a pending suit by which they could be bound. For the doctrine to be applicable,

three requirements must be satisfied: (1) the property must be of such a character as to be subject to the rule, (2) the court must have jurisdiction both of the person and of the res, and (3) the property involved must be sufficiently described in the pleadings. The doctrine of lis pendens may apply to any proceeding. It is the existence of the suit itself, not the probabilities of success, which invokes the principle of lis pendens.

*Civil Procedure > Remedies > Lis Pendens > Notices*
*Real Property Law > Priorities & Recording > Lis Pendens*
[HN5] A lis pendens is not an injunction, as it does not formally restrain sale, conveyance or purchase. Instead, the doctrine of lis pendens acts to provide notice to subsequent purchasers of pending litigation and guarantees that the subsequent purchasers will be bound by the court's ultimate decision in that matter. Nothing in the lis pendens doctrine precludes a sale of the real property from going forward.

*Civil Procedure > Remedies > Lis Pendens > Notices*
*Real Property Law > Priorities & Recording > Lis Pendens*
[HN6] A lis pendens notice is not an injunction forbidding the sale of real estate, but instead seeks to give notice to subsequent purchasers that their rights may be effected by ongoing litigation, while also protecting the rights of the parties involved in the current litigation.

**COUNSEL:** [*1] For Bighorn Capital Inc, an Oregon corporation, Moody Group International Ltd, a Delaware corporation, Plaintiffs: Jeannie M Ridings, John Christopher Anderson, John A. Dienner, III, Kubasiak, Fylstra, Reizen & Rotunno P.C., Chicago, IL, US.

For 1000 SMA LLC, AN ILLINOIS LIMITED LIABILITY COMPANY, 1000 South Michigan Avenue LLC, an Illinois Limited Liability Company, Chicago Title Land Trust Company, an Illinois corporation, as Trustee under Trust Agreement dated 9/9/98, and known as Trust Number 1106328, Guy Gardner, Defendants: Marty Jay Schwartz, Marty J. Schwartz, Esq., Chicago, IL.

**JUDGES:** JAMES F. HOLDERMAN, District Judge.

**OPINION BY:** JAMES F. HOLDERMAN

OPINION

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiffs Bighorn Capital, Inc., ("Bighorn"), Moody Group International, Ltd, and Moody Investment Company, ("Moody"), (collectively "plaintiffs"), invoking this court's diversity jurisdiction pursuant to *28 U.S.C. § 1332*, filed a first amended complaint on October 21, 2005 against defendants 1000 SMA, LLC, 1000 South Michigan Avenue, LLC, ("1000 South Michigan"), Chicago Title Land Trust Company ("Chicago Title"), and Guy Gardner [*2] ("Gardner"), (collectively "defendants"). (Dkt. No. 17). Defendants filed the pending motion on October 19, 2005, and supplemented the motion on October 26, 2005, seeking the cancellation of the *lis pendens.* (Dkt. Nos. 14, 18). For the reasons set forth below, the defendants' motion to cancel the *lis pendens* is denied.

BACKGROUND

This case centers around a condominium development planned for the property at 1000 South Michigan Avenue in Chicago, Illinois. Bighorn is a real estate finance firm and Moody is a consulting firm working with Bighorn. (Dkt. No. 17 at PP 9-10). Bighorn is in the business of securing financing commitments from third party lenders for commercial real estate developments. (*Id.* at P 9). Chicago Title's only involvement in this case is that it holds the property at 1000 South Michigan Avenue and the air rights for the property at 1006 South Michigan Avenue in a land trust, otherwise the plaintiffs make no allegations of wrongdoing against Chicago Title. (*Id.* at PP 5, 11). The defendants, who are real estate developers and are the sole beneficiary to the land trust, (*Id.* at P 12), obtained financing for the 1000 South Michigan Avenue project [*3] through the plaintiffs. (*Id.* at P 20).

