IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NOMANBHOY FAMILY LIMITED PARTNERSHIP, | ) ) ) | |
| Plaintiff, | ) ) | NO:  08 C 3787 |
| v. | ) ) ) | |
| McDONALD'S CORPORATION; McDONALD'S USA, LLC; RICK LEVIN & ASSOCIATES, INC., and RICK LEVIN, | ) ) ) ) ) | |
| Defendants. | ) | |

## MOTION TO DISMISS

Defendants, Rick Levin and Associates, Inc. and Rick Levin (together, "**RLA**") respectfully move this Court to dismiss the Count against them pursuant to Federal Rule of Civil Procedure 12(b)6, stating as follows:

### INTRODUCTION

Plaintiff, Nomanbhoy Family Limited Partnership ("**Nomanbhoy**") alleges that RLA tortiously interfered with Nomanbhoy's contract to purchase land from co-defendants McDondald's Corporation and McDonald's USA, LLC (together, "**McDonald's**").  See First Amended Complaint ("**FAC**"), Count IV.

Even accepting Nomanbhoy's factual allegations as true, Nomanbhoy fails to state a claim against RLA because RLA acted under a privilege.

Also, Rick Levin should be dismissed as an individual defendant.  There are no allegations that Mr. Levin acted outside the scope of his authority for Rick Levin & Associates, Inc., nor that Mr. Levin personally took any of the actions complained of.

## BACKGROUND

Nomanbhoy alleges that it entered into a Real Estate Sales Contract ("**R/E Contract**") with McDonald's on June 18, 2008 for the purchase of five parcels of real estate (the "**Properties**"). FAC ¶ 26, attached here as Exhibit 1.[1] Nomanbhoy alleges that, on June 19, 2008, notwithstanding the existence of the alleged R/E Contract, McDonald's sold the Properties to other purchasers through an auction conducted by RLA. FAC ¶ 20. Nomanbhoy alleges that RLA, by conducting the auction, tortiously interfered with Nomnabhoy's R/E Contract with McDonald's for purchase of the parcels. FAC ¶ 24 and Count IV. Count IV is the only count pled against RLA.

RLA was not a party to the alleged R/E Contract between Nomanbhoy and McDonald's. See Exhibit A to the FAC, section 1 "Parties". However, RLA was a party to its own contract with McDonald's, which pertained to RLA's auctioneering services (the "Auction Contract"). See Auction Contract attached hereto as Exhibit 2, with accompanying RLA affidavit.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of claims that fail to state a claim upon which relief can be granted. At a minimum, a complaint must contain facts sufficient to state a claim as a matter of law. Further, the Court is not obligated to accept as true legal conclusions or unsupported conclusions. *Hickey v. O'Bannon*, 287 F.3d 656, 657-658 (7th Cir. 2002). The purpose of a motion brought under this Rule is to examine the sufficiency of the complaint. *Gibson v. City of Chicago*, 910 F. 2d 1510, 1520 (7th Cir. 1990). Plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corporation v. Twombly*, 127 S. Ct. 1955, 1974 (2007). "The pleading must contain something more...than...a

---

[1]    The existence of the R/E contract is assumed for purposes of this Motion. Co-defendant McDonald's denies the existence of the R/E Contract in its various papers filed with this Court and, indeed, whether the R/E Contract ever came into being is the real essence of this dispute.

statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Bell Atlantic Corporation*, 127 S. Ct. at 1965 (quoting 5 C. Wright & Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004).

## ARGUMENT

**I.     RLA acted at all times under a privilege and therefore no claim for tortious interference can be stated.**

### A.   RLA's privilege arose from its performance under its own contract with McDonald's.

Plaintiff contends that RLA tortiously interfered in the R/E Contract by conducting the auction.   In conducting the auction, RLA acted pursuant to its Auction Contract with McDonald's.   Moreover, RLA conducted the audit after being directed to do so by McDonald's. Plaintiff contends, of course, that RLA should not have conducted the auction.   To not conduct the auction, however, RLA would have had to breach its own Auction Contract in order to avoid the alleged tortious interference with the R/E Contract.

RLA is not required to breach its own Auction Contract with McDonald's so as to avoid the claim of tortious interference with the R/E Contract.   RLA had a privilege to act so as to not breach its own agreement, and this privilege bars Nomanbhoy's claim of tortious interference.

"Under Illinois law, the elements of a tortious interference with contract claim are as follows: (1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) the defendant's awareness of the contractual relationship; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the third party caused by the defendant's wrongful conduct; and (5) damages resulting from the breach." *Prince v. Zazove*, 959 F.2d 1395, 1397 (7th Cir. 1992).

But a party who interferes with another's contract is privileged from liability where the party acts "to protect a conflicting interest which is considered to be of equal or greater value than that accorded the contractual rights involved." *Id., citing to Langer v. Becker*, 176 Ill.App.3d 745 (1st Dist. 1988). *See also Interlease Aviation Investors II (Aloha) LLC, et al, v. Vanguard Airlines, Inc., et al,* 2004 WL 114937 (N.D. Ill. 2004).

"In most cases, conflicting contractual rights stand on an equal plane. Generally, when A has a valid contract with C, and C enters into a contract with B, and the enforcement of A's contract depends on the non-enforcement of B's contract, A is privileged to use any reasonable means to bring about a breach of B's contract with C to protect his own interest." *Connaughton v. Gertz*, 94 Ill.App.3d 265, 270 (1st Dist. 1981).

RLA, in acting so as not to breach its own Auction Contract with McDonald's, was privileged to act in a way that interfered with Nomanbhoy's alleged R/E Contract. As such, Nomanbhoy fails to state a claim against RLA and Count IV should be dismissed.

**B. RLA's privilege arose from its work on behalf of McDonald's.**

RLA was also privileged to proceed with the auction because it was acting on behalf of McDonald's, as alleged in the Complaint and as shown in its contract. FAC ¶ 15, 20, 22, 27 and Exhibit B.

"A conditional privilege exists to interfere with the contractual relationship of others where the third party acts to protect a conflicting interest which is considered to be of equal or greater value than that accorded the contractual rights involved." *Antonic Rigging v. MDCON, Inc.*, 1990 WL 171795 (N.D. Ill. 1990). Such a privilege may extend to an entity acting to further the interests of one of the parties to the contract. If so, "[t]o succeed on a claim of tortious interference with a contract where a conditional privilege exists, the plaintiff must allege

that the agent's intentional acts were not taken to further its principal's best interests, but instead were taken to further its own personal goals or to injure the other party to the contract." *Id*. at 6, regarding privilege of architects to deal with subcontractor change orders, and citing to *Waldinger v. CRS Group Engineers, Inc*., 775 F. 2d 781, 789 (7th Cir. 1985).

Here, RLA proceeded with the auction as McDonald's directed it to and, at all times, RLA was acting to further the interests of McDonald's, and Plaintiff has alleged nothing to the contrary.

Therefore, RLA was acting within the scope of a privilege allowing it to proceed with the auction, no claim of tortious interference can be stated, and Count IV should be dismissed.

## II.    Rick Levin should be dismissed as an individual defendant.

The sum total of the allegations against Rick Levin, individually, is that Mr. Levin "is, on information and belief, a citizen of the state of Illinois. Levin is a principal of RLA and is, on information and belief, a licensed auctioneer." FAC ¶ 6.

Mr. Levin is not alleged to have personally taken any of the acts described in the Complaint. "General corporation law is clear that personal liability for a corporation's debts cannot be imposed on a person merely because he is an officer, shareholder, and incorporator of that corporation." *Musikiwamba v. ESSI, Inc*., 760 F. 2d 740, 753 (7th Cir. 1985)(citations omitted). Therefore, Mr. Levin is not a proper party defendant and should be dismissed from the case.

## CONCLUSION

Taking the facts alleged in the FAC as true, Nomanbhoy cannot state a claim against RLA for tortious interference with a contract because RLA was privileged to act so as not to

breach its own contract. RLA was also privileged to act in furtherance of McDonald's interests. Nomanbhoy has alleged nothing to the contrary.

Also, Rick Levin, individually, is not alleged to have taken any of the acts alleged in the Complaint and therefore should be dismissed.

WHEREFORE, RLA respectfully asks this Court to dismiss the claims against Rick Levin and Rick Levin and Associates, Inc. with prejudice.

Respectfully submitted,
WILLIAMS MONTGOMERY & JOHN LTD.

By:  /s/R. Michael McCann
R. MICHAEL McCANN

Thomas F. Falkenberg
Michael R. McCann
WILLIAMS MONTGOMERY & JOHN LTD.
Attorneys for Certain Defendants
20 North Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 443-3200

EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NOMANBHOY FAMILY LIMITED PARTNERSHIP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 CV 3787 |
| | ) | |
| McDONALD'S CORPORATION, | ) | Honorable Joan B. Gotschall |
| McDONALD'S USA, LLC, | ) | Magistrate Judge Cole |
| RICK LEVIN & ASSOCIATES, INC., and | ) | |
| RICK LEVIN, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT FOR SPECIFIC
## PERFORMANCE, INJUNCTION AND DAMAGES

The Nomanbhoy Family Limited Partnership, by its attorneys, Miller Shakman & Beem LLP,

for its First Amended Complaint for Specific Performance, Injunction and Damages, states as

follows.

1.     This is a claim for specific performance, injunction and damages arising out of

Defendants' breach of contract and interference with contract. The contract at issue is the June 18,

2008 Real Estate Sales Contract between the Nomanbhoy Family Limited Partnership and

McDonald's Corporation under which McDonald's Corporation or McDonald's USA, LLC, agreed

to sell and the Nomanbhoy Family Limited Partnership agreed to buy five parcels of real estate

located in Illinois, Wisconsin and Indiana.

### Parties

2.     The Nomanbhoy Family Limited Partnership ("NFLP") is a limited partnership

formed in January, 2008 under the laws of the state of California. The general partner of NFLP is

Nomanbhoy Enterprises, LLC, and the limited partners are Shabbir T. Nomanbhoy and Munira Nomanbhoy, as Trustees of the Nomanbhoy Family Revocable Trust dated June 5, 2000, as amended. Nomanbhoy Enterprises, LLC is a limited liability corporation organized in 2008 under the laws of the state of California. Nomanbhoy Enterprises, LLC has its principal place of business in Cupertino, California. The Nomanbhoy Family Revocable Trust dated June 5, 2000, as amended, through Shabbir T. Nomanbhoy and Munira C. Nomanbhoy, Trustees, is the sole member of Nomanbhoy Enterprises, LLC. Shabbir T. Nomanbhoy ("Nomanbhoy") and Munira Nomanbhoy are both citizens of Cupertino, California. The principal place of business of NFLP is also Cupertino, California.

3.      McDonald's Corporation ("McDonald's Corp.") is a corporation formed under the laws of the state of Delaware. It maintains its principal place of business in Oak Brook, Illinois. McDonald's Corp. is in the primary business of selling fast foods.

4.      McDonald's USA, LLC ("McDonald's USA") is a limited liability company formed under the laws of the state of Delaware. It maintains its principal place of business in Warrenville, Illinois. On information and belief, McDonald's USA is a subsidiary or affiliate of McDonald's Corp. and owned the five parcels of real estate at issue her. (McDonald's Corp. and McDonald's USA are hereafter collectively referred to as "McDonald's")

5.      Rick Levin & Associates, Inc. ("RLA") is a corporation formed under the laws of the state of Illinois, and maintains its principal place of business at 1467 North Elston Avenue, Chicago, Illinois. RLA is in the business of auctioneering. At all times relevant, RLA and McDonald's were represented by Ira Lauter ("Lauter").

6.    Rick Levin ("Levin") is, on information and belief, a citizen of the state of Illinois. Levin is a principal of RLA and is, on information and belief, a licensed auctioneer.

## Jurisdiction And Venue

7.    This Court has original subject matter jurisdiction of this action under 28 U.S.C. § 1332(a)(1), in that it is a civil action wherein the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

8.    Venue is proper in this Court under 28 U.S.C. § 1391(a)(1) and (2), in that all defendants reside in this judicial district and a substantial part of the events giving rise to the claim occurred, or a substantial part of the property that is the subject of the action, is situated in this judicial district. Venue is also proper under the terms of the subject Real Estate Sales Contract.

