IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NOMANBHOY FAMILY LIMITED PARTNERSHIP, | ) ) ) | |
| Plaintiff, | ) ) | No. 08 C 3787 |
| vs. | ) ) | Magistrate Judge Jeffrey Cole |
| McDONALD'S CORPORATION, McDONALD'S USA, LLC, RICK LEVIN & ASSOCIATES, INC., and RICK LEVIN, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

The Complaint charges that on June 18, 2008, the plaintiff entered into a written contract with McDonald's Corporation and McDonald's USA, LLC ("McDonald's") to purchase five parcels of property in Wisconsin, Indiana and Illinois, and that the next day, McDonald's breached the agreement and sold the properties at auction to other purchasers. The closings are scheduled for October 6. The Complaint seeks injunctive relief prohibiting McDonald's from closing and, alternatively, damages for breach of contract of not less than $5,000,000

On August 4, 2008, the district court granted the plaintiff's Motion For A Temporary Restraining Order and extended it for another 10 days on August 15. It has since expired. The parties have consented to jurisdiction here for the limited purpose of deciding the plaintiff's Motion For A Preliminary Injunction. *See* 28 U.S.C. §636(c).

McDonald's contends (1) that the plaintiff rejected McDonald's written offer (Exhibit A to

Complaint) early in the morning of June 18 – that fact is undisputed – and that a valid and enforceable contract was never formed because the parties' subsequent all-day negotiations did not result in a "meeting of the minds" on all essential terms; (2) that if there was a "meeting of the minds" on June 18, essential terms of the agreement were that the agreement was not to be binding until reduced to writing, executed by the plaintiff, and sent to McDonald's before 1:00 p.m. CDT on June 19 before the auction began; (3) since those conditions precedent did not occur, there was no binding contract, and McDonald's was free to sell the property at auction; and (4) that the Statute of Frauds' requirement that a contract for the sale of land be in writing has not been satisfied and thus the plaintiff cannot prevail.

The plaintiff has filed notices of *lis pendens* on all five parcels of land purchased at the June 19 auction. Under the terms of the auction contracts, If McDonald's cannot deliver clear title by a date certain, the purchasers are entitled to a return of their earnest money deposits, and McDonald's will have no further obligations to them.

## I.
## THE PROCEEDINGS BEFORE THE DISTRICT COURT

On August 4, 2008, the district court entered an order temporarily restraining the defendants from closing on one of the parcels on August 5. The other four closings were scheduled for October 6, 2008. After considering the complaint, the memorandum in support of the motion for injunctive relief, the arguments of counsel, and the affidavit of Shamir Nomanbhoy,[1] the court found that the

---

[1] Mr. Nomanbhoy is one of the limited partners of the Nomanbhoy Family Limited Partnership. The general partner is Nomanbhoy Enterprises LLC. The Nomanbhoy Family Revocable Trust is the sole member of Nomanbhoy Enterprises LLC. Mr. Nomanbhoy is also one of the trustees of the trust. Mr. Nomanbhoy dealt exclusively with McDonald's in the events leading to this suit. Mr. Nomanbhoy was formerly the CEO of Dyna Care Health Care, Inc. which was sold in May 2007 to Amedisys, a publicly held company.

plaintiff had shown a likelihood of success on the merits because the evidence indicated that there was "a meeting of the minds" of the parties on June 18 regarding the sale of the five parcels. (Temporary Restraining Order of August 4, 2008, ¶ 1). The court also found that the plaintiff would suffer irreparable harm if the defendants sold those properties to other purchasers, that it had no adequate remedy at law, and that the balance of equities weighed in the plaintiff's favor. The TRO was set to expire on August 14, 2008.

The plaintiff moved to extend the TRO on August 13. In the interim, McDonald's had submitted its own briefs with exhibits comprised of affidavits of its in-house counsel, Bruce Neumann, Mary Meyer, McDonald's Regional Real Estate Manager for the Chicago Region, and Ira Lauter, an associate at Rick Levin and Associates, Inc., which was acting on behalf of McDonald's and was to be the auctioneer of the properties. Also submitted were the email communications between the parties on June 18, 19, and 20.

On August 14, plaintiff filed a reply brief. While conceding that McDonald's initial offer sent early in the morning of June 18 to Mr. Nomanbhoy was rejected and that over the course of the next ten hours there were numerous offers and counteroffers involving the key terms of the deal, (*see also* Complaint, ¶ 13, admitting continued negotiations), the reply brief argued that in the evening on June 18, Mr. Lauter verbally suggested that the parties return to the original written offer that had been rejected by the plaintiff 10 hours earlier, and that Nomanbhoy agreed. McDonald's vehemently denied the allegation.

McDonald's responded on the 14th with a motion for leave to file a sur-reply, which argued that in Illinois an offer once rejected ceases to exist and cannot thereafter be accepted, that the Statute of Frauds required that the purported verbal agreement to go back to the rejected offer itself

3

had to be in writing and signed by McDonald's to be enforceable. The next day, August 15, the district court granted the plaintiff's motion to extend the TRO for an additional ten days. The court again found that the plaintiff had demonstrated a likelihood of success on the merits, irreparable harm, lack of adequate legal remedy, etc. The Order extending the TRO made no mention of the claimed verbal agreement between McDonald's and plaintiff on the evening of June 18 or of the Statute of Frauds argument raised by McDonald's.

The Order concluded that as a consequence of an email sent by McDonald's to Mr. Nomanbhoy at 11:30 a.m. CDT on the morning of the 19th, all that was required for performance by the plaintiff was that the earnest money deposit be wire-transferred before the auction commenced at 1:00 p.m. CDT. (Order at 2-5, 7):

> [McDonald's] was emphatically clear to Nomanbhoy [in the email] that the validity of the contract and the cancellation of the auction depended *entirely* on confirmation of the wire transfer:
>
>> You must have the earnest money delivered to Rick Levin's account this morning. Our discussions with you are occurring only hours prior to the scheduled auction .... If the earnest money comes in so late that we do not know that we have it, we must have the right to move forward with the auction and all offers/contracts with you are automatically terminated.
>>
>> It is currently 11:30 Central time. The auction is scheduled for 1:00 today. If you have wired the earnest money, you must provide us with the confirmation number immediately.

(Order of 8/15/08, at 7, citing McDonald's Ex. 14)(Emphasis supplied).

The court found that there had been no mention "that the June 19 a.m. proposal needed to be returned prior to the auction's start, only the wire transfer of the earnest money." (*Id.* at 7). Based on the record before it, the court found plaintiff's likelihood of success was "somewhat better than

negligible," thereby tipping the balance in favor of temporary injunctive relief:

> If [plaintiff] timely transferred the money, then he filled the requirements of performance specified by [defendant] and the auction should not have gone forward or, failing that, the auction sales should have been declared void. If he failed, then the contract was void, as specified by [defendant]. Given the possibility that the money transfer occurred in a timely fashion before the commencement of the auction, and that fact has somehow fallen into the interstices of [defendants'] argument, the court finds that the auction and [defendants'] disavowal of the contract on the evening of June 19, 2008 might well have been improper.

(*Id.* at 8). The TRO was extended for an additional ten days; it has since expired.[2]

On August 19, the plaintiff's Motion For A Preliminary Injunction was referred to me for a Report and Recommendation. At the time of the referral, I was out of the country. I met with counsel for the parties on August 29, the day after my return. I granted the parties' requests to file supplemental briefing, which sharpened and clarified the parties' positions. As a consequence of a long-standing prior commitment of McDonald's counsel, oral argument on the Motion For A Preliminary Injunction could not be scheduled until Friday, September 12. On September 9, the parties consented to jurisdiction here for the limited purpose of deciding the Motion For A Preliminary Injunction.

Given significant factual disputes in the affidavits, an evidentiary hearing was scheduled. *In re Aimster Copyright Litigation*, 334 F.3d 643, 654-55 (7th Cir. 2003); *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007). As a consequence of a commitment of Mr. Nomanbhoy, the hearing could not proceed until Tuesday, September 23. Mr.

---

[2] A TRO cannot remain in force for more than 20 days without the consent of the parties. *Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 942 (7th Cir.2006). While the parties can agree to have the TRO extended beyond the 20-day period, if it is extended by the court without consent, it automatically becomes a preliminary injunction, regardless of what the parties or the court may call it. *United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d 918, 923 (7th Cir.2005).

Nomanbhoy testified for the plaintiff, and McDonald's called three witnesses, Mr. Neumann, Ms. Meyer and Mr. Lauter. The hearing was concluded on September 24.

Before turning to the merits, I would like to commend Mr. Widman, counsel for the plaintiff, and Ms. DeHayes and Mr. Haussmann, counsel for McDonald's, for the extraordinary degree of civility and professionalism that they displayed throughout the case and for their skillful written and oral presentations. Ours is an adversarial system, and judges depend upon input from lawyers. *United States v. Cronic,* 466 U.S. 648, 655 (1984); *Burdett v. Miller,* 957 F.2d 1375, 1380 (7th Cir.1992). Indeed, Justice Brandeis was of the view that a "judge rarely performs his functions adequately unless the case before him is adequately presented." *The Living Law,* 10 Ill.L.Rev. 461, 470 (1916). The presentations of the parties in this case more than fulfilled that expectation.