In order to facilitate the financing, the defendants provided Bighorn with an appraisal of the value of the property. (*Id.* at P 15). The plaintiffs allege that the defendants knew that Bighorn and other third parties would rely on the appraisal for locating, securing and pricing financing for the condominium project (*Id.* at P 15), and the plaintiffs did in fact reasonably rely on the appraisal. (*Id.* at P 18). The plaintiffs allege that the

defendants' appraisal falsely overstated the true value of the property. (*Id.* at P 17). According to the plaintiffs, the true value of the property is $ 22,000,000 for the 1000 South Michigan Avenue property plus $ 1,000,000 for the air rights over 1006 South Michigan Avenue. (*Id.* at P 26). According to the plaintiffs, the defendants' false appraisal improperly stated the value of 1000 South Michigan Avenue as $ 45,235,000 and the air rights over 1006 South Michigan Avenue as $ 3,000,000. The plaintiffs allege that the parties had already entered into the loan agreement before the plaintiffs learned about the overstated false values in the appraisal. (*Id.* at P 26). They also allege [*4] that the defendants never secured the air rights to 1006 South Michigan Avenue even though they had represented they had in the loan agreement. (*Id.* at P 27).

The plaintiffs further allege they attempted to work with the defendants to reform the loan agreement in order to reflect the true economic reality of the transaction, "so that the parties could secure the benefits of the bargain they had made." (*Id.* at P 30). The plaintiffs allege that defendants "have refused to [conform the agreement] in order to escape from their obligations [under the original agreement] so that they would be free to either enter into a new loan commitment or sell the property to a third party on more favorable terms." (*Id.* at P 31). The defendants have allegedly entered into an agreement with a third party to sell the property with closing occurring in the month of November 2005. (*Id.* at P 32). The plaintiffs' first amended complaint seeks the equitable relief of: (1) reformation of the loan contract, (2) specific performance of the reformed loan contract, (3) an injunction or, (4) in the alternative, monetary remedies for the breach of contract and fraud.

The original complaint in [*5] this case was filed with the court on September 16, 2005. (Dkt. No. 1). On the same day, the plaintiffs' recorded a *lis pendens* notice on the 1000 South Michigan Avenue property with the Cook County Record of Deeds. (Dkt. No. 14 at Ex. A). The defendants filed a motion to dismiss on September 30, 2005 in this court and a briefing schedule was set on the motion on October 13, 2005. (Dkt. No. 6, 11). However, this court *sua sponte* issued a minute order on October 3, 2005 ordering the plaintiffs to file an amended complaint including a jurisdictional statement detailing the citizenship of the defendant LLCs in order to insure that this court possessed subject matter jurisdiction in this matter. [1] (Dkt. No. 10). The defendant then filed the

present motion to cancel *lis pendens* on October 19, 2005 and the supplement on October 26, 2005. (Dkt. No. 18). The parties have proceeded on an expedited briefing schedule on the *lis pendens* motion in light of the defendants' desire to proceed with the sale of the property. (Dkt. No. 14 at P 6). This matter was fully briefed on November 3, 2005.

> 1   The filing of an amended complaint was required because the plaintiffs' original complaint failed to detail the citizenship of the defendant LLC's members. The Seventh Circuit has instructed that "unincorporated enterprises are analogized to partnerships, which take the citizenship of every general and limited partner. ... Limited liability companies are citizens of every state of which any member is a citizen." *Belleville Catering Co v. Champaign Market Place, L.L.C., 350 F.3d 691, 692 (7th Cir. 2003)* (internal citations omitted).

[*6] ANALYSIS

The defendants argue that plaintiffs' filing of this lawsuit and their recording of the *lis pendens* notice are solely for the purpose of tying this matter up in litigation so as to prevent the defendants' sale of the property. (Dkt. No. 18 at P 2 n.1). The defendants seek an order from this court cancelling the *lis pendens* notice arguing that: (1) the plaintiffs cannot record a *lis pendens* notice since the loan transaction in this case did not transfer an interest in real estate, (2) the plaintiff has an adequate remedy in law, and (3) the plaintiffs legal claims in this case are incorrect under Illinois law and therefore they cannot succeed in this case. The defendants seek a "quick resolution of this issue ... because defendants have in hand an agreement to sell the real estate, which agreement calls for a closing between November 8 and November 21, 2005." (*Id.*)

[HN1] "'*Lis pendens*' means a pending suit. Under the *lis pendens* doctrine anyone who purchased or otherwise acquired an interest in property involved in litigation took such interest subject to the outcome of the litigation." *United States v. First Midwest Bank/Illinois, N.A., 1997 U.S. Dist. LEXIS 16913, No. 97 [*7] C 7365, 1997 WL 675192, at *19 (N.D. Ill. Oct. 28, 1997)* (quoting *Admiral Builders Corp. v. Robert Hall Vill., 101 Ill. App. 3d 132, 427 N.E.2d 1032, 1035, 56 Ill. Dec. 627 (Ill. App. Ct. 1981)); see, e.g., First Midwest, A Div. of Jacksonville Sav. Bank v. Pogge, 293 Ill. App. 3d 359,*