## The Agreed Sale In Bulk And In Lieu Of Auction

9.    In June 2008, McDonald's, acting individually and through RLA, advertised and promoted the sale by McDonald's of five parcels of real estate located in Illinois and elsewhere. Originally, McDonald's intended to sell the properties via auction to be held on Thursday, June 19, 2008 in Chicago. The five properties which are the subject of this dispute are the properties that McDonald's originally intended to auction.

10.    On or around June 12, 2008, Nomanbhoy, acting for the NFLP, and McDonald's, acting for itself and through RLA, began negotiating the sale by McDonald's and purchase by NFLP of the five parcels directly rather than via auction. The negotiations, primarily via e-mail and telephone, contemplated an all-cash bulk purchase for the five properties located at 5057 Wentworth, Chicago, Illinois; 10245 Roosevelt Road, Westchester, Illinois; 130 South Virgin Street, Crystal Lake, Illinois; 6574 North 76th Street, Milwaukee, Wisconsin; and 5377 Broadway, Merrillville,

3

Indiana (the "Five Subject Properties").

11.    Initially, McDonald's offered to sell the subject properties for $2 million. As negotiations continued into the week of June 16, 2008, McDonald's agent Lauter told Nomanbhoy on June 18 at around 2:00 p.m. Pacific Time ("PT") that McDonald's would not accept less than $1.2 million. However, 90 minutes later, McDonald's, acting through Lauter and RLA, e-mailed Nomanbhoy that McDonald's would now only accept $1.4 million. Two hours later, at about 5:45 p.m. PT but still on June 18, 2008, Lauter again e-mailed Nomanbhoy that if NFLP "will pay $1.4 MIL they [McDonald's] will sign the contract as agreed and cancel the Auction."

12.    Less than 20 minutes later, at about 6:00 p.m. PT on June 18, Nomanbhoy e-mailed Lauter, accepting McDonald's revised offer of $1.4 million. Nomanbhoy's e-mail stated: "Okay. I will pay $1.4 mill for the five properties."

13.    As of the time of RLA's and McDonald's renewed offer and Nomanbhoy's acceptance on June 18, Bruce Neumann ("Neumann"), Senior Counsel for McDonald's Corporation, had already signed and sent to Nomanbhoy and Lauter the Real Estate Sales Contract (the "RESC") on behalf of McDonald's. That was the last version of the contract before the June 18 offer and acceptance stated above. The parties had continued to negotiate after that version was sent, including over price. That contract, attached hereto as Exhibit A, is the Real Estate Sales Contract agreed to by Lauter and Nomanbhoy on June 18, and contains the terms and conditions governing this transaction, including the $1.4 million purchase price and $210,000 initial earnest money deposit due from NFLP.

14.    Shortly after 7:00 p.m. PT, Nomanbhoy e-mailed Neumann, Lauter and Mary Meyer ("Meyer"), McDonald's USA's Regional Real Estate Manager, that "the contract is acceptable as

I indicated to Ira [Lauter]." Nomanbhoy's e-mail was referring to and attached the RESC that Neumann had sent earlier that day, as stated above. Nomanbhoy only requested confirmation that RLA was to be the escrow agent, as the contract referred to Chicago Title Insurance Company.

**McDonald's Confirmation And
NFLP's Performance**

15.     Within about two hours of Nomanbhoy's acceptance of McDonald's offer, McDonald's sent to Nomanbhoy e-mails and a letter confirming that RLA represented McDonald's in the sale of the Five Subject Properties, stating that RLA was the escrow agent, and directing Nomanbhoy to wire the initial earnest money deposit to an RLA bank account in Chicago. One of those e-mails came from Neumann, who had signed and sent the RESC on behalf of McDonald's earlier that day. Neumann told Nomanbhoy that the initial earnest money "must be wired and received by Rick Levin or the auction will go forward." In other words, the auction would be cancelled if the earnest money arrived before 1:00 p.m. Central Time ("CT"). The other e-mail, from Meyer, referred to the "contract." These communications from McDonald's to Nomanbhoy were clear acknowledgments by McDonald's that it and NFLP had a contract with respect to the Five Subject Properties.

16.     Nomanbhoy, acting for NFLP, caused the initial earnest money deposit of $210,000 to be wired to RLA early the next morning, June 19, from NFLP's California bank, Fidelity Investments. Due to the time zone difference, RLA's bank received the wire transfer of funds on 12:12 p.m. CT on June 19, 2008. That was well before the auction was to start.

17.     At 12:52 p.m. CT on June 19, 2008, after RLA's bank received the earnest money, Lauter e-mailed Nomanbhoy that RLA was "preparing to tell bidders that there is no auction."

5

### McDonald's Tries To Change The Deal
### And Proceeds With The Auction

18.    On the morning of June 19, 2008, Neumann sent to Nomanbhoy a different version

of a Real Estate Sales Contract which added a significant new provision that Nomanbhoy had not

agreed to, that was not in any of the prior drafts, and was not in the version sent by Neumann and

accepted by Nomanbhoy on June 18. The addition stated: "In the event Seller has not received the

Earnest Money before the commencement of the auction of the Properties on June 19, 2008, **or if**

**the auction otherwise occurs**, this Contract shall be null and void and of no further force or effect."

(Emphasis added.) Neumann provided no explanation for this unilaterally inserted term. This new

term effectively gave McDonald's the option of proceeding with the auction despite the valid and

binding contract between NFLP and McDonald's.

19.    On June 18, Nomanbhoy, on behalf of NFLP, initialed each page (except the legal

descriptions) of the June 18 version of the RESC sent to him by Neumann. Nomanbhoy also

returned that version of the RESC to Neumann, Lauter and Meyer on June 19. On the morning of

June 19, Nomanbhoy told Lauter that Nomanbhoy would not and did not accept the change proposed

by Neumann earlier that morning because, as stated, it was not part of the prior negotiations, had not

previously been accepted by Nomanbhoy, and was instead a unilateral change of terms by Neumann

and McDonald's.

20.    Notwithstanding the existence and validity of the Real Estate Sales Contract accepted

by Nomanbhoy on June 18, 2008, NFLP's payment and RLA's receipt and acceptance of the earnest

money, and Neumann's and RLA's indication to Nomanbhoy that McDonald's and RLA would not

proceed with the auction, at about 1:00 p.m. on June 19, 2008, McDonald's and RLA held the

auction and purportedly sold the Five Subject Properties. NFLP and Nomanbhoy do not currently

know who purchased or the total auction price of the Five Subject Properties, but believe that the

sale price exceeded the $1.4 million sum in the NFLP sales contract.

21.     Later in the afternoon of June 19, 2008, after the auction occurred, Neumann e-mailed

Nomanbhoy and stated that NFLP did not have an agreement or contract with McDonald's.

Neumann instead stated that all prior offers had been revoked and invalidated. However, Neumann

could not retract or revoke the offer and acceptance made between Lauter, acting for McDonald's,

and Nomanbhoy, acting for NFLP, the day before on June 18. Neumann's position was also contrary

to the numerous confirmations – including his own – of the RESC made by McDonald's with NFLP

on June 18.

22.     On information and belief, Levin and RLA were the auctioneers at the auction of the

Five Subject Properties.

23.     At the time of the auction, Levin and RLA knew that NFLP had a valid and

enforceable Real Estate Sales Contract with McDonald's for the Five Subject Properties.

24.     Levin's and RLA's auctioning of the Five Subject Properties on behalf of

McDonald's interfered with NFLP's contract with McDonald's.

### Count I
### (Specific Performance)

25.     NFLP restates and realleges Paragraphs 1 - 24 above as and for this Paragraph 25.

26.     On June 18, 2008, NFLP and McDonald's entered into the Real Estate Sales Contract

pursuant to which NFLP agreed to purchase and McDonald's agreed to sell the Five Subject

Properties for the sum of $1.4 million.

27.    NFLP performed all conditions of the Real Estate Sales Contract to be performed by it, including the timely tender to RLA as agent for McDonald's the sum of $210,000 as initial earnest money.

28.    NFLP is, and at all times has been, ready, willing and able to perform and meet its obligations under the Real Estate Sales Contract, including to pay McDonald's the balance due for the Five Subject Properties.

29.    McDonald's has failed and refused to perform its obligations under the Real Estate Sales Contract and has indicated that it will not sell the Five Subject Properties to NFLP.

30.    NFLP has no adequate remedy at law because the Five Subject Properties are unique.

WHEREFORE, the Nomanbhoy Family Limited Partnership prays that the Court order McDonald's Corporation and McDonald's USA, LLC to specifically perform the Real Estate Sales Contract with respect to the Five Subject Properties, and grant such other and further relief that the Court deems just.

**Count II**
**(Injunction)**

31.    NFLP restates and realleges Paragraphs 1 - 24 and 26 - 29 above as and for this Paragraph 31.

32.    NFLP has no adequate remedy at law because the Five Subject Properties are unique.

33.    NFLP will be irreparably harmed if the Five Subject Properties are instead sold by McDonald's to purchasers other than NFLP.

34.    Despite demand upon McDonald's, it intends to proceed with the auctioned sales of the Five Subject Properties to purchasers other than the NFLP.

8

WHEREFORE, the Nomanbhoy Family Limited Partnership prays that this Court enjoin McDonald's Corporation, McDonald's USA, LLC, and their employees and agents from completing the sales of any and all of the Five Subject Properties to purchasers other than the Nomanbhoy Family Limited Partnership.

**Count III**
**(Breach Of Contract)**

35.    NFLP restates and realleges Paragraphs 1 - 24 and 26 - 29 above as and for this Paragraph 35.

36.    This Count III is pled in the alternative to Counts I and II above.

37.    NFLP had a viable business plan to develop and operate or develop and resell each of the Five Subject Properties. The plan was to build shopping centers on each of the Five Subject Properties. NFLP had consulted with a builder/developer, and had incurred time and expense, to develop the plan. The plan was similar to many successful plans for the same types of property in the same circumstances.

38.    NFLP's development plan reasonably calculated the profits to be between $5 - $10 million.

39.    McDonald's Corporation and McDonald's USA, LLC have breached the Real Estate Sales Contract, and such breach has caused substantial damages to NFLP.

40.    As an alternative to the equitable relief sought above, NFLP is entitled to its damages, including the lost profits of its development and resales of the Five Subject Properties.

WHEREFORE, the Nomanbhoy Family Limited Partnership prays that this Court, in the alternative to equitable relief, enter judgment against McDonald's Corporation and McDonald's

9

USA, LLC, in the amount not less than $5 million, or such other amount as proven at trial, and grant

such other and further relief that the Court deems just.

## Count IV
### (Interference With Contract)

41.     NFLP restates and realleges Paragraphs 1 - 24, 26 - 29, and 37 - 38 as and for its

allegations for this Paragraph 41.

42.     This Count IV is pled in the alternative to Counts I and II above.

43.     At the time of the auction on June 19, 2008, a valid and enforceable contract existed

between the NFLP and McDonald's.

44.     RLA and Levin, auctioneers of the Five Subject Properties, knew that there was a

valid and enforceable contract, and knew that selling the Five Subject Properties by auction would

interfere with the Real Estate Sales Contract.

45.     RLA's and Levin's auctions of the Five Subject Properties were an intentional and

unjustified interference with NFLP's Real Estate Sales Contract with McDonald's.

46.     Such interference caused McDonald's to breach the RESC with NFLP, prevented and

deprived NFLP from acquiring the Five Subject Properties and developing them, and caused NFLP

to lose significant profits on the real estate purchase.

WHEREFORE, the Nomanbhoy Family Limited Partnership prays that the Court, in the

alternative to equitable relief, enter judgment in its favor and against Defendants Rick Levin &

Associates, Inc. and Rick Levin, individually, in the amount not less than $5 million or such other

amount as proved at trial, and for such other and further relief that the Court deems just.