## II.
## THE AFFIDAVITS AND EMAILS OF JUNE 18, 19 And 20

### A.
### The Events of Wednesday, June 18, 2008

Prior to June 18, 2008, Mr. Nomanbhoy, on behalf of the plaintiff, made written offers to McDonald's for five parcels of land McDonald's was offering for sale. *See* Exhibits to McDonald's Opposition to Plaintiff's Motion for Preliminary Inunction, Exs. 4-6. ("Defendants' Ex."). It is undisputed that those offers were rejected. On the morning of June 18 (at 9:47 a.m. CDT/ 7:47 PDT), in response to a seven-page, single spaced, written offer from plaintiff, Bruce Neumann, in-house counsel for McDonald's, sent plaintiff and Ira Lauter, McDonald's agent in the deal, the following email to which was attached as a pdf file a document captioned, REAL ESTATE SALES CONTRACT:

Ira:
Attached is the contract signed by McDonald's.
We have made a few minor changes consistent with the discussions you had with
Mary Meyer. The basic changes are:
the earnest money to 15%,
Closing by July 31, 2008

If we fail to close by this date, we will pay the buyer 2% on the earnest money, prorated to
the closing date or termination
The restrictive covenant has been slightly changed and attached as Exhibit B
The legal descriptions are attached as Exhibit A-2 through A-6

If the contract is acceptable to the buyer, the changes need to be initialed, *the contract
signed*, the earnest money wired.
Please let us know if you have any questions.
Thanks
Bruce

(Plaintiff's Ex. B; Defendants Ex. 7)(Emphasis supplied).[3]

In brief, the offer was $1.4 million, with an earnest money payment of $210,000, which was

15% of the purchase price. It was to be held by Chicago Title Insurance Company. McDonald's was

to deliver a survey of the property if it had one. There was a restrictive covenant on plaintiff's future

use of the land for a period of 20 years: "the property could not be used for and plaintiff and any

successor will not lease/sell to any tenant/buyer whose primary purpose is the sale of hamburgers,

chicken and/or coffee." The covenant went on to list 34 fast-food franchises that were also

prohibited. The offer was irrevocable until 5 p.m. Chicago time on June 18, 2008. (Plaintiff's Ex.

A; Defendants' Ex. 7).

From the beginning, and consistently throughout the negotiations, McDonald's insisted on

a signed contract – as did the plaintiff. Not only did Mr. Neumann's email specify that the plaintiff

---

[3] While the wording of the Real Estate Sales Contract cast the purchaser as the offeror and
McDonald's the offeree ("Purchaser's execution delivery of this Contract to Seller is an irrevocable offer"),
since the document was signed by McDonald's it actually was the offeror. *Cf. Borg-Warner Corp. v. Anchor
Coupling, Inc.*, 16 Ill.2d 234, 240-41, 156 N.E.2d 513, 516 (1959).

was required to sign the Real Estate Sales Contract, but Paragraph 14 of the offer required that it be

"execut[ed] and deliver[ed]" to McDonald's by the plaintiff. *Id.*

Mr. Nomanbhoy emailed his rejection of the offer to Ira Lauter, who was negotiating on

behalf of McDonald's, at about 11:30 p.m. CDT/9:30 a.m. PDT. He volunteered to come to Chicago

to negotiate in person. It was clear from his email that, at that point, there was no "meeting of the

minds":[4]

> There are too many changes to contract language that was previously agreed. I had
> understood from your emails we were only negotiating on price and earnest money,
> after you conveyed to me yesterday that all language was acceptable as written to
> McDonalds [sic].
>
> At this point, I believe that the best way to handle this is if I catch a flight this
> afternoon, and we have a meeting tomorrow morning at 8am at a location convenient
> to Bruce [Neumann] and Mary [Meyer] in Chicago. I will bring cashiers checks for
> the earnest money deposit.
>
> I am willing to work with McDonalds [sic] at arriving at language that is mutually
> acceptable, but given the last few days, I don't believe this can be done on the phone.
> I will come there at no obligation to McDonalds [sic] or yourself, and I hope we can
> work this out in the morning before the auction is scheduled to start. The only thing
> I ask is that McDonalds have all the right decision makers in the room!
>
> Please let me know if a meeting can be arranged. I am on my way to get the checks
> made at Fidelity in Palo Alto, but you can reach me on my cell at 408-xxx-xxxx.
> Sincerely, Shabbir Nomanbhoy

---

[4] Although it is a handy shorthand, the phrase is misleading if taken literally. *See Laserage
Technology Corp., v. Laserage Laboratories, Inc.*, 972 F.2d 799,802 (7th Cir. 1992). Since Justice Holmes'
classic article, *The Path of the Law*, 10 Harv.L.Rev. 457 (1897), it has been understood that the formation
of a contract does not actually require the meeting of the minds of the parties in the sense the terms convey.
Today there is common agreement that "no one will understand the true theory of contract or be able to
discuss some fundamental questions intelligently until he has understood that all contracts are formal, that
the making of a contract depends not on the agreement of two minds in one intention, but on the agreement
of two sets of external signs- not on the parties having meant the same thing but on their having said the same
thing." *Id.* at 464. *See Navair, Inc. v. IFR Americas, Inc.*, 519 F.3d 1131, 1139 (10th Cir.2008)("Put another
way, the inquiry will focus not on the question of whether the subjective minds of the parties have met, but
on whether their outward expression of assent is sufficient to form a contract.").

(Defendants' Ex. 8; Plaintiff's Ex. G).

McDonald's didn't want to negotiate in person, and Mr. Lauter emailed Mr. Nomanbhoy at about 12:00 p.m. CDT /10:00 a.m. PDT with changes in the language of the restrictive covenant requested by Mr. Nomanbhoy. This version of the covenant was more favorable to plaintiff than the one in McDonald's 9:47 a.m. offer. (Meyer Aff. ¶¶20-21; Neumann Aff. ¶¶ 21-22).[5] But plaintiff balked at the new covenant and again rejected the offer.

At 2:40 p.m. CDT /12:40 p.m. PDT, Mr. Nomanbhoy emailed McDonald's expressing his disappointment with McDonald's refusal to meet with him "to discuss the last minute changes they made to the contract after agreeing on the language previously." (Plaintiff's Ex. D; Defendants' Ex. 9). But he wrote that he would "take one last shot"; he would accept the language in the new restrictive covenant if the price was reduced to $1 million. (*Id.*). Plaintiff's counter-offer reflects his conclusion that the restrictive covenant was too broad to justify anything more than $1 million.

Mr. Lauter responded that McDonald's authorized him to counter-offer with a demand of $1.25 million. (Plaintiff's Ex. E; Defendants' Ex. 9). At 3:26 p.m. CDT /1:26 p.m. PDT, Plaintiff rejected that offer and countered with $1.125 million, and said they needed to figure out how to get the money over, suggesting a meeting in Chicago or San Francisco. (Plaintiff's Ex. D; Defendants' Ex. 9). Mr. Lauter rejected that offer and countered with $1,200,000, which, he said, "is half way between the $1,000,000 and the original $1,4000,000." Lauter's email went on to say: "We will need a Cashier's Check for $300,000 made payable to the Rick Levin & Associates, Inc. Escrow

---

[5] Instead of prohibiting sale or lease to any buyer or tenant that sold hamburgers, chicken or coffee, it prohibited sale or lease "to any regional and/or national restaurant chain or user whose primary purpose is the sale of hamburgers, chicken and/or coffee." (Plaintiff's Ex. C; Defendants' Ex. 9). The list of prohibited franchises remained the same.

Account sent via red Ex with 8:30 a.m. delivery tomorrow." This email also contained a demand

for the immediate return of a signed contract:

> Please revise the $1,400,000 contract to $1,200,000 and send back to me asap and we will
> have it signed. [6]
> We are running out of time.
> 5 00pm CST [sic] is the latest we can get this executed.

(Plaintiff's Ex. E; Defendants' Ex. 9).

> Plaintiff replied at 4:18 p.m. CDT /2:18 p.m. PDT:

> OK, Ira, Deal!

> Remember that [McDonald's] will supply the survey, and the interest is 2% per
> month, if they delay closing.

> Are you sure you want me to make changes? Will Mcdonalds [sic] accept my
> changes, or will they want the clean contract? Maybe its [sic] better to have them
> make changes, especially as the covenant is only on email. Email me the complete
> contract: with all changes, *and I will sign and send back right away*. Meanwhile I am
> calling fedex for pickup.

> The contract says checks should be made out to chicago title company as escrow
> agent, not Rick Levin and associates. Please clarify on contract.

> I still need to speak with Bruce, as he is the signor on the contract. Please advise
> when I can call him. Also, please send me the signed contract from Mcdonald's [sic]
> authorizing Rick Levin as auctioneer/agent.

(Plaintiff's Ex. E; Defendants' Ex. 9)(Emphasis supplied).

At about 5 p.m CDT /3 p.m. PDT, Mr. Nomanbhoy, Ms. Meyer, Mr. Neumann, and Mr.

Lauter had a telephone conference. Plaintiff suggested that Mr. Lauter fly to San Francisco that

evening to pick up the earnest money, but both Ms. Meyer and Mr. Neumann said that did not make

sense because the parties still were not in agreement on the terms of the contract, and McDonald's

---

[6] Referring to the document Mr. Neumann sent at 9:47 a.m. CDT, which plaintiff rejected.

still did not have a final written contract executed by plaintiff. Mr. Neumann told plaintiff that he would send plaintiff an amended document that plaintiff would need to sign and return. Mr. Neumann's affidavit asserts that he was unequivocal in telling Mr. Nomanbhoy that if McDonald's did not receive the revised document before the auction took place, McDonald's would go forward with the auction, and that it would not sell the five parcels to plaintiff.