*687 N.E.2d 1195, 1198, 227 Ill. Dec. 713 (Ill. App. Ct. 1997)* (citing *E&E Hauling, Inc. v. County of DuPage, 77 Ill. App. 3d 1017, 396 N.E.2d 1260, 1265, 33 Ill. Dec. 536 (Ill. App. Ct. 1979))* ("Under the doctrine of *lis pendens*, one who obtains an interest in property during the pendency of a suit affecting it is bound to the result of that litigation as if he had been a party from the outset."). "A *lis pendens* is not an injunction as it does not formally restrain sale, conveyance or purchase." *Id.* (citing *E&E Hauling, Inc., 396 N.E.2d at 1266)*).

[HN2] Under Illinois law [2], a party to a lawsuit may file a *lis pendens* notice in "every condemnation proceeding, proceeding to sell real estate of decedent to pay debts, or other action seeking equitable relief, affecting or involving real estate." *735 ILCS 5/2-1901*. The effect of a properly filed *lis pendens* notice is to give "constructive notice to [*8] every person subsequently acquiring an interest in or lien on the property affected thereby, and every such person acquiring an interest or lien ... not in possession of the property and whose interest or lien is not shown of record at the time of filing such notice, shall, ... be deemed a subsequent purchaser and shall be bound by the proceedings to the same extent and in the same manner as if he or she were a party thereof." *Id.*

> 2   [HN3] "State law governs the creation and cancellation of *lis pendens* in both federal and state courts." *Duncan v. Farm Credit Bank of St. Louis, 940 F.2d 1099, 1101 (7th Cir. 1991)* (citing *In re Texas Extrusion Corp., 844 F.2d 1142, 1153 (5th Cir. 1988); Hamilton v. Smith, 808 F.2d 36, 37 (10th Cir. 1986); Knodle v. Jeffrey 189 Ill. App. 3d 877, 545 N.E.2d 1017, 1021, 137 Ill. Dec. 256 (Ill. App. Ct. 1989))*.

[HN4] "The doctrine of *lis pendens* as codified serves to: (1) avoid endless litigation of property rights precipitated by transfers of interests; [*9] (2) protect parties to the litigation from persons who acquire an interest in the subject matter of the litigation during the pendency of litigation such as would preclude the court from granting the relief requested; and (3) protect purchasers by giving them notice that the land which they are buying might be affected by a judgment entered in a pending suit by which they could be bound." *Knodle v. Jeffrey, 189 Ill. App. 3d 877, 545 N.E.2d 1017, 1022, 137 Ill. Dec. 256 (Ill. App. Ct. 1989)* (citing *Admiral Builders Corp. v. Robert Hall Vill., 101 Ill. App. 3d 132, 427*

*N.E.2d 1032, 1035, 56 Ill. Dec. 627 (Ill. App. Ct. 1981)).*

"For the doctrine to be applicable, three requirements must be satisfied: (1) the property must be of such a character as to be subject to the rule, (2) the court must have jurisdiction both 'of the person and of the *res*," and (3) the property involved must be sufficiently described in the pleadings." *First Midwest, A Div. of Jacksonville Sav. Bank v. Pogge, 293 Ill. App. 3d 359, 687 N.E.2d 1195, 1198, 227 Ill. Dec. 713 (Ill. App. Ct. 1997)* (citation omitted). The doctrine of "*lis pendens* may apply to any proceeding. ... It is the existence of the suit itself, not the probabilities of success, which invokes the principle [*10] of *lis pendens.*" *Id. at 1199* (emphasis in original) (citations omitted).

In the present action, the plaintiffs have properly recorded their *lis pendens* notice under the statute. *See 735 ILCS 5/2-1901.* The notice was properly filed in the Cook County Recorder of Deeds office, signed by the plaintiffs' attorney on the plaintiffs' behalf, set forth the title of the action, the parties, the court where the case is being brought and the description of the real estate involved. Additionally, the doctrine of *lis pendens* applies in this case because (1) the plaintiffs' complaint seeks equitable relief in matter involving real estate, (2) this court has both jurisdiction over both the persons and *res* involved in this matter, and (3) the involved property has been sufficiently described in the pleadings.

Now that the court has determined that the plaintiffs have properly filed their *lis pendens* notice under Illinois law, this court turns to the defendants arguments for cancelling the notice. This court finds the defendants' arguments unconvincing and must reject them.