NOMANBHOY FAMILY LIMITED PARTNERSHIP,
Plaintiff


By ____ s/Stuart M. Widman _____
            One Of Its Attorneys


Stuart M. Widman
Miller Shakman & Beem LLP
180 North LaSalle Street, Suite 3600
Chicago, Illinois   60601
312-263-3700
Attorney No. 3010104


PLAINTIFF DEMANDS A TRIAL BY JURY

11

# EXHIBIT A

Rx Date/Time    JUN-17-2008(TUE) 16:42     4089962786      P.002
04/11/2008   19:59    4089962786     NOMANBHOYS      PAGE 02

REAL ESTATE SALES CONTRACT — *VERSION 2*
*WITH EXHIBIT A & B 2*

**1. Parties.**

Seller:      McDonald's Corporation or its nominee
One McDonald's Plaza
Oak Brook, Illinois 60523
Tel.: 630.836.4982
Fax: 630.836.4804

Purchaser: *NOMANBHOY FAMILY LIMITED PARTNERSHIP*
*(OR TRUST, OR IRA, ACCOUNTS OF NOMANBHOY FAMILY)*
*11254 MT CREST PLACE*
*CUPERTINO, CA 95014*
*Tel 408 996-8786   call 408 507-7863*
*Email SHABIR. NOMANBHOY @ GMAIL.COM*

**2. Purchase Price**

| | | |
|---|---|---|
| 2.1. High Bid Price | *BULK SALE OFFER* | $_____ |
| 2.2. Buyer's Premium (3% of 2.1) | *FOR 5 PROPERTIES* | $_____ |
| 2.3. Purchase Price (2.1 + 2.2) | | $ *1,400,000.00* |
| 2.4. Total Earnest Money Required (10% of 2.3) | | $210,000.00 |
| 2.5. Initial Earnest Money Deposit | | $210,000.00 |
| 2.6. Additional Earnest Money Required (2.4- 2.6) | | $ -0- |
| 2.7. Balance of Purchase Price Due at Closing (2.3- 2.4) | | $1,190,000.00 |

**3. Agreement to Sell and Purchase.** Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller, at the price and on the terms set forth herein, the real estate consisting of that parcel of land identified on Rider 1 attached to this Contract (the "Property) and more particularly described on Exhibit "A" attached hereto.

**4. All Cash Transaction.** This is an all-cash sale and purchase; and is NOT contingent upon Purchaser obtaining financing even though Purchaser may apply to a lending institution of Purchaser's choice for a mortgage loan. Purchaser understands and agrees that neither their receipt of a commitment from such a lending institution, their acceptance of such a commitment, nor their satisfaction of any condition set forth in such a commitment shall in any way be conditions of Purchaser's obligations under this Contract. Seller makes no representation or warranty as to Purchaser's ability to obtain financing.

**5. Earnest Money.** Purchaser *WILL UPON ACCEPTANCE* has deposited the Initial Earnest Money set forth in Paragraph 2.5 and receipt is hereby acknowledged. The Additional Earnest Money Required set forth in Paragraph 2.6 shall be paid by cash or cashier's check payable to the order of the Escrow Agent (as set forth on Rider 1 attached to the Real Estate Sales Contract) and received by Escrow Agent on or before noon on Thursday, June 26, 2008, at the offices of Escrow Agent. The Additional Earnest Money Required may be paid by personal check only if paid on the date of the auction at the time this Contract is executed. All earnest money shall be held by Escrow Agent for the benefit of the parties. Purchaser acknowledges that TIME IS OF THE ESSENCE with respect to the payment of any additional earnest money and the closing of this sale. Upon Seller's execution of this Contract, Rick Levin & Associates, Inc. or Rick Levin & Associates, Inc., in conjunction with Rick Levin, licensed Indiana auctioneer, as applicable ("Auctioneer") shall deposit the Earnest Money with the Escrow Agent for the mutual benefit of Purchaser and Seller.

bicago Title
nsurance
ompany

**6. The "Closing"** The purchase and sale of the Property shall be closed (the "Closing") on *Thursday, July 31, 2008* Tuesday, August 5, 2008, or on such other date as agreed to by the parties". Closing shall take place at an office of Chicago Title Company or such other title company as agreed to between Seller and Purchaser (the "Title Company") at such location as approved by Seller. Purchaser may use the proceeds of a money lender's escrow to pay the balance of the Purchase Price, provided that the terms of the money lender's escrow are not inconsistent with the terms of this Contract or the Escrow Agreement. Purchaser shall deposit, by certified funds, wire transfer or a bank cashier's check made payable to Title Company, all funds necessary to close the transaction contemplated by this Contract and shall promptly deliver and execute all required documents.

*If due to Seller's default hereunder, Seller fails to close on or before July 31, 2008, Seller shall pay to Purchaser a penalty of two (2%) percent per annum on the total earnest money deposit, prorated to the earlier of the actual closing date, or the termination of this contract.*



Rx Date/Time      JUN-17-2008(TUE) 01:50              4089962786                    P. 002
04/11/2008  25:07   4089962786                NOMANBHOYS                    PAGE   82

7.  Delivery of Deed. On the Closing Date, Seller shall convey or cause to be conveyed to Purchaser by recordable Limited or Special Warranty or Trustee's Deed, title to the Property subject only to the following matters ("Permitted Exceptions"):

7.1.    general real estate taxes for the years 2007 and 2008 and subsequent years;

7.2.    covenants, conditions and restrictions of record (including without limitation such easements and restrictions as may be recorded after the date hereof which Seller determines are necessary or appropriate);

7.3.    certain mutually beneficial restrictions and obligations with respect to the proper use, conduct and maintenance of the Property and other property (Purchaser hereby authorizes Seller to record any such restrictions and obligations as covenants affecting the Property and other property)X AFTER REVISION & AGREEMENT BY MCGOWNER

7.4.    private and/or public utility easements, roads and highways, if any, whether or not of record;

7.5.    all matters which a current, accurate survey of the Property would disclose;

7.6.    applicable zoning and building lines and ordinances;

7.7.    in the event Seller or any entity related to Seller is the owner of or otherwise has an interest in any adjacent property, a reservation to Seller or its nominee of the right and privilege of Seller, its lessees, franchisees, successors and assigns to use and enjoy the benefit of all existing private utilities, drainage areas and access ways of any kind, whatsoever, if any. Purchaser agrees to accept to Seller's deed to Purchaser the Restrictive Covenant set forth o

7.8.    Purchaser agrees to accept in Seller's deed to Purchaser a restriction prohibiting the property from being used for restaurant Exhibit B. purposes for a period of 20 years from the date of the deed. Purchaser agrees that the restriction shall be a covenant running with the land and be binding upon Purchaser, its heirs, administrators, successors and assigns. SEE ATTACHED RESTRICTIVE COVENANT EXHIBIT B--2

7.9.    acts done or suffered by Purchaser or by any party claiming by, through or under Purchaser;

7.10.   party wall rights, if any; and

7.11.   all installments of special assessments heretofore levied falling due after date of closing.

8.  Title/Survey. At least five days prior to Closing, Seller shall show to Purchaser or his agent evidence of merchantable title in the intended grantor by delivering a Commitment for Title Insurance issued by the Title Company bearing date on or subsequent to the date of the acceptance of this Contract, in the amount of the Purchase Price subject to no other exceptions than those listed in Paragraph 7 and to general exceptions contained in said commitment. Every Commitment for Title Insurance furnished by Seller hereunder shall be conclusive evidence of title as therein shown. If evidence of title discloses other exceptions, Seller shall have thirty (30) days from Seller's receipt of evidence of title to cure such exceptions and notify Purchaser accordingly, and as to those exceptions which may be removed at closing by payment of money, Seller may have same removed at closing by using the proceeds of sale in payment thereof. Seller has to be delivered a copy of any survey of the property of Seller's possession to Purchaser. If Seller is unable to have such defects cured or To the extent waived within 30 days, Purchaser may, as its sole remedy, terminate this Contract within 10 days thereafter. In no event shall Seller have Seller has a c any obligation to commence litigation or to expend money to cure or remove any title objections. Seller and Purchaser acknowledge and of such survey agree that Seller shall not be obligated to provide any new or updated survey to Purchaser. in its possess

9.  Payments at Closing. Purchaser shall pay all recording charges, all money lender's charges (including money lender's escrow fees), municipal transaction tax stamps, if applicable, escrow fees and any and all title insurance charges.

10. Possession. Purchaser shall be entitled to occupancy and possession of the Property from and after the Closing date provided final payment of the Purchase Price has been made and the Closing has been fully consummated. Prior to Closing, Seller shall have sole control and exclusive possession of the Property.

11. Prorations. At closing, Purchaser shall receive, to the extent that they have not been paid, a credit for real estate taxes for 2007 and 2008. In the event the actual amount of the tax bills is unknown, such credit shall be based on 105% of the most recent ascertainable general real estate tax bill for the Property. General real estate taxes shall be prorated to the date of closing. If the real estate tax bill includes additional property owned by Seller, at Closing Purchaser shall give Seller a credit for taxes from the date of Closing through the remainder of the tax year and the parties shall complete a tax division on the Property such that it shall be separately assessed. Prior to such separate assessment, Seller and Purchaser shall each pay their pro rata share of the tax bill based upon the square footage of each parcel. All prorations are final. All other items customarily prorated shall be prorated as of the date of closing.

12. Intentionally Deleted

Rx Date/Time    JUN-17-2008(TUE) 01:50        4089962786                    P. 003
04/11/2008  05:07    4089962786            NOMANBHOYS            PAGE  03

13. Commission/Broker-Agency Disclosure. Seller shall cause to be paid a broker's commission to Auctioneer at closing, as provided in the Exclusive Agreement For Auctioneering Services between the Seller and Auctioneer. The provisions of this paragraph shall survive the closing.   Purchaser represents and warrants to Seller that no auctioneer or broker, other than Auctioneer and _____ NONE _____ ("Participating Broker") was involved in showing, submitting or selling the Property to Purchaser. Purchaser agrees to indemnify and hold Seller, Auctioneer and Participating Broker, if any, harmless and defend them from any claim relating to Purchaser's purchase of the Property asserted against the Seller or Auctioneer by any broker other than as set forth in this Paragraph 13.  The provisions of this Paragraph shall survive the closing.  Purchaser acknowledges that Auctioneer and its licensed associates represent the Seller as Seller's agent in the sale of this Property.

14. Irrevocable Offer.  Purchaser's execution and delivery of this Contract to Seller is an irrevocable offer to purchase the Property made to Seller and shall not be binding upon Seller until executed by Seller, or Seller's duly authorized agent.  Purchaser agrees that this offer shall remain irrevocable until 5:00 p.m. Chicago time on ~~Tuesday, June 19,~~ Wednesday, June 18, 2008.  Notification of Seller's acceptance may be given pursuant to the notice provision in this Contract or by telephone. Seller's, or a duly authorized agent of Seller's, failure to notify Purchaser on a timely basis that Seller rejects Purchaser's offer shall not constitute acceptance or rejection of Purchaser's offer, but Purchaser's offer shall then become revocable by Purchaser.  If Seller rejects Purchaser's offer or Purchaser's offer is effectively revoked, all deposits made by Purchaser shall be promptly returned to Purchaser.

15. Default.
    15.1.     Purchaser's Default. At Seller's option, Purchaser shall be in default under the terms of this Contract if, in addition to any other default specified herein, Purchaser shall:

            15.1.1. fail to close pursuant to the terms hereof;
            15.1.2. fail to timely make any payment required of Purchaser hereunder;
            15.1.3. reserved;
            15.1.4. fail to appear at the time and place designated by Seller, as provided herein, to close the transaction; or
            15.1.5. fail to make Closing deposits at the times required thereunder.

            15.1.6. If Seller declares Purchaser in default pursuant to the terms herein, or if Purchaser fails or refuses to carry out any other obligation of Purchaser under the terms of this Contract and any supplemental agreements made a part hereof, or Purchaser defaults under any provision hereof, then, at Seller's option, this Contract is terminated, and, upon notice to Purchaser, the earnest money shall be forfeited.  Seller may also elect to assert against Purchaser any other remedy available, at law or in equity.

16. Demand For Earnest Money.  Purchaser and Seller hereby agree that if Seller makes a demand upon Auctioneer stating that Seller has thereby elected to forfeit Purchaser's earnest money, and demanding that Auctioneer remit to Seller any earnest money deposited by Purchaser with Auctioneer, pursuant to Paragraph 15.1.6, whereupon Auctioneer shall serve notice upon both parties as to same by certified mail, return receipt requested.  Purchaser shall have seven (7) days from the date Auctioneer deposits the notice in the U. S. mail with sufficient postage prepaid to (a) cure the default; or (b) object in writing to Auctioneer of the intended disposition of earnest money.  The mailing of a notice by certified mail, return receipt requested, shall be sufficient service when the notice is mailed.  If Purchaser fails to cure the default or Auctioneer does not receive Purchaser's written objection within said seven (7) day period, then Auctioneer is hereby authorized by Purchaser and Seller to remit same to Seller (reduced by any monies due Auctioneer from Seller, if any), and Purchaser's right under this Contract shall be forfeited, and the Contract shall be terminated without further action by either party or Auctioneer.  Seller is then free to sell the Property to any other party.