This version of events was confirmed by the hearing testimony of Mr. Neumann, Ms. Meyer and Mr. Lauter. It was disputed by Mr. Nomanbhoy's Supplemental Affidavit filed on 9/10 (*Id.* at 4, ¶6) and by his testimony at the evidentiary hearing. *See infra* at 22.

Mr. Neumann told Mr. Nomanbhoy that, consistent with McDonald's practice, a new document would need to be agreed to and authorized by the parties so that the parties would be clear as to the terms being offered and accepted; in light of the extensive negotiations throughout the day; that way, all parties would thereby understand what the final agreement was. Plaintiff indicated that he fully understood that a final contract would need to be executed. (Meyer Aff. ¶ 22; Neumann Aff. ¶¶ 23-24; Lauter Aff. ¶ 23).

Late in the afternoon of the 18th the parties were still discussing price. The $1.2 million price went by the wayside when Ms. Meyer spoke to her supervisor and was told that McDonald's would not take less than $1.4 million. (Meyer Aff. ¶ 23). She told Mr. Lauter, who sent an email to that effect to plaintiff at 5:36 p.m. CDT /3:36 p.m. PDT. (Plaintiff's Ex. I; Defendants' Ex. 10). Mr. Nomanbhoy's email rejected the offer and countered with $1.2 million. The email makes clear Mr. Nomanbhoy's insistence that there be a signed contract:

> Hello Ira
> This is a moving target!
> I would appreciate your calling me to let me know what happened this time.

There is still an opportunity to save the deal (at 1.2mil). I can fly
out there if you call me in forty five minutes. Or I can wire the
money tomorrow-morning, *if I have the contract revised and signed*
tonight.

Shabbir

(Plaintiff's Ex. I; Defendants' Ex. 11)(Parenthesis in original)(Emphasis supplied).

Mr. Lauter responded:

Shabbir
As we discussed, Mary will meet with you tomorrow in the morning if you will pay
1.4 MIL for all 5 properties.
Please advise your decision.
Best regards,
Ira

(Plaintiff's Ex. I-J; Defendants' Ex. 11).

Plaintiff rejected the counter-offer and countered with $1.2 million. Again stressed was Mr.

Nomanbhoy's awareness of the need for and insistence on a signed contract:

Ira,

Its too late to fly out there or do fedex, as we are past both deadlines.

I am willing to do the deal at 1.2 million as they
agreed earlier. I would wire the money to the
escrow account first thing tomorrow morning at
8am, and it would reach you before 1pm.

*I would need the revised contract, signed, tonight.* I
also need on McDonalds letterhead that you are the
escrow agent, and showing the escrow account info in
that same letter.

Please advise.
Shabbir

(Plaintiff's Ex. I-J; Defendants' Ex. 11)(Emphasis supplied).

McDonald's responded:

Shabbir-

As we discussed, McDonald's will only sell the properties for a combined $1,400,000. If you will pay 1.4 MIL they will sign the contract as agreed and cancel the Auction. Please advise if you will pay 1.4 MIL?

Best regards,
Ira

(Plaintiff's Ex. I-J; Defendants' Ex. 11).

At 8:02 p.m CDT /6:02 p.m. PDT, Mr. Nomanbhoy agreed to pay $1.4 million for the five properties. He asked defendants to "revise the contract for the interest rate [in the event of a delay in closing caused by McDonald's], escrow agent, survey, and dates." Mr. Nomanbhoy stressed that he needed a cover letter on McDonald's letterhead saying that Rick Levin and Associates was the escrow agent and instructing him to wire the earnest money to a specific account. (Plaintiff's Ex. J; Defendants' Ex. 11). It is at this point that the historical record becomes opaque, and the parties' versions of events dramatically diverge.

Mr. Nomanbhoy's affidavit alleges that almost immediately thereafter he had a phone conversation with Mr. Lauter during which he asked Lauter "to send a fully revised contract containing all the terms we had discussed." Nomanbhoy Aff. at ¶16. (Document No. 14-2, filed 7/28/08). Lauter said that he could not get him a revised contract that evening, because Mr. Neumann was unavailable, and Lauter suggested that Mr. Nomanbhoy use the original real estate sales contract signed by McDonald's and sent earlier that morning. (Plaintiff's Exs. A-B; Defendants' Ex.7). This, of course, constituted a new offer by McDonald's but on the same terms as the original offer rejected by Nomanbhoy that morning. The original terms differed – and in one particular quite significantly – from the terms the parties had negotiated over the past 10 hours.[7]

---

[7] For example restrictions on who plaintiff could sell or lease to were more favorable to McDonald's, (continued...)

Mr. Nomanbhoy's affidavit asserts that he accepted this offer, because the issues of who would provide the survey and the interest to be charged in the event McDonald's did not close (i.e., 2% per annum vs. 2% per month), were minor, and he wanted to have a signed contract before he sent any earnest money. (Nomanbhoy Aff. ¶ 16).[8] This, however, ignores the differences in the two versions of the restrictive covenant, which was not a minor matter.

In any event, the Lauter affidavit's version of the conversation is radically different, as was his testimony at the evidentiary hearing. While he agreed that Mr. Nomanbhoy again asked him to send a fully revised document, he vehemently disputed the balance of the claimed conversation, branding it as "false." His version of the conversation is that he didn't suggest anything, and that Mr. Nomanbhoy told him that he did not need Mr. Neumann to send him a revised contract on the 19th because "the prior contact was fine." Lauter claims he rejected this suggestion, reminding Nomanbhoy that he had to execute and deliver the revised contract that would be sent by Neumann on June 19. (Lauter Aff. ¶ 33). His testimony at the evidentiary hearing was consistent with this version.

About a half hour later, around 8:30 p.m. CDT /6:30 p.m. PDT, Mr. Nomanbhoy, Ms. Meyer, and Mr. Lauter had a conference call. Consistent with McDonald's repeated insistence on a signed contract, Ms. Meyer's affidavit asserts that she told Mr. Nomanbhoy that Mr. Neumann would be

---

[7](...continued)
in the original offer, as were the terms relating to penalties in the event McDonald's did not close on time, and the obligation of McDonald's to provide surveys on the property. The negotiated new terms required McDonald's to provide surveys on the property (whether it had them or not) and to pay interest on the earnest money at 2% per month (instead of per annum), and the restrictive covenant negotiated during the course of the day was now more favorable to the plaintiff.

[8] At the evidentiary hearing, Ms. Meyer testified that these two terms were worth $15,000 to $20,000 to plaintiff. The evidence showed that plaintiff was at one point only willing to pay $1,000,000 with the original restrictive covenant in place.

14

sending him a revised document early on the following morning – June 19. Plaintiff agreed that when he received it, he would initial, sign, and return it in the morning. Ms. Meyer says that she told Mr. Nomanbhoy that the auction would proceed if the defendants did not receive the signed contract and the earnest money in the morning.[9] Mr. Nomanbhoy said he understood. (Meyer Aff. ¶¶ 25-26; Lauter Aff. ¶¶ 27-28). No mention was made of the alleged deal he had just made with Lauter.

Sometime after the preceding conversation – but before 9:17 p.m. CDT /7:10 p.m. PDT-- Mr. Lauter called Mr. Nomanbhoy to confirm that Mr. Levin would be the escrow agent – a representation confirmed that evening in writing by McDonald's. (Lauter Aff. ¶ 33). During that conversation, Mr. Nomanbhoy again asked Mr. Lauter to send him a fully revised contract.

At 8:59 p.m. CDT /7:59 p.m. PDT, Ms. Meyer emailed Mr. Nomanbhoy. The first sentence of her two sentence email noted that the letter Mr. Nomanbhoy wanted acknowledging that Rick Levin and Associates was acting for McDonald's was attached. The second sentence stated: "We will need the wire *and contract very early tomorrow, or we will have to go forward with the Auction.*" (Plaintiff's Ex. K; Defendants' Ex. 11)(Emphasis supplied). At the evidentiary hearing, Mr. Nomanbhoy testified that no one ever told him there had to be a signed contract returned to McDonald's prior to the auction at 1:00 p.m. on the 19th, and while he acknowledged reading the email from Ms. Meyer, he said he did not notice the second sentence. *See infra* at 23.

At 9:17 p.m. CDT /7:17 p.m. PDT, Mr. Nomanbhoy sent the following email to Mr. Lauter, Ms. Meyer, and Mr. Neumann:

---

[9] Receipt in "the morning" would necessarily be at least an hour before the auction was to begin at 1:00 p.m.

*The contract* is acceptable, *as I indicated to Ira* [[10]]. I am waiting for Mary to clarify, on McDonalds letterhead, which escrow agent will be used (I understand you want a change to Rick Levin Asociates[sic], though *contract* says Chicago Title) and where I should send the earnest mony.

I am happy to accomodate[sic] your request to wire the earnest money tomorrow morning, even though *the contract* mentions a date of June 26 for earnest money receipt. If you prefer, there is a Chicago Title Co office near my house in Saratoga, CA, that we could use.
Sincerely,
Shabbir Nomanbhoy

(Plaintiff's Ex. L)(Emphasis supplied)(Parentheses in original).