The defendants' primary argument is that the plaintiffs are using [*11] this lawsuit, and the *lis pendens* notice, to stop their sale of the 1000 South Michigan Avenue property that the defendants hope to close on during the period between November 8 and November 21, 2005. However, [HN5] a "*lis pendens* is not an injunction as it does not formally restrain sale, conveyance or purchase." *First Midwest, A Div. of Jacksonville Sav. Bank v. Pogge, 293 Ill. App. 3d 359, 687 N.E.2d 1195, 1198, 227 Ill. Dec. 713 (Ill. App. Ct. 1997)* (citing *E&E Hauling, Inc. v. County of DuPage, 77 Ill. App. 3d 1017, 396 N.E.2d 1260, 1266, 33 Ill. Dec. 536 (Ill. App. Ct. 1979)).* Instead, the doctrine of *lis pendens* acts to provide notice to subsequent purchasers of this pending litigation and guarantees that these subsequent purchasers will be bound by this court's ultimate decision in this matter. Nothing in the *lis pendens* doctrine precludes the sale from going forward.

The defendants' argument that a *lis pendens* notice is not appropriate because the loan transaction did not transfer an interest in real estate is incorrect for several reasons. First, it appears that the transaction in this case can be interpreted to involve a transfer of a real estate interest. According to the loan commitment, defendant 1000 [*12] SMA, LLC, a holding company for the property, was to be transferred with 60% to Moody and 40% to the developer. (Dkt. No. 17 at P 21). Therefore, it appears that the loan transaction involves a transfer of real estate. Regardless, the question of whether a real estate transfer occurred in this case is irrelevant because the doctrine of *lis pendens* may apply to "any proceeding." *First Midwest. A Div. of Jacksonville Sav. Bank v. Pogge, 293 Ill. App. 3d 359, 687 N.E.2d 1195, 1199, 227 Ill. Dec. 713 (Ill. App. Ct. 1997).* This case involves both real estate and a request for injunctive relief, that is sufficient to implicate the *lis pendens* statute.

The defendants' next argument is that the plaintiffs have an adequate remedy at law and therefore should not be allowed to have a *lis pendens* notice recorded on the property. This argument, however, misunderstands the purpose of a *lis pendens* notice. [HN6] A *lis pendens* notice is not an injunction forbidding the sale of real estate, but instead seeks to give notice to subsequent purchasers that their rights may be effected by ongoing litigation while also protecting the rights of the parties involved in the current litigation. *See Knodle v. Jeffrey, 189 Ill. App. 877, 545 N.E.2d 1017, 1022, 137 Ill. Dec. 256 (Ill.App. ·Ct. 1989)* [*13] (citing *Admiral Builders Corp. v. Robert Hall Vill., 101 Ill. App. 3d 132, 427 N.E.2d 1032, 1035, 56 Ill. Dec. 627, (Ill.App.Ct.1981)).*

Lastly, the defendants argue that the plaintiffs' claims are not sufficient as a matter of law and therefore the *lis pendens* notice should be cancelled. (Dkt. No. 18 at pg. 6) ("In the face of such a transparent and baseless effort to use this litigation as a vehicle to upset the defendants' efforts to sell the real estate, this Court should cancel the *lis pendens* notice."). However, as discussed earlier in this opinion, a *lis pendens* notice does not prohibit the sale of the real estate. The court understands that a *lis pendens* notice could impact potential sale negotiations

between the defendant and potential third party buyers. However, this court is somewhat skeptical of the defendants' argument that this court's failure to cancel the lis pendens notice "would effectively leave defendants with a single negotiating partner - themselves," (Dkt. No. 14 at pg. 4), since the defendants have been able to negotiate a sale to a third party. The third party is given at a minimum constructive notice under the statute of this pending proceeding (and potential actual [*14] notice if they have been informed of this proceeding), and therefore the defendants and the third party can easily structure their sale negotiations to consider the probability of whether the plaintiffs will be successful on their claims in this case.

CONCLUSION

For the reasons set forth above, this court denies the defendants' motion to cancel the *lis pendens* (Dkt. No. 14), of October 19, 2005. The previously established dates of October 27, 2005 remain in effect. (Dkt. No. 19). This case is set for a report on status on November 15, 2005 at 9:00am.

ENTER:

JAMES F. HOLDERMAN

United States District Judge

Date: November 9, 2005