17. Interpleader.  If either party objects to the intended disposition in writing within the aforementioned seven (7) day grace period, then the parties hereto agree that Auctioneer may deposit earnest money, less costs, with the Clerk of the Circuit Court of Cook County by filing an action in the nature of interpleader.  The parties agree that Auctioneer may be reimbursed from the earnest money for all costs, including reasonable attorney's fees, relating to the filing of the interpleader and do hereby agree to indemnify, defend and hold Auctioneer harmless from any and all claims and demands, including the payment of reasonable attorney's fees, costs and expenses arising out of such default claims and demands.

6/18

Rx Date/Time    JUN-17-2008(TUE) 01:50          4089962786                        P.004
04/11/2008  05:87     4089962786              NOMANBHOYS              PAGE    04

18. Warranty And Disclaimer Of Warranties.    PURCHASER REPRESENTS THAT EITHER PURCHASER OR A DULY AUTHORIZED AGENT OF PURCHASER HAS INSPECTED, OR WAIVES THE RIGHT TO INSPECT, THE PROPERTY AND VERIFIED THE FACTS AND INFORMATION CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER PRIOR TO EXECUTING THIS CONTRACT. PURCHASER WARRANTS THAT PURCHASER IS PURCHASING THE PROPERTY, ALL IMPROVEMENTS, FIXTURE, EQUIPMENT AND PERSONAL PROPERTY, THEREOF ON AN "AS-IS, WHERE-IS" BASIS, WITH ALL FAULTS AND WITH NO WARRANTIES OF ANY KIND, EXPRESS OF IMPLIED, EITHER ORAL OR WRITTEN, EXCEPT AS EXPRESSLY STATED IN THIS CONTRACT, WHETHER OF HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION OF IMPROVEMENTS, ENVIRONMENTAL CONDITION OR OTHERWISE MADE BY SELLER, AUCTIONEER OR ANY AGENT OF EITHER OF THEM, INCLUDING, BUT NOT LIMITED TO, INFORMATION CONTAINED IN THE SALES BROCHURE, ADVERTISING OR SUPPLEMENTAL BROCHURES. NEITHER SELLER, AUCTIONEER, NOR ANY OF THEIR AGENTS ASSUME ANY LIABILITY FOR INACCURACIES, ERRORS OR OMISSIONS CONTAINED IN ANY MATERIALS PROVIDED TO PURCHASER.    PURCHASER'S INITIALS:

By executing this Contract, Purchaser expressly represents and agrees that Purchaser is not relying upon any representative warranty or statement by Seller, Auctioneer or its or their sales representatives which differs from the disclosures made in this Contract. Purchaser acknowledges that Purchaser has not relied upon any sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Seller, Auctioneer or others, including, but not limited to, any relating to the description of physical condition of the Property, or the dimensions of the Property or any other physical dimensions thereof, the estimated real estate taxes of the Property, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other data, except as may be specifically represented herein. Purchaser has relied on their own examination and investigation thereof. No person has been authorized to make any representation on behalf of Seller. Purchaser agrees (a) to purchase the Property without offset or any claim against, or liability to, Seller or its agents, whether or not any layout or dimension of the Property or any part thereof, is accurate or correct, and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the Closing.

SELLER AGREES THAT NO MATERIAL DIFFERENCES EXIST FROM
RICK LEVIN WEBSITE INFORMATION.                    PURCHASER'S INITIALS:

19. Notices.  All notices herein required shall be in writing and signed by either party, and shall be served on the other party at the addresses set forth in Paragraph 1. The mailing of a notice by registered or certified mail, return receipt requested with sufficient postage prepaid, shall be sufficient service when the notice is mailed. Notices may also be served by a nationally recognized air courier, or personal delivery. Notices sent by air courier shall be deemed delivered on the date of receipt. Either party may change its address for notice purposes by giving notice to that effect in the manner set forth herein, provided such change of address shall not be deemed received until actual receipt thereof by the addressee. Any notices required herein may be sent by and to each party's respective attorney.

20. Attorney Review.  PURCHASER REPRESENTS THAT PURCHASER HAS BEEN ADVISED BY THE SELLER AND AUCTIONEER TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS CONTRACT. PURCHSER FURTHER ACKNOWLEDGES THAT HE HAS READ AND UNDERSTANDS EACH AND EVERY PART OF THIS CONTRACT.

21. Property Condition.  The parties hereto acknowledge that Auctioneer is not obligated to and has not made any independent investigation of the condition of the Property including, but not limited to, any environmental matters with respect thereto (collectively the "Physical Condition"). The parties hereto further acknowledge that all investigations, reports and information with respect to the Physical Condition, if any, have been prepared by or for the Seller and have been furnished to Purchaser on behalf of Seller. Seller makes no representation as to the truth or accuracy of any such investigations, reports and/or information.

22. Statutory Compliance.  Purchaser and Seller hereby agree to make all disclosures and do all things necessary to comply with the applicable provisions of the Real Estate Settlement Procedures Act of 1974, as amended. Purchaser and Seller agree to make all certifications and do all things necessary to comply with Section 1445 of the Internal Revenue Code at or before the time of Closing.

23. Stamp Taxes.  Seller shall furnish a completed declaration signed by the Seller or Seller's agent in the form required by the state and county, and shall furnish any declaration signed by the Seller or Seller's agent or meet other requirements as established by any local ordinance with regard to a transfer or transaction tax.

6/08

Rx Date/Time    JUN-17-2008(TUE) 01:50           4089962786                    P. 005
04/11/2008   05:07    4089962786        NOMANSHOYS                       PAGE   05

24. <u>Use of Pronouns.</u>  Wherever appropriate, the singular includes the plural and the masculine includes the feminine or the neuter. The term "Purchaser" shall be interpreted as "Purchasers" if more than one person are purchasing the Property, and their obligations shall be joint and several.

25. <u>No Assignment.</u> Purchaser shall not directly or indirectly assign or transfer his rights under this Contract without prior written approval of Seller which may be granted or withheld in the sole and absolute discretion of Seller.  Seller may assign this Contract without the consent of Purchaser, subject, however, to Purchaser's rights hereunder. Any attempted assignment or transfer by Purchaser without Seller's prior written consent shall be deemed null and void and shall be considered an event of default by Purchaser subject to the provisions of Paragraph 16.2 of this Contract.

26. <u>Headings; Exhibits.</u> The paragraph headings used herein are for the reader's convenience only and they shall not be used to interpret the meaning of the terms set forth herein. Exhibits attached hereto are incorporated as a part of this Contract.

27. <u>Governing Law.</u> The parties agree that any litigation or dispute concerning the enforcement of this Contract shall be brought in the State of Illinois, the jurisdiction shall be the county in which the Property is located, and that Illinois law shall govern its interpretation.

28. <u>Complete Agreement; Severability.</u> This Contract sets forth the entire understanding between the parties relating to the transactions described herein, there being no terms, conditions, warranties or representations other than those contained herein. This Contract may be amended only in an instrument signed by both parties hereto. The parties intend that faxed signatures and that a faxed Contract containing the signatures (original or faxed) of all parties is binding on the parties.  At the request of either party, any faxed document subject to this paragraph shall be re-executed by both parties in an original form.  Neither party shall raise the use of a facsimile machine as a defense to this Contract and shall forever waive such defense. If any provision of this Contract is invalid or unenforceable as against any party under certain circumstances, the remainder of this Contract and the applicability of such provision to other persons or circumstances shall not be affected thereby.  Each provision of this Contract, except as otherwise herein provided shall be valid and enforced to the fullest extent permitted by law.

29. <u>Invalidity.</u>  The invalidity of any covenant, grant, condition or provision of this Contract shall not impair or affect in any manner the validity, enforceability or effect of the remainder of the Contract.

30. <u>Purchaser's Status.</u>  Purchaser represents and warrants there is nothing in Purchaser's status which could or might preclude or prevent Purchaser from consummating this transaction as herein set forth.  Purchaser also agrees that he or she shall not cause any labor or material to be incorporated or delivered to the Property prior to Closing.

31. <u>Binding Agreement.</u>   The terms and provisions of this contract shall be binding upon the parties hereto and their heirs, administrators, executors, successors, and permitted assigns.

32. <u>Request for Escrow.</u>  At the request of Seller or Purchaser, evidenced by written notice to the other party at any time prior to the date for delivery of deed hereunder, this sale shall be closed through an escrow with the Title Company, in accordance with the general provisions of the usual form of Deed and Money Escrow Agreement then furnished and in use by said company, with such special provisions inserted in the escrow agreement as may be required to conform with this Contract.  Upon the creation of such an escrow, anything herein to the contrary notwithstanding, payment of purchase price and delivery of deed shall be made through the escrow and this Contract and the earnest money shall be deposited in the escrow and Auctioneer shall be made a party to the escrow with regard to commission due.  The cost of the escrow shall be paid by the party requesting it.

33. <u>Other Documents.</u>  Seller agrees to furnish an affidavit of title subject only to those items set forth herein, and an ALTA statement if required by Purchaser's mortgagee, and transfer tax declarations.

34. <u>Existing Mortgage.</u>  Seller shall have the right to pay off any existing mortgage(s) out of the proceeds of this sale.

35. <u>Indemnity.</u>  Purchaser covenants to indemnify, defend and hold Seller harmless against any and all losses, claims, damages, liabilities, costs (including reasonable attorney's fees and court costs), and causes of action including, without limitation, those arising from mechanics liens, injuries to person or damage to property, including the Property, suffered or incurred by Seller directly or indirectly, as a result of, the entry onto the Property by Purchaser, Purchaser's agents, contractors, employees, and licensees.

Rx Date/Time    JUN-17-2008(TUE) 01:50    4089962786    P.006
04/11/2008  05:07    4089962786    NOMANBHOYS    PAGE   06

36.  Anti-Terrorism Representation and Warranty. Seller and Purchase each represent and warrant that neither they nor the officers and directors controlling Purchaser are acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by the United States Treasury Department as a Specially Designated National and Blocked Person, or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and that they are not engaged in the transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation. Each party hereby agrees to defend, indemnify, and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the foregoing representation and warranty.

THIS SPACE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.

x Date/Time      JUN-17-2008(TUE) 01:50        4089962786              P. 007
04/11/2008  05:07  4089962786              NOMANBHOYS          PAGE  07

IN WITNESS WHEREOF, the parties have executed this Contract on the dates set forth below their signatures.

SELLER:                                    PURCHASER: *NOMANBHOY FAMILY LIMITED PARTNERSHIP*

McDonald's Corporation                     *Signature* by its President

BY: *Bruce Neumann*                        *SHABBIR NOMANBHOY*
TITLE: *Senior Counsel*                    *Signature*
DATE: *June 16, 2008*
                                           DATE: *June 16, 08*

SELLER'S ATTORNEY:                         PURCHASER'S ATTORNEY:
Bruce Neumann                              *To be determined*
McDonald's Corporation
1 McDonald's Plaza, Dept 067
Oak Brook, Illinois  60523
Tel.: 630.623.7556
Fax: 630.623.8084

AUCTIONEER:
    Rick Levin & Associates, Inc. or Rick Levin &
    Associates, Inc., in conjunction with Rick Levin,
    licensed Indiana auctioneer
    1467 North Elston Avenue, 2nd Floor
    Chicago, IL  60622                      EXHIBITS:
    Telephone: 773.252.4500 x223
    Facsimile:  773.252.4520                Exhibit A: Legal Description

*6/18*

Rx Date/Time    JUN-17-2008(TUE) 01:50    4089962786    P.008
04/11/2008  05:07    4089962786    NOMANBHOYS    PAGE  08

EXHIBIT A -1

LIST OF PROPERTIES  ~~Legal Description~~ — ALL FORMER McDONALDS RESTAURANTS

BRIEF DESCRIPTION FROM RICK LEVIN WEBSITE

| # | ADDRESS | | Value of Property |
|---|---------|---|---|
| 1. | 5057 WENTWORTH CHICAGO, IL | VACANT LAND — 1.108 ACRES | |
| 2. | 10245 ROOSEVELT RD WESTCHESTER, IL | LAND — 29,951 SF  BUILDING — 2,100 SF (UNOCCUPIED) | |
| 3. | 130 S. VIRGINIA ST CRYSTAL LAKE, IL | VACANT LAND — 26,000 SF | |
| 4. | 6574 N. 76th ST MILWAUKEE, WIS | VACANT LAND — 22,526 SF | |
| 5. | 5377 BROADWAY MERRILVILLE, IN | VACANT LAND — 1.55 ACRES (2 PARCELS) | |

6/18

5057 S. Wentworth, Chicago

LC 012-1061    FILE NO. 8591

THAT PART OF THE NORTHEAST 1/4 OF SECTION 9, TOWNSHIP 38 NORTH, RANGE
14 EAST OF THE THIRD PRINCIPAL MERIDAN, COMMENCING AT THE INTERSECTION
OF THE EAST LINE OF WENTWORTH AVENUE AND THE NORTH LINE OF 51ST STREET
IN SAID CITY, THE POINT OF BEGINNING; THENCE NORTH ALONG SAID EAST
LINE OF WENTWORTH AVENUE, 220 FEET TO A POINT; THENCE EAST AT A RIGHT
ANGLE TO THE LAST DESCRIBED COURSE, 220 FEET TO A POINT THENCE SOUTH
AT A RIGHT ANGLE TO THE LAST DESCRIBED COURSE, 220 FEET TO A POINT OF
INTERSECTION WITH THE NORTH LINE OF 51ST STREET; THENCE WEST ALONG
SAID NORTH LINE OF 51st STREET, 220 FEET TO THE POINT OF BEGINNING,
IN COOK COUNTY, ILLINOIS.