At 10:18 p.m. CDT /8:18 p.m. PDT, Mr. Neumann emailed Nomanbhoy to let him know that Rick Levin would be the escrow agent, and that the earnest money had to go out first thing in the morning and be received before the auction. He also requested a wire confirmation number from plaintiff. (Plaintiff's Ex. M; Defendants' Ex. 20).

In response to Ms. Meyer's email of 8:18 p.m. (Defendants' Ex. 11; Plaintiff's Ex. K) informing him that the wire transfer *and contract* had to be received very early in the morning of June 18 in order for the auction not to proceed, Mr. Nomanbhoy emailed Ms. Meyer. The email stated that he had faxed wire instructions that evening but made no mention of Ms. Meyer's insistence that the contract be received by McDonald's on the morning of June 19. (Plaintiff's Ex. N).

At 10:48 p.m. CDT /8:48 p.m. PDT – more than 2 hours after the hotly disputed phone call between Lauter and Nomanbhoy – Mr. Lauter emailed Mr. Neumann:

I also asked him verbally to send us the wire confirmation number first thing.

---

[10] As discussed *infra* at 27, neither in this nor any other email did Mr. Nomanbhoy ever refer to Lauter's claimed offer to revert back to the original offer and his supposed acceptance of that offer.

16

I would like him to send us back the revised signed contract prior to the 1:00pm Auction time with the revised deed restriction and changes incorporated in it.

Not sure why, however, Shabbir is saying he is no longer worried about the contract (which has me worried) and he will send the money without a new contract as the contract is acceptable to him.
Thank you and have a good night.
Ira

(Defendants' Ex. 20). And so ended the very busy day of June 18, 2008.

## B.
## The Events Of Thursday, June 19, 2005

The next morning, Mr. Nomanbhoy's affidavit asserts that he called Mr. Lauter at 6:45 a.m. PDT /8:45 a.m. CDT to inquire if anything had changed from "the prior evening," and was assured that they were "okay with the contract, and we are just waiting for the earnest money *with the contract.*" (Nomanbhoy Aff. ¶ 21)(Emphasis supplied). Mr. Nomanbhoy then wired the funds, but did not send the contract, although at the hearing he said that he initialed each page indicating his acceptance of each term before 9:00 in the evening on June 18. As we shall see, his claimed reasons for not sending the contract either that night or early the next morning are not credible, and undercut his claim that he and Lauter agreed to revive McDonald's original offer.

Mr. Lauter's affidavit admits that Mr. Nomanbhoy did call him, but insisted that the purpose of the call was to find out when he could expect the revised contract from Neumann. At 9:03 a.m. CDT /7:03 a.m. PDT, Mr. Neumann emailed to Mr. Nomanbhoy a "Revised Contract." Copied on the email were Mr. Lauter and Ms. Meyer. The email outlined the terms of the revised contract and instructed Nomanbhoy to return the signed contract:

Attached is the revised contract.
The purchase price is $1.4 Mill
Penalty if we do not close is 2% per month of the earnest money

17

We provide surveys.
If we do not have the earnest money prior to the auction (or If the auction otherwise occurs), the contract is null and void, (I have inserted this language to make if [sic] clear that we must have the $ prior to the auction and if the $ comes in so late such that we do not know that the $ has arrived and the action occurs, the contract is void.) I can not be In a situation where I have sold a site to two parties.

Shabbir:
Please initial on each page next to each of my (BAN) initials (including the bottom corner of each page),
*send the contract back to us*
wire the earnest money and Inform us of the confirmation number.
Thnks
      Bruce

(Plaintiff's Ex. P; Defendants' Ex. 12)(Emphasis supplied).

The revised contract was the original offer with the revision negotiated by the parties on the 18th. (*Compare* Defendants' Ex. 5 with Defendants' Ex. 12). The price was $1.4 million and the earnest money amount was $210,000 (which is 15% of $1.4 million) as it had been in the original rejected offer. The restrictive covenant, which had occupied so much of the parties' energy and time during the negotiations of June 18 was the version discussed by the parties on June 18 and was more favorable to the plaintiff than the restrictive covenant in McDonald's initial offer. One term, however, was added to paragraph 14 by Neumann that had not been agreed upon by the parties on the 18th and was not in the original version. Paragraph 14 of the revised contract provided:

"In the event Seller has not received the Earnest Money before the commencement of the auction of the Properties on June 19, 2008, *or if the auction otherwise occurs,* this Contract shall be null and void and of no further force or effect." (Defendants' Ex. 12)(Emphasis supplied).

The italicized term was unacceptable to Nomanbhoy, and at about 10:30 a.m. CDT/8:30 a.m. PDT, he told Lauter that he would not sign the Revised Contract and sought to renegotiate the language of paragraph 14. (Lauter Aff., Defendants' Ex. 3 at ¶36). Mr. Lauter forwarded the

18

information to Mr. Neumann, who sent the following email at 11:30 a.m. CDT /9:30 a.m. PDT:

> Shabbir:
> Ira expressed your desire to revise paragraph 14 of the contract and alternatively that you were "accepting" the contract from yesterday.
>
> I want to make sure that I am very clear and that you understand McDonald's position.
> The only offer/contract open to you for acceptance is the offer/contract set fort[sic] below and previously forwarded to you this morning. All prior offers/contracts have been rejected and are not valid.
>
> You must have the earnest money delivered to Rick Levin's account this morning. Our discussions with you are occurring only hours prior to the scheduled auction. I can not put McDonald's or Rick Levin in a situation where you continue to claim the earnest money has been wired, we have not received it and then are forced to decide whether to cancel the auction with the hope that the earnest money will arrive or move forward with the auction and risk "selling" the sites to two parties. If the earnest money comes in so late that we do not know that we have it, we must have the right to move forward with the auction and all offers/contracts with you are automatically terminated. If we were to receive your earnest money after the auction had commenced, it would be promptly returned to you.
>
> It is currently 11:30 Central time. The auction is scheduled for 1:00 today. If you have wired the earnest money, you must provide us with the confirmation number immediately.
>
> Bruce Neumann

(Defendants' Ex. 14).

The "offer/contract set fort[sic] below" was that attached to Mr. Neumann's earlier email to Mr. Nomanbhoy at 9:03 a.m. CDT. (Defendants' Ex. 12). It provided not only that the earnest money had to be paid in a timely way (¶5), but also – like the original sent on June 18 – plainly obligated Mr. Nomanbhoy to "execute and deliver" the revised contract – not some other contract unilaterally chosen by Mr. Nomanbhoy – to McDonald's. (Defendants' Ex. 7, ¶14; Defendants' Ex. 12, ¶14; Plaintiff's Ex. A, ¶14). In short, Exhibit 14 did not eliminate Mr. Nomanbhoy's obligation to sign and return the contract to McDonald's prior to the auction – a term repeatedly insisted on by

19

McDonald's in emails and in phone conversations and agreed to by Mr. Nomanbhoy on the 18th. [11]

At about 12:00 p.m. CDT/10:00 a.m. PDT, Mr. Lauter called Nomanbhoy to ask about the June 19 revised contract and the earnest money. Lauter claims that during the call he "pleaded with Nomanbhoy to sign" the revised contract and confirm that the money had been wired. According to Lauter, Nomanbhoy said he couldn't send McDonald's a signed document because he had to take his daughter to the airport. Mr. Lauter concludes that this excuse was false because he could hear a dog barking in the background, indicating to him that Mr. Nomanbhoy was at home. (Lauter Aff., Ex. 3, ¶38).

At 12:05 p.m. CDT/10:05 a.m. PDT, Mr. Neumann sent Mr. Nomanbhoy another email: "as of 12:05 we have not received the contract or wire." (Plaintiff's Ex. O; Defendants' Ex. 16). Then, forty-five minutes later came this email, which insisted on immediate delivery of the contract:

> Shabbir-
> Rick is contacting the bank to confirm the wire.
> Rick is also preparing to tell bidders that there is no auction.
> I am going down to a lower level in a hotel . . . where we were to conduct the auction.
> *Please send the contract to all parties on this email ASAP.*
> I look forward to us *receiving your contract to get this all wrapped up.*
> Thank you,
> Ira

(Plaintiff's Ex. O; Defendants' Ex. 16)(Emphasis supplied).

Although the earnest money was timely received, no signed contract – either the June 18 version or the revised version of June 19 – was sent or received prior to the auction at 1 p.m. CDT.

---

[11] Because Exhibit 14 did not have the revised contract attached to it, and did not appear as part of the actual email string, it appeared to be a stand alone email that only required delivery of the earnest money and not execution and delivery of the contract. Even McDonald's "Opposition To Plaintiff's Motion For A Preliminary Injunction" (filed August 11) only refers to Exhibit 14, and does not simultaneously refer the reader back to Exhibit 12, thus fostering the impression that the email was an isolated communication.

(Meyer Aff. ¶ 37; Neumann Aff. ¶ 30; Lauter Aff. ¶ 40). It is undisputed that Mr. Nomanbhoy has never signed the revised contract, and that he did not send the original June 18 version to McDonald's until four hours after the auction was over. (Lauter Aff. ¶41).