Exhibit A-2

Westchester

EXHIBIT A -3

LOTS 1, 2, 3, AND LOT 4 (EXCEPT THE WEST 2.20 FEET THEREOF) LOT 48 AND THE
VACATED ALLEY ADJACENT THERETO AND LOTS 49 AND 50 ALL IN GEORGE F. NIXON
AND COMPANY'S WESTCHESTER IN THE WEST HALF OT HE NORTH WEST QUARTER
OF SECTION 21, TOWNSHIP 39 NORTH, RNAGE 12, EAST OF THE THIRD PRINCIPAL
MERIDIAN, IN COOK COUNTY, ILLINOIS, IN THE VILLAGE OF WESTCHESTER, COOK
COUNTY, ILLINOIS.

130 3. Virginia Street

EXHIBIT A-4

LEGAL DESCRIPTION

The Easterly 170.0 feet (as measured along the lot lines) of Lot 3, in Lakeacres, a subdivision of part of the North Half of Section 6, Township 43 North, Range 8, East of the Third Principal Meridian, according to Plat thereof recorded February 26, 1954, as Document #275689 in McHenry County, Illinois.

LESS AND EXCEPT:

That part of the Easterly 170 feet (as measured along the property lines) of Lot 3 in Lakeacres, a subdivision of part of the North Half of Section 6, Township 43 North, Range 8 East of the Third Principal Meridian, according to the Plat thereof recorded February 26, 1954 as Document No. 275689, in Book 11 of Plats, page 100, described as follows:

Beginning at the most northerly corner of Lot 3; thence on an assumed bearing of South 54 degrees 14 minutes 25 seconds West along the Northerly line of said Lot 3, a distance of 7.18 feet to a point; thence South 15 degrees 19 minutes 37 seconds East, a distance of 143.70 feet to a point on a 585.50 foot radius curve, the center of the circle bears North 74 degrees 40 minutes 23 seconds East from said point; thence Southeasterly along said curve 6.29 feet, central angle 00 degrees 36 minutes 57 seconds, to a point on the Southerly line of said Lot 3; thence North 54 degrees 14 minutes 25 seconds East, a distance of 6.90 feet to the Southwesterly line of Virginia Street; thence North 15 degrees 14 minutes 14 seconds West along said Westerly line, a distance of 150.10 feet to the point of beginning, in McHenry County, Illinois.

Parcel #19-06-204-036

Contract                        EXHIBIT A - 4

6574 N. 76th Street, Milwaukee

Exhibit A-5

That part of Lots One (1), Two (2), Ten (10), and Eleven (11) in Block Seventy-three (73) in Menomonee River Hills East, being a Subdivision of a part of the South East One-quarter (1/4) of Section Twenty-two (22), Township Eight (8) North, Range Twenty-one (21) East, in the City of Milwaukee, Milwaukee County, Wisconsin, which is bounded and described as follows: Commencing at the Northwest corner of said Block 73; thence South 00° 23' West 150.00 feet to a point; thence South 89° 36' 10" East 150.00 feet to a point; thence North 00° 23' 50" East 150.35 feet to a point on the South line of West Acacia Street; thence West 30.81 feet along the South line of West Acacia Street, being the arc of a curve whose center lies to the North whose radius is 1360.78 feet and whose chord bears South 89° 44' 55" West 30.81 feet to a point; thence North 89° 36' 10" West along the South line of West Acacia Street 119.19 feet to the point of beginning.

EXHIBIT A -5
L/C: 48-0035
Parcel Type: MS

5377 Broadway, merrilville

Exhibit A-6

Part of the Northwest Quarter of Section 3, Township 35 North, Range 8
West of the 2nd P.M. in Lake County, Indiana, described as beginning at
a point on the West line of said Northwest Quarter of Section 3 which is
548.6 feet South of the Northwest corner of said Northwest Quarter of Section
3; thence South 89 degrees 21' East a distance of 50 feet to the point or
place of beginning of this legal description; thence continuing South 89
degrees 21' East a distance of 162 feet; thence South and parallel to the
West line of said Northwest Quarter of Section 3 a distance of 144.7 feet; thence
West a distance of 162 feet; thence North 144.7 feet to the point or place
of beginning.

PARCEL II

Part of the Northwest Quarter of Section 3, Township 35 North, Range 8 West
of the Second Principal Meridian, in Lake County, Indiana, being more
particularly described as follows:

Beginning at a point on the centerline of Broadway 373.60 feet South of
the Northwest corner of said Northwest quarter of Section 3; thence South
89 degrees 21 minutes East, 166 feet; thence South 175 feet; thence North
89 degrees 21 minutes West 166 feet to a point on the centerline of
Broadway; thence North along the centerline of Broadway 175 feet to the point
of beginning, subject to the rights of the public and the State of Indiana
in the Westerly 50 feet lying within the right of way of Broadway for road
purposes.

EXHIBIT A -6
L/C: 13-0013
Parcel Type: MS

Exhibit B

**Restrictive Covenant:**

For a period of 20 years from the date of the deed, the Property may not be used for and Purchaser and any successor will not lease/sell to any tenant/buyer whose primary purpose is the sale of hamburgers, chicken and/or coffee.

In addition, the following restaurants operating under the listed trade names, or operating under any successor trade names, are prohibited:

| | |
|---|---|
| Apolo Burgers | Astro Burgers |
| Atlanta Burgers | A & W |
| Backyard Burgers | Burger Chef |
| Burger King | Burger Street |
| Carl's Jr. | Caribou Coffee |
| Checkers | Cheeburger, Cheeburger |
| Chick-Fil-A | Church's Chicken |
| Crown Burgers | Crystal Burgers |
| Culvers | Dunkin Donuts |
| Friendly's | Hardee's |
| Harold's Chicken | In N Out Burgers |
| Jack-in-the-Box | Jamba Juice |
| KFC | Popeye's Chicken |
| Rally's | Sonic |
| Starbuck's | Steak 'N' Shake |
| Tim Horton's | Whataburger |
| Wendy's | Whitecastle |

**Westlaw Delivery Summary Report for NIEMEYER,STEPHEN 6317999**

| | |
|---|---|
| Your Search: | manipulat! w/s settl! |
| Date/Time of Request: | Thursday, August 28, 2008 14:13 Central |
| Client Identifier: | 27622.00D600 |
| Database: | IL-CS-ALL |
| Citation Text: | 820 N.E.2d 1089 |
| Lines: | 270 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

Westlaw.

820 N.E.2d 1089
354 Ill.App.3d 330, 820 N.E.2d 1089, 290 Ill.Dec. 22

Page 1

C
Sheppard v. Rebidas
Ill.App. 1 Dist.,2004.

Appellate Court of Illinois,First District, Fourth Division.
Bernard SHEPPARD, Plaintiff-Appellee,
v.
Bozena REBIDAS, Defendant (Sentry Insurance
Company, as Subrogee of Maytag Corporation, In-
tervenor-Appellant).
No. 1-03-3379.

Dec. 9, 2004.

**Background:** Employee brought personal injury
suit against non-employee, with respect to second
of three work-related accidents for which carrier
and employee settled workers' compensation
claims. While proceedings to vacate the default
judgment against non-employee were pending,
workers' compensation carrier was allowed to inter-
vene, as subrogee of employer. Employee and non-
employee settled the personal injury claim for
$400,000. Employee petitioned to adjudicate carri-
er's workers' compensation lien. The Circuit Court,
Cook County, Jennifer Duncan-Brice, J., found that
the $50,000 carrier paid to employee to settle work-
ers' compensation claim for first accident should
not be included in the lien on the proceeds of the
settlement of the personal injury claim. Carrier ap-
pealed.

**Holding:** The Appellate Court, Greiman, J., held
that the workers' compensation settlements were
not unified, and thus, workers' compensation lien
with respect to settlement of personal injury claim
relating to second accident did not include the
$50,000 carrier paid to settle workers' compensa-
tion claim for first accident.
Affirmed.

West Headnotes

**Workers' Compensation 413 ☞2252**

413 Workers' Compensation
    413XX Effect of Act on Other Statutory or
Common-Law Rights of Action and Defenses
        413XX(C) Action Against Third Persons in
General for Employee's Injury or Death
            413XX(C)7 Right to Proceeds of Action
or Settlement
                413k2250 Rights of Employer or In-
surer
                    413k2252 k. Lien of Employer or
Insurer. Most Cited Cases
Insurance carrier's workers' compensation lien, as
subrogee of employer, on proceeds of employee's
settlement of personal injury claim against non-
employee, relating to second of three work-related
accidents for which carrier and employee had
settled the workers' compensation claims, did not
include the $50,000 carrier paid to employee to
settle the first workers' compensation claim, where
there was no unified settlement of workers' com-
pensation claims; carrier's settlement agreement
with employee as to second claim, in which carrier
agreed to pay one dollar to employee as lump sum
for permanent partial disability, did not refer to first
accident, which had occurred two months before
second accident, and settlement agreement for
second claim was signed two months after carrier
had settled first claim. S.H.A. 820 ILCS 305/5(b).

**1090 *330 ***23 Rusin Maciorowski & Fried-
man, Ltd., Chicago (Gregory G. Vacala, Maxwell
H. Brusky, of counsel), for Intervenor-Appellant.
Barry G. Doyle, Chicago, for Plaintiff-Appellee.

Justice GREIMAN delivered the opinion of the court:
Intervenor-appellant, Sentry Insurance Company
(Sentry), as subrogee of Maytag Corporation
(Maytag), appeals from an order of the circuit court
of Cook County finding that it did not have a lien
pursuant to section 5(b) of the Illinois Workers'
Compensation Act (Act) (820 ILCS 305/5(b) (West
2002)) against the proceeds of a settlement between
plaintiff, Bernard Sheppard (Sheppard), and de-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

820 N.E.2d 1089
354 Ill.App.3d 330, 820 N.E.2d 1089, 290 Ill.Dec. 22

Page 2

fendant, Bozena Rebidas (Rebidas). We affirm the circuit court.

The facts of this case are as follows. In 2000 and 2001, Sheppard was involved in several work-related accidents while employed by Maytag. The first accident occurred on October 17, 2000, the second on December 21, 2000, and the third on June 26, 2002. With regard to each accident, Sheppard filed a separate claim for benefits under the *331 Act with the Illinois Industrial Commission. In each instance, Sentry was Maytag's insurance carrier.