At 4:30 p.m. CDT /2:30 p.m. PDT, on June 19, Mr. Nomanbhoy emailed Ms. Meyer, Mr. Lauter and Mr. Neumann, saying that he was attaching "the copy of the contract *you requested back with my initials*.[12] I am glad to send this copy to you for your records, even though there is no requirement to do so to make it effective." (Defendants' Ex. 17)(Emphasis supplied). The email went on to explain:

> This contract is the one executed by Bruce yesterday, and which I had informed you yeterday [sic] I was accepting, and on the basis of which I sent a wire this morning for $210,000 to Rick Levin & Associates. Ira acknowledged receiving the money. You should have received the money by about 12-30pm in chicago[sic], as my bank called me at 10-15 am in CA, and I promptly called Ira with the Federal reserve confirmation number. Again, I was happy to accomodate[sic] your request and wire you the money earlier than required in this contract.

Curiously, Mr. Nomanbhoy, having purportedly agreed with Mr. Lauter to revert back to the June 18 offer, went on to discuss further the June 19 revised contract, which he found acceptable except for a clause in paragraph 14:

> The contract changes you faxed me this morning are all fine, except the changes at the bottom of item 14, which would allow you to unilaterally resell the properties at auction. At this time, hopefully, this is all moot, so I am willing to accept the other changes to the contract, if you will be so kind as to delete this clause, and resend me the contract.

(Defendants' Ex. 17).

On June 20, Mr. Neumann rejected what he properly characterized as Mr. Nomanbhoy's

---

[12] The contract requested by Mr. Neumann was the June 19 revised contract, not the June 18 initial offer that Mr. Nomanbhoy attached to the email and that he had initially rejected.

"counteroffer" and said that McDonald's "had no interest in pursuing a possible agreement or transaction with you":[13]

* * *

On Wednesday evening [June 18] you were informed that our offer to you was for $1.4 million, plus various other terms. You immediately rejected this offer. Approximately 3 hours later you made a counter-offer by contacting Ira and stating you would now accept the terms contained in our prior offer. We did not and do not accept your "counter offer."

On Thursday morning [June 19] we extended another offer to you. I followed-up on this offer with an e-mail to you stating that the only offer available to you was the Thursday morning offer. You rejected this offer and responded by initialing and returning the Wednesday evening offer. As stated above, this offer was no longer valid and was not available for acceptance by you.

(Defendants' Ex. 19).

At 5:53 p.m. CDT on June 20, Mr. Neumann emailed Mr. Nomanbhoy to say that there was

no deal. He explained that Mr. Nomanbhoy had rejected the early morning June 18 offer, as well

as the revised offer sent on the morning of June 19. (Plaintiff's Ex. Q).

## C.
## The Evidentiary Hearing On September 23 And 24
## 1.
## The Testimony Of Shabbir Nomanbhoy

The testimony of Mr. Nomanbhoy, like that of Messrs. Neumann and Lauter and Ms. Meyer,

essentially repeated the version of events in his affidavits. Discussed below are those aspects of the

testimony that amplified on or deviated from the affidavits.

Mr. Nomanbhoy testified that did not see the second sentence in Ms. Meyer's two-sentence

email on June 18 at 7:59 p.m. PDT, insisting that the executed contract and earnest money be

---

[13] At the time this email was written, McDonald's had the right under the terms of the contracts with the auction purchasers to walk away from the deals with no obligation other than to return the earnest money deposits. It chose not to do so even though going forward with Mr. Nomanbhoy would have resulted in a greater sales price than that realized in the auction. (Trial testimony of Bruce Neumann and supplemental affidavit of Bruce Neumann).

received before the auction. I do not credit that testimony. Mr. Nomanbhoy was an engineer and a careful and effective negotiator, as the undisputed evidence shows. He was a successful business man who for more than 20 years had been the CEO of a company that enjoyed such success that it was purchased by a publicly traded company. Given the punctiliousness the evidence shows he demonstrated in connection with every phase of this transaction, it is simply not credible to believe that he read only the first sentence of Ms. Meyer's email, but not the second.

The McDonald's witnesses were emphatic that they told Mr. Nomanbhoy that McDonald's had to have a signed contract or the auction would go forward and they pointed to email exhibits that made the point in various ways. They were also in agreement that Mr. Nomanbhoy said that he understood and that he said he would get the signed contract to them in time. I find this testimony credible, and Mr. Nomanbhoy's testimony that he was never told by McDonald's that he had to have a signed contract before the auction not credible.

Mr. Nomanbhoy admitted that he wanted the deal be in writing and that late in the afternoon of June 18, he insisted that a "revised," "clean contract," incorporating agreements made that afternoon be signed that evening. (Plaintiff's Ex. I, at 1; Defendants' Ex. 11, at 3; Nomanbhoy Aff. ¶16). He said he "thought [he] needed everything in writing." He was quite clear that without a signed contract he would not send the earnest money, and he wanted the contract executed on Friday evening so that he could, as he put it, "tie down" all the details. Mr. Nomanbhoy conceded that it was as fair and important for McDonald's to insist on a signed agreement as it was for him.

McDonald's insistence on a signed contract as a precondition to calling off the auction is supported by the emails and also by McDonald's actions on June 19. Mr. Lauter spoke at about 6:45 a.m. PDT with Nomanbhoy, who admitted that there was a conversation, but disputed Lauter's

23

version of what was said. Mr. Nomanbhoy claimed that he was calling to see whether the claimed deal that he had made with Lauter regarding the resuscitation of the June 18 agreement was still in place. He said Lauter told him everything was fine, and there was no discussion then–or ever–that a signed contract had to be returned to McDonald's before the auction. Lauter would later testify that the conversation focused on Mr. Nomanbhoy's concern that he had not gotten the *revised contract*. During that conversation, Lauter said he told Nomanbhoy that they had to have the contract before the auction.

I do not find Mr. Nomanbhoy's testimony credible, and I fully credit Mr. Lauter's version. Indeed Mr. Nomanbhoy's affidavit filed on July 28, admits that Lauter said that "we are just waiting for the earnest money *with the contract*." (Document 14-2 at ¶21 )(Emphasis supplied).

At 7:03 a.m. PDT/9:03 a.m. CDT, Mr. Neumann emailed Mr. Nomanbhoy the revised contract and instructed him to initial each page, *send it back* and to wire the earnest money. (Defendants' Ex. 12). Three hours later, the contract had not been returned. Thus at 10:00 a.m. PDT /12 p.m.CDT, Mr. Lauter emailed Nomanbhoy expressing his concern that they "still have not received the contract or wire." (Defendants' Ex. 15). And finally, at 12:52 p.m. CDT /10:52 a.m. PDT, with time having almost run out for cancelling the auction, Mr. Lauter pleaded with Nomanbhoy: "Please send the contract to all parties on this e-mail ASAP. I look forward to us receiving your contract to get this all wrapped up." (Defendants' Ex. 16).

Ultimately, Mr. Nomanbhoy admitted that on June 18 he was told a revised contract needed to be signed and returned before the auction. But, he said, that was only when the price was $1.2 million. Because McDonald's then insisted on $1.4 million, he thought that he no longer had to send a signed contract to McDonald's. I do not find this testimony credible.

Even more unconvincing was Mr. Nomanbhoy's testimony explaining his failure to have sent the June 18 version of the contract to McDonald's until almost four hours after the auction was over the next day, even though he said that he signed and initialed the initial offer of the 18th between 7:17 and 8:48 p.m. CDT on June 18. [14] But he did not send it back that day. When asked why, given his admitted sense of urgency and his supposed deal with Lauter, Mr. Nomanbhoy was evasive and unconvincing. He admitted he had a home office, outfitted with computer, scanner, and fax machine, but claimed his scanner was "pretty slow," thereby preventing him from making a pdf version of the signed document and email it to McDonald's. When asked why he did not use his fax machine – which he testified he had used to wire instructions to his bank that evening about the earnest money – he had no answer. Ultimately, he tried to say "it was quite late, 9 o'clock in the evening. But he had initialed each page and provision between 7:17 and 8:48, and he faxed wire instructions to his bank at 8:48 p.m. In short, his testimony regarding his failure to have returned the signed document he claims he and Lauter agreed would constitute the contract is not credible.

In any event, the lateness of the hour does not explain why he did not fax the document to McDonald's early in the morning on June 19. When asked why he did not do so, he said I don't have an answer for that. He then tried to claim that his daughter was going to the airport and it was hectic at his house and there were some things that had to be done. When asked what, he haltingly and evasively said that his daughter could not find some clothing. When asked why Mr. Nomanbhoy's wife and other daughter could not look for the clothing while he faxed the executed June 18 agreement to McDonald's, Mr. Nomanbhoy had no real answer, other than to say "I wish I had."

Mr. Nomanbhoy could give no answer for why he, rather than his wife, had to take his

---

[14] That act, he testified, signaled his acceptance of every term in the document.

daughter to the airport given his eagerness to get the deal done and the exigencies of the situation. When it was pointed out to him that he had tried to persuade McDonald's to meet with him in Chicago on the morning of June 19 (Defendants' Ex. 8; Plaintiff's Ex. G), which would have made it impossible to take his daughter to the airport, he said his wife would have taken her. But since McDonald's would not meet with him he was available to drive her.

In no email sent by Mr. Nomanbhoy to McDonald's on June 19 did he mention the claimed deal he had with Mr. Lauter. And Mr. Nomanbhoy's email of June 20 is significant for what it does not say. While it insisted that "[w]e have a contract," and threatened litigation that would "tie up these properties for a long time, as well as costs and time for McDonalds," to say nothing of the "negative publicity resulting from your trying to double sell these properties at auction," (McDonald's Ex. 19), it made no mention of the alleged deal with Lauter.