Sentry settled all three of Sheppard's workers' compensation claims. To settle Sheppard's claim for the October 17 accident, Sentry agreed to pay him a lump sum of $50,000. The settlement agreement was prepared by Sheppard's former attorney, Bradley Dworkin, and sent to a claims representative for Sentry, Kelly Kumm. Kumm signed the agreement on July 31, 2002. The agreement was later approved by the Illinois Industrial Commission on September 10, 2002. With regard**1091 ***24 to Sheppard's claim for the December 21 accident, Sentry agreed to pay only $1 as a lump-sum payment, and the settlement agreement specified that there had been no temporary disability, otherwise known as "lost time." Again, this agreement was prepared by Dworkin and sent to Kumm. It was signed by Kumm on October 8, 2002, and approved by the Illinois Industrial Commission on January 13, 2003. Finally, with regard to the June 26 accident, the parties again agreed that there had been no "lost time" and that Sentry would pay the lump sum of only $1. The agreement, prepared by Dworkin, was signed by Kumm on August 20, 2002, and approved by the Illinois Industrial Commission on January 10, 2003.

On June 20, 2002, before Sheppard and Sentry had settled the workers' compensation claims, Sheppard filed a personal injury suit against Bozena Rebidas, a third party involved in the December 21 accident, for the injuries he sustained in that accident. Sheppard initially obtained a default judgment in his suit

against Rebidas and was awarded $560,000. While proceedings to vacate the default judgment were pending, Sentry filed a petition to intervene in the suit. In its petition, Sentry asserted that, as a result of the December 21 accident, it had paid Sheppard over $90,000, and, therefore, it retained a lien in that amount pursuant to section 5(b) of the Act (820 ILCS 305/5(b) (West 2002)) against any award or settlement between Rebidas and Sheppard in the suit. The court permitted Sentry's intervention. On July 2, 2003, Rebidas and Sheppard settled Sheppard's personal injury claim for $400,000.

Upon settlement of the action with Rebidas, Sheppard filed his petition to adjudicate the workers' compensation lien. In it, Sheppard moved the court to enter an order adjudicating Sentry's recoverable workers' compensation lien as $19,523.37. In support, Sheppard noted that the parties had settled the claim for the December 21 accident, agreeing that Sentry would pay a lump sum of $1 for permanent partial disability and that there was no payment for temporary total disability. Thus, Sheppard maintained, the only item properly included in the lien was the medical expenses that Sentry had paid pursuant to *332 section 8 of the Act (820 ILCS 305/8 (West 2002)). Sheppard calculated the lien to be $19,523.37.

Sentry responded to Sheppard's petition by claiming that the settlement contracts that it had entered with Sheppard were negotiated and resolved in "unity," such that the $50,000, though allocated in the settlement agreements to the October 17 accident, gave rise to a lien with regard to the December 21 accident. Sentry asserted:

"It will be demonstrated by [Sheppard's] own admission and in the facts at bar that [Sentry's] lien in the subject action pursuant to Section 5 includes the $50,000 permanent partial disability payment since said payment was made as a result of a surgical procedure on or about June 19, 2001, which is attributable to the December 21, 2000 accident rather than the October 17, 2000 accident."

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

On July 14, 2003, the parties settled part of their dispute, with Sheppard agreeing to reimburse Sentry for $19,523.37 in medical expenses. However, the dispute as to whether Sentry retained a $50,000 lien remained. The court held a hearing on the matter and considered the following evidence.

Kelly Kumm testified via evidence deposition that she was assigned to handle Sheppard's workers' compensation claims. Kumm further testified that, after negotiating with Dworkin, she authorized Sheppard's**1092 ***25 claims to be settled together for $50,000. She received the contracts from Dworkin in separate mailings months apart. On cross-examination, Kumm admitted that at the time that she handled the Sheppard matter, she understood the procedures by which workers' compensation claims were resolved in Illinois. Kumm stated that she was familiar with the type of settlement contract she signed on July 31, 2002, before she signed it. Kumm acknowledged that the contract, which was made in relation to the December 21 accident, neither made reference to the October 17 accident nor allocated payments for temporary total disability. The total amount of the settlement was $1. Kumm admitted that she was fully familiar with the significance of the settlement contract when she signed it.

Attorney Bradley Dworkin testified that he represented Sheppard in his workers' compensation cases. Sheppard's cases were settled through lump-sum settlement contracts and negotiations with the adjuster, Kumm, and were later approved by the Illinois Industrial Commission. Dworkin testified that the $50,000 settlement was for a single claim, and that the other two claims were settled for $1 each. Dworkin denied that the claims for the October 17 accident and the December 21 accident were settled together for $50,001. According to Dworkin, the different dates that appear next to Kumm's signatures *333 on the two documents indicated to him that the contracts were negotiated at separate times. Dworkin further testified that the three claims were never consolidated before the Illinois

Industrial Commission.

Sentry sought to admit into evidence a letter from Sheppard's counsel to Sentry's counsel indicating that they had settled the issue regarding the medical expenses for $19,523.37. Sentry withdrew the letter when Sheppard's counsel objected to its admission. Finding that the letter was relevant, the court nevertheless admitted it without objection from Sentry. The parties stipulated to the admission of the three settlement contracts.

On October 9, 2003, upon considering the evidence presented at trial, the trial court determined that Sentry did not have a lien on the settlement of the third-party action. The court found that the parties' dispute regarding the medical bills had been resolved, as evidenced by the letter between their attorneys. With regard to the alleged $50,000 lien, the court found that the claims had been settled and that Sentry was bound by the terms of the settlement contract. The court reasoned as follows:

"What is clear to this court is that Ms. Kumm, acting on behalf of Sentry Insurance Company, knew that [*sic*] the impact of negotiating the contracts as she did, which included not pursuing any subrogation rights. The fact that some other person in Sentry Insurance Company later disagrees with that decision, is irrelevant. Intervenor, Sentry Insurance Company is bound by the terms of the contract and, as such, it does not have a lien on the case."

As such, the court denied Sentry's request for relief.

Sentry contends on appeal that the trial court erred in its ruling because Sentry was not required to file its own suit in subrogation against Rebidas in order to preserve its lien rights over the proceeds of the settlement. Sentry further claims that the trial court erred in finding that Sentry waived its lien rights during the negotiations leading to the settlement. Finally, Sentry asserts that its "lien rights under Section 5(b) apply to all the monies it paid to Sheppard under Section 8 of the Act."Sentry requests

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

820 N.E.2d 1089
354 Ill.App.3d 330, 820 N.E.2d 1089, 290 Ill.Dec. 22

Page 4

that we reverse the trial court's order and enter judgment in **1093 ***26 favor of Sentry and against Sheppard in the amount of $62,646.56. We find each of Sentry's arguments to be without merit and, therefore, affirm.

In this appeal, Sentry alleges that the $62,646.56 lien is comprised of medical expenses, temporary total disability, and a lump-sum payment of $50,000 for permanent partial disability. We begin by noting that the trial court specifically found that the parties had resolved the matter of the medical expenses before trial. In our review, we give deference to the trial court's findings of fact unless they are against *334 the manifest weight of the evidence. *Lowe Excavating Co. v. International Union of Operating Engineers Local No. 150,* 327 Ill.App.3d 711, 720, 262 Ill.Dec. 195, 765 N.E.2d 21 (2002). We find that the trial court's finding is amply supported by the record inasmuch as it contains the letter evidencing the parties' agreement to settle the medical expenses for $19,523.37. Next, we find that Sentry's claim to a payment for temporary total disability is also belied by the record because the settlement contract for the claim for the December 21 accident explicitly states that there was "no lost time" or temporary total disability paid. Finally, Sentry's claim that it is owed $50,000 for permanent partial disability is similarly belied by the same settlement contract, which reveals that Sentry agreed to pay Sheppard the lump sum of $1 for permanent partial disability stemming from the December 21 accident.

Sentry attempts to circumvent the plain language of the settlement contracts by arguing that it was the parties' intent to settle Sheppard's claims in unison. In support, Sentry asks us to consider Kumm's testimony. We note, however, that the trial court has already weighed Kumm's testimony, finding her testimony that she understood the consequences of signing the settlement contract for the December 21 accident more persuasive than her testimony that the parties agreed to settle the claims together. We will not substitute our judgment for that of the trial

court regarding conflicts in testimony and the credibility of witnesses. *Lowe Excavating Co.,* 327 Ill.App.3d at 720, 262 Ill.Dec. 195, 765 N.E.2d 21. Furthermore, the record reveals that the settlement contract for the December 21 accident made no mention of the October 17 accident and was signed by Kumm over two months after she signed the contract which settled the claim for the October 17 accident. Accordingly, we find that the trial court did not err in determining that Sentry's $50,000 payment made in settlement of the claim for the October 17 accident did not give rise to a lien with regard to the claim for the December 21 accident.

In so finding, we reject Sentry's argument that the court had an obligation to protect Sentry's alleged interests in this case. Sentry cites several cases for the proposition that the Act imposes a duty upon the court to protect an employer's lien. See *Freer v. Hysan Corp.,* 108 Ill.2d 421, 92 Ill.Dec. 221, 484 N.E.2d 1076 (1985) (responsibility lies with the trial court to protect an employer's lien rights *vis-a-vis* an employee's settlement with a third party); *Page v. Hibbard,* 119 Ill.2d 41, 115 Ill.Dec. 544, 518 N.E.2d 69 (1987) (cause remanded to trial court to determine whether allocation of a settlement agreement between an injured employee and a third party was fair and reasonable or if it inequitably circumvented employer's workers' compensation lien); *Blagg v. Illinois F.W.D. Truck & Equipment Co.,* 143 Ill.2d 188, 157 Ill.Dec. 456, 572 N.E.2d 920 (1991) (where settlements between the employee and a third party *335 represent an obvious attempt to circumvent the employer's workers' compensation lien, the trial court should intervene to protect the employer). **1094 ***27 We note, however, that the Illinois Supreme Court's holdings in these cases were premised on the notion that it is unfair for an employee to **manipulate a settlement** with a third party in a manner which would circumvent his employer's workers' compensation lien where the employer is not a party to that **settlement** and cannot protect itself. Such is not found in the instant case. Unlike the employers in *Freer, Blagg,* and *Page,* who were not parties to the settlement agree-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

820 N.E.2d 1089                                                                      Page 5
354 Ill.App.3d 330, 820 N.E.2d 1089, 290 Ill.Dec. 22

ments which served to deprive them of their liens,
Sentry negotiated and signed the very agreement
which precluded its recovery. The Act cannot be
read to require the court to step in under these cir-
cumstances to save Sentry from itself.

Affirmed.

REID, P.J., and THEIS, J., concur.
Ill.App. 1 Dist.,2004.
Sheppard v. Rebidas
354 Ill.App.3d 330, 820 N.E.2d 1089, 290 Ill.Dec. 22

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 2

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NOMANBHOY FAMILY LIMITED PARTNERSHIP, | ) ) ) | |
| Plaintiff, | ) ) | NO:  08 C 3787 |
| v. | ) ) | |
| McDONALD'S CORPORATION; McDONALD'S USA, LLC; RICK LEVIN & ASSOCIATES, INC., and RICK LEVIN, | ) ) ) ) ) | |
| Defendants. | ) | |

## AFFIDAVIT

I, Rick Levin, being duly sworn on oath, depose and state that if I were called to testify, I could competently testify to the following facts, of which I have personal knowledge:

1.    I am a principal owner of Rick Levin and Associates, Inc. ("RLA")

2.    I am familiar with the agreement entered into between RLA and McDonald's Corporation for the purpose of auctioning the Property at issue in the action (the "Auction Contract").

3.    A true and correct copy of the Auction Contract is attached hereto.

4.    On June 19, 2008, RLA conducted an auction whereby McDonald's entered into contracts for the sale of the Property at issue in this action.

5.    RLA proceeded with the auction at the direction of McDonald's.

Subscribed and Sworn to before me
this ___ day of _August_, 2008.

_Lorraine M. Casiello_
Notary Public

Further affiant sayeth not.