These omissions are relevant to Mr. Nomanbhoy's credibility under the doctrine of impeachment by omission. "The theory of impeachment by omission is that 'if [a] former statement fails to mention a material circumstance presently testified to, which it would have been natural to mention in the prior statement, [then] the prior statement is [considered] sufficiently inconsistent' to be admitted to impeach the present testimony." *United States v. Useni*, 516 F.3d 634, 652 (7th Cir. 2008). Had the deal with Lauter claimed by Mr. Nomanbhoy existed, one would have expected him to have told Lauter or Neumann when he received the revised contract on the morning of the 19th that he already had a deal with Lauter. And, when he wrote his threatening email to Mr. Neumann at 1:15 p.m. PDT on June 20, (Defendants' Ex. 19), one would have expected at least a mention of how he and Lauter had agreed to use the original offer to support his claim of how McDonald's had once again breached an agreement it had made..

Not only was Mr. Nomanbhoy's testimony implausible, but his demeanor further persuaded me not to credit his testimony. Demeanor can be a significant component of credibility and related determinations. *Cf. Thornton v. Snyder,* 428 F.3d 690, 697 (7th Cir.2005), *cert. denied,* 547 U.S. 1192 (2006); *United States v. Bruscino,* 687 F.2d 938, 941 (7th Cir.1982) (en banc) (ability of judge to observe demeanor of jurors). Indeed, the Supreme Court has said that the demeanor of a witness may satisfy the tribunal not only that the witness' testimony is not true but that the truth is the opposite of his story, "for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 408 (1962). *See also Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 575 (1985). *Compare United States v. Wendt,* 465 F.3d 814 (7th Cir.2006) (superior opportunity of judge to observe the verbal and non-verbal behavior of the witnesses). *But cf. Consolidation Services v. KeyBank National Association,* 185 F.3d 817, 820 (7th Cir.1999).

When questioned about his reasons for not returning the contract in a timely way and about his phone conversations with Mr. Lauter and the conference call with Lauter, Meyer and Neumann, Mr. Nomanbhoy's demeanor was evasive, halting and contrasted markedly with his demeanor when discussing undisputed matters.

### 2.

### The Testimony Of Mr. Lauter, Ms. Meyer And Mr. Neumann

The testimony of the McDonald's witnesses largely tracked their affidavits.[15] In addition they

---

[15] The affidavits of Mr. Nomanbhoy and the McDonald's witnesses were offered into evidence without objection and thus received.

testified about various conversations with Mr. Nomanbhoy. Mr. Lauter denied that he ever suggested or agreed that the parties should revert back to the original June 18 offer. He said that it was Mr. Nomanbhoy who said not to worry about a revised contract because the original version was okay with him, and that he told Mr. Nomanbhoy that they could not do that, especially after having spent a day negotiating and coming to agreements different than those in the original June 18 offer. The documentary evidence supports Mr. Lauter's version as does Mr. Nomanbhoy's failure to return the contract to McDonald's until well past the auction.

Moreover, that this was Mr. Lauter's first deal on behalf of McDonald's and he said he would have never taken it upon himself to scuttle a whole day's worth of negotiations and authorize a return to a deal that had been rejected 10 hours earlier.

Mr. Lauter testified that he participated in a phone call between 8:00 and 8:30 p.m. CDT on June 28 with Mr. Nomanbhoy, Mr. Neumann and Ms. Meyer. During the conversation, it was agreed that McDonald's would provide a survey and agreed to pay 2% per month interest on the earnest money deposit in the event the closing was delayed by McDonald's. During the conversation Lauter said that Mr. Nomanbhoy was told he had to sign the revised contract that would be coming from Mr. Neumann the next day and that it had to be returned in the morning before the auction. He said that McDonald's had spent thousands of dollars advertising the auction and that McDonald's was unwilling to cancel the auction without a signed document. He said that Nomanbhoy said he understood and agreed. He noted that Mr. Nomanbhoy's understanding that a signed document was required was evident from Mr. Nomanbhoy's own emails, such as Ex. 9 (email of 4:18 PDT/6:18 CDT).

Mr. Lauter testified that Mr. Nomanbhoy called him early on the morning of the 19th at 6:45

a.m. PDT /8:45 a.m. CDT) to ask where the "new" contract was. Mr. Lauter testified that this indicated to him that Mr. Nomanbhoy had abandoned the idea of reverted back to the "old" contract. Mr. Nomanbhoy made no mention of an upcoming trip to the airport. Later he had another conversation with Mr. Nomanbhoy in an attempt to get him to sign and send the June 19 contract that had been sent by Mr. Neumann. Nomanbhoy said he couldn't because he was taking his daughter to the airport. I find Mr. Lauter's testimony credible.

## 2.
## The Testimony Of Mary Meyer

Ms. Meyer testified that in her 15 years in the real estate business and in her more than 2 years at McDonald's in which she has been involved in 50 real estate transactions, she has never heard of a real estate transaction without a signed contract. She confirmed Mr. Lauter's testimony regarding the agreements reached in the telephone call in the afternoon of June 18 and his testimony that Mr. Nomanbhoy was told that a revised contract would be sent frm Mr. Neumann and that it had to be returned before the auction, along with the earnest money. She said that Mr. Nomanbhoy agreed and said he would do so.

Ms. Meyer said in a later conversation with Mr. Nomanbhoy between 8:00 and 8:30 p.m.CDT, the revised contract was again discussed as well as the need for its return prior to the auction. After this conversation, Ms. Meyer sent Mr. Nomanbhoy an email confirming that Rick Levin and Associates represents McDonald's in the transaction and stating "[w]e will need the wire and contract very early tomorrow, or we'll have to go forward with the Auction." (Defendants' Ex. A).

Ms. Meyer also confirmed that she was present during two conversations on June 19 during

29

which Mr. Lauter told Mr. Nomanbhoy that McDonald's had to have a contract or the auction would go forward. The first of those conversations occurred at 12:00 p.m. CDT/10:00 a.m. PDT. This was one half hour after Mr. Nomanbhoy testified he left for the airport. The second occurred at 12:50 p.m. CDT/10:50 a.m. PDT. During the second call, Lauter told Nomanbhoy that they had the money but not the contract. He informed Mr. Nomanbhoy that the auction would commence in 10 minutes if they did not receive the contract. Fifteen to twenty people attended the auction and they were waiting for it to begin. Mr. Nomanbhoy said he could not get the contract back because he was taking his daughter to the airport.

Like Mr. Lauter, Ms. Meyer conceded that by the end of the day on June 18, there was at least tentative agreement on the price, who was to provide surveys, the penalty rate of interest in the event of late closing, and the language of the restrictive covenant, and that she expected the revised contract to incorporate those agreements.

### 3.
### The Testimony Of Bruce Neumann

Mr. Neumann testified that he has negotiated hundreds of real estate contracts on behalf of McDonald's during his eight years with the company, that he has never done a real estate deal without a contract, and that fully executed contracts are required by McDonald's standard procedures and are not merely an optional memorialization. He stated that he participated in only one telephone call with Mr. Nomanbhoy and that it occurred between 4:30 and 5:00 p.m. CDT on June 18. Mr. Lauter and Ms. Meyer also participated. Mr. Nomanbhoy wanted Mr. Lauter to come to Los Angeles to pick up the earnest money deposit – a request rejected by Neumann since, as he put it, the parties did not even have an agreement yet.

30

He said, for example, that Mr. Nomanbhoy wanted a 2% per day penalty on the $210,000 earnest money deposit in the event McDonald's did not close on time. Mr. Neumann rejected that offer out of hand, and Mr. Nomanbhoy ultimately agreed to a 2% per month provision. He said that both he and Ms. Meyer told Mr. Nomanbhoy that McDonald's needed a fully executed contract in its possession prior to the auction. He said that Mr. Nomanbhoy agreed.

Mr. Neumann conceded that the June 19 proposal did not have a time limit for the return of the executed contract by Mr. Nomanbhoy. He said that he did not include such a provision because of Mr. Nomanbhoy's assurance that he understood that he had to get the contract to McDonald's before the auction.[16] I credit Mr. Neumann's rendition of what occurred during the telephone call in which he participated.

## II.
## ANALYSIS

### A.
### STANDARDS FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND THE LAW OF THE CASE DOCTRINE

"We begin with the basics. A preliminary injunction is an 'extraordinary and drastic remedy.' It is never awarded as of right. Rather, a party seeking a preliminary injunction must demonstrate, (1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) an irreparable harm will result if the injunction is not granted." *Munaf v. Geren*, 128 S.Ct. 2207, 2219 (2008)(citations omitted). *See also Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 340 (1999)("' reasonable probability of success'"); *Duthie v. Matria Healthcare, Inc.*, _F.3d _, 2008 WL 3931571 at *3 (7th Cir. 2008); *Digrugilliers v. Consolidated City of Indianapolis*,

---

[16] Since Mr. Nomanbhoy never signed this agreement, the absence of a provision requiring return of the contract by a certain time is not pertinent.