_Rick Levin_
Rick Levin

> "OFFICIAL SEAL"
> LORRAINE M. CASIELLO
> Notary Public, State of Illinois
> My Commission Expires 11/07/10

7

RICK LEVIN & ASSOCIATES, INC.
EXCLUSIVE AGREEMENT FOR AUCTIONEERING SERVICES OF REAL PROPERTY

**DEFINITIONS:**

| | |
|---|---|
| Auctioneer: | Rick Levin & Associates, Inc., an Illinois corporation<br>1467 N. Elston, 2nd Floor, Chicago, IL 60622<br>(773) 252-4500 • fax (773) 252-4520<br>The Term Auctioneer shall also include a licensed Indiana and Wisconsin real estate broker and auctioneer, if necessary. |
| Seller: | McDonald's Corporation or related entity |
| Seller's Address: | One McDonald's Plaza, Oak Brook, IL 60523 |
| Seller's Telephone Number: | 630-623-3000   Fax: 630-623- |
| Property (legal description as defined in a title commitment dated after this Agreement): | Those certain five parcels located at 10245 Roosevelt Road, Westchester, IL; 5057 S. Wentworth Chicago, IL; 5377 Broadway, Merrillville, IN; 6574 N. 76th Street, Milwaukee, WI and 130 S. Virginia Street, Crystal Lake, IL. Additionally, Seller may add additional locations if it so desires, in its sole discretion. Each parcel may be referred to as a Unit, and the Units may collectively be referred to as the "Property." |
| Auction Date: | On or about May 20, 2008 |
| Marketing Fee: | $45,000 |

This Agreement for Real Property Auctioneering Services ("Agreement") is entered into by and between Seller and Auctioneer.

**RECITALS**

A.  Auctioneer is engaged in the business of selling real property at auction, and has an established place of business from which to perform real property auction marketing services and through its joint venture with a licensed Indiana and Wisconsin real estate broker and auctioneer (if necessary) promotes property in Illinois Indiana and Wisconsin for a public auction sale in Illinois.

B.  Seller is the owner of the Property in the States of Illinois, Indiana and Wisconsin which Seller wishes to sell at an auction.

C.  Seller wishes to retain Auctioneer as the exclusive broker and auctioneer for purposes of marketing and auctioning the Property, and Auctioneer is desirous of same.

NOW THEREFORE, in consideration of the mutual covenants contained herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**AGREEMENT**

**1. Auctioneer's Duties**

1.1.  Seller hereby grants to Auctioneer the sole and exclusive right to offer the Property for sale, on the terms set forth herein.  Said right shall commence at 12:00 AM on the date of this Agreement and shall terminate ninety (90) days following the actual date of the auction.  The last day of this period shall be referred to as the "Termination Date."  The exclusive right herein granted shall be irrevocable until the Termination Date, unless (1) the Termination Date is mutually rescinded, or extended, by the parties hereto or (2) if either party breaches any term of this Agreement, the non-breaching party shall have the right and option to terminate this Agreement.

1.2.  Notwithstanding anything contained herein to the contrary, no commission will be due and owing pursuant to the terms of this Agreement if (1) the property is residential; and (2) after the Termination Date, a valid written listing is entered into with another licensed real estate broker.

1.3  Designated Agent.  Auctioneer designates Rick Levin ("Seller's Designated Agent"), a sales associate affiliated with Auctioneer as the only legal agent of the Seller.  Auctioneer reserves the right to name additional designated agents when in Auctioneer's discretion it is necessary.  If additional designated agents are necessary, Seller shall be informed in writing in advance of their designation.  Seller acknowledges that Seller's Designated Agent may from time to time have another sales associate, who is not an agent of the Seller, sit an open house of Seller's property or provide similar support in the marketing of Seller's property.  Seller understands and agrees that this agreement is a contract for Auctioneer to market Seller's property and that Seller's Designated Agent is the sole legal agent(s) of Seller.  Seller's Designated Agent will be primarily responsible for the direct marketing and sale of the Property.  Seller has been informed that potential buyers may elect to employ the services of a licensed real estate broker or sales associate as their own agent (buyer's agent).

1.4  Dual Agent Consent.  The undersigned Rick Levin ("Licensee"), may undertake a dual representation (represent both the seller or landlord and the buyer or tenant) for sale or lease of the Property.  The undersigned Seller acknowledges that it was informed of the possibility of this type of representation.  BEFORE SIGNING THIS DOCUMENT PLEASE READ THE FOLLOWING: Representing more than one party to a transaction presents a conflict of interest since both clients may rely upon Licensee's advice and the client's respective interest may be adverse to each other.  Licensee will undertake this representation only with the written consent of ALL clients in the transaction.  Any agreement between the clients as to a final contract price and other terms is a result of negotiations between the clients acting in their own best interests and on their own behalf.  You acknowledge that Licensee has explained the implications of dual representation, including the risks involved, and understand that you have been advised to seek independent advice from your advisors or attorneys before signing any documents in this transaction.

WHAT A LICENSEE CAN DO FOR CLIENTS WHEN ACTING AS DUAL AGENT
1. Treat all clients honestly.
2. Provide information about the property to the buyer or tenant.
3. Disclose all latent material defects in the property that are known to Licensee.
4. Disclose financial qualification of the buyer or tenant to the seller or landlord.
5. Explain real estate terms.
6. Help the buyer or tenant to arrange for property inspections.
7. Explain closing costs and procedures.
8. Help the buyer compare financing alternatives.
9. Provide information about comparable properties that have been sold so both clients may make educated decisions on what price to accept or offer.

WHAT LICENSEE CANNOT DISCLOSE TO CLIENTS WHEN ACTING AS A DUAL AGENT
1. Confidential information that Licensee may know about the clients, without that client's permission.
2. The price the seller or landlord will take other than the listing price without permission of the seller or landlord.
3. The price the buyer or tenant is willing to pay without permission of the buyer or tenant.
4. A recommended or suggested price the buyer or tenant should offer.
5. A recommended or suggested price the seller or landlord should counter with or accept.
If either client is uncomfortable with this disclosure and dual representation, please let Licensee know.  You are not required to sign this document unless you want to allow the Licensee to proceed as a Dual Agent in this transaction.  By signing below, you acknowledge that you have read and understand this form and voluntarily consent to the Licensee acting as a Dual Agent (that is, to represent BOTH the seller or landlord and the buyer or tenant) should that become necessary.

```
┌─────────────────────────────────────────────┐
│  SELLER - INITIAL HERE ⇨                      │
└─────────────────────────────────────────────┘
```

1.5 Seller understands and agrees that Auctioneer may from time to time represent or assist other sellers who may be interested in selling property to buyers with whom Auctioneer has a buyer agency contract or with whom Auctioneer is working as a customer.  The Seller consents to Auctioneer's representation of such other sellers before, during and after the expiration of this Agreement and expressly waives any claims, including, but not limited to, breach of fiduciary duty or breach of contract based solely upon Auctioneer's representation or assistance of other sellers who may be interested in selling property to buyers with whom Auctioneer has a buyer agency contract or with whom Auctioneer is working as a customer.

1.6  Provided the Property is not open to the public and Seller has ceased its business operations from the Property, Seller agrees that Auctioneer may enter the Property at reasonable times for the purpose of showing it to prospective buyers before, at or after the auction and Auctioneer shall have the right to place auction signs on the Property, or as near the Property as possible, for the purpose of notifying the public and other parties as to the conduct of the auction.  Auctioneer shall not be charged with custody or control of the Property at any time, including during showings of the Property, nor shall Auctioneer have any duty or obligation with respect to the management, maintenance, upkeep or repair of the Property.

1.7 Auctioneer agrees to:

1.7.1.  acquire and collect information about the Property, however Auctioneer shall not be required to independently investigate the Property or confirm information Seller or its agent provides Auctioneer;

1.7.2.  advertise it for auction;

Document #: 457403-v4

1.7.3.  accept delivery of and present to the Seller offers and counter offers to buy, sell, or lease the Seller's property;

1.7.4.  assist the Seller in developing, communicating, negotiating, and presenting offers, and notices that relate to the offers and counteroffers until a lease or purchase agreement is signed and all contingencies are satisfied or waived;

1.7.5.  answers the Seller's questions relating to offers, counteroffers notices and contingencies;

1.7.6.  make an earnest and best effort to sell the Property on the terms as set forth herein.

1.8 Auctioneer is hereby authorized by Seller, and Auctioneer shall have the sole and absolute right to market the Property in accordance with the terms of this Agreement, including but not limited to design and placement of advertisements, signage, brochures, any internet homepage and/or other sales materials.

1.9 Auctioneer may, provided it has obtained Seller's prior written approval, which may be withheld in its sole discretion, add the Property to other property in a multiple owner auction sale.

1.10.  Auctioneer shall hold the earnest money pursuant to a separate escrow agreement, as escrow agent, for all contracts to purchase the Property during the terms of this Agreement, including, but not limited to, pre-auction and post-auction sales, if any.

1.11.  Both Seller and Auctioneer agree that Auctioneer's relationship with Seller is that of an independent contractor and not an employee.  Auctioneer retains the right to determine the procedures necessary to conduct the auction and implement said procedures in any manner Auctioneer deems appropriate, subject to the terms of this Agreement.

**2. Auction.**

2.1.  On the Auction Date, Auctioneer shall conduct one competitive public auction of the Property of which Auctioneer is the Property.

2.2.  For the parcels located at 10245 Roosevelt Road, Westchester, IL; 5057 S. Wentworth Chicago, IL and 6574 N. 76th Street, Milwaukee, WI, Inc, the auction shall be conducted with reserve, subject to Seller confirmation.  For the parcels located at 5377 Broadway, Merrillville, IN and 130 S. Virginia Street, Crystal Lake, IL the auction shall be conducted absolute, without reservation.  Seller agrees to execute, or cause to be executed, the Real Estate Contract at the auction for 5377 Broadway, Merrillville, IN and 130 S. Virginia Street, Crystal Lake, IL sold during the absolute rounds of bidding.

2.3.  The successful High Bidders shall deposit, on the day of the auction, a non-refundable earnest money payment in cash or cashier's check for an amount not less than $10,000.  Earnest money shall be increased to ten percent (10%) of the total purchase price within five business days of the auction.

2.4.  A Buyer's Premium Fee ("Premium") shall be defined as three percent (3%) of the final bid or offer ("High Bid") received for the Property.  At the auction, the Premium shall be added to the High Bid, and this total shall be the total purchase price inserted in the Real Estate Contract.  Notwithstanding anything contained herein to the contrary, for offers for the Property accepted by Seller prior to the auction or during the Post-Auction Period: (A) if no Premium is inserted on the face of the Real Estate Contract, it shall be defined as three percent (3%) of the total purchase price set forth in the Real Estate Contract; and (B) if no High Bid is specified on the face of the Real Estate Contract, the High Bid shall be defined as the total purchase price in said offer.

2.5.  Upon full execution of Seller's form Contract, to be signed by High Bidder immediately following the auction, a contract between High Bidder and Seller ("Real Estate Contract") shall exist.  It is agreed by the parties hereto that Auctioneer does not guarantee performance by any High Bidder and, therefore, is not responsible if, for any reason, any High Bidder fails to perform their obligations and duties pursuant to the Real Estate Contract.  The form of Seller's Real Estate Contract is attached hereto as Exhibit __.

2.6.  All sales will be for cash or cashier's check, and closing shall be approximately thirty (30) days after the Auction Date, unless otherwise agreed to by the parties to the Real Estate Contract.

2.7.  Auctioneer shall use Seller's Real Estate Contract form for all offers.  The offer procured by Auctioneer will be sold subject to the terms, conditions, representations and warranties set forth in the Real Estate Contract.

2.8.  Chicago Title Insurance Company shall be designated as escrow closing agent.

**3. Seller's Duties**

3.1.  Seller shall reasonably cooperate with Auctioneer to achieve a sale of the Property as set forth herein, including, but not limited to:

3.1.1.  Providing Auctioneer with documentation and information regarding the Property and any improvements thereon, including, but not limited to, to the extent such documents are in Seller's possession or not in cost to Seller, existing leases, financing, surveys and other matters Auctioneer requests from time to time.  Seller does not represent or warrant to Auctioneer or any other party the truth, accuracy and/or completion of any such information and documentation.

3.1.2.  Giving Auctioneer current evidence of Seller's good and marketable title to the Property.

3.1.3.  Executing Seller's form Real Estate Contract for every Property.

3.2.  Seller hereby represents and warrants to Auctioneer that Seller or a subsidiary of Seller is the legal owner of the Property and the same at closing will not be subject to any leases, other than those provided to Auctioneer upon execution of this Agreement, or contracts to purchase.

3.3.  Seller hereby represents and warrants to Auctioneer that Seller, and the person executing this Agreement on behalf of Seller is not an individual, has the authority, right and power to enter this Agreement.

3.4.  Seller hereby represents and warrants to Auctioneer that Seller has the authority, right and power to sell the Property in accordance with the terms and conditions set forth herein and to convey title to the Property to any duly authorized buyer.