506 F.3d 612, 618 (7th Cir.2007)(movant need only show that claim has "at least some merit").

Injunctive relief should not be granted unless the movant, by a "clear showing," carries the burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Christian Legal Society v. Walker*, 453 F.3d 853, 870 (7th Cir. 2006). "'If a plaintiff seeking a preliminary injunction cannot show that his chance of prevailing on the merits is better than negligible,' a court must deny the injunction regardless of how heavily any other equities may weigh in the plaintiff's favor.'" *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 458 (7th Cir.1993). If the moving party meets the first three requirements, then the district court balances the relative harms that could be caused to either party. *Hicks v. Miranda*, 422 U.S. 332, 353 (1975); *Digrugilliers*, 506 F.3d at 618.

The district court concluded that the standards for issuance of a TRO are the same as those that govern applications for preliminary injunction. (Order of August 15, at 5-6). *See e.g.*, *Marranca v. C.I.R.*, 2008 WL 68740 (W.D.N.Y. 2008); *Recycled Paper Greetings, Inc. v. Davis*, 533 F.Supp.2d 798, 803 (N.D.Ill. 2008). That convergence raises the question of whether the court's conclusion that timely receipt of the earnest money was enough to show likelihood of success is the law of the case.

The doctrine holds that a court generally should not reopen issues decided in earlier stages of the same litigation. *Agostini v. Felton*, 521 U.S. 203, 236 (1997). Reflecting as it does interests in consistency, finality, and the husbanding of judicial resources, the doctrine applies even when a case is reassigned from one judge to another. *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007). Nonetheless, the doctrine is not inflexible and is not a limit on judicial power. *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)(Holmes, J.); *United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008). The doctrine seldom, if ever, applies to rulings on application for pretrial injunctive

relief. *Cf. Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C.Cir. 1974); *Bloomington Partners, LLC v. City of Bloomington*, 2006 WL 2578916 (C.D.Ill. 2006).

The doctrine is inapplicable to the district court's apparent observation that all that was required for the plaintiff to show likelihood of success was to prove that the earnest money was received before the auction. First, the conclusion was preliminary and was made under significant time pressure and without the benefit of the kind of finely sharpened briefing that I received after the case came here, including McDonald's August 27 supplemental brief in response to the August 15 order, and the plaintiff's September 10, 2008 sur-reply in support of its motion for preliminary injunction. Second, the district court had only a few days before extending the TRO on August 15 to review the voluminous exhibits submitted by McDonald's on August 11 in opposition to the application for injunctive relief. Indeed, despite the care taken by both sides in preparing their submissions, the exhibits were not in perfect chronological order and, as McDonald's now contends, one of the exhibits on which the district court relied did not have in it certain parts of the email chain that were critical to understanding both the chronology and the substance of what preceded it. Finally, the court did not have the benefit of the evidentiary hearing held on September 23 and 24.

## B.
## The "Mirror Image" Rule

It is undisputed that Mr. Nomanbhoy rejected McDonald's offer of June 18. Under Illinois law, a response to an offer to enter into a contractual relationship that does not comply strictly with it – that is, that is not the "mirror image" of the offer – is not an acceptance, but a counteroffer. It matters not how minor the deviation. *See Beaumont v. Prieto*, 249 U.S. 554 (1919)(Holmes, J.); *Venture Associates Corp. v. Zenith Data Systems Corp.*, 96 F.3d 275, 278 (7th Cir.1996); *Dawson*

*v. General Motors Corp.,* 977 F.2d 369, 374 (7th Cir.1992); *Venture Associates v. Zenith Data Systems,* 987 F.2d 429, 432 (7th Cir.1993).[17] And once rejected, the offer is extinguished and any subsequent attempt to accept is inoperative. *See People v. Henderson,* 211 Ill.2d 90, 103-104, 809 N.E.2d 1224, 1232 (2004)(when an offer is rejected, "the parties go 'back to the drawing board.'"); *Hicks Road Corp. v. Marathon Oil Co.,* 1994 WL 327361, *4-5 (N.D.Ill.1994); *Finnin v. Bob Lindsay, Inc.,* 366 Ill.App.3d 546, 548, 852 N.E.2d 446, 448 (3rd Dist. 2006); *D'Agostino v. Bank of Ravenswood,* 205 Ill.App.3d 898, 902, 563 N.E.2d 886, 889 (1st Dist. 1990); 1 Richard A. Lord, Williston on Contracts, §5.3 (4th ed. 1990); Restatement Second, Contracts, §§ 36, 38, 39 (1981).

These principles provide the analytical framework for this case and compel the conclusion that once Mr. Nomanbhoy rejected McDonald's initial June 18 offer – and it is undisputed that he did and that 10 or more hours of negotiations followed – it could not be unilaterally revived by and accepted by plaintiff. Yet, that is the contract that plaintiff claimed – at least initially – McDonald's breached. For example, paragraph 1 of the Complaint alleged that the "contract at issue is the June 18, 2008 Real Estate Contract between the [plaintiff] and McDonald's...." That contract was attached as Exhibit A to the Complaint, paragraph 13 of which alleged that it "contains the terms and conditions governing" the deal. The Memorandum of Law in Support of Motion for Specific Performance, Injunction, and Damages filed on July 28 and plaintiff's Sur-Reply filed on September 10, specified the initial written offer from McDonald's as *the contract* that the plaintiff was seeking to enforce.

---

[17] It was because the "mirror image" rule was widely believed to take insufficient account of the "incorrigible fallibility of individuals," *Union Carbide Corp. v. Oscar Mayer Foods Corp.,* 947 F.2d 1333, 1335 (7th Cir. 1991), and of their "haste and sloppiness, and disregard for lawyerly niceties, that characterize commercial dealing," *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.,* 58 F.3d 1227, 1230 (7th Cir. 1995), that the drafters of the UCC replaced the rule with a more flexible one.

The Sur-Reply In Support Of The Motion For Preliminary Injunction states that the district court "must have concluded that the June 18 RESC was the parties' contract. *That is the contract that* [plaintiff] has consistently alleged and maintained bound the parties." *Id.* at 1 (Emphasis supplied). And this: "[t]hroughout this case, [plaintiff] has always and only alleged that it had a valid written agreement – the June 18, 2008 a.m version of the RESC . . . ." *Id.* at 4. The Memorandum of Law asserted that between 6:02 p.m. PDT and 7:17 p.m. PDT, the Plaintiff "accepted McDonald's version of the RESC sent by Neumann 10 hours earlier on June 18." *Id.* at 4.

Finally, there is the Supplemental Affidavit of Mr. Nomanbhoy (Document No. 49-2, September 10, 2008) in which he states that he "agreed with Lauter [on the evening of June 18] to use the June 18 a.m. version *without further change,*" because he wanted to have a signed contract before sending the earnest money, and that as a consequence, "I ended up accepting the interest rate, survey and other terms that were favorable to McDonald's in that version." Mr. Nomanbhoy's affidavit states that he was willing to do this because those terms "were not in my view, material, and because my priority was to have a finished contract before I wire transferred the earnest money." *Id.* at 4, ¶7; 6, ¶11.[18]

This position changed abruptly during the oral argument on the Motion For Preliminary Injunction. No longer was the operative contract the original June 18 offer as is; now it was the original June 18 offer, but as amended by the terms negotiated in the emails and in telephone conversations during the extensive negotiations on the 18th – following Mr. Nomanbhoy's initial rejection. In any event, for purposes of analysis, let us consider both theories.

---

[18] These statements are inconsistent with others in the same paragraph that say plaintiff had accepted the initial version of the contract "as modified by the negotiated and agreed changes." Acceptance of the contract as modified would not have resulted in acceptance of the initial terms of McDonald's initial offer.

The first theory is dependent upon Mr. Nomanbhoy's claim that he and Lauter agreed to go back to the terms of the original June 18 offer. There are two difficulties with the theory. The first is the Statute of Frauds. The Illinois Statute of Frauds provides that no action shall be brought to charge any person upon any contract for the sale of land unless the contract or some memorandum or note thereof shall be in writing and signed by the party to be charged therewith. 740 ILCS 80/2. The purpose of the statute is to protect against the uncertainty of oral testimony, *Central Illinois Light Co. v. Consolidation Coal Co.*, 349 F.3d 488, 491 (7th Cir. 2003), and to prevent a contracting party from creating a triable issue concerning the terms of the contract – or for that matter concerning whether a contract even exists on the basis of his say-so alone:

> The principal purpose of the statute of frauds is evidentiary. It is to protect contracting or negotiating parties from the vagaries of the trial process. A trier of fact may easily be fooled by plausible but false testimony to the existence of an oral contract. This is not because judges or jurors are particularly gullible but because it is extremely difficult to determine whether a witness is testifying truthfully. ...

> When, however, there is particularly compelling evidence of the contract's existence, the strictures of the statute of frauds can safely be relaxed, for example in the case of an admission. Partial performance is often indicative of a contract, but rarely of its terms, and so in most cases of partial performance of a contract subject to the statute of frauds the performer is remitted to his (noncontractual) remedy in quantum meruit for the value of his performance.

*Consolidation Services, Inc. v. KeyBank Nat. Ass'n,* 185 F.3d 817, 821 (7th Cir. 1999). *See also Cloud Corp. v. Hasbro, Inc.,* 314 F.3d 289, 296 (7th Cir. 2002).