3.5.  Seller hereby represents and warrants to Auctioneer that Seller, to the best of its knowledge, without any investigation, has no knowledge of any notices, suits or judgments by any governmental authority relating to violations at the Property or any governmental ordinance, code or law establishing zoning, construction, plumbing, heating, electrical, fire prevention, air pollution, sanitation or other health, environmental or safety standards applicable thereto.  Seller agrees to give notice to Auctioneer in the event of receipt of any such notice prior to the Auction Date.

3.6.  Seller hereby represents and warrants to Auctioneer that Seller, to the best of its knowledge, without any investigation, has not received notice of:

3.6.1.  any pending or contemplated foreclosure of the Property or improvements thereon;

3.6.2.  violation of condominium declarations, if any, or

3.6.3.  any special assessment pending or contemplated regarding the Property or improvements thereon.

3.6.4.  Seller agrees to notify Auctioneer in writing if Seller receives notice of any of the foregoing prior to the Auction Date.

3.7.  Seller hereby represents and warrants to Auctioneer that Seller has no listing agreement of any kind incorporating the Property in whole or in part with any other party.

04/11/08 3:48:00 PM z:/elk/proposal/mcdonalds agreement.doc

3.8.  Seller shall be responsible for all fees, charges, costs, other expenses or penalties, if any, charged by the holder of any mortgage or trust deed of record regarding the sale of the Property. Furthermore, Seller has consent from any secured lender authorizing the sale of the Property and agreements are in place with said lender for the release of any security agreements. Upon request from Auctioneer, Seller agrees to provide Auctioneer with documentation from any secured lender which indicates (1) Seller has that lender's consent; (2) said lender authorizes the sale of the Property, and (3) that agreements are in place with said lender for the release of any security agreements.  If Seller fails to provide Auctioneer with the requested documentation from any secured lender, Auctioneer shall have the right to declare Seller in material breach of this Agreement and the provisions of paragraph 4.1.6. shall become effective.

3.9.  Seller hereby indemnifies Auctioneer for any claims brought by third parties based on Seller's failure to disclose the existence of any security agreements or secured claims against the Property, such indemnity to include reimbursement for any reasonable attorneys' fees and costs incurred by Auctioneer in defense of any such claim.

3.10.  Seller hereby represents and warrants to Auctioneer that Seller shall refer to Auctioneer all inquiries on, and offers it receives to purchase, the Property during the term of this Agreement, and Seller shall promptly inform Auctioneer of all such inquiries and offers.  Seller agrees to conduct all negotiations through Auctioneer.  Seller agrees not to disclose to any third parties the terms of any offers received during the term of this Agreement without first obtaining Auctioneer's express consent.  Seller's failure to abide by any term set forth in this paragraph may, at Auctioneer's sole option, be deemed a material breach of this Agreement, and subject Seller to the terms of Paragraph 4.1.6.

3.11  Seller acknowledges that Auctioneer is not obligated to and has not made any independent investigation of the condition of the Property including, but not limited to, the physical condition of the structure (exterior or interior), the fixtures, personal property and equipment therein, if any, or any environmental matters with respect thereto (collectively the "Physical Condition").  Auctioneer has the right to insert in the Real Estate Contract an acknowledgment by the purchaser to the foregoing.  Seller shall indemnify, defend and hold Auctioneer harmless against any claim, demand or lawsuit with respect to the Physical Condition of the Property, including, but not limited to, claims and suits for personal injury, death, property damage or otherwise actually or allegedly resulting from the condition or repair of the Property or any part thereof, including all costs, expenses, and damages, including reasonable attorneys' fees, related to any claims, suits, or judgments incidental to the foregoing.

3.12.  If the property is other than a condominium or a cooperative, then prior to closing, Seller shall furnish a survey if any, that is in its possession. Seller makes no representation or warranty regarding the truth or accuracy of any such survey.  If Purchaser or Purchaser's mortgagee desires a more recent or extensive survey, same shall be obtained at Purchaser's expense.

3.13.  Intentionally Deleted

3.14.  Intentionally Deleted

3.15.  Auctioneer has advised Seller on the safeguarding or removal of valuables now located within the Property and the need to obtain personal property insurance through the Seller's insurance company.  If property is leased, Seller agrees to advise his tenant of the foregoing.

4.  **Auctioneer Compensation and Marketing Expenses.**

4.1.  Commission.

4.1.1.  Seller agrees to pay Auctioneer a commission in the amount equal to: (1) two percent (2%) of the High Bid; but not including the Premium if (1) if any purchaser becomes ready, willing and able to purchase the Property, regardless if said person is found by Auctioneer, Seller, or any other person; or (2) if the Property is sold, gifted, exchanged, transferred, optioned (and such option is exercised before or after the termination of this Agreement), a joint venture is contracted, or the Property is exchanged through or as a result of the service and efforts of Auctioneer, or Seller, or any other person or persons during the period of this Agreement; or (3) if the Property is sold, optioned, joint ventured, transferred or exchanged up to and including the last day of the Post-Auction Period to any person to whom the Property was submitted during the term of this Agreement, provided however the Property is residential property of four units or less and if a valid, bonafide, written listing agreement is entered into with another licensed real broker after the Termination Date, no commission or compensation shall be due and owing pursuant to the terms of this Agreement.  For property which is not residential property of four units or less, if the Property is listed with another broker after the Termination Date, Seller shall be liable for only one commission, the allocation thereof to be determined by the brokers.

4.1.2.  Auctioneer will pay a one percent (1%) co-operating broker fee out of its commission to a licensed and authorized broker whose client closes on the Property.

4.1.3.  In addition to the commission set forth above, Auctioneer shall be entitled to the Premium.

4.1.4.  Auctioneer is authorized to share Auctioneer's compensation or commission with all cooperating brokers, regardless of any cooperating broker's agency relationship to Seller, Auctioneer or the Buyer.

4.1.5.  Commission due to Auctioneer shall be paid at time Seller has received the total purchase price and any and all proceeds of sale under the Real Estate Contract without any conditions or restrictions and all conditions of the sale have been satisfied, and Auctioneer is authorized to deduct the commission and approved expenses (if any) from the earnest money deposit at such time.  If the Property closes in escrow, Auctioneer shall be made a party to each escrow agreement which shall provide that payment of Auctioneer's fees as set forth in this Agreement.

4.1.6.  If this Agreement is canceled or materially breached by Seller, Seller shall pay to Auctioneer the amount of $25,000 (the "Cancellation Fee"), immediately due and payable, not as a penalty, but liquidated damages sustained by Auctioneer by Seller's acts. If Auctioneer's authority to sell the Property is revoked or the Property is withdrawn from the market during the period of Auctioneer's authority to sell hereunder, Seller shall pay Auctioneer upon such revocation or withdrawal, not as a penalty, but as liquidated damages, an amount equal to the Cancellation Fee.  Notwithstanding anything contained herein to the contrary, unpaid portions of the Marketing Fee, if any, shall be payable in addition to, and due concurrently with, the Cancellation Fee.  Seller agrees to reimburse Auctioneer for all costs including reasonable attorneys' fees incurred by Auctioneer to enforce the terms of this paragraph.

4.1.7.  In case there is no closing because of a default by Seller under the Real Estate Contract, Auctioneer's commission shall be immediately due and payable.  Seller agrees to reimburse Auctioneer for all costs including reasonable attorneys' fees incurred by Auctioneer to enforce the terms of this paragraph.

4.1.8.  In case of a default by a purchaser under the Real Estate Contract, the purchaser's earnest money shall be forfeited to Seller.  Seller hereby authorizes Auctioneer to resell the Property at the same total purchase price and on substantially the same terms as the contract under which the original purchaser defaulted.  Said authorization shall exist only during the term of this Agreement and shall not be interpreted to extend the term of this Agreement. If a dispute arises between Seller and purchaser as to whether a default had occurred, Auctioneer shall hold the earnest money and pay it out as agreed in writing by Seller and purchaser or as directed by a court of competent jurisdiction.  In the event of such dispute, Seller agrees that Auctioneer may deposit the funds with the Clerk of the Circuit Court by the filing of an action in the nature of an Interpleader.  The Seller agrees that Auctioneer may be reimbursed from the earnest money for all costs, including reasonable attorney's fees, related to the filing of the Interpleader and hereby agrees to indemnify and hold Auctioneer harmless from any and all claims and demands, including the payment of reasonable attorney's fees, costs and expenses arising out of such default claims and demands.  If Seller defaults, the earnest money, upon written direction by Seller and Purchaser or as directed by a Court of competent jurisdiction, shall be refunded to Purchaser, but such refunding shall not release Seller from the obligation of this Agreement.

4.2.  Marketing Fees.

4.2.1.  The marketing and promotional costs for the Property payable by Seller shall be the Marketing Fee defined herein.  The Auctioneer shall pay any marketing and promotional costs in excess of the Marketing Fee.  The Marketing Fees shall be paid in accordance with the schedule set forth below:

| Marketing Fee Due And Payable On or Before | Marketing Fee |
| --- | --- |
| Ten (10) business days after full and final execution of this Agreement | $45,000 |

4.2.2.  Auctioneer agrees to provide marketing and accounting reports to Seller upon Seller's request.

4.2.3.  Auctioneer reserves the right to cancel the auction or curtail the marketing of the Property if the Marketing Fee is not paid on the dates or dates specified.  Such non-payment, may, at Auctioneer's option, be declared a material breach of this Agreement.

5  **Miscellaneous.**

5.1.  This Agreement shall inure to the benefit of and be binding upon the heirs, representatives, successors and assignes of Seller.

5.2.  Intentionally Deleted

5.3.  If any litigation or controversy arises out of or in connection with this Agreement between the parties hereto, the prevailing party in such litigation or controversy shall be entitled to recover from the other party or parties its reasonable costs and expenses, including without limitation reasonable attorneys' fees and costs.

5.4.  The parties agree that any disputes arising under or in connection with this Agreement shall be litigated, if at all, solely in the courts of the State of Illinois and the jurisdiction shall be the County of Cook.

5.5.  This Agreement shall be deemed to have been executed and delivered in Illinois.  This Agreement and all rights and obligations hereunder, including matters of construction, validity and performance, shall be governed by the internal laws (and not the conflicts of law provisions) of the State of Illinois.

5.6.  This Agreement set forth the entire understanding between the parties relating to the transactions described herein, there being no terms, conditions, warranties or representations other than those contained herein.  This Agreement may be amended only in an instrument signed by both parties hereto.

5.7.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  The parties intend that faxed signatures and that a faxed agreement containing the signatures (original or faxed) of all parties is binding on the parties.  Any faxed document subject to this paragraph shall be re-executed by both parties in an original form.  Neither party shall raise the use of a facsimile machine as a defense to this Agreement and shall forever waive such defense.

5.8.  The parties hereto acknowledge it is illegal for either the Seller or Auctioneer to refuse to show to or sell to any person because of their race, color, religion, national origin, sex, handicap, or familial status.

5.9.  SELLER ACKNOWLEDGES THAT AUCTIONEER AND/OR ITS AGENTS CANNOT ACCURATELY PREDICT THE PRICE THE PROPERTY WILL BRING AT AUCTION AND SELLER FURTHER ACKNOWLEDGES THAT THE AUCTIONEER AND/OR ITS AGENTS HAVE NOT MADE ANY SUCH ASSURANCES OR PREDICTIONS OF PRICE TO SELLER OR SELLER'S AGENTS.

5.10.  Seller and Auctioneer agree that they have had the opportunity to review this Agreement and have an opportunity to be advised by legal counsel as to its contents, requirements and liabilities, and have signed this Agreement and fully understand their respective rights, responsibilities, and obligations as set forth herein.

5.11.  This Agreement may not be assigned, in whole or in part, by either party without the prior written consent from the other party.

5.12.  The recitals set forth above are incorporated herein by this reference.

5.13.  The invalidity of any covenant, grant, condition or provision of this Agreement shall not impair or affect in any manner the validity, enforceability or effect of the remainder of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused their hand, or their duly authorized agent to set their hand, to this Agreement on the day and year set forth below.

AUCTIONEER:

RICK LEVIN & ASSOCIATES, INC.

BY: _Richie Levin, Pres._      4-1-08
                                                DATE

SELLER:

McDONALD'S CORPORATION

BY: _____      4-24-08
     Catherine A. Griffin                    DATE

04/11/08 4:15:04 PM  s:\ria\proposals\mcdonalds agreement.doc