Obviously, Mr. Lauter's claimed offer and Mr. Nomanbhoy's claimed acceptance was not in writing. "People deserve some protection against the risks and costs of being hauled into court... on the basis of an unacknowledged promise." *D.F. Activities Corp. v. Brown,* 851 F.2d 920, 923 (7th Cir. 1988). In *D'Agostino v. Bank of Ravenswood,* the seller/defendant rejected the plaintiff's offer

to buy real estate for $230,000, raised the price to $235,000 and then initialed and signed the offer. Subsequently, in a telephone conference, the seller acquiesced in the original offer of $230,000, and the plaintiff drew a line through the $235,000 figure, wrote in a price of $230,000 and initialed the change. The seller did not sign the new offer. The trial court held that the original signature was sufficient to satisfy the Statute of Frauds and granted specific performance. The Appellate Court reversed:

> ... [The Seller] never initialed the document after plaintiff changed the written price to $230,000. Thus, the alleged contract fails to comply with the Statute of Frauds because one of the essential terms of the contract, the price, was never reduced to writing and signed by [the Seller], the party to be charged.

> 205 Ill.App.3d at 903, 563 N.E.2d at 889.

The instant case presents even a stronger case for application of the Statute of Frauds. In *D'Agostino*, the parties stipulated that the conversation between the buyer and seller actually occurred.[19] Here, the conversation between Lauter and Nomanbhoy in which Lauter supposedly reoffered the original contract – with terms that differed from those in the emails – is disputed. To allow oral evidence of the supposed agreement to revert to McDonald's original offer would destroy the purpose of requiring that the essential terms of a contract governed by the statute of frauds be signed by the party to be charged. *Olympia Exp., Inc. v. Linee Aeree Italiane, S.P.A.*, 509 F.3d 347, 352 -353 (7th Cir. 2007).

It must not be forgotten that most of the essential terms of the contract sought to be enforced by the plaintiff were not in the emails but in the original seven-page, single-spaced Real Estate Sales

---

[19] While the ultimate result in *D'Agostino* is perhaps questionable in light of the admission that the conversation actually occurred, *Consolidation Services, Inc. v. KeyBank Nat. Ass'n*, 185 F.3d 817, 821 (7th Cir. 1999), the Statute of Frauds analysis could not be more applicable here.

Contract, with its seven additional pages of exhibits, including the very significant restrictive covenant. Among those terms were: whether the transaction was to be all cash, the closing date, the kind of deed to be provided by McDonald's, what payments were to be made at closing, when possession would occur, prorations, who was to pay certain costs, what constituted a default, the nature of the warranties, required notices, representations regarding statutory compliance, responsibility for transfer or transaction taxes, assignability of the contract by purchaser, where litigation could be brought, severability, warranties by purchaser, and indemnification provisions.

Perhaps McDonald's was still willing to be governed by these provisions. In all likelihood it was. But the Statute of Frauds is not satisfied by speculation. The offer containing the majority of the essential terms of the contract had been rejected by the plaintiff shortly after it received the offer at 9:47 a.m. CDT on June 18. Hence the offer was extinguished. From the perspective of the Statute of Frauds to be enforceable, it had to be re-signed by McDonald's. That never occurred.[20]

Even if the Statute of Frauds were not applicable, the theory that the June 18 offer is the contract is unacceptable because I have found credible Mr. Lauter's testimony that he never made the offer attributed to him and that there was never an agreement to revert back to the original June 18 offer.

The second theory is that the contract is the initial offer plus "all of the communications – email and verbal . . . between [plaintiff] and the agents or representatives of McDonald's" that

---

[20] The plaintiff has argued it has fully performed all of the obligations under the contract and thus we need not consider whether part performance in the form of the earnest money payment takes the case out of the Statute of Frauds. But it may be noted that the argument would seem to be foreclosed by *United States v. Capital Tax Corp.*, _ F.3d _, 2008 WL 4276583 at *6 (7th Cir. 2008)("Under Illinois law, a contract is taken outside the Statute of Frauds if the buyer makes whole or partial payment of the purchase price, takes possession of the property *and* makes substantial and lasting improvements to it")(Emphasis in original).

occurred over a 12-hour period on June 18. *See* Motion For Preliminary Injunction Or, Alternatively, Temporary Restraining Order, at 2, ¶4. But if that be true, two essential terms of the contract have not been satisfied. The first is that there had to be a formalized, executed document before any contract would be formed. Under basic principles of the law of contracts, even if parties agree, point by point, on all the terms of a contract, if they understand that the execution of a formal document shall be a prerequisite to their being bound–as opposed to it being merely a memorialization of the parties' bargain – there is no enforceable contract until the document is executed. *See PFT Roberson, Inc. v. Volvo Trucks North American, Inc.,* 420 F.3d 728, 731 (7th Cir. 2005); *Lambert Corp. v. Evans,* 575 F.2d 132, 135 (7th Cir.1978); *Quake Construction, Inc. v. American Airlines,* 141 Ill.2d 281, 287, 565 N.E.2d 990, 993 (1990). Until then each party is "free to walk away...." *Solaia Technology LLC v. Arvinmeritor,* 2006 WL 695699 at * 10 (N.D.Ill. 2006)(Filip, J.).

Justice Story once wisely observed that "[t]here is no magic in words." *Briscoe v. Kentucky,* 36 U.S. 257, 347 (1837)(dissenting opinion). That attitude towards words animates Illinois' approach to determining whether parties intend that an executed written agreement is a condition precedent to contract formation. As the court in *PFT Roberson* put it: In Illinois, there is no "magic-words approach...; the parties need not recite a formula to demonstrate that a definitive agreement lies in the future. Words expressing contingency or dependence on a subsequent event or agreed-on element will do." 420 F.3d at 732. Even where a party has said that "this will confirm our agreement" and that "we have agreed" on certain issues, it did not create a contract on *any* term because it showed that negotiations remained open. *Id.*

Whether the parties intended that a written agreement be a condition precedent to a binding contract depends on an assessment of various factors including: whether the type of agreement

39

involved is one usually put into writing; whether the agreement contains many or few details; whether the agreement involves a large or small amount of money; whether the agreement requires a formal writing for the full expression of the covenants; and whether the negotiations indicated that a formal written document was contemplated at the completion of the negotiations. *Quake Construction, Inc.*, 141 Ill.2d at 287; *David Copperfield's Disappearing, Inc. v. Haddon Advertising Agency, Inc.*897 F.2d 288, 292 (7th Cir. 1990).

Each of these factors favors McDonald's contention that a final, written, mutually executed contract was a condition precedent to its being bound to sell the properties to the plaintiff. The contract was for the sale of land, and such contracts are invariably reduced to writing; the agreement contained many details, involved a large amount of money, required a formal writing for the full expression of the covenants and the negotiations and understandings of the parties as expressed in the emails and as discussed in various conversations between McDonald's. Both parties, to use Mr. Nomanbhoy's own words, insisted on "a clean contract."

The need for a "clean contract" was apparent. McDonald's original multi-page offer had many terms beyond who was to provide the survey, the restrictive covenant, price, and the interest to be paid on the earnest money in the event the closing did not go forward. The latter terms had been discussed and negotiated all day. What was the final understanding on these terms? And were there any difficulties with the numerous other terms in the original offer? The emails make clear that both parties thought it essential that there be a written document that once and for all articulated the final understanding on the essential terms, to avoid having to cobble together the emails and to harmonize conversations that were subject to varying interpretations and fallible memories. Indeed, in the critical conversation with Lauter on the evening of June 18, even Mr. Nomanbhoy insisted on

40

"a fully revised contract containing all the terms we had discussed." (Nomanbhoy Aff. at ¶16).

There is a final factor that bears mention. The emails and his testimony make clear that Mr. Nomanbhoy did not trust McDonald's. It had reneged on what he thought was a deal at $1.2 million, and he was concerned that it would do so again. For its part, McDonald's witnesses claimed not to have trusted Mr. Nomanbhoy, whom they characterized as "sneaky." While a number of the reasons they gave for this distrust were tenuous or baseless – self-interested negotiation does not show bad faith, *PFT Roberson, Inc.*, 420 F.3d at 733 – perception is reality.[21] This kind of adversarial relationship is an important factor in determining whether the parties intended a written agreement as a precondition to contract formation. *Solaia Technology LLC*, 2006 WL 695699 at * 8.[22]

The second essential term revealed by the emails and the telephone conversations between the parties over the day-long, nonstop negotiations – Mr. Nomanbhoy testified that the negotiations occupied the whole day and he barely had time to eat – is that the offer had to be signed by the plaintiff and be in McDonald's possession before the auction started. That did not occur. If an agreement makes full performance by one contracting party a condition precedent to the performance by the other, partial performance is not sufficient. *Hardin, Rodriguez & Boivin Anesthesiologists Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 636-37 (7th Cir. 1992).

---

[21] Motion For Preliminary Injunction Or, Alternatively, Temporary Restraining Order (Document 12, 7/28/08 at 2, ¶4).

[22] This perception perhaps accounts for McDonald's refusal to accept Mr. Nomanbhoy' offer to return to the original offer even though the purchase price at the auction turned out to be less than the plaintiff was willing to pay and the terms of the auction left McDonald's free to accept Nomanbhoy's untimely counteroffer.

## CONCLUSION

The plaintiff has failed to make a clear showing that it has a more than negligible chance of success on the merits. Consequently, it is unnecessary to consider the relative harms to either party. *See supra* at 32. The plaintiff's Motion For A Preliminary Injunction is denied.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 9/30